FILED
MARCH 5, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT W. WELSH, d/b/a BIG TEN DEVELOPMENT,<br><br>Plaintiff,<br><br>v.<br><br>BIG TEN CONFERENCE, INC. and BIG TEN NETWORK SERVICES, LLC,<br><br>Defendants. | No.<br><br>JURY DEMAND  **08 C 1342**<br><br>JUDGE GOTTSCHALL<br>MAGISTRATE JUDGE COX |

## COMPLAINT

Plaintiff Robert W. Welsh (d/b/a Big Ten Development) ("Welsh") for his complaint against the Big Ten Conference, Inc. and Big Ten Network Services, LLC alleges as follows:

### PRELIMINARY STATEMENT

1. Scholars of the Big Ten institutions of higher learning undoubtedly embrace Johann Kasper Lavater's *Aphorisms on Man*, particularly no. 449: *"Trust not him with your secrets, who, when left alone in your room, turns over your papers."*

Regrettably, the same is not true of the defendants who – in breach of a confidential relationship – have converted and illegally usurped the Confidential Business Plan and valuable property rights of Welsh leading to what has become the controversial yet profitable **"BIG TEN NETWORK."** This action seeks relief for, *inter alia*, the defendants' conversion and resulting unjust enrichment, including fraudulent registration of trademark rights.

### PARTIES/VENUE

2. Robert W. Welsh is a businessman who has long supported Big Ten athletics. Welsh is a resident of Lake County.

3. The Big Ten Conference, Inc. is a Delaware Corporation with its principal place of business in Cook County at 1500 West Higgins Road, Park Ridge, Illinois.

4. On information and belief, Big Ten Network Services, LLC is a foreign LLC doing business in Cook County, Illinois.

5. Jurisdiction is founded on 15 U.S.C. 1120 and 28 U.S.C. 1331 as to Count V and 28 U.S.C. 1367 as to Counts I-IV. Venue is proper pursuant to 28 U.S.C. 1391.

## ALLEGATIONS PERTINENT TO ALL COUNTS

6. Beginning at least as early as the spring of 1997, Welsh undertook the development of a comprehensive business plan to enhance the profitable promulgation of Big Ten athletics. One component of that plan was the implementation of comprehensive television coverage specifically including coverage of typically non-revenue producing women's and men's athletic events coupled with a variety of so-called "talk show" formats and other features. In his Confidential Business Plan, Welsh identified and specified this programming proposal and the related organizational and functional structure with the trademark **"BIG TEN NETWORK."** Welsh initially contemplated that his business plan would be implemented by a stand-alone entity – Big Ten Development. The details of the Welsh plan are set forth in a Confidential Plan proposal, dated May 1998.

7. Following a preliminary presentation of his Confidential Business Plan to the Big Ten Conference in early 1998 and having expressly acknowledged the confidential nature of Welsh's plan, Big Ten officials invited Welsh to attend the meeting of all Big Ten officials, including the athletic directors of the Big Ten schools on May 18, 1998. As an inducement for Welsh to make the plan available, albeit under strict terms of confidentiality, Welsh was told of the Big Ten's interest in his plan and that the Big Ten was "prepared to continue to move

2

forward with the development of the relationship" subject to appropriate approvals. As a consequence and based on these promises and inducements, Welsh distributed his business plan on a confidential basis and made a comprehensive and detailed presentation including a specific delineation of the **"BIG TEN NETWORK"** plan as a satellite/cable television medium. Welsh, in confidence, disclosed his plan for the various programming, organizational, financial and operational details of the **"BIG TEN NETWORK"** to assembled Big Ten officials.

8. After the lapse of a number of weeks, Welsh was advised that, despite the merits and creativity of the Confidential Business Plan and of the **"BIG TEN NETWORK"** proposal, the Big Ten officials did not wish to "cede control" over such matters to an independent entity. Of course, these same defendants did not tell Welsh that confidentiality would soon be breached and that the Big Ten would then usurp and convert Welsh's assets.

9. Several years after the Big Ten advised Welsh it would not "cede control," word came that the Big Ten Conference would partner with others and would soon introduce the **"BIG TEN NETWORK."** Throughout the various announcements of the **"BIG TEN NETWORK"** – both before and after programming hit the air – the Big Ten issued various promotional pieces that resonate as though lifted from the Confidential Business Plan of Welsh. Indeed, Big Ten Commissioner Delany – who praised the "novel and creative" Confidential Business Plan of Welsh – now touts the **"BIG TEN NETWORK"** as No. 2 on his list of "Innovative Accomplishments."

10. On information and belief, the Big Ten defendants have converted and usurped Welsh's assets that were presented to and received by the Big Ten Defendants under terms of strict confidentiality.

3

## COUNT I – BREACH OF IMPLIED-IN-FACT CONTRACT

11. Welsh realleges and adopts by reference the allegations set forth in the foregoing paragraphs 1-10.

12. In 1998, The Big Ten Conference knew that Welsh presented his Confidential Business Plan anticipating the development of, among other programs, the **"BIG TEN NETWORK."**

13. Acknowledging the confidentiality of the Welsh/BTD Business Plan as well as the "novel and creative" concepts embodied in the Plan, the Big Ten induced Welsh to submit and elaborate the Plan's specific features.

14. The Big Ten's inducements included The Big Ten Conference's continued interest in exploring the development of the relationship between the Conference and Big Ten Development[Welsh] and the further implementation of the business plan for Big Ten Development[Welsh].

15. The Confidential Business Plan included detailed and specific proposals that were to be treated and maintained as Confidential by The Big Ten Conference as well as by the athletic directors of the Big Ten Universities in attendance at the May meeting.

16. Subsequent to the Welsh submission and as discovery will reveal and confirm, The Big Ten Conference and Big Ten Network Services, LLC (as well as other actors yet to be identified) have undertaken to use, exploit and profit from the novel and creative proposals presented to these defendants in confidence as herein alleged.

17. Welsh (d/b/a Big Ten Development) has never consented to such use, conversion and exploitation of Welsh's "novel and creative" business plans by the Big Ten defendants and/or by those yet unnamed parties acting in concert with the Big Ten defendants.

4

18. Welsh has never been compensated for the usurpation and conversion of the Confidential Business Plan nor has Welsh received any compensation or remuneration as a result of the promotion and implementation of Welsh's novel and creative plan for the **"BIG TEN NETWORK."**

19. Such usurpation, conversion and exploitation of the Welsh Confidential Business Plan constitute a breach of an implied-in-fact contract that has caused and continues to cause Welsh substantial damages.

**WHEREFORE**, Welsh respectfully requests the following relief:

A. That this Court award Welsh all monetary damages including costs, expenses and attorneys' fees incurred in connection with this action; and

B. That this Court award all other appropriate relief.

## **COUNT II – VIOLATION OF THE ILLINOIS TRADE SECRETS ACT**

20. Welsh realleges and adopts by reference the allegations set forth in the foregoing paragraphs 1-10.

21. The Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* prohibits any person from utilizing the trade secrets of another for that person's commercial advantage. That Act defines "trade secrets" to include:

> (d) information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data or list of actual or potential customers or suppliers that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

22. The Big Ten defendants acknowledged, agreed and understood that the Welsh Business Plan and the novel and creative proposals embodied in that Plan were the confidential property rights and trade secrets of Welsh. Indeed, the information that the Big Ten defendants have exploited for their own use constitutes "trade secrets" under the Act because Welsh's Confidential Business Plan contains programs and methods that were sufficiently secret to derive economic value and were the subject of efforts to maintain the Plan's secrecy.

23. Welsh has never consented nor agreed that the confidential property rights and trade secrets embodied in the Confidential Business Plan could be used or converted by the Big Ten Defendants. Nonetheless, these defendants have so unlawfully usurped and converted Welsh's Confidential Business Plan and have misappropriated Welsh's confidential property rights and trade secrets.

24. Such unlawful misappropriation has caused and continues to cause Welsh substantial damages while the Big Ten defendants (and those acting in concert with those defendants) profit to the tune of many millions of dollars.

**WHEREFORE**, Welsh respectfully requests the following relief:

A. That this Court award Welsh all monetary damages including costs, expenses and attorneys' fees incurred in connection with this action;

B. That this Court award punitive damages to full extent permitted by law as a result of the defendants' willful and malicious conduct and

C. That this Court award all other appropriate relief.

### COUNT III – UNJUST ENRICHMENT/CONSTRUCTIVE TRUST

25. Welsh realleges and adopts by reference the allegations set forth in paragraphs 1 through 10.

26. At all relevant times, the Big Ten defendants have unjustly retained the benefits flowing from Welsh's confidential information and trade secrets – including, of course, the programs and proposals for the **"BIG TEN NETWORK"** as outlined in his Confidential Business Plan. The defendants' improper retention of such benefits has damaged Welsh by denying Welsh his appropriate share of those benefits.

27. The defendants' misuse of Welsh's assets and their retention of the valuable benefits flowing from that misuse violates fundamental principles of justice, equity and good conscience.

28. As a direct and proximate result of the defendants' illegal conduct, the defendants have been unjustly enriched by retaining proceeds and profits that are lawfully due to Welsh. Indeed, Welsh's damages are continuing so long as the defendants are permitted to unjustly retain benefits that properly belong to the plaintiff. Such damages will be proved at a trial on the merits.

**WHEREFORE**, Welsh respectfully requests the following relief:

A. That this Court order the defendants to account for all benefits flowing from the misuse of Welsh's confidential assets;

B. That this Court impose a constructive trust for Welsh's benefit on all proceeds and profits improperly retained by the defendants and that the Court order all such proceeds and profits be transferred and conveyed to Welsh;

C. That this Court award punitive damages to full extent permitted by law as a result of the defendants' willful and malicious conduct;

D. That this Court award pre-judgment and post-judgment interest at the maximum rate prescribed by law as well as all attorneys' fees and costs to the full extent permitted by law; and

E. That this Court award all other appropriate relief.

### COUNT IV – MISAPPROPRIATION AND CONVERSION OF TRADE AND SERVICE MARK ASSETS

29. Welsh realleges and adopts by reference the allegations set forth in the foregoing paragraphs 1-10.

30. As evidenced by the details laid out in the Confidential Business Plan, Welsh disclosed in confidence that one of several avenues for enhancing the promulgation of Big Ten athletics would be through the vehicle of audio, video and internet transmission services whereby fans of the Big Ten would realize, *inter alia*, in depth coverage of sports and culture of the Big Ten Conference. Welsh's Confidential Business Plan laid out in some detail various programming, production and distribution techniques under the umbrella of the trade and service mark "**BIG TEN NETWORK**."

31. Welsh has now determined that, in addition to the other wrongs the defendants have committed as herein alleged and in further breach of the confidential relationship that existed between the parties, the Big Ten defendants have willfully misappropriated and converted Welsh's trade and service mark assets (i.e., "**BIG TEN NETWORK**") as well as the details of the potential application of these assets to Big Ten properties, programs and materials.

32. Compounding the misappropriation and conversion of these valuable Welsh assets (i.e., "**BIG TEN NETWORK**") is the fact that the Big Ten defendants have applied for and obtained a host of formal trademark and service mark registrations from the United States Patent and Trademark Office. In doing so and in contravention of established law and Federal

statute, the Big Ten defendants suppressed and concealed from the Patent Office that the assets being protected (i.e., **"BIG TEN NETWORK"**) were purloined from Welsh in violation of an admitted confidential relationship.

33. Because of the willful and wanton breaches of the Big Ten defendants, Welsh has been and continues to be deprived of the millions of dollars of revenue that the Big Ten has realized and is realizing from the commercial exploitation of the Welsh assets and property rights (i.e., "BIG TEN NETWORK").

**WHEREFORE**, Welsh respectfully requests the following relief:

A. That this Court order the defendants to account for all benefits flowing from the misappropriation and conversion of Welsh's assets and valuable property rights.

B. That this Court impose a constructive trust for Welsh's benefit on all proceeds and profits improperly retained by the defendants and that the Court order all such proceeds and profits be transferred and conveyed to Welsh;

C. That this Court award punitive damages to full extent permitted by law as a result of the defendants' willful and malicious misappropriation and conversion.

### COUNT V – FALSE AND FRAUDULENT REGISTRATION OF WELSH'S TRADEMARK ASSETS IN VIOLATION OF 15 U.S.C. 1120

34. Welsh realleges and adopts by reference the allegations set forth in the foregoing paragraphs 29-33.

35. As set forth in the foregoing paragraph 32 and after obtaining Welsh's Confidential Business Plan, the Big Ten defendants wrongfully pursued the registration of Welsh's **"BIG TEN NETWORK"** trademark in the United States Patent and Trademark Office as follows:

| | | | |
|---|---|---|---|
| 78971639 | BIG TEN NETWORK | TARR | LIVE |
| 78979877 | BIG TEN NETWORK | TARR | LIVE |
| 78979876 | BIG TEN NETWORK | TARR | LIVE |
| 78971650 | BIG TEN NETWORK | TARR | DEAD |
| 78971645 | BIG TEN NETWORK | TARR | DEAD |
| 78979540 | BIG TEN NETWORK | TARR | LIVE |
| 78966000 | BIG TEN NETWORK | TARR | LIVE |
| 78971652 | BIG TEN NETWORK | TARR | LIVE |
| 78971648 | BIG TEN NETWORK | TARR | LIVE |
| 78971647 | BIG TEN NETWORK | TARR | LIVE |
| 78971647 | BIG TEN NETWORK | TARR | LIVE |
| 78971636 | BIG TEN NETWORK | TARR | LIVE |
| 77975265 | BIG TEN NETWORK | TARR | LIVE |
| 77020176 | BIG TEN NETWORK | TARR | DEAD |
| 77020174 | BIG TEN NETWORK | TARR | LIVE |
| 77020173 | BIG TEN NETWORK | TARR | LIVE |

36. In wrongfully pursuing each of the above identified trademark applications the Big Ten Conference falsely and fraudulently asserted and stated:

> "The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 2001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares . . . that he/she believes the applicant to be the owner of the trademark/service mark sought to be registered . . . [and] to the best of his/her knowledge and belief no other person, firm, corporation or association has the right to use the mark in commerce. . . ."

37. Section 1120 of Title 15 of the United States Code provides as follows:

> Any person who shall procure registration in the patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

38. At the time that the Big Ten defendants filed and prosecuted the aforementioned registrations before the United States Patent and Trademark office, these defendants knew that all right, title and interest in and to the **"BIG TEN NETWORK"** trademark assets belonged to Welsh and that they gained access to these valuable assets through a confidential relationship.

10

39. At the time that the Big Ten defendants received and gained knowledge of the **"BIG TEN NETWORK"** trademark assets of Welsh, these defendants had expressly undertaken and agreed that Welsh's submission and disclosure of the "novel and creative" concepts, plans and programs (including the **"BIG TEN NETWORK"** trademark assets) as embodied in the Confidential Business Plan were to be "held in strict confidence and in trust for the sole and exclusive benefit of Robert Welsh."

40. After falsely asserting to Welsh that the Big Ten Conference had no interest in any aspect of Welsh's Confidential Business Plan and after falsely asserting that all of Welsh's confidential materials had been returned to Welsh, the Big Ten Conference converted the **"BIG TEN NETWORK"** trademark assets and then undertook to falsely and fraudulently procure trademark protection in willful violation of §1120 of Title 15. Thus, the Big Ten Conference knew at the time of its sworn statements that it had agreed to keep confidential Welsh's detailed proposal for the **"BIG TEN NETWORK."** Accordingly, the Big Ten Conference's sworn statements were fraudulent because (1) Welsh had legal rights in the mark at the time the oaths were signed; (2) Welsh's legal rights were superior to the Big Ten's rights; (3) the Big Ten Conference knew that Welsh had legal rights in the mark superior to those alleged by the Big Ten and (4), in failing to disclose these facts to the Patent and Trademark Office, the Big Ten Conference intended to procure trademark registrations to which the Big Ten was not entitled.

41. As a direct and proximate result of the wrongful and tortious conduct of the defendants and the false and fraudulent registration of Welsh's trademark assets, Welsh has suffered severe economic losses including the loss of the many millions of dollars of revenue that the Big Ten defendants have wrongfully obtained through the violation of §1120.

**WHEREFORE**, Welsh respectfully requests the following relief:

A. That this Court order the defendants to account for all proceeds and profits flowing from the misappropriation, conversion and false and fraudulent registration of Welsh's trademark assets and valuable property rights;

B. That this Court impose a constructive trust for Welsh's benefit on all proceeds and profits improperly retained by the defendants and that the Court order all such proceeds and profits be transferred and conveyed to Welsh;

C. That this Court order that the defendants assign and transfer to Welsh all right, title and interest in and to any valid property rights which the defendants have acquired as a result of their wrongful and illegal conduct pursuant to 15 U.S.C. 1119; and

D. That this Court award Welsh attorneys fees and such other relief as may be appropriate including injunctive relief as may be appropriate.

PLAINTIFF DEMANDS TRIAL BY JURY.

Dated: March 5, 2008

                                                       **ROBERT W. WELSH,**
                                                     **d/b/a BIG TEN DEVELOPMENT**

                                                     By:   /s/ Robert P. Cummins
                                                                 One of His Attorneys

Robert P. Cummins
Thomas C. Cronin
Cummins & Cronin LLC
77 West Wacker Drive, Suite 4800
Chicago, Illinois 60601
T: (312)578-0500
F: (312)578-1234

Hall Adams
Law Offices of Hall Adams LLC
77 West Wacker Drive, Suite 4800
Chicago, IL 60601
T: (312)606-8711
F: (312)444-9658

12