Exhibit 9 – Part 2

**Westlaw.**

Slip Copy
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 1

**H**Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
TOP TOBACCO, L.P. and Republic Tobacco L.P., Plaintiffs,
v.
NORTH ATLANTIC OPERATING COMPANY, INC. and National Tobacco Company L.P., Defendants.
**No. 06 C 950.**

April 17, 2007.

Antony Joseph McShane, Hillary Altekruse Mann, Sarah Elizabeth Smith, Neal, Gerber & Eisenberg, Charles S. Bergen, Lynn Hagman Murray, Lynn Hagman Murray, Grippo & Elden LLC, William J. Lenz, Factor & Lake, Ltd., Chicago, IL, for Plaintiffs. Paul R. Garcia, Daniel Ibsen Morales, Deanna R. Swits, Jami A. Jarosch, Khara AishaAshanti Coleman, Lisa M. Holubar, Melody N. Drummond, Michael P. Bregenzer, Kirkland & Ellis LLP, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge.
*1 On January 4, 2007, the Court granted North Atlantic Operating Company, Inc. and National Tobacco Company L.P.'s (together, North Atlantic) motion for summary judgment against Top Tobacco, L.P. and Republic Tobacco L.P. (together, Top Tobacco). North Atlantic has moved for an award of attorneys' fees under the Lanham Act, 15 U.S.C. § 1117(a), which authorizes an award of reasonable attorneys' fees to the prevailing party in "exceptional cases." It has also submitted a bill of costs pursuant to 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 26(b)(4)(C)(i). Top Tobacco contends that North Atlantic is not entitled to attorneys' fees and that its bill of costs should be reduced significantly. For the following reasons, the Court grants defendants' motion for attorneys' fees, and grants in part and denies in part their bill of costs.

**Discussion**

**1. Attorneys' fees**

The facts of this case are fully set forth in the Court's January 4, 2007 Memorandum Opinion and Order. *Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.*, No. 06 C 950, 2006 WL 118527 (N.D.Ill. Jan. 4, 2007). Top Tobacco and North Atlantic both manufacture and sell roll-your-own (RYO) cigarette tobacco and rolling papers. Top Tobacco sells its products under the TOP brand, and North Atlantic sells it products under the ZIG-ZAG brand. Top Tobacco brought five claims based on North Atlantic's use of "Fresh-Top Canister": a claim under the Lanham Act for infringement of a registered trademark (Count 1), a federal dilution claim (Count 2), a Lanham Act unfair competition claim, which amounts to a claim for infringement of an unregistered trademark (Count 3), a claim for violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act (ICFA) (Count 4), and a state law unfair competition claim (Count 5). The Court granted summary judgment in favor of North Atlantic on all counts.

Under the Lanham Act and ICFA, a court may award reasonable attorneys' fees to a prevailing party if the losing party's conduct can be regarded as oppressive. 15 U.S.C. § 1117(a); 815 ILCS 505/10a(c); *Door Sys., Inc. v. Pro-Line Sys., Inc.*, 126 F.3d 1028, 1029-30, 1032 (7th Cir.1997) (citations omitted). The Seventh Circuit has held that a suit is oppressive if "it lacked merit, had elements of an abuse of process claim, and plaintiff's conduct unreasonably increased the cost of defending against the suit."*S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir.2001). A case, however, can be exceptional and fees may be awarded "simply on the basis that it is wholly lacking in merit."*Id.* at 626 ("[t]his was not a murky case. Based solely on the weakness of S Industries' claims, Judge Lindberg acted well within his discretion in granting attorneys['] fees."); *Bretford Mfg., Inc. v. Smith Sys. Mfg. Co.*, 389 F.Supp.2d 983, 984 (N.D.Ill.2005).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 2
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

North Atlantic argues that this case is exceptional for several reasons. First, it contends that Top Tobacco's claims were extremely weak and that it failed to produce any evidence of a likelihood of confusion. Second, North Atlantic points to Top Tobacco's decision to seek a preliminary injunction and over ten million dollars in damages for the alleged infringement, requiring defendants to defend themselves with "expedited vigor" that resulted in substantial costs. Finally, and most importantly in the Court's view, North Atlantic cites to Top Tobacco's 2002 representations to the United States Patent & Trademark Office (USPTO) when it was attempting to register the TOP mark.

**a. Strength of Top Tobacco's claims**

**\*2** *S Industries* holds that this case may be deemed exceptional "based solely on the weakness of [Top Tobacco's] claims." *S Indus., 249 F.3d at 626.* Top Tobacco's infringement and dilution claims were exceptionally weak. Without rehashing the lengthy analysis in the Court's January 4, 2007 memorandum opinion and order, a simple look at the canisters as they appeared on store shelves shows the virtual impossibility that consumers would be confused by North Atlantic's use of the phrase "Fresh-Top Canister":





Moreover, North Atlantic removed the "Fresh-Top Canister" designation from the front of its product years before Top Tobacco filed this suit. By 2004, a consumer would have had to pick up the ZIG-ZAG product and turn it ninety degrees to the right even to see the words "Fresh-Top Canister." Given these considerations, it is not surprising that Top Tobacco did not come forth with any evidence of actual confusion despite North Atlantic's use of "Fresh-Top Canister" on one of its products for over five years.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Top Tobacco argues that, in addition to the canisters, certain North Atlantic price lists identified one of the ZIG-ZAG products as a "Fresh-Top Canister." Top Tobacco's contention that this was likely to confuse wholesale customers regarding the source of ZIG-ZAG MYO tobacco is unavailing. The price list was given only to wholesalers who purchased by the case and, it is fair to infer, took far greater care in purchasing products than ordinary retail consumers. In addition, the price lists all clearly identified the product as ZIG-ZAG. Some of the price lists even had the ZIG-ZAG logo emblazoned on the top of the list. Based on these facts, it is inconceivable that a wholesaler, whose business is purchasing tobacco, would confuse two of the largest players in the MYO market. Moreover, even in the extremely unlikely event that a wholesaler thought he was purchasing a TOP product instead of a ZIG-ZAG product, he would be set straight when a case of ZIG-ZAG canisters that looked nothing like the TOP canisters arrived. Top Tobacco's suggestion that wholesalers may never see the canisters because they are packed in cases, Pl.'s Resp. at 6, is pure conjecture on the present record.

Even more importantly, however, North Atlantic stopped using "Fresh-Top Canister" on its price lists before Top Tobacco filed suit. The injunction sought by Top Tobacco, therefore, plainly did not relate to the price lists. Moreover, as North Atlantic points out, Top Tobacco's damages expert did not even address whether Top Tobacco had suffered injury as a result of the price lists. Rather, he focused entirely on the canisters. In short, the existence of the price lists cannot be used to retroactively buttress the claims that were actually advanced in the litigation. At best, North Atlantic's alleged infringing use of "Fresh-Top Canister" on its price lists was a throw-away issue for Top Tobacco that was just as weak as its claims regarding the canisters.

*3 Top Tobacco now argues for the first time that it has evidence of actual confusion. It has submitted an affidavit from its chairman, Donald Levin, who recounts a conversation he had with a wholesaler at a trade show in Las Vegas in February 2007. According to Levin, the state of Tennessee had issued a document identifying certain tobacco products that could no longer be sold in the state. The list identified several ZIG-ZAG products, including those that used the phrase "Fresh-Top Canister." Levin avers as follows:

Today, February 22, 2007, at the AWMA "Real Deal" trade show in Las Vegas, Nevada, I was talking with Mr. Charles Enoch, of B & W Wholesale Distributing, Murfreesboro, Tennessee. Mr. Enoch had looked at the de-listing document and asked me. "Are your products being discontinued in Tennessee?"I told him "no," those were not our Top products.

Pl.'s Resp. Ex. K.

The affidavit does not constitute evidence of actual confusion that would bolster the strength of the claims Top Tobacco advanced in this case. First, the conversation occurred a year after Top Tobacco filed suit and after it had lost the case without offering any evidence of confusion. In addition, there are many ways to interpret Enoch's question to Levin. Enoch said nothing about the ZIG-ZIG brand or "Fresh-Top Canister" at all. A perfectly reasonable interpretation is that it simply was a general question about Top Tobacco's products that had nothing to do with ZIG-ZAG. Finally, as discussed above, no matter what Enoch had in mind, the price list issue still was not part of Top Tobacco's claim for injunctive relief or, apparently, its claim for damages. In short, Levin's belated affidavit is not evidence of actual confusion and does not alter the Court's finding regarding the weakness of Top Tobacco's claims.

Top Tobacco also contends that this is not an exceptional case because it had no choice but to file suit to protect its TOP mark. See2 McCarthy, Trademarks and Unfair Competition § 11:91 (4th ed. 1992) ("The law imposes on trademark owners the duty to be pro-active and to police the relevant market for infringers."). Though true, this does not immunize a trademark owner who filed a baseless suit. Otherwise, every losing Lanham Act plaintiff could claim that his case was not exceptional because he had no choice but to police his mark. Such an interpretation of a trademark owner's duties would read § 1117(a) out of the Act because no case could ever be deemed exceptional.

**b. Arguments before USPTO**

As discussed above, this case could be deemed exceptional based solely on the sheer weakness of Top Tobacco's claims. See S Indus. ., 249 F.3d at

Slip Copy                                                                                                      Page 4
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

627. But there is more. As fully discussed in the Court's January 4, 2007 order, the USPTO initially refused to register Top Tobacco's TOP mark. In response, Top Tobacco stated that

[h]ere there are not only 13 Cited Marks which incorporate the term "TOP," but an online search of the Trademark Office's records using the TESS system on May 10, 2002, revealed no less than *2,360* live applications and registrations comprised of "TOP." The overwhelming frequency of applications and registrations comprised of "TOP" in the Trademark Office's records coupled with the longstanding coexistence of the Cited Marks, all in Class 34, demonstrates the Trademark Office's recognition that the scope of protection that should be afforded to these marks is *extremely* narrow. The fact that the Trademark Office has granted coexisting registrations for TOP STONE and TOP VALUE, both for cigars ..., and TOPCO and TOPS, both for book matches ... further bolsters this point.

*4 Def.'s Summ. Judg. Ex. C at 7 (emphasis in original).[FN1] Top Tobacco also told the USPTO that "where the Cited Marks exist in an extremely crowded field, the marks in question should be entitled to a comparably narrow scope of protection."*Id.* at 3. It continued,

> FN1. Class 34, as used in the quoted passage, includes "tobacco, smokers' articles, and matches."

[t]hus, marks like the Cited Marks which incorporate very common terms such as TOP are entitled to only a very narrow scope of protection, and the addition of any matter which could distinguish one mark from another in sight, sound or meaning, or a slight difference in the goods and services with which the respective marks are used should be sufficient to distinguish one mark from the next for the purposes of avoiding consumer confusion. *Id.* at 3. Top Tobacco further argued that none of the Cited Marks employ the term 'TOP' in the same or even a similar fashion. They either use 'TOP' as a superlative describing their product as 'the best' or 'above all others' *or to refer to a lid or closure.*Accordingly, these differing commercial impressions *weigh strongly in favor of a finding of no likelihood of confusion....*

*Id.* at 7 (emphasis added).

Top Tobacco's statements to the USPTO to convince it to register the TOP mark quite obviously contradict the positions it took before the Court in this case. Again, these inconsistencies are outlined at length in the Court's January 4, 2007 opinion, so only a few examples will be recited here. First, Top Tobacco told the USPTO that a mark utilizing "top" to refer to a lid or closure would not lead to a likelihood of confusion with its TOP brand tobacco products. North Atlantic's use of the term "Fresh-Top" refers to the lid on the container. Second, Top Tobacco told the USPTO that marks utilizing "top" are entitled to a narrow scope of protection because marks such as TOP STONE and TOP VALUE have coexisted for cigars. In this case, it argued that TOP was entitled to such broad protection that it could not coexist with the phrase "Fresh-Top Canister" affixed in small type to the side of a ZIG ZAG canister. Third, Top Tobacco pointed out to the USPTO that there are many other marks in Class 34 that utilize the word "top." A "humdrum" mark such as "top" cannot achieve fame necessary for dilution protection when so many others use it in a similar field. *See Fruit of the Loom, Inc. v. Girouard,* 994 F.2d 1359, 1363 (9th Cir.1993).

While before the USPTO, Top Tobacco needed other marks using the word "top" to be given a narrow scope of protection so that it could convince the USPTO to register its TOP mark in the already crowded "tobacco, smokers' articles, and matches" classification. So, it argued as such. In this case, it needed to convince the Court of the diametrically opposite view: that its TOP mark enjoyed broad protection against another user of the word "top" in the tobacco market. So, it simply switched positions. This is not cricket. *See Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1427-28 (7th Cir.1993) ("A litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory.") Based on Top Tobacco's statements to the USPTO, it is difficult to reach any conclusion other than it had to know before it filed this case that its claims lacked merit. Its change of positions before this Court needlessly increased the costs of defending this suit.

*5 Top Tobacco argues that the Court has taken its statements before the USPTO out of context. Though the Court need not rehash its opinion granting

summary judgment, the Court disagrees. The Court reviewed all of Top Tobacco's statements to the USPTO, not just those portions cited in the summary judgment opinion. Top Tobacco was quite clearly telling the USPTO that marks utilizing "top" in Class 34 were entitled to a narrow scope of protection. It also clearly stated that marks utilizing "top" to "refer to a lid or closure" were unlikely to lead to a likelihood of confusion with other users of "top" in Class 34.

**c. Top Tobacco's litigation positions**

The deposition testimony of Top Tobacco's chairman, Donald Levin, further illustrates Top Tobacco's apparent willingness to say whatever it believes suits it at the time and supports a finding that this is an exceptional case within the meaning of § 1117(a). When confronted with the ZIG-ZAG and TOP canisters side-by-side, Top Tobacco's chairman refused to concede the obvious-that they look different. The Court reviewed the testimony on video and could hardly believe that Levin gave the following testimony with a completely straight face:

Q: The appearance with the packaging in Exhibit 1 [TOP canister] and Exhibit 2 [ZIG-ZAG Fresh-Top Canister], do you agree with me that the overall appearance of them is very different?
A: No, as I said, it looks the same. The can looks the same.[FN2]

> FN2. In the quoted excerpt, if one is quite charitable to Levin, one could conclude that at the outset, he might have intended to refer to the bare cans without the labeling. But it soon became apparent that he intended to say that the overall look of the labeling on the cans was the same, a preposterous contention.

...
Q: I'm talking about the way that it looks, the words, the colors, the combination of things. Do you agree with me that Exhibit 1, your can, looks very different from Exhibit 2, our can? If you-yes or no?
...
A: No.
Q: Do you agree with me that the way they look, they're sitting on a counter top or on a shelf, looking at them from the front, they look different?
A: No. They look the same. They're both cans of

tobacco.
...
Q: Okay. Forgive me for pushing you on this, Mr. Levin, because I really want to make sure I understand this. In your judgment as the chairman of the company, looking at Exhibit 1, looking at Exhibit 1, you think they look similar?
A: I think the cans are identical.

Levin Dep. at 105-07, 110. Levin eventually conceded that ZIG-ZAG is a different word than TOP and that the cans are different colors. He refused, however, to budge from his contention that the cans are "identical." This position is similar to looking at the shelves in a library and maintaining that all the books look identical because they are all books, regardless of their titles, jacket designs, and colors. Simply put, Levin's testimony is absurd; it highlights the weakness of Top Tobacco's claims and-like Top Tobacco's inconsistent positions before the USPTO and the Court-demonstrates that Top Tobacco was not playing straight. Moreover, when witnesses dissemble as Levin did, it needlessly increases the costs of defending a suit, one of the factors the Seventh Circuit said courts may consider when deciding whether a case is exceptional. *See S Indus.,* 249 F.3d at 627.

**d. Conclusion**

*6 These considerations, taken together, establish that this case is exceptional within the meaning of § 1117(a) and that North Atlantic should be awarded reasonable attorneys' fees. The Court cautions North Atlantic that "reasonable" means exactly what it says and requires that its fee petition reflect the exercise of "billing judgment." *See Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In addition, North Atlantic should organize the attorney and paralegal time in its fee petition by activity rather than by date or by attorney.[FN3] *See In re Continental Illinois Securities Litig.,* 572 F.Supp. 931, 934 (N.D.Ill.1983). Finally, to the extent time is claimed for multiple attorneys on the same task, North Atlantic will be expected to justify this in its supporting memorandum. The Court admonishes North Atlantic that it will not sift through an unreasonable request to make it reasonable.

> FN3. In this regard, North Atlantic should include ABA task codes if North Atlantic's

Slip Copy
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 6

counsel used them for billing purposes.

In addition, the Court is opting out of the provisions of Local Rule 54.3 to a significant extent, as they are quite cumbersome and, in many cases, lead to undue delay in a court's consideration of a fee request. North Atlantic is to file its fee petition and supporting memorandum by no later than May 7, 2007. On that same date, North Atlantic is to provide to Top Tobacco the materials covered by Local Rule 54.3(d)(1) & (3). Top Tobacco is to file its response to the fee petition by no later than May 29, 2007. If it objects to the amount sought by North Atlantic, it is to produce to North Atlantic on that same date the materials covered by Local Rule 54.3(d)(5). North Atlantic's reply is to be filed by June 8, 2007.

**2. Bill of costs**

Under 28 U.S.C. § 1920, a court may tax "(1) [f]ees of the clerk and marshal; (2)[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3)[f]ees and disbursements for printing and witnesses; (4)[f]ees for exemplification and copies of papers necessarily obtained for use in the case," among other costs. The Court presumes that the prevailing party is entitled to costs, and "the losing party bears the burden of an affirmative showing that the costs taxed are not appropriate."*Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir.2005). North Atlantic has submitted a bill of costs in the amount of $139,541.34, comprised of service fees, court reporting fees, printing and witness fees, copying fees, and fees incurred responding to discovery. Top Tobacco objects to approximately 90% of the costs claimed by North Atlantic.

**a. Service fees**

North Atlantic requests $384 for service fees. Top Tobacco raises no objections. The Court therefore taxes these costs to Top Tobacco.

**b. Court reporting fees**

**i. Video deposition costs**

North Atlantic claims $26,367.46 for court reporting fees related to transcripts for twenty depositions, and video costs for seventeen of the depositions. The video costs amount to $16,179.13, and the transcript costs amount to $10,188.33. Top Tobacco contends that North Atlantic cannot recover the costs of transcripts and videotapes for the same depositions. Courts may tax the costs of a transcript and a videotape of the same deposition only if both are necessary and reasonable in the context of the particular case. *See Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 448-49 (4th Cir.1999); *Tilton v. Capital Cities/ABC Inc.*, 115 F.3d 1471, 1478 (10th Cir.1997); *Rogers v. City of Chicago*, No. 04 C 5569, 2002 WL 423723, at *3 (N.D.Ill. Mar. 15, 2002).

\*7 North Atlantic has not argued that the witnesses it videotaped were outside the Court's subpoena power and therefore potentially unavailable for trial. *See, e.g., Nat'l Diamond Syndicate, Inc. v. Flanders Diamond USA, Inc.*, No. 00 C 6402, 2004 WL 1557765, at *2 (N.D.Ill. Jul.8, 2004). Rather, it cites the benefits of videotape testimony for impeachment at trial and other purposes. Though there is undoubtedly a benefit to having video of a witness's prior testimony (especially a witness like Levin), generally speaking, potential impeachment is not always a proper basis for taxing videotape deposition costs. *See Rockett v. Marten Transp., Ltd.*, No. 99 C 3957, 2002 WL 54545, at *1 (N.D.Ill. Jan.15, 2002) ("If defendants want that impeachment 'edge,' however, they must pay for it themselves."). This Court has rejected requests for costs of transcripts and video recordings for the same deposition for precisely this reason. *See Engate, Inc. v. Esquire Deposition Svcs., LLC*, No. 01 C 6204, 2006 WL 695650, at *2 (N.D.Ill. Mar.13, 2006). This case, however, is different. The videotape of Levin's deposition was not merely useful for impeachment; with the videotape in its arsenal, North Atlantic likely would have eviscerated Levin at trial. Because Levin is Top Tobacco's chairman, it is hard to overestimate the potential impact of the videotape on a jury. The cost of videotaping Levin's deposition, therefore, was reasonable and necessary. With regard to the other seven depositions taken by North Atlantic for which it seeks video costs, North Atlantic has not provided any support for departing from the general rule that a party may not recover both video and transcript costs. The Court therefore taxes Top Tobacco $1,367.63 for video costs related to Levin's deposition.

Nine of the depositions for which North Atlantic

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

seeks video costs were noticed and taken by Top Tobacco. Top Tobacco is the party that decided to video tape these depositions and bore the lion's share of the expense. For these nine depositions, North Atlantic is only seeking the costs incurred to receive a copy of the video tape. Knowing that its opponent possessed video tapes of these depositions, it was reasonable and necessary for North Atlantic to obtain copies. In such a hotly contested case, North Atlantic would have been ill-advised not to do so. The Court taxes Top Tobacco $3,483.50 for video costs related to the nine depositions taken by Top Tobacco.

**ii. Expedited transcripts**

Top Tobacco also contends that North Atlantic cannot recover costs associated with obtaining expedited deposition transcripts. The expedited transcripts cost $4.40 per page instead of the standard $3.30 per page, resulting in an additional cost of $2,187.90. North Atlantic contends that expedited transcripts were necessary because depositions were often scheduled simultaneously or on back-to-back days, due to an expedited discovery schedule, and many Top Tobacco witnesses deferred questions to other witnesses. Therefore, North Atlantic argues, it needed the transcripts to prepare for the immediately upcoming depositions of later witnesses.

**\*8** According to North Atlantic's bill of costs, it took eight depositions of Top Tobacco witnesses and ordered the transcripts at the expedited rate. It took the depositions on the following dates: two on July 12, 2006, and one each on July 13, 2006, July 14, 2006, August 22, 2006, August 30, 2006, September 7, 2006, and September 13, 2006. The July 14, 2006 and September 13, 2006 transcripts plainly did not need to be ordered at an expedited rate because North Atlantic was not deposing any Top Tobacco witnesses shortly after July 14, 2006, and the September 13, 2006 deposition was its last. Those deposition costs will be taxed at the standard rate of $3.30 per page. The remaining depositions were scheduled sufficiently close to the depositions of other Top Tobacco witnesses that it was reasonable and necessary to order expedited transcripts. The Court therefore taxes $9,682.33 to Top Tobacco for deposition transcripts.

**c. Witness costs**

**i. Witness attendance fees and travel costs**

North Atlantic requests $2,024.40 for witness attendance fees and travel costs. Top Tobacco raises no objection. The Court therefore taxes these costs to Top Tobacco.

**ii. Expert discovery costs**

A court may also tax certain expenses incurred responding to expert discovery. Fed.R.Civ.P. 26(b)(4)(C).Rule 26(b)(4) (C) provides that "[u]nless manifest injustice would result ... the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery ...." This allows recovery only for time spent preparing for and attending depositions. *See Nilssen v. Osram Sylvania, Inc., No. 01 C 3585, 2007 WL 257711, at \*4 (N.D.Ill. Jan.23, 2007).*

North Atlantic requests $43,698 that it spent responding to expert discovery. Top Tobacco objects to the imposition of expert costs because, it contends, North Atlantic did not provide invoices from its experts sufficient to show the time they spent preparing for and attending their depositions, as opposed to other tasks. North Atlantic attaches to its bill of costs invoices for its three expert witnesses. It seeks $17,050 for Walter McCullough, $10,000 for Marian Moore, and $16,648 for Lisa Stamm. McCullough's invoice describes the services he rendered as "reading other expert reports, phone calls with attorneys, reviewing all documents relating to the case, preparing documents for discovery, traveling to Chicago to have my deposition taken, and subsequent examination of document for various issues raised in my deposition."Bill of Costs, Ex. E. He billed thirty-two hours for these services. He did not, however, itemize how much of the thirty-two hours was spent preparing for his deposition. Based on the complexity of the issues and the detailed nature of the consumer survey about which he testified, the Court believes that a ratio of twice the length of the deposition is a reasonable time for preparation. According to Top Tobacco (and undisputed by North Atlantic), McCullough's deposition lasted less than three hours. The Court taxes Top Tobacco with $4,500 in costs for the time McCullough spent preparing for and attending his deposition (McCullough's hourly rate of $500 multiplied by six hours for preparation, plus three

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 8
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

hours for the deposition).

**\*9** Marian Moore's invoice also does not specify precisely how much time she spent preparing for and attending her deposition. Her deposition lasted four hours. The Court taxes Top Tobacco with $6,000 in costs for the time she spent preparing for and attending her deposition (Moore's hourly rate of $500 multiplied by eight hours for preparation, plus four hours for the deposition). Lisa Stamm's invoices are similarly vague. Her deposition lasted six hours. The Court taxes Top Tobacco with $8,910 in costs for the time she spent preparing for and attending her deposition (Stamm's hourly rate of $495 multiplied by twelve hours for preparation, plus six hours for the deposition).

In sum, the Court taxes Top Tobacco $19,410 for costs spent responding to expert discovery.

**c. Copying and exemplification costs**

North Atlantic requests $62,630.72 for photocopying, $706.85 for sequential numbering of documents, and $3,729.91 for obtaining trademark registrations and file histories.

**i. Sequential ("Bates") numbering**

Top Tobacco does not object to the sequential numbering costs, and thus the Court taxes this cost to Top Tobacco.

**ii. Photocopying costs**

A prevailing party may recover photocopying costs for those documents provided to the court or the other parties, but not for those made for its own convenience. *See McIlveen v. Stone Container Corp., 910 F.2d 1581, 1584 (7th Cir.1990).* Top Tobacco contends that much of North Atlantic's claimed copying costs are not taxable because it produced only 5,000 pages of documents during discovery. Therefore, Top Tobacco argues, there is no way North Atlantic could have incurred $62,630.72 in taxable copying charges. Indeed, North Atlantic seeks to recover for *568,607* black and white copies; this is the equivalent of well over one hundred copies of every piece of paper it produced in discovery. Although the parties' submissions to the Court were

often voluminous, thankfully were not *that* voluminous.

The Court acknowledges, as North Atlantic points out, that a prevailing party is not required to submit a description "so detailed as to make it impossible economically to recover photocopying costs."*Northbrook Excess and Surplus Ins. Co. v. Proctor & Gamble Co., 924 F.2d 633, 643 (7th Cir.1991).* But it is reasonable to expect a party seeking over $62,000 in photocopying costs to put *some* effort into explaining, at least in general, what was copied. North Atlantic, however, has provided the Court with no justification for its request, other than to say this was a big case. That is insufficient.

For these reasons, the Court will tax photocopying costs for 15,000 pages relating to discovery (one set of discovery documents produced to Top Tobacco, one set for use at depositions, and one set for North Atlantic's attorneys, which the Court finds was reasonable and necessary), and for 3,000 pages of pleadings, motions, and exhibits submitted to the Court and served on Top Tobacco. The latter figure is concededly a rough estimate. Because this case involved trademarks whose color was relevant, the Court will also tax costs related to 500 color copies (as opposed to the almost 4,000 for which North Atlantic seeks reimbursement).

**\*10** In sum, the Court taxes Top Tobacco $2,505 in copying costs (18,000 copies at $0.10 per page, and 500 color copies at $1.41 per page).

**iii. Trademark registrations**

Top Tobacco appears to agree that North Atlantic may recover costs incurred to obtain Top Tobacco's trademark registrations and file histories. It contends, however, that the invoices provided by North Atlantic do not support North Atlantic's claim that it incurred all these costs to obtain registrations and file histories for plaintiffs' trademarks. Rather, some of the invoices appear to relate to other third-party trademarks and certain cancellation and opposition proceedings. In this case, due to Top Tobacco's prior representations to the USPTO, official documents other than plaintiff's trademark registrations were relevant. The Court has reviewed the invoices provided by North Atlantic and concludes that they provide adequate backup for its request. The Court

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

Page 9

taxes Top Tobacco $3,729.91 for trademark
registrations and file histories.

### Conclusion

For the reasons stated above, the Court grants
defendants' motion for attorneys' fees [docket no.
100] and grants in part and denies in part its bill of
costs [docket no. 107]. The Court taxes costs in favor
of defendants in the amount of $43,293.62.
Defendants are ordered to file their fee petition by
May 7, 2007; plaintiffs shall respond by May 29,
2007. Defendants may file a reply by June 8, 2007.
The Court will rule by mail.

N.D.Ill.,2007.
Top Tobacco, L.P. v. North Atlantic Operating Co.,
Inc.
Slip Copy, 2007 WL 1149220 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 2375454 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

C Richmond ex rel. Liberty Institute Trust v.
National Institute of Certified Estate Planners
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                        Division.
    Michael RICHMOND, as Trustee of the LIBERTY
        INSTITUTE TRUST, Plaintiff,
                          v.
NATIONAL INSTITUTE OF CERTIFIED ESTATE
        PLANNERS, et al., Defendants.
                 **No. 06 C 1032.**

                   Aug. 15, 2006.

Lethcal Neal Johnson, Anderson J. Ward, James W.
Lyne, The Law Offices of Anderson J. Ward, P.C.,
Mokena, IL, for Plaintiff.
Marc Scott Blackman, Kevin Patrick Ferguson, Jones
Day, Chicago, IL, for Defendants.

           ***MEMORANDUM AND ORDER***

BLANCHE M. MANNING, District Judge.
*1 According to the complaint filed in this trademark
action, Michael Richmond and Rex Black, the co-
trustees of the Liberty Institute Trust, coined the term
"certified estate planner" ("CEP") for use as a
trademark in connection with the provision of
educational services for estate planners. The trustees
entered into negotiations to license the use of the
CEP mark and eventually, this suit against defendants
The National Institute of Certified Estate Planners
("NICEP") and NICEP's Directors followed.

NICEP presently seeks to dismiss Richmond's claims
against it based on civil conspiracy (Count V),
conversion (Count VI), and trespass to chattel (Count
VII). In turn, NICEP's Directors, who have been sued
in their individual capacities, seek to dismiss the
claims against them, contending that this court cannot
exercise personal jurisdiction over them. For the
reasons set forth below: (1) the Directors' motion to
dismiss for lack of personal jurisdiction is granted so
all the counts directed at them are dismissed without
prejudice; (2) NICEP's motion to dismiss the civil
conspiracy claims against the Directors is stricken as

moot since the court has already dismissed this count
based on lack of personal jurisdiction; and (3)
NICEP's motion to dismiss Richmond's conversion
and trespass to chattel claims is granted.

**I. Background**

The court's task in providing a summary of the
relevant facts is hampered by the fact that the parties
did not highlight the relevant facts in their
memoranda. Indeed, they did not include any
summary of the facts whatsoever. With this in mind,
the court will attempt to summarize the allegations in
Richmond's 104-paragraph complaint, and will
accept the allegations therein as true for the purpose
of resolving the defendants' motions to dismiss.

Basically, Richmond alleges that he owns the CEP
mark. This mark is associated with estate planning
education and signifies that the person styling him or
herself as a CEP has completed a ten-module unit of
study in the area of estate planning, passed two
examinations, and maintained a continuing education
relationship with the program.

Beginning in late 2001, Richmond began to explore
options to license the CEP mark. Eventually,
Richmond and defendants Timothy Taylor, Dean
Beckner, and David Clancy entered into an
agreement allowing NICEP to use the CEP mark for
three years for a total cost of $216,000. Shortly
afterwards, Becker filed articles of incorporation in
Indiana to incorporate NICEP.

In the meantime, Rex Black (the other trustee of the
Liberty Institute Trust who, along with Richmond,
came up with the CEP concept) also entered into an
assignment which transferred the rights to use the
certifications "CEP" and "Master CEP" to
unspecified persons. Black later executed another
assignment which transferred all rights to the CEP
mark to NICEP. The second assignment thus
purported to give NICEP the right to use the CEP
mark. NICEP's lawyer recorded the second
assignment with the United States Patent and
Trademark Office ("USPTO").

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2375454 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**\*2** Richmond claims that both of the assignments are invalid and that NICEP and its Directors knew this when NICEP recorded the second assignment with the USPTO. In his seven-count complaint, he alleges that NICEP and its Directors misappropriated the CEP mark in violation of 15 U.S.C. § 1120 (Count I), breached their contractual obligation to pay him for the use of the CEP mark (Count III), were unjustly enriched by their use of the CEP mark (Count IV), are liable for conversion (Count VI), and are liable for trespass to chattel (Count VII). With respect to NICEP individually, Richmond alleges that it engaged in trademark infringement in violation of 15 U.S.C. § 1114(1) (Count II). With respect to the Directors individually, Richmond alleges that they engaged in a civil conspiracy (Count V). The Directors contend that this court cannot exercise personal jurisdiction over them, while NICEP seeks to dismiss Counts V (civil conspiracy), VI (conversion), and VII (trespass to chattel) pursuant to Rule 12(b)(6).

**II. Discussion**

**A. The Director's Motion to Dismiss for Lack of Personal Jurisdiction**

**1. Standard for a Motion to Dismiss for Lack of Personal Jurisdiction**

In ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) based on lack of personal jurisdiction, the court may consider matters outside the pleadings, such as affidavits and other materials submitted by the parties. SeeFed.R.Civ.P. 12(b). The plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence. Turnock v. Cope, 816 F.2d 332, 333 (7th Cir.1987). In making its determination regarding personal jurisdiction, the court must resolve any factual disputes in the plaintiff's favor, but must accept the allegations in the complaint as true only to the extent that they are not controverted by other evidence in the record. Id. The court must also accept uncontested jurisdictional facts presented by the defendants as true. Connolly v. Samuelson, 613 F.Supp. 109, 111 (N.D.Ill.1985).

Where the court's subject matter jurisdiction stems from diversity of citizenship, as in this case, the court may assert personal jurisdiction over a defendant

only if personal jurisdiction would be proper in an Illinois court.Michael J. Neuman & Assoc., Ltd. v. Florabelle Flowers, Inc., 15 F.3d 721, 724 (7th Cir.1994). Under the Illinois long-arm statute, Illinois state courts have general jurisdiction over nonresident defendants "doing business" in Illinois and specific jurisdiction over nonresident defendants if the claims arise from their "transactions" in Illinois. 735 ILCS §§ 5/2-209(a) & (b).

The Illinois long-arm statute also contains a "catch-all" provision which allows Illinois state courts to assert personal jurisdiction to the maximum extent permitted by the Illinois and United States Constitutions. 735 ILCS § 5/2-209(c). Thus, jurisdiction is coextensive with federal due process requirements. See, e.g., RAR, Inc. v. Tuner Diesel Ltd., 107 F.3d 1272, 1276 (7th Cir.1997). The Due Process Clause of the Fourteenth Amendment to the United States Constitution limits when a state may assert in personam jurisdiction over nonresident defendants. Pennoyer v. Neff, 95 U.S. 714, 733 (1878). To assert personal jurisdiction consistent with federal due process, a defendant must have (1) "certain minimum contacts with the forum state such that (2) the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

**\*3** A court's assessment of personal jurisdiction under this standard depends on whether the "general" or "specific" jurisdiction is at issue.RAR, Inc. v. Tuner Diesel Ltd., 107 F.3d at 1277,quoting Helicopteras Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 8 (1984). Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum."Id. at 1277.General jurisdiction is applicable when the lawsuit neither arose nor was related to the defendant's contacts with the forum state. Id. Such jurisdiction is permitted only where the defendant has "continuous and systematic general business contacts" with the state. Id.

**B. Specific Jurisdiction & the Fiduciary Shield Doctrine**

Here, the parties agree that the court can potentially exercise only specific jurisdiction over NICEP's Directors. As noted above, specific jurisdiction

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2375454 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

applies when the court is asserting jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum."*RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d at 1277,*citing Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. at 416. The court may exercise specific jurisdiction over the Directors if they "purposefully established minimum contacts within the forum state" and those contacts "make personal jurisdiction fair and reasonable under the circumstances."*RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d at 1277,*quoting Burger King v. Rudzewicz,* 471 U.S. at 476-77.

According to Richmond, the Directors "had contacts with an Illinois business interest" (Response Memorandum at 3) because: (1) he is a trustee of an Illinois trust with its principal place of business in Illinois and holds a trademark registration for the "CEP" mark; (2) he entered into negotiations with Director David W. Clancy, Jr. regarding the exclusive use of the CEP mark; (3) NICEP ratified the agreement to use the CEP mark in commerce; (4) NICEP's primary business is based on offering the CEP credentials to estate planners, and NICEP's ability to this flows from the license issued by a trust located in Illinois.

Richmond also contends that his complaint contains allegations showing that NICEP's Directors committed tortious acts within Illinois because: (1) they operate a business that derives revenue from providing educational credentials to estate-planning practitioners nationally and thus promote and sell their services to Illinois consumers; (2) NICEP collects $250 in annual fees and provides educational credentials to twenty-one individuals in Illinois; (3) NICEP entered into a contract with him concerning the ownership and control of an asset that is present in Illinois; (4) current NICEP Directors Randy Freitas, Art Rothfuss, Harold Tincher, David Clancy and Buck Steffens signed the second assignment of the CEP mark which was filed with the USPTO and thereby approved NICEP's use of the CEP mark, which caused Richmond injury in Illinois; (5) NICEP's Directors willfully and maliciously made false representations to intentionally affect Richmond's Illinois interest in the CEP mark; and (6) Richmond suffered an economic injury in Illinois due to the NICEP Directors' conduct.

*4 As noted by the NICEP Directors, only two of

these alleged contacts rest on specific actions taken by individual NICEP Directors, as opposed to NICEP. First, Richmond alleges, without providing any specifics, that he entered into negotiations with Director David W. Clancy, Jr. regarding the exclusive use of the CEP mark. Second, Richmond alleges that current NICEP Directors Randy Freitas, Art Rothfuss, Harold Tincher, David Clancy and Buck Steffens caused him to be injured in Illinois when they signed the second assignment of the CEP mark which was filed with the USPTO.

These allegations fail to show that all of the named Directors purposefully established minimum contacts with Illinois. Richmond has not pointed to any evidence or specifics showing that Clancy conducted negotiations in Illinois. Richmond bears the burden of establishing personal jurisdiction by a preponderance of the evidence, *Turnock v. Cope,* 816 F.2d at 333, and his filings fail to point to evidence that satisfies this standard. With respect to the second assignment, the record shows that NICEP-not the Directors individually-filed the assignment with the USPTO. *See* Complaint at ¶¶ 42-50. It is clear beyond peradventure that a corporation and its officers are separate entities, so actions taken by a corporation's officers in the name of the corporation are not actions by the officers in their individual capacities. *APS Sports Collectibles, Inc. v. Sports Time, Inc.,* 299 F.3d 624, 628 (7th Cir.2002).

In any event, even if these contacts were enough to hale all of the Directors into court in Illinois, the fiduciary shield doctrine means that this court cannot exercise personal jurisdiction over them. Under the fiduciary shield doctrine, courts may not exercise jurisdiction over a non-resident corporate official when the only contacts that individual has with Illinois were made in his or her corporate capacity. *Rollins v. Ellwood,* 141 Ill.2d 244, 279 (Ill .1990) (where an individual defendant's conduct in Illinois "was a product of, and was motivated by, his employment situation and not his personal interests, ... it would be unfair to use this conduct to assert personal jurisdiction over him as an individual"); *see also Rice v. Nova Biomedical Corp.,* 38 F.3d 909, 912 (7th Cir.1994) (Illinois recognizes the fiduciary shield doctrine, which "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal").

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2375454 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Richmond acknowledges the existence of the fiduciary shield doctrine, but argues that the Directors' conduct falls within an exception. Specifically, he points to the well-established rule that the doctrine is inapplicable if a defendant's actions were taken to further his or her personal interests. *See, e.g., Banc Corp USA v. Perez,* No. 05 C 7307, 2006 WL 1594100 at *5 (N.D.Ill. Jun. 5, 2006). In determining whether the personal interest exception applies, courts focus on whether the individual at issue "has a direct financial stake in the company's health." *United Financial Mortg. Corp. v. Bayshores Funding Corp.,* 245 F.Supp.2d 884, 885 (N.D.Ill.2002). Accordingly, "in reviewing the personal interest exception, the critical factor is the individual's status as a corporate shareholder, not merely whether he is an officer or director." *Plastic Film Corp., Inc. v. Unipac, Inc.,* 128 F.Supp.2d 1143, 1147 (N.D.Ill.2001); *Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,* 262 F.Supp.2d 898, 912 (N.D.Ill.2003).

*5 For example, in *United Financial Mortg. Corp. v. Bayshores Funding Corp.,* 245 F.Supp.2d at 895, a bank sued a mortgage loan processor and the mortgage company's president. The *Bayshores* court noted that the processor's contacts with the bank were all made as part of his job, the president signed the loans in his corporate capacity, and neither defendant had a direct financial stake in the mortgage company or stood to individually profit from the alleged wrongdoing. The court thus concluded that the fiduciary shield doctrine prevented it from exercising personal jurisdiction over these defendants. *Id.*

Here, as in *Bayshores,* no evidence suggests that the Directors stood to individually profit from their actions taken in connection with their positions with NICEP. Moreover, the record establishes that none of the Directors own a stake or share of NICEP, which is a not-for-profit entity. Thus, the Directors do not have a financial stake in NICEP and, in any event, could not have individually profited from any of their allegedly wrongful actions.

The court acknowledges that Richmond posits that NICEP did not exist as a corporation when he negotiated with Clancy regarding the use of the CEP mark. However, Richmond does not point to any evidence indicating that Richmond was acting on his own behalf, as opposed to on behalf of a nascent organization, while Clancy has submitted an affidavit stating that his communications with Richmond regarding the CEP mark were made on behalf of NICEP. The court also rejects Richmond's contention that possible issues regarding the corporate status of NICEP mean that the Directors acted in their individual capacities. Even if NICEP's corporate records were not up to date at all times, NICEP still existed as a legal entity.

In addition, the fact that the Directors all use the CEP designation is irrelevant, as their use of this designation is not connected to the allegations in Richmond's complaint. Finally, Richmond's unsupported contention that the Directors caused the second assignment to be filed with the USPTO directly conflicts with the complaint's allegation that NICEP's attorney filed the assignment with the USPTO on behalf of NICEP. *See* Complaint at ¶¶ 42-50. In essence, Richmond's argument conflates NICEP with its Directors, but from a legal perspective, the company and its Directors are not interchangeable. Thus, the fact that NICEP filed an assignment with the OSPTO does not mean that NICEP's Directors acted to further their own independent and personal interests.

Thus, the fiduciary shield doctrine applies despite Richmond's arguments to the contrary. Accordingly, the court cannot exercise personal jurisdiction over the individual Directors. This means that all of the claims directed at the individual defendants are dismissed without prejudice.

**B. NICEP's Motion to Dismiss**

**1. Standard on 12(b)(6) Motion to Dismiss**

In ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *See, e.g., McMath v. City of Gary,* 976 F.2d 1026, 1031 (7th Cir.1992). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). However, the court is neither bound by the plaintiff's legal characterization of the facts, nor required to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2375454 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

ignore facts set forth in the complaint that undermine the plaintiff's claims. *Scott v. O'Grady,* 975 F.2d 366, 368 (7th Cir.1992).

## 2. Civil Conspiracy (Count V)

*6 NICEP asks the court to dismiss Richmond's civil conspiracy claim, arguing that under the intracorporate conspiracy doctrine, "a conspiracy cannot exist solely between members of the same entity" if the allegedly unlawful acts are within the scope of employment. *Payton v. Rush-Presbyterian-St. Luke's Medical Center,* 184 F.3d 623, 632 (7th Cir.1999). In response, Richmond contends that the intracorporate conspiracy doctrine does not bar his claims for civil conspiracy amongst NICEP's Directors because the Directors used the CEP designation for their personal benefit as well as to benefit NICEP.

These arguments are beside the point as Count V is directed at the Directors, not NICEP, and the court has found that it cannot exercise personal jurisdiction over the Directors. The motion to dismiss Count V is thus stricken as moot.

## 3. Conversion (Count VI) & Trespass to Chattel (Count VI)

As noted in McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION:
The common law tort of conversion of a chattel is an old and venerable type of Anglo-American legal claim. In its modern form, conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."A chattel is a form of tangible property other than real estate. Some courts have stretched the tort of conversion to include the illegal taking of not only tangible property, but also some forms of intangible property. This sometimes leads attorneys to make the allegation that a defendant has "converted" a piece of intellectual property, such as a patent, trademark or copyright.

J. Thomas McCarthy, 4 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 25:9.1 (4th ed.2005). This is precisely what has happened in this case, as Richmond asserts that

NICEP's use of his mark means that it committed the state law torts of conversion and trespass to chattel.

In general, to state a claim for conversion, Richmond must allege that he has a right to the property at issue, he has an absolute and unconditional right to immediately possess that property, he made a demand for possession, and NICEP wrongfully and without authorization assumed control, dominion, or ownership over that property. *See Cirrincione v. Johnson,* 703 N.E.2d 67, 70 (Ill.1998). In turn, to state a claim for trespass to chattel, Richmond must show that NICEP intentionally dispossessed him of his chattel and that the dispossession resulted in damages. *See Najieb v. Chrysler-Plymouth,* No. 01 C 8295, 2002 WL 31906466 at * 10 (N.D.Ill.Dec. 31, 2002), *citing Restatement (Second) of Torts* §§ 217-218, 221-222.

In the special world of trademarks, however, "[c]ourts that have been faced with a claim that a trademark has been 'converted' have rejected the concept outright." 4 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION at § 25:9.1 (collecting cases). According to Professor McCarthy, this is because trademarks are creatures of the federal laws creating and governing them, so the use of state law to analyze trademark infringement is "the wrong tool for the job."*Id.*

*7 Richmond argues that Illinois courts nevertheless have recognized a cause of action for conversion or trespass to property when the property at issue is either tangible or represented by something tangible. *See In re Thebus,* 483 N.E.2d 1258, 1260 (Ill.1985) (in Illinois, an action for conversion generally only lies for personal property which is tangible, or at least represented by or connected with something tangible"). Contending that the trademark registration is a tangible representation of his property, Richmond asserts that his claims for conversion and trespass to property state a colorable claim.

The problem with this argument is that Richmond's proposed combination of federal trademark law and Illinois law governing conversion and chattel just doesn't work when the chattel at issue is a federal trademark. A trademark exists solely because a federal statute memorialized an idea and thereby transformed it into intellectual property protected by federal law. In contrast, property that is typically the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2375454 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

subject of a conversion or trespass to chattel action, whether tangible or intangible, exists independently (*e.g.*, a house, a satellite signal, a customer list, etc.). Accordingly, Richmond's conversion and trespass to chattel counts fail to state a claim under Illinois law and are, in fact, just a different and unnecessary restatement of his federal trademark infringement claims. *See* 4 McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION at § 25:9.1, n. 7. Counts VI and VII, therefore, are dismissed with prejudice.

**III. Conclusion**

For the reasons stated above, the motion to dismiss filed by NICEP's Directors [# 20] is granted, and the claims against all of the individual defendants are hereby dismissed without prejudice as this court cannot exercise personal jurisdiction over them. In addition, NICEP's motion to dismiss [# 23] is granted in part and denied in part. Specifically, NICEP's motion to dismiss the civil conspiracy claims against the Directors is stricken as moot since the court has already dismissed this count based on lack of personal jurisdiction and NICEP's motion to dismiss Richmond's conversion and trespass to chattel claims (Counts VI and VII) is granted.

N.D.Ill.,2006.
Richmond ex rel. Liberty Institute Trust v. National Institute of Certified Esstate Planners
Not Reported in F.Supp.2d, 2006 WL 2375454 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1861931 (E.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**C**Metro Sanitation, L.L.C. v. C & R Maintenance, Inc.
E.D.Mich.,2005.
Only the Westlaw citation is currently available.
United States District Court,E.D. Michigan, Southern Division.
METRO SANITATION, L.L.C., Plaintiff(s),
v.
C & R MAINTENANCE, INC., Defendant(s).
No. 05-70673.

Aug. 4, 2005.

<u>Joan H. Lowenstein</u>, <u>Lawrence R. Jordan</u>, <u>Peter M. Falkenstein</u>, Jaffe, Raitt, Ann Arbor, MI, for Plaintiffs.
<u>Benjamin J. Aloia</u>, Beeding Legal Group, Mount Clemens, MI, for Defendants.

OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART PLAINTIFF'S MOTION
TO DISMISS [18] AND GRANTING IN PART
AND DENYING IN PART DEFENDANT'S
MOTION TO DISMISS [19]

<u>EDMUNDS</u>, J.
**\*1** This is a dispute concerning service marks and trade dress rights under the Lanham Act and Michigan law. Each side has filed a motion to dismiss alleging that the opposing party's mark and/or dress is not protected. Some of the arguments presented by the parties involve issues of fact that cannot be resolved at this stage. However, neither party is permitted, as a matter of law, to bring a claim for conversion of service marks or trade dress under Michigan law. Therefore, for these reasons and as set forth more thoroughly below, both Plaintiff's motion [18] and Defendant's motion [19] are GRANTED IN PART AND DENIED IN PART.

I. Factual and Procedural Background

Plaintiff Metro Sanitation, L.L.C. ("Metro" or "Plaintiff") and Defendant C & R Maintenance, Inc., a company that does business as Rizzo Services, ("Rizzo" or "Defendant") both provide waste management and disposal services. (Compl.¶¶ 6, 10.)

In July of 1999, Metro created an "Express Service" division that provides drop-off trailers for construction waste materials. (Id.¶ 6.) On February 16, 2005, Metro filed an application with the U.S. Patent and Trademark Office ("USPTO") for protection of the phrases "Express Service" (Serial No. 78568417), "Express Service & Design" (Serial No. 78568414), and "Express & Design" (Serial No. 78568407). (Compl. ¶ 8; Am. Counter-Compl. ¶ 27.) Metro has used a variety of colors for its equipment, including blue and green. (Id.¶ 19.)For its new "Express Service," the trailers are red. (Id.¶ 25.)

Rizzo uses the phrase "Rizzo Express Services" on its trailers. (Id.¶ 12.)On October 5, 2004 (or, according to Plaintiff, in January of 2005), Rizzo filed an application with the USPTO for protection of "Rizzo Express" and "Rizzo Services." (Id. ¶ 16; Compl. ¶ 11.) Rizzo's vehicles and equipment are all red. (Am.Counter-Compl.¶ 11.) Defendant claims this color has come to be known as "Rizzo-Red." (Id.)

On February 4, 2005, the domain name "rizzoexpress.com" was registered to Sharon Campo through Yahoo!, Inc. ("Yahoo").(Id.¶ 27.)Ms. Campo is the wife of one of Metro's shareholders. (Id.) The address "rizzoexpress.com" was originally set up so that, when a user entered this name into his browser, Metro's website (www.metrosanitation.com) would appear. (Id.)

On February 22, 2005, Metro filed a complaint alleging that Rizzo had infringed rights it acquired in its service marks and trade dress and therefore violated § 43(a) of the Lanham Act, <u>15 U.S.C. § 1125(a)</u>; Michigan's Consumer Protection Act, <u>MICH. COMP. LAWS § 445.903</u>; common law unfair competition; and conversion.

On May 9, 2005 Rizzo filed an amended counter-complaint. It alleges that, pursuant to § 43(a) of the Lanham Act, Metro's color scheme constitutes trade dress violations. It similarly claims that Metro's actions constituted violations of Michigan's Consumer Protection Act, <u>MICH. COMP. LAWS §</u>

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 1861931 (E.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

445.903, common law unfair competition, and conversion. In addition, Rizzo claims that Metro and Campo violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), when "rizzoexpress.com" was registered and users were automatically directed to Metro's website.[FN1]Metro and Rizzo have filed motions to dismiss.

> FN1. Rizzo originally claimed that Yahoo also violated this statute. On July 18, 2005, however, it voluntarily dismissed Yahoo from the case.

II. Standard of Review

*2 "Dismissal pursuant to a Rule 12(b)(6) motion is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."*United Food & Commercial Workers Local 1099 v. City of Sidney,* 364 F.3d 738, 745 (6th Cir.2004) (citation omitted). The factual allegations in the complaint must be looked at as if they were true. *Id.* However, the court need not adopt the plaintiff's legal conclusions or unwarranted factual inferences. *Id.*

III. Rizzo's Motion to Dismiss

A. Classification of "Express" and "Express Service" marks

The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness. Courts have identified four general categories of terms: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. A generic or common descriptive term is one which is commonly used as the name or description of a kind of goods. It cannot become a trademark under any circumstances. *Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc.,* 76 F.3d 743, 748 (6th Cir.1996) (citations omitted). Rizzo argues that Metro's use of "Express" and "Express Service" are generic terms. However, "[w]hether a name is generic is a question of fact."*Id.* (citation omitted). The issue cannot be decided on a motion to dismiss because the test for genericness requires the Court to consider "whether the public perceives the term primarily as the designation of the article."*Id.* (citation omitted). Thus, Rizzo's motion must be denied.[FN2]

> FN2. In MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION(4th ed.1996)(hereinafter "MCCARTHY ON TRADEMARKS"), there is an entire chapter devoted to "Generic Terms." In that chapter, numerous sections are devoted exclusively to the topic of "Consumer Surveys." *See*MCCARTHY ON TRADEMARKS §§ 12:14-12:17. In one section the author states as follows:
> Consumer surveys have become almost de rigueur in litigation over genericness. [citation omitted] Judges are now used to survey evidence and often expect to receive legal assistance by surveys in resolving generic disputes. [citation omitted] A litigant who does not introduce a survey to support a generic challenge may be viewed as less than serious by many judges. As Judge Will stated in frustration, "Neither side in this case has produced any consumer surveys or other similar evidence. Both sides are at fault for such laxness."*Gimix, Inc. v. JS & A Group, Inc.,* 213 U.S.P.Q. 1005 (N.D.Ill.1982). But there is no need for a survey *if other evidence* overwhelmingly proves that the disputed designation is a generic name. *Nartron Corp. v. STMicroelectronics, Inc.,* 305 F.3d 397 (6th Cir.2002), *cert. denied,*538 U.S. 907, 123 S.Ct. 1486, 155 L.Ed.2d 227 (2003)("Thus, the overwhelming evidence in this case obviates the need for [defendant] to have conducted a consumer survey."). McCarthy on Trademarks § 12:17 (emphasis added). In *Nartron,* the Sixth Circuit granted a motion for summary judgment on genericness grounds. It noted that,
> on its summary judgment motion for genericness, ST sufficiently carried its burden of demonstrating the absence of any genuine issue of material fact on its claim of genericness. *ST produced overwhelming evidence,* which Nartron failed to rebut, that the term "smart power," as used by ST and other participants in the semiconductor industry, denotes a type of technology, not goods associated with Nartron.
> *Nartron,* 205 F.3d at 405 (emphasis added). Thus, even where survey evidence is not used, a genericness challenge requires some evidence regarding public perception. This cannot be done in a motion to dismiss.

B. Conversion of Service Marks under Michigan Law

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1861931 (E.D.Mich.)
(Cite as: Not Reported in F.Supp.2d)

"Under Michigan law, conversion is defined generally as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein."*Murray Hill Publications, Inc. v. ABC Communications, Inc.,* 264 F.3d 622, 636-37 (6th Cir.2001) (citation omitted). Rizzo argues that Metro's claim for conversion based on its service marks cannot stand. Specifically, it argues that Michigan does not recognize this type of claim.

In *Sarver v. Detroit Edison Co.,* 225 Mich.App. 580, 571 N.W.2d 759, 761 (Mich.Ct.App.1997), the Michigan Court of Appeals rejected the plaintiff's claim for conversion based on her idea. The Court acknowledged that "Michigan appellate courts have held that certain intangible property can be the subject of a conversion action."*Id.* at 762 (citing *Warren Tool v. Stephenson,* 11 Mich.App. 274, 161 N.W.2d 133 (Mich.Ct.App.1968)(negotiable instrument); *Tuuk v. Andersen,* 21 Mich.App. 1, 175 N.W.2d 322 (Mich.Ct.App.1969)(right to lease a machine); *Miracle Boot Puller Co., Ltd. v. Plastray Corp.,* 57 Mich.App. 443, 225 N.W.2d 800 (Mich.Ct.App.1975)(patent right)). But, it then noted that this has only occurred when "the plaintiff's ownership interest in intangible property was represented by or connected with something tangible."*Id.* The court focused on the existence of property rights, quoting cases that distinguished between ideas and protected intellectual property, such as trademarks. *See id.* at 762-63, 225 N.W.2d 800. It then concluded that the plaintiff did not establish any ownership interest in her idea and therefore could not maintain a conversion claim. *Id.* at 763, 225 N.W.2d 800.

*3 Metro urges the Court to accept the converse of the *Sarver* court's holding. That is, a conversion claim can be maintained if an ownership interest can be established. However, this interpretation turns the ruling on its head. In *Sarver,* the court explained one condition necessary for a conversion claim. It did not hold that this condition was *sufficient* for such a claim. Metro has not cited and the Court has not found any cases which extend conversion to trademarks or service marks. In contrast, there are numerous cases which hold that this common law tort does not reach these bounds. *See, e.g., Big Time Worldwide Concert & Sport Clubt at Town Ctr. v. Marriott Int'l, Inc.,* 236 F.Supp.2d 791, 806-07

(E.D.Mich.2003)(Michigan law); *Neles-Jamesbury, Inc. v. Bill's Valves,* 974 F.Supp. 979, 981-82 (S.D.Tex.1997)(Texas law). The Court therefore finds that an action for conversion of Metro's service marks would not be recognized in Michigan.

IV. Metro's Motion to Dismiss

A. Protection of Color under the Lanham Act

Metro first argues that Rizzo's use of the color red is not protected under the Lanham Act and therefore its trade dress infringement claims, brought under § 43(a) of the Lanham Act and Michigan statutory and common law, must fail.[FN3] Specifically, Metro contends that the use of a "floating color," divorced from a specific product or container, is not protected.

> FN3. The Court notes that there appears to be some overlap between trade dress and trademark in this context. Traditionally, trade dress was limited to the overall appearance of labels, wrappers, and containers used in packaging a product.... [However, o]ver a period of years, the traditional definition gradually expanded to a second category which includes the totality of any elements in which a product or service is packaged or presented.
> MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8.1. Thus, under this definition, the manner in which a service is presented may qualify for trade dress protection. The color of the service provider's uniforms, equipment, etc. likely constitute the manner which it is presented.
> The definition of trademark is also broad. It "includes any word, name, symbol, or device, or any combination thereof...."15 U.S.C. § 1127."Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive."*Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 162, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). In fact, even a color may qualify as a trademark. *See id.* at 163.
> Thus, the service provider's use of color in its uniforms, equipment, etc. can be protected by either trade dress or trademark rights. Rizzo's claim is for trade dress infringement however. Thus, the Court need not belabor this point any further.

Some courts have given protection based on the color

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 4
Not Reported in F.Supp.2d, 2005 WL 1861931 (E.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

of a product's packaging. *See, e.g., DAP Products, Inc. v. Color Title Mfg., Inc.,* 821 F.Supp. 488 (S.D.Ohio 1993)(red bucket used to package ceramic tile mastic entitled to protection). When a plaintiff seeks protection for a service rather than a product (as is the case here), the issue is more difficult. Although this issue has never been directly addressed, the Supreme Court has ruled that color *per se* can sometimes qualify for protection when used with a product. *See Qualitex Co. v. Jacobson Products Co., Inc.,* 514 U.S. 159, 166, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)(holding that "color alone, at least sometimes, can meet the basic legal requirements for use as a trademark"). The Court first turns to this case for guidance.

The plaintiff in *Qualitex Co. v. Jacobson Products Co., Inc.* sold pads that were used for dry cleaning presses. *Id.* at 161.For decades, it had colored these pads a special green-gold shade. *Id.* After noting that a color can act as a symbol, the Court specifically held that

[a] color is also capable of satisfying the more important part of the statutory definition of a trademark, which requires that a person "use" or "intend to use" the mark "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."

*Id.* at 162 (quoting 15 U.S.C. § 1127). Although "a product's color is unlike 'fanciful,' 'arbitrary,' or 'suggestive' words or designs, which almost *automatically* tell a customer that they refer to a brand[,]" the public may eventually correlate "a particular color on a product or its packaging" with a specific company. *Id.* at 162-63 (citations omitted)(emphasis in original). In other words, a Lanham Act plaintiff may show that the color has achieved a "secondary meaning" therefore entitling it to protection. *Id.* at 163;*see also Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 211-12, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)("indeed, with respect to at least one category of mark-colors-we have held that no mark can ever be inherently distinctive.... [A] color c[an] be protected as a trademark, but only upon a showing of secondary meaning.")(citing *Qualitex,* 514 U.S. at 162-163).

**\*4** This rule can be translated to services, but not

without some adjustment. Unlike a product, there will not always be a tangible object associated with a service that is capable of being colored. In some situations, however, specific equipment is needed for a service. For example, a taxi cab is directly tied to a taxi service. Courts have found that the Lanham Act gives protection to some cabs' colors. *See, e.g., Transportation, Inc. v. Mayflower Services, Inc. ., * 769 F.2d 952 (4th Cir.1985)(red/black color scheme used for taxi cabs acquired a "secondary meaning" and was therefore entitled to protection under 15 U.S.C. § 1125(a)); *Yellow Cab Transit Co. v. Louisville Taxicab & Transfer Co.,* 147 F.2d 407 (6th Cir.1945)(Kentucky unfair competition law protected combination of yellow color of cab and "yellow" used in name of company). In other circumstances where colored items are needed to provide services, there is no reason why the *Qualitex* rule should not also apply: If a plaintiff shows that the color of its service equipment has achieved a "secondary meaning," the Lanham Act provides protection.[FN4]

> FN4. Most of the arguments against protecting color *per se* for services mirror those for products-*e.g.,* because colors are of limited supply, they will soon be exhausted. In *Qualitex,* the Supreme Court squarely addressed and rejected these arguments. *Qualitex,* 514 U.S. at 167-74.

In the counter-complaint, Rizzo claims that it has used "a distinctive red color on its vehicles, containers, trailers, and other equipment" and that this color "is associated exclusively" with its business. (Am.Counter-Compl.¶¶ 11, 13.) While it is possible that every piece of Rizzo's red "equipment" has not achieved a secondary meaning, this is a factual inquiry and therefore not appropriate for a motion to dismiss. *See, e.g., Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 731 (7th Cir.1998) ("Secondary meaning is a question of fact ....") (citation omitted).[FN5] The other elements of a trade dress claim-*e.g.,* likelihood of confusion-are not presently before the Court. Therefore, the Court does not decide them here.

> FN5. In the cases cited by Metro, the courts were faced with summary judgment motions. *See, e.g., Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.,* 65 F.3d 1063 (2d Cir.1995). Thus, Metro's reliance

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1861931 (E.D.Mich.)
(Cite as: Not Reported in F.Supp.2d)

on them is misplaced.

B. "Famousness" and "Distinctiveness" of Rizzo's Trade Dress

Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides federal protection for dilution of trademarks.
For a plaintiff to succeed on a federal claim of dilution (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark.

Kellogg Co. v. Exxon Corp., 209 F.3d 562, 577 (6th Cir.2000) (citations omitted). In its motion to dismiss, Metro only argues that Rizzo's trade dress is not "famous" or "distinctive." Congress has set forth a non-exhaustive list of factors for courts to consider when making this determination:(A) the degree of inherent or acquired distinctiveness of the mark;
(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
(C) the duration and extent of advertising and publicity of the mark;
*5 (D) the geographical extent of the trading area in which the mark is used;
(E) the channels of trade for the goods or services with which the mark is used;
(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;
(G) the nature and extent of use of the same or similar marks by third parties; and
(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1225(c)(1).

Even a cursory review of these factors shows that the famousness and distinctiveness analysis require the court to consider facts outside of the pleadings and thus cannot be done on a 12(b)(6) motion. Cf. Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 876 (9th Cir.1999)(noting "the overlap between the statutory famousness considerations and the factors relevant to

establishing acquired distinctiveness" and then holding that "[p]roof of acquired distinctiveness is a difficult empirical inquiry which a factfinder must undertake")(citing Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1119-20 & n. 7 (5th Cir.1991), aff'd,505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992)). For example, the first factor requires the Court to determine the degree of acquired distinctiveness. As noted above, this inquiry is not appropriate for a motion to dismiss.

Metro argues, however, that a mark cannot meet the distinctive requirement unless it is inherently distinctive (which, as noted above, a color cannot be). This ignores the plain language of the statute dealing with courts' analyses "[i]n determining whether a mark is distinctive and famous."See15 U.S.C. § 1225(c)(1)(A) ("the degree of inherent or acquired distinctiveness of the mark")(emphasis added). In addition, contrary to Metro's claim, the Sixth Circuit has not adopted this rule. Rizzo has alleged that its dress is famous. At the pleadings stage, this is sufficient. Thus, Rizzo's trademark dilution claim cannot be dismissed.

C. Bad Faith Requirement of the ACPA

Rizzo's third claim is brought pursuant to the ACPA, which protects against "cybersquatting."
A trademark owner asserting a claim under the ACPA must establish the following: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit.

DaimlerChrysler v. The Net Inc., 388 F.3d 201, 204 (6th Cir.2004) (citation omitted).

Metro asserts that this claim must be dismissed because Rizzo cannot show bad faith. This argument is also premature. "The issue of defendant's good or bad faith is primarily a question of fact requiring an examination of defendant's intent or state of mind."Rohde v. Massachusetts Mut. Life Ins. Co., 632 F.2d 667, 670 (6th Cir.1980) (citation omitted); see also In re Abbott Laboratories Derivative Shareholders Litigation, 325 F.3d 795, 811 (7th Cir.2003)("[B]ad faith actions present a question of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1861931 (E.D.Mich.)
**(Cite as: Not Reported in F.Supp.2d)**

fact that cannot be determined at the pleading stage.")
(citation omitted). Rizzo, in its counter-complaint,
alleged that Metro acted in bad faith. Thus, the
motion to dismiss the APCA claim on this ground
must be denied.

D. Conversion Claim

**\*6** Metro argues that Rizzo's conversion claim cannot
stand. For the reasons stated above, Michigan would
not recognize a conversion claim in Rizzo's alleged
trade dress. Thus, Metro's motion on this count is
granted.

IV. Conclusion

For the reasons stated above, the Court hereby orders
that Rizzo's motion to dismiss is GRANTED IN
PART and DENIED IN PART; and that Metro's
motion to dismiss is GRANTED IN PART and
DENIED IN PART.

SO ORDERED.

E.D.Mich.,2005.
Metro Sanitation, L.L.C. v. C & R Maintenance, Inc.
Not Reported in F.Supp.2d, 2005 WL 1861931
(E.D.Mich.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1994 WL 517456 (S.D.N.Y.), 32 U.S.P.Q.2d 1683
**(Cite as: Not Reported in F.Supp.)**

▷Liebowitz v. Maxwell
S.D.N.Y.,1994.

United States District Court, S.D. New York.
Dr. Harold LIEBOWITZ, and Advanced Engineering
Research & Development Corporation, Plaintiffs,
v.
Robert MAXWELL, deceased, Estate of Robert
Maxwell, Maxwell Communication Corporation
PLC, Pergamon Press, PLC, Pergamon Press, Inc.,
Elsevier N.V., Elsevier Science Publishers B.V.,
Defendants.
**No. 91 CIV. 4551 (LLS).**

Sept. 21, 1994.

MEMORANDUM AND ORDER

STANTON, District Judge.
**\*1** Defendants move pursuant to Fed.R.Civ.P. 56 for
summary judgment.

BACKGROUND

Beginning in 1970, plaintiff Advanced Engineering
Research & Development Corporation ("AERDCO"),
a company owned and controlled by plaintiff Dr.
Harold Liebowitz, who was then dean of George
Washington University's School of Engineering and
Applied Sciences, entered into a series of agreements
with defendant Pergamon Press, plc ("Pergamon") to
publish several scientific journals conceived by Dr.
Liebowitz.[FN1] Plaintiffs claim that they own the
journal trademarks and that for over twenty years
they have controlled the content, editorial policy and
appearance of each journal. Defendant Pergamon also
claims ownership of the trademarks, having
controlled the publishing end of the business over the
same period of time.[FN2] The publishing agreements
are silent about trademark ownership.

On May 16, 1991, defendant Maxwell
Communication Corporation plc ("MCC") sold all
the stock of Pergamon, which was one of MCC's
subsidiaries, to defendant Elsevier N.V. ("Elsevier")
for over 400 million pounds sterling. MCC
represented and warranted to Elsevier that Pergamon

owned all intellectual property and goodwill in regard
to the journals. Defendant Robert Maxwell, who died
in November 1991, was the principal of MCC.
Defendant Elsevier Science Publishers N.V. ("ESP"),
a wholly owned subsidiary of Elsevier, allegedly also
asserted ownership and control over Pergamon.
Defendant Pergamon Press, Inc. ("PPI") and
Pergamon are allegedly so closely related that for
purposes of this action they are indistinguishable.

Plaintiffs claim that defendants MCC and Maxwell
(and Maxwell's estate) were unjustly enriched by the
inclusion of the journal trademarks in the sale of
Pergamon, and that the transaction constituted a
conversion of their trademark rights. In addition,
plaintiffs claim that Pergamon breached the
publishing agreements. They seek damages, a
declaratory judgment that AERDCO owns all right,
title and interest in the trademarks, titles and logos of
the journals and an order terminating the publishing
arrangement between AERDCO and Pergamon.

Defendants' motions for summary judgment are
disposed of [FN3] as follows.

A. *MCC*

MCC is attacked in counts I, II and III of the Second
Amended and Supplemental Complaint filed July 2,
1993 (the "complaint"). Count I seeks a declaratory
judgment that plaintiff AERDCO owns the
trademarks, titles and logos of the journals at issue.
Count II claims that defendants Maxwell and MCC
were unjustly enriched by purporting to sell the
trademarks, titles and logos to Elsevier in the 1991
sale of all the stock of Pergamon to Elsevier, since
the trademarks, titles and logos were not owned by
Pergamon. Count III claims that the 1991 sale was a
conversion of plaintiffs' trademark rights.

For purposes of analysis, it is clearer to consider
these claims in the following sequence.

A.1. *Unjust Enrichment*

**\*2** To establish unjust enrichment a plaintiff must
show: "1. A benefit conferred upon the defendant by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 517456 (S.D.N.Y.), 32 U.S.P.Q.2d 1683                                    Page 2

(Cite as: Not Reported in F.Supp.)

the plaintiff; 2. An appreciation or knowledge by the defendant of the benefit; and 3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *Yost v. Early,* 87 Md.App. 364, 386-87, 589 A.2d 1291, 1302 (Md.Ct.Spec.App.), *cert. denied,* 324 Md. 123, 596 A.2d 628 (1991).[FN4]

The complaint alleges that MCC was unjustly enriched by selling the journal trademarks. Accordingly to plaintiffs, they are entitled to a share of the proceeds from the sale because they are the rightful owners. The theory is flawed. If plaintiffs were to establish ownership of the marks, the only party with standing to assert unjust enrichment would be Elsevier, which would have paid MCC for intangible rights Pergamon never owned. Any benefit conferred upon MCC by the bogus sale would be at the expense of Elsevier, not of plaintiffs, if Elsevier received less than the represented value of Pergamon's stock.

As recently stated by the Court of Appeals in *Fulani v. Bentsen,* Docket No. 93-6205 (2nd Cir. September 6, 1994):

To have standing, a plaintiff must "[1] allege personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Id.* at 751; *see also Fulani III,* 882 F.2d at 624 (quoting *Allen,* 468 U.S. at 751). "A plaintiff must always have suffered 'a distinct and palpable injury to himself....'" *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100 (1979) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)). The injury must be "concrete in nature and particularized to [the plaintiff],"*Catholic Conference,* 885 F.2d at 1023-24, and not "abstract," "conjectural," or "hypothetical." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02 (1983). (Material in brackets in original.)

Plaintiffs suffered no palpable injury from the sale of Pergamon's stock, and would be paid nothing if MCC were unjustly enriched by it.

Accordingly, count II is dismissed as against MCC.

A.2. *Conversion*

Conversion of trademarks has not been recognized in

either New York or Maryland. As stated recently by Judge Owen in interpreting New York Law:

Conversion is the denial or violation of the plaintiff's dominion, rights, or possession in specific, identifiable money or tangible personal property. A trademark is not tangible personal property, but rather is intangible intellectual property having no existence apart from the good will of the product or service it symbolizes. No claim exists for conversion of intangible property.

*Financial Matters, Inc. v. Pepsico, Inc.,* No. 92-7497, 1993 WL 378844 at *4 (S.D.N.Y. Sept. 24, 1993).

Plaintiffs argue that Maryland law recognizes an action for conversion of intangible property. In *Lawson v. Commonwealth Fund Title Ins. Co.,* 69 Md.App. 476, 480-81, 518 A.2d 174, 176 (Md.Ct.Spec.App.1986), the court stated that a claim for conversion of intangible property is permissible when the property is closely associated with something tangible:

*3 Most of the commentators agree that the tort has, in recent times, made a two-stage leap beyond the bounds of chattels to permit recovery for the loss or deprivation of intangible property as well. In the first stage, the law came to regard the physical document evidencing an intangible right-a promissory note, a stock certificate, a bank book, etc.-as itself a chattel capable of conversion. In the second, it merged the underlying intangible right with the document so that the injured owner could recover not just the nominal value of the document itself that was wrongfully withheld but also the value of the right evidenced or represented by the document.

Notwithstanding this expansion, there do remain some limits to the tort. The initial focus continues to be on the tangible item withheld.

The kinds of intangible property for which actions of conversion have been recognized in Maryland, such as stocks, *see Kalb v. Vega,* 56 Md.App. 653, 666-67, 468 A.2d 676, 683 (Md.Ct.Spec.App.1983), *cert. denied,* 299 Md. 427, 474 A.2d 219 (1984), and insurance policies, *see Durst v. Durst,* 225 Md. 175, 178-80, 169 A.2d 755-57 (1961), are distinguishable. In those cases, intangible rights had been incorporated in documents which were then converted. Here, nothing tangible has been converted. Plaintiffs claim that "the names of the Journals at

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 517456 (S.D.N.Y.), 32 U.S.P.Q.2d 1683
(Cite as: Not Reported in F.Supp.)

Page 3

issue and the trademarks, are closely associated with and, as a practical matter, cannot be separated from either the copies of the Journals themselves, or the quality associated with the Journals." (Pls.' November 24, 1993 Mem. at 76 n. 34.) Although the trademark rights are closely associated with the journals, it cannot be claimed that defendants have converted the journals themselves, because as publisher Pergamon has always had the right to possess them.

Since defendants have not withheld anything tangible and even under Maryland's "liberal" definition of conversion "the initial focus continues to be on the tangible item withheld," *Lawson,* 64 Md.App. at 481, 518 A.2d at 176, plaintiffs' claim for conversion cannot stand.[FN5]

This is true for another reason: the transfer of Pergamon's stock made no change in what Pergamon owned. Whatever it possessed before the transaction (whether or not that included the trademarks, titles and logos), it possessed after the transaction-and nothing more.[FN6] Its assets were not "converted" by the transfer of its stock.

Count III of the complaint is dismissed as against MCC.

### A.3. *Declaratory Judgment*

Since, as held above, there was no conversion during the sale and plaintiffs have no standing to claim that the sale unjustly enriched MCC, there remains no justiciable controversy upon which to render a declaratory judgment involving MCC. MCC does not assert any interest in the resolution of the dispute between plaintiffs and other defendants over the ownership of the trademarks, titles and logos; on the contrary, MCC asserts that there is no justiciable dispute. Elsevier, the purchaser of Pergamon, disclaims any ownership of the trademarks, titles and logos.

**\*4** Count I of the complaint is dismissed as against MCC.

### B. *Elsevier and ESP*

On a similar analysis, the complaint cannot stand as

against the Elsevier defendants. The sale of Pergamon stock to Elsevier did not unjustly enrich Elsevier, nor did it convert (or even affect the possession of) the trademark and other rights claimed by plaintiffs. Contrary to the assertions in paragraph 24 of the complaint, neither Elsevier nor ESP claims to own any of the trademarks, titles or logos which plaintiffs claim.

The complaint is dismissed as against Elsevier and ESP.

### C. *Pergamon and PPI*

Pergamon's situation is quite different. It does claim to own-and to have owned since the journals' inception-the trademarks, titles and logos which plaintiffs claim. Pergamon urges (among other things) that plaintiffs' claims to the trademarks, etc. should be dismissed because of laches and the statute of limitations, the statute of frauds, lack of proof, lack of jurisdiction, and absence of a justiciable controversy for declaratory judgment.

Taking the last as first-

### C.1. *Justiciability*

Count one seeks a declaratory judgment that plaintiffs own the trademarks, titles and logos of the journals. The Declaratory Judgment Act, Title 28 United States Code section 2201, provides in pertinent part:
(a) In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

The controversy must be " 'between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959-60 (1969), quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512 (1941). "Whether a real and immediate controversy exists in a particular case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 517456 (S.D.N.Y.), 32 U.S.P.Q.2d 1683
(Cite as: Not Reported in F.Supp.)

is a matter of degree and must be determined on a case-by-case basis." *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.,* 925 F.2d 556, 562 (2d Cir.)*cert. denied,*501 U.S. 1218, 111 S.Ct. 2829 (1991). *See also Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464 (1937) ("It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts.").

Defendants rely on trademark cases where there were no justiciable controversies. In *Windsurfing Int'l Inc. v. AMF Inc.,* 828 F.2d 755, 757 (Fed.Cir.1987), for example, the plaintiff sought to invalidate certain trademark registrations even though it was not engaging in any conduct that brought it into adversarial conflict with the defendant. The court lacked subject matter jurisdiction because the plaintiff, who was interested in using the mark at some unspecified point in the future, sought an advisory opinion concerning the validity of the trademarks. *Id.* at 758.

**\*5** Here the dispute concerning Pergamon's ownership of trademark rights claimed by plaintiffs is not hypothetical. It is not dependent on future decisions by any party, but rather on events which have already occurred. The requirement of an actual controversy is satisfied. The plaintiffs and Pergamon have direct, palpable interests in its outcome. The determination is not advisory, but adjudicatory.

*C.2. Laches and Limitations*

Plaintiffs do not dispute that the applicable limitations period for the declaratory judgment claim is three years.[FN7]*See Construction Technology, Inc. v. Lockformer Co., Inc.,* 704 F.Supp. 1212, 1219 (S.D.N.Y.1989) ("because courts in analyzing a defense of laches presume that a claim for an injunction is stale if the acts alleged fall outside the applicable statute of limitations ... the distinction between limitations and laches has little practical effect for any claim beyond the limitations period").

Plaintiffs argue that it was not until the 1991 sale of Pergamon that defendants asserted ownership over the journals. In response, defendants point to the 1986 sale of Pergamon by Pergamon Holding

Foundation to the British Printing and Communications Corporation (which later changed its name to Maxwell Communication Corporation plc). Associated with that transaction was a disclosure statement which claimed that Pergamon owned the journals in its "own right." (Defs'. Ex. 20). At that point, defendants argue, plaintiffs were on notice of their claim.

Plaintiffs contend that they were unaware of the 1986 transaction, which they say was little publicized and only a shift of assets between two Maxwell-controlled companies. Because this court " 'must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor,' "*Cement and Concrete Workers District Council Welfare Fund v. Lollo,* --- F.3d ----, Nos. 93-7845 & 93-7847, 1994 WL 265059 at \*2 (2d Cir. June 16, 1994), those issues cannot be resolved on the present record as a matter of law.

Defendants also point to the various ways in which Pergamon exploited the business of publishing the journals. Its ownership of the copyrights to the articles, sales of advertising, retention of the bulk of the profits, etc. constitute in their view demonstration of ownership over the journals-including the trademarks. Plaintiffs acknowledge that Pergamon controlled publication of the journals, but claim that it did so as at most a joint venturer, with the owners' permission, and recognizing plaintiffs' right to change publishers. According to plaintiffs, they owned the trademarks from the outset, as evidenced by their allegedly exclusive control over the nature and quality of the journals. They say they granted Pergamon only publishing rights. *See Cotton Ginny, Ltd. v. Cotton Gin, Inc.,* 691 F.Supp. 1347, 1354 (S.D.Fla.1988) ("Since the licensee has no proprietary interest in the mark, its success in marketing the product obviously cannot create an ownership interest in the mark, in favor of the licensee...."). Plaintiffs argue that from the beginning of the relationship, Maxwell and others at Pergamon recognized AERDCO's proprietary interest in the journals. For example, in a 1967 letter Pergamon described one of the journals as a "joint venture." (Pl.'s Ex. 15.) They also argue that the compensation paid by Pergamon to AERDCO far exceeds what Pergamon typically pays editors for simply editing journals which Pergamon owns, and that it is customary for Pergamon, when it owns the rights to a

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 517456 (S.D.N.Y.), 32 U.S.P.Q.2d 1683
**(Cite as: Not Reported in F.Supp.)**

journal, to say so explicitly in the publishing agreements.

**\*6** These opposing views raise sufficient issues of fact to preclude summary judgment.

*C.3. Statute of Frauds*

Defendants argue that the complaint is barred by the statute of frauds. They rely principally on *Myers v. Waverly Fabrics, 101 A.D.2d 777, 777, 475 N.Y.S.2d 860, 861 (2d Dep't 1984), aff'd,65 N.Y.2d 75, 489 N.Y.S.2d 891 (1985),* in which an alleged oral agreement prevented the defendant "in perpetuity" from using a particular design in any manner except on fabric or wallpaper. Because the defendant could not perform its obligations under the contract within one year, it was voided by the statute of frauds. *Id.*

However, the agreements here are not perpetual. According to the last accord between the parties, their arrangement will "remain in force as long as any or all journals included in this agreement are published by Pergamon Press." (Ex. 48, ¶ 8.) Pergamon could have performed its obligation within one year from the contract's inception. Therefore, unlike *Myers,* the agreement here does not run afoul of the statute of frauds.

Defendants' statute of frauds argument seems to miss much of the point of the complaint: that the journals were plaintiffs' from the beginning, without need of any agreement on Pergamon's part, and that Pergamon's actions (written and otherwise) confirm and reflect plaintiffs' title in various ways because all parties always knew (until MCC's action in 1991) that plaintiffs owned the journals, and everyone acted accordingly.

*C.4. March 1989 Agreement*

Defendants claim that the March 1989 Agreement is a complete statement of the rights and obligations of the parties. Specifically, they contend that under the agreement, MCC had the right to sell Pergamon without any obligation to plaintiffs. However, according to plaintiffs, the agreement-which they characterize as an "amendment"-only addressed payments to AERDCO in exchange for Pergamon's

publishing rights. They argue that it did not give MCC or Pergamon any right to own, much less transfer, AERDCO's trademarks.

Because the 1989 agreement-like all the prior agreements between the parties-does not address the issue of trademark ownership, it does not foreclose proof of the other dealings and statements, written and oral, between the parties.

*C.5. Corporate Entity and Jurisdiction*

Plaintiffs argue that Pergamon and PPI are in effect the same entity, and the acts of one should be (and have been) freely attributed to the other. The record as submitted is insufficiently one-sided to permit summary adjudication on this point. Dismissal of PPI on the present record would be premature.

On November 12, 1993, a full development of the jurisdictional arguments was deferred until after the other issues presented by these motions were decided. Accordingly, with respect to Pergamon and PPI, jurisdictional discovery may proceed.

CONCLUSION

The complaint is dismissed as against MCC, Elsevier and ESP. Counts II and III of the complaint are dismissed.

**\*7** The motions are denied with respect to Count I and the breach of contract claims as against Pergamon and PPI.

So ordered.

> FN1. The most recent agreement, signed in 1989, provides AERDCO with annual payments of $100,000 per journal and 5% of the total net subscription revenue. It also provides that it "will remain in force as long as any or all journals included in this agreement are published by Pergamon Press." (Pls.' Ex. 48, ¶ 8.)

> FN2. Among its rights as publisher, Pergamon owns the copyrights to the individual articles, and has had control over the sale of subscriptions, back issues and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 517456 (S.D.N.Y.), 32 U.S.P.Q.2d 1683
(Cite as: Not Reported in F.Supp.)

microfilm.

FN3. Plaintiffs claim that Maryland law applies; defendants claim that New York law applies. For purposes of these motions, the result is the same under the law of either state.

FN4. Similarly, under New York law, "A quasi-contractual obligation is one imposed by law when the acts of the parties or others have placed in the possession of the defendant money or its equivalent 'under such circumstances that in equity and good conscience he ought not to retain it.' " *Barratta v. Kozlowski,* 94 A.D.2d 454, 464, 464 N.Y.S.2d 803, 809 (2d Dep't 1983) (citations omitted).

FN5. Plaintiffs cite *Brand Iron, Inc. v. Koehring Co.,* 595 F.Supp. 1037, 1040 (D.Md.1984), for the proposition that Maryland law recognizes conversion of intangible property. The court stated, without citing any authority, that under Maryland law a debt "may be converted in certain circumstances." *Id.* That is not authority for the conversion of trademarks. Plaintiffs also cite *Edwards v. Gramling Engineering Corporation,* 322 Md. 535, 588 A.2d 793 (1991). In that case the trial court, without objection, sent to the jury a counterclaim alleging that plaintiff converted a patent. *Id.* at 544, 588 A.2d at 798. Because the jury found for plaintiff on that counterclaim, the Court of Appeals did not address when a claim for conversion of intangible property is permissible. Defendants point out that the holder of a trademark has less "property" than the holder of a patent or copyright: he can succeed in an infringement suit only by showing a likelihood of confusion by the public. See *B & L Sales Associates v. H. Daroff & Sons, Inc.,* 298 F.Supp. 908, 910 (S.D.N.Y.1969).

FN6. It is apparent from the acquisition agreement that all the rights at issue here were represented to belong to Pergamon. Plaintiffs' belief that part or all of them were conveyed separately from Pergamon's stock (Pls.' November 24, 1993 Mem. at 90-91) stems from a misunderstanding of the parties to the transaction, whose names were

confusing. (See Elsevier's Suppl.Mem. of April 19, 1994, at 2).

FN7. The appropriate limitations period under New York law is contained in CPLR § 214(4), which provides that "an action to recover damages for an injury to personal property must be commenced within three years." See *Construction Technology, Inc. v. Lockformer Co., Inc.,* 704 F.Supp. 1212, 1220 (S.D.N.Y.1989).

Under Maryland law, the three-year limitations period for civil actions would apply. Md.Cts. & Jud.Proc.Code Ann. § 5-101.

S.D.N.Y.,1994.

Liebowitz v. Maxwell

Not Reported in F.Supp., 1994 WL 517456 (S.D.N.Y.), 32 U.S.P.Q.2d 1683

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2005 WL 818410 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**H** Vincent v. City of Chicago
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois, Eastern
                        Division.
             Veronica VINCENT, Plaintiff,
                            v.
  CITY OF CHICAGO; Harold Washington College;
  Ezekiel Morris, Realty Executive; Wilbur Wright
College; Chicago Ass'n of Realtors, a/k/a Real Estate
        Education Company, Defendants.
                   **No. 04 C 7641.**


                   April 6, 2005.

Veronica Vincent, Oak Park, IL, pro se.
<u>Paul H. Burmeister</u>, City Colleges of Chicago, <u>Lewis
T. Steadman, Jr.</u>, <u>Peter Michael Friedman</u>, Holland &
Knight LLC, <u>Elayna Tau Pham</u>, Holland & Knight
LLC, Chicago, IL, for Defendants.


           *MEMORANDUM OPINION AND ORDER*


LEINENWEBER, J.
**\*1** Plaintiff Veronica Vincent (hereinafter,
"Vincent") filed a six-count Complaint against the
City of Chicago and other Defendants for copyright
and service mark infringement (Counts I and II), false
advertising (Count III), Illinois common-law unfair
competition (Count IV), and Illinois deceptive
business practices and deceptive trade practices
violations (Counts V and VI). Defendant Wilbur
Wright College (hereinafter, "Wright") and the
Chicago Association of Realtors a/k/a Real Estate
Education Company (hereinafter, "CAR" and
"REEC") filed two separate motions to dismiss all
Counts of the complaint.


                   I. BACKGROUND


Plaintiff's Complaint states that Vincent, a licensed
real estate agent, taught a class at several Chicago
colleges called "Smart Foreclosure Buying" for
which she owned copyrights, registered in 1992 and
1994, on a book with the same title and a service
mark. Vincent had an oral agreement with REEC,
which allowed REEC to produce only enough books

for their students and sell the book under its own
cover, but pay Vincent 15% royalties. Vincent states
that she terminated this agreement by writing in
2000. CAR purchased all of REEC's assets that same
year. She claims that she had no problems with
REEC until 2003 when she received a course
brochure of the REEC real estate classes offered in
summer 2003 that listed a home study course titled
"Smart Foreclosure Buying." She also received a call
from an REEC student who claimed to have attended
an REEC class in January 2003 and bought a 1999
copy of the "Smart Foreclosure Buying" book under
the REEC cover. Vincent contacted REEC/CAR
sometime during the summer of 2003 and demanded
they cease using her copyright and pay damages. In
September 2003, REEC's course guide no longer
listed "Smart Foreclosure Buying."


Vincent requests injunctive relief, damages, and
costs. Vincent also seeks to have the Court withdraw
accreditation approval for Defendants and suspend
Defendants' Illinois licenses.


                   II. LEGAL STANDARD


A motion to dismiss under <u>Federal Rule of Civil
Procedure 12(b)(6)</u> tests whether the plaintiff has
properly stated a claim upon which relief could be
granted, not whether the plaintiff will ultimately
prevail on the merits.<u>Scheuer v. Rhodes</u>, 416 U.S.
232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In
ruling on a motion to dismiss, a court must construe
all well-pleaded allegations of the Complaint as true,
and draw all reasonable inferences in favor of the
plaintiff. *Id.* A motion to dismiss will not be granted
unless it "appears beyond doubt that the plaintiff can
prove no set of facts in support of his claims which
would entitle him to relief."<u>Conley v. Gibson</u>, 355
U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).


                   III. DISCUSSION


             A. Wright's Motion to Dismiss


Wright's Motion to Dismiss argues that Vincent has
failed to plead any facts or other allegations against
Wright that would entitle her to relief if proven to be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 818410 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

true. The Court agrees. Although Vincent names Wright as a defendant, the Complaint is devoid of any factual statements regarding Wright's violations of the allegations in Plaintiff's Complaint. The only direct mention of Wright is a statement that claims, "Wilbur Wright violated Vincent's copyright and service mark by example."(Complaint ¶ 33). This singular statement is not enough to satisfy even the most liberal interpretation of FED. R. CIV. PROC. 8. Accordingly, Wright's motion to dismiss is granted.

**\*2** The same is true for Defendant City of Chicago. Beyond naming it as a Defendant, Plaintiff fails even to mention the City of Chicago in her Complaint. Plaintiff has pled no facts or other allegations under which relief could be granted, and therefore the City of Chicago is dismissed as a Defendant in this case.

### B. CAR's (REEC) Motion to Dismiss

CAR moves to dismiss all six Counts of the Complaint. Taking Plaintiff's Complaint as true, the Court dismisses Counts II through VI, and denies CAR's motion as to Count I.

#### 1. Copyright Infringement

Plaintiff claims that CAR violated her valid copyright by using and selling her book, "Smart Foreclosure Buying" in 2003 without her authorization after she terminated their agreement in 2000. CAR first argues that Plaintiff's Complaint is technically deficient because she did not identify what the alleged infringed work is or how the work was infringed. The Court finds that Plaintiff's Complaint sufficiently alleges that the work is a book covered by two federally registered copyrights, TXU-514-195 and TXU-655-938, and that Defendant sold copies of her book without authorization in 2003. (Complaint at 6 and 8).

CAR also argues that the books it sold to students were legally held copies of Vincent's book that were produced prior to 2000 and were sold validly under the Copyright Act's "First Sale Doctrine." 17 U.S.C. § 109(a) (entitling "any person authorized by such [copyright] owner ... without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord"). Plaintiff's Complaint states that in 2003 a REEC student contacted her and "was sold a 1999 copy of 'Smart

Foreclosure Buying' with REEC's cover."(Complaint ¶ 54). Even when construing all of Plaintiff's allegations as true, the First Sale Doctrine may bar Plaintiff's copyright infringement claim: that Plaintiff had an agreement with REEC from at least 1992 in which they could use and sell her book to students under their own cover and pay royalties to her; that she terminated her agreement with REEC in 2000; that she "had no problems with REEC during the years of 1992-2002"; and that REEC or CAR sold a 1999 copy of Plaintiff's book in 2003. (See Complaint at 8). Under this doctrine, CAR could have sold the 1999 copy to the student without Vincent's authorization if it was "lawfully made," or that the "copyright owner has transferred ownership of a particular copy." Am. Int'l Pictures, Inc. v. Foreman, 576 F.2d 661, 663 n. 1 (5th Cir.1978).

This defense, however, is more appropriate for a summary judgment motion because "the burden of proving that a particular copy was lawfully made or acquired rests on the defendant."Id. at 664.Plaintiff's Complaint does not concede that the particular 1999 book was lawfully made. (Complaint ¶ 48 (stating that "all editing, controls and ownership remain with Vincent")). CAR must show that Vincent sold the particular books to CAR or otherwise transferred ownership for the doctrine to apply. ISC-Bunker Ramo Corp. v. Altech, 765 F.Supp. 1310, 1331 (N.D.Ill.1990). The Court cannot make that determination at this time. Accordingly, CAR's motion is denied as to the copyright infringement claim.

#### 2. Service Mark Infringement and False Advertising

**\*3** CAR also argues that Plaintiff fails to set forth any specific statutory basis for her false advertising claim. Defendant is correct. However, because of the language in Plaintiff's Complaint (see Complaint ¶¶ 78-83) and the fact that the Court liberally construes a pro se pleading, see Alvarado v. Litscher, 267 F.3d 648, 651 (7th Cir.2001), the Court finds that Plaintiff has sufficiently alleged a federal false advertising claim under Section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a)(1)(A).

Plaintiff also alleges that pursuant to Section 1114, CAR violated her federally registered service mark (or trademark), titled "Smart Foreclosure Buying," by advertising and teaching a class with the same name.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 818410 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

However, Plaintiff's Complaint fails to state her registered U.S. Patent and Trademark number or provide any other information that would allow the Court to infer that she holds a valid service mark. Although she does give the registrations for her copyright, a copyright does not protect names, titles, slogans, or short phrases. Those things, such as the phrase "Smart Foreclosure Buying," may be protected as trademarks registered with the U.S. Patent and Trademark Office.

To prevail on a claim under either section of the Lanham Act-Sections 1114 or 1125-Vincent must show that she has "prior protectable rights in the trademark." *Microsoft Corp. v. V3 Solutions, Inc.,* No. 01 C 4693, 2003 WL 22038593, at *7 (N.D.Ill. Aug.28, 2003). Accordingly, Counts II and III are dismissed as to all Defendants.

### 3. Illinois Claims

#### a. Deceptive Trade Practices Act and Common-Law Unfair Competition

Plaintiff also fails to state a claim under the Illinois Uniform Deceptive Trade Practices Act (the "DTPA"), 815 ILCS 510/2, for two reasons. First, the only remedy under the DTPA is injunctive relief and Plaintiff's Complaint concedes that CAR voluntarily ceased advertising "Smart Foreclosure Buying," negating the likelihood of future harm. *Greisz v. Household Bank,* 8 F.Supp.2d 1031 (N.D.Ill.1998), *aff'd,* 176 F.3d 1012 (7th Cir.1999). Therefore, Plaintiff fails to state a claim for which the Court can grant relief.

Second, "[u]nder both State and Federal statutes, the principles of trademark law and the tests for infringement are the same ... and the courts apply a single analysis to Federal, State, and common law claims." *Tarin v. Pellonari,* 253 Ill.App.3d 542, 192 Ill.Dec. 584, 625 N.E.2d 739, 746 (Ill.App.1993); *see also* M-F-G Corp. v. EMRA Corp., 626 F.Supp. 699, 707 (N.D.Ill.1985) (citation omitted). Besides Plaintiff's state statutory claim, she "also claim[s] that the defendants had engaged in unfair competition in violation of Illinois common law. We need not address this claim separately as the Illinois Deceptive Trade Practices Act ... is merely a codification of the Illinois common law of unfair competition." *McGraw-Edison Co. v. Walt Disney*

*Productions,* 787 F.2d 1163, 1174 n. 9 (7th Cir.1986)(citing *McDonald's Corp. v. Gunville,* 441 F.Supp. 71 (N.D.Ill.1977), *aff'd,* 622 F.2d 592 (7th Cir.1980)). For the same reasons explained in Section III.B.2, *supra,* Plaintiff's DTPA and common-law claims fail. Therefore, Counts IV and VI are dismissed as to all Defendants.

#### b. Consumer Fraud and Deceptive Business Practices Act

*4 Defendant argues that Plaintiff has failed to state a claim under the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 (the "Act")(Plaintiff's Complaint incorrectly cites to 815 ILCS 510/2-3, which is the DTPA). The Act requires: (1) a deceptive act or practice by defendant; (2) defendant's intent that plaintiff rely on the deception; and (3) the deception occurred in the course of conduct involving trade and commerce. *See* Connick v. Suzuki Motor Co., 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 593 (Ill.1996). Plaintiff fails to plead any facts that indicate CAR intended for Vincent to rely on the deception, assuming that the deceptive act was to advertise and sell unauthorized copies of Plaintiff's book.

A defendant can also be liable for "deceptive trade practices" if the defendant "used or employed any practice described in Section 2 of the DTPA." *Microsoft,* 2003 WL 22038593, at *12. Therefore, using the DTPA analysis, *see* Section III.B.3.a, *supra,* Count V is dismissed as to all Defendants.

### 4. Relief Requested

Plaintiff also seeks particular relief that the Court has no power to grant. Plaintiff asks the Court to "instruct the Higher Learning Commission to withdraw accreditation approval" from Defendants and to suspend Defendants' Illinois licenses. (Complaint at 15-16). Accordingly, the Court strikes the above requested relief.

### IV. CONCLUSION

For the reasons stated herein, all Counts against Wright and the City of Chicago are dismissed. Counts II through VI against all Defendants are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 818410 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

dismissed. Accordingly, Wright's Motion to Dismiss is GRANTED, and CAR's Motion to Dismiss is GRANTED IN PART, leaving only Count I of Plaintiff's Complaint.

IT IS SO ORDERED.

N.D.Ill.,2005.
Vincent v. City of Chicago
Not Reported in F.Supp.2d, 2005 WL 818410 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷ Learning Curve Toys, L.P. v. Playwood Toys, Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
LEARNING CURVE TOYS, L.P., Plaintiff,
v.
PLAYWOOD TOYS, INC., Defendant.
No. 94 C 6884.

July 20, 1999.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.
**\*1** Learning Curve Toys L.P., a toy manufacturer,
sought a declaratory judgment that its activities do
not violate any rights of PlayWood Toys, Inc., a toy
designer. PlayWood filed an eight-count
counterclaim, naming Learning Curve as well as
three individuals, Roy Wilson, Harry Abraham and
John Lee (collectively, "Counterdefendants"), all
currently or formerly employed by Learning Curve.
The individual Counterdefendants now move for
summary judgment. For the reasons set forth below,
the motion is granted in part and denied in part.
Because many of the arguments made by the
individual Counterdefendants are equally applicable
to Learning Curve L.P., the court grants summary
judgment in favor of Learning Curve on certain
claims as well.

*BACKGROUND*

Judge Grady, who was assigned this case originally,
outlined the nature of the dispute in his earlier ruling
on Learning Curve's own motion for summary
judgment, *Learning Curve Toys, L.L.C. v. PlayWood
Toys, Inc.,* No. 94 C 6884, 1998 WL 46894 (N.D.Ill.
Jan. 30, 1998), so the court will set forth only a brief
summary here. The court views disputed facts in the
light most favorable to PlayWood. In February 1993,
Wilson and Abraham visited PlayWood's offices to
discuss a joint business venture in manufacturing
toys, particularly toy trains. (12N Response ¶ 24.)
[FN1] An express confidentiality agreement governed the
exchange of ideas at this meeting. (12N Add'l Facts ¶

1.) PlayWood proposed production ideas for cutting
grooves in the wooden train tracks, to make them
look more realistic, and to generate a "clickity-clack"
sound.(*Id.* ¶ 3.) Learning Curve was receptive to this
idea, and PlayWood created a prototype and
delivered it to Learning Curve. (*Id.* ¶ 4.) PlayWood
proposed calling the product "Clickity-Clack Track."
(Clausi Dep., at 141-42.) PlayWood had no patent or
trademark on its idea, nor any registered rights in the
name "Clickity-Clack Track." (12N Response ¶¶ 43,
44, 46.) PlayWood itself was not at that time a
manufacturer or distributor of toys (the court has no
information that this status has changed), but had
produced some prototypes of the track. (*Id.* ¶¶ 23-26.)

> FN1. Rather than submit another 12M
> statement, Counterdefendants have chosen
> to rely on facts as presented in PlayWood's
> 12N statement filed in July 1997 in
> opposition to Learning Curve's motion for
> summary judgment. The court has
> considered this document, as well as the
> exhibits both sides have attached to their
> briefs.

Learning Curve backed off, and the parties never
closed a formal deal. "In 1994, Learning Curve
patented and began to manufacture a toy train track
called Clickety-Clack Track ® which made a 'clickety
clack' noise when traversed by a toy train."*Learning
Curve Toys,* 1998 WL 46894, at \*1. At the heart of
this dispute is the question of which company
originated the idea for the more realistic-looking,
clickity clack sound-producing wooden toy railroad
track. Learning Curve was the first to enlist the
assistance of the courts in resolving this dispute,
filing this suit for a declaratory judgment in
December 1994.

PlayWood counterclaimed, alleging that Learning
Curve is liable for breach of implied-in-fact contract
(Count I), unjust enrichment (Count II), "idea
misappropriation" (Count III), and violations of the
Illinois Consumer Fraud and Deceptive Business
Practices Act (Count IV), Illinois Trade Secrets Act
(Count V), Sections 44(b) and 43(a) of the Lanham
Act (Counts VI and VII), and the Uniform Deceptive
Trade Practices Act (Count VIII). Learning Curve

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

moved for summary judgment on all eight counterclaims in 1997. Judge Grady granted the motion with respect to Count I, but denied summary judgment on the remaining claims. After analyzing the implied contract issues in Counts I and II, Judge Grady stated with regard to the other counts:
*2 There are disputed issues of material fact on the remaining counterclaims. For example, it is disputed whether PlayWood designed the toy track, whether PlayWood and Learning Curve had a confidentiality agreement, whether PlayWood otherwise attempted to keep the train track design secret, and the extent of damages sustained by PlayWood. As trial is necessary on these issues, [the court] will, in the interest of judicial economy, deny summary judgment on the remaining counterclaims.

*Learning Curve Toys,* 1998 WL 46894, at *5.

The individual Counterdefendants now move for summary judgment a second time.[FN2] PlayWood has moved to strike portions of Counterdefendants' reply brief, on the grounds that they contain arguments not raised in the opening brief. The court has taken this motion into account as it considers the summary judgment issues.

FN2. All Counterdefendants were party to the first motion for summary judgment.

Counts II & III-Unjust Enrichment [FN3] and Idea Misappropriation

FN3. The court uses the terms "unjust enrichment," "quasi-contract" and "implied-in-law contract" interchangeably.

Counterdefendants maintain that these counterclaims must be dismissed altogether, because they are preempted by the Illinois Trade Secrets Act (ITSA).[FN4] By its terms, the ITSA displaces other causes of action that provide civil remedies for misappropriation of a trade secret. 765 ILCS 1065/8.[FN5] Counterdefendants argue that PlayWood is using theories of unjust enrichment and misappropriation to attempt to obtain redress for the same conduct that PlayWood identifies as violative of the ITSA, and therefore these counterclaims fall within the scope of the ITSA preemption provision and must be dismissed. Counterdefendants cite three cases-*Nilssen v. Motorola, Inc.,* 963 F.Supp. 664,

683-84 (N.D.Ill.1997), *Web Communications Group, Inc. v. Gateway 2000, Inc.,* 889 F.Supp. 316, 321 (N.D.Ill.1995), and *Pope v. Alberto-Culver Co.,* 296 Ill.App.3d 512, ___, 694 N.E.2d 615, 619 (1st Dist.1998)-in support of their argument.

FN4. Although PlayWood did not respond to this argument in its latest briefs, the court has referred to PlayWood's briefs from the first summary judgment.

FN5.765 ILCS 1065/8 states:
(a) Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret.
(b) This Act does not affect:
(1) contractual remedies, whether or not based upon misappropriation of a trade secret, provided however, that a contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty;
(2) other civil remedies that are not based upon misappropriation of a trade secret;
(3) criminal remedies, whether or not based upon misappropriation of a trade secret; or
(4) the definition of a trade secret contained in any other Act of this State.

These cases cited by Counterdefendants plainly establish that a plaintiff may not resort to common law causes of action as well as the ITSA to obtain relief for the same alleged wrongdoing. *See Web,* 889 F.Supp. at 321 (finding unjust enrichment claim preempted "to the extent [it was] directed at trade secret misappropriation"). PlayWood, however, that the ITSA only preempts claims that require misappropriation of a trade secret as an element. PlayWood insists that "[t]rade secret misappropriation [under the ITSA] and idea misappropriation are distinct causes of action that seek to protect different types of intellectual property ."(PlayWood March 9, 1999 Response, at 11). PlayWood does not fully explain its reasoning, but the court interprets it to be essentially a pleading-in-the-alternative approach: PlayWood believes its ideas are protectible as trade secrets under the ITSA; however, if the ideas do not meet the requirements of trade secrets, PlayWood believes it is still entitled to

pursue common law causes of action for Counterdefendants' alleged theft of ideas.

**\*3** The caselaw from the Seventh Circuit, and in this district, belies PlayWood's argument. *See* Robert Unikel, *Bridging the "Trade Secret" Gap: Protecting "Confidential Information" Not Rising to the Level of Trade Secrets,* 29 LOY. U. CHI.L.J. 841, 886 n. 176 (1998) (collecting cases). The purpose of the ITSA was to codify all the various common law remedies for theft of ideas. *See Pepsico, Inc. v. Redmond,* 54 F.3d 1262, 1269 (7th Cir.1995). The ITSA did not establish a parallel statutory regime to complement the common law; rather, it "abolished common law theories of misuse of such [secret] information.... Unless defendants misappropriate[ ] a statutory trade secret, they d[o] no legal wrong." *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir.1992). Thus, plaintiffs who believe their ideas were pilfered may resort only to the ITSA; the alleged theft of ideas cannot support multiple claims under different theories of recovery. *See Powell Prods., Inc. v. Marks,* 948 F.Supp. 1469, 1474 (D.Colo.1996) (dicta) (preemption appropriate under the Uniform Trade Secrets Act where " 'other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation" ') (quoting ROGER M. MILGRIM, MILGRIM ON TRADE SECRETS, § 1.01[4], at 1-68.14 (1996)).

*C & F Packing Co. v. IBP, Inc.,* No. 93 C 1601, 1994 WL 30540 (N .D. Ill. Feb. 1, 1994) illustrates this rule. There, the plaintiff, a meat products business, negotiated a deal whereby Pizza Hut was to use the plaintiff's sausage in its restaurants. The plaintiff disclosed to Pizza Hut, under a confidentiality agreement, information regarding a secret process for making sausage. The deal went sour, and the plaintiff brought suit for misappropriation of trade secrets as well as several common law actions, including unjust enrichment and unfair competition. The court held that the common law claims were preempted,[FN6] since they were based on the same course of events-specifically, Pizza Hut's allegedly using the plaintiff's ideas without permission-as the statutory claim. 1994 WL 30540, at \*7 (noting that the "common law claims cannot be meaningfully distinguished from plaintiff's statutory misappropriation claim"). Numerous other cases have similarly interpreted the ITSA preemption provision. *See, e.g., Precision*

*Screen Machs., Inc. v. Elexon, Inc.,* No. 95 C 1730, 1996 WL 495564, at \*4 (N.D.Ill. Aug. 28, 1996) (tortious breach of a confidential relationship claim preempted); *cf. Thermodyne Food Svc. Prods., Inc. v. McDonald's Corp.,* 940 F.Supp. 1300, 1309 (N.D.Ill.1996) ("To the extent that the breach of fiduciary duty claim is premised on conduct other than the misappropriation of Thermodyne technology, the claim survives.").

> FN6. *C & F Packing Co.* considered the preemption provision of the Kansas Uniform Trade Secrets Act. However, the Kansas and Illinois statutes were both derived from the Uniform Trade Secrets Act, and their preemption provisions are practically identical. The Kansas statute states: "[t]his act displaces conflicting tort, restitutionary, and other laws of this state pertaining to civil liability for misappropriation of a trade secret." K.S.A. 60-3326(a).

In sum, the ITSA does not, as PlayWood contends, simply preempt common law claims for which misappropriation of a trade secret is an element. Rather, the provision eliminated common law claims based on conduct which might support an ITSA action. In other words, if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois. This strict interpretation is fatal to PlayWood's idea misappropriation and unjust enrichment counterclaims, and Counterdefendants' motion for summary judgment is granted on those two counterclaims.

Count IV-Consumer Fraud and Deceptive Business Practices Act

**\*4** Counterdefendants contend that PlayWood's Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) claim must be dismissed because it does not implicate "consumer protection concerns," and therefore PlayWood does not have standing to sue under the statute. Both parties addressed this issue as part of Learning Curve's earlier motion for summary judgment. PlayWood protests that the court should disregard Counterdefendants' re-submission of this argument because this time around they did not raise it until

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

their reply brief, and because Judge Grady already rejected it. From this court's reading of the earlier decision, however, it does not appear that Judge Grady reached the issue. Rather, he denied summary judgment "in the interest of judicial economy" because trial was necessary to decide several factual issues, and because the court could consider a motion for judgment as a matter of law at a later time. *Learning Curve,* 1998 WL 46894, at *5. Since it is potentially dispositive of the claim, the court will re-examine Counterdefendants' argument, and refer to the briefing from the first summary judgment motion for PlayWood's response.

The Consumer Fraud Act prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact ... in the conduct of any trade or commerce."815 ILCS § 505/2. The law is designed "to protect consumers and borrowers and businessmen against fraud, unfair methods of competition and unfair or deceptive acts or practices."*Id.* § 505/1 (historical notes).

Although PlayWood is not a consumer of Learning Curve toys, a plaintiff who is not a consumer of the defendant's goods or services may sue under the Consumer Fraud Act if the alleged wrongful conduct "involves trade practices directed to the market generally or otherwise implicates consumer protection concerns."*Athey Prods. Corp. v. Harris Bank Roselle,* 89 F.3d 430, 437 (7th Cir.1996). Counterdefendants maintain that PlayWood cannot show that "any Illinois consumer was ever confused over the source of Learning Curve's Clickity-Clack Track product ... or that any Illinois consumer was directly injured from Learning Curve's conduct."(Learning Curve Reply, at 9-10.) PlayWood concedes that it has identified no individual consumer who has been confused about the origin of Clickity-Clack Track. (PlayWood 12N Response ¶ 62.) But PlayWood argues that there is a genuine dispute over who invented the product, and that Learning Curve improperly markets itself as the originator of the product in its promotional materials. PlayWood's position is that by holding itself out as the creator Clickity-Clack Track, Learning Curve engages in deliberate "deception on the market" which harms PlayWood as well as consumers. (PlayWood July 8,

1997 Response, at 14-15.)

*5 PlayWood's claim falls short. Trade practices directed at "the market generally" must still cause harm to consumers to be cognizable, *Amon v. Harrison,* No. 91 C 980, 1994 WL 532025, at *3 (N.D.Ill. Sept. 29, 1994) (statute does not "authorize a suit by a non-consumer where there is no injury to consumers"), and PlayWood does not meet this requirement. PlayWood cannot substitute conclusory allegations of "fraud on the market" for its obligation to show injury to consumers. *See American Broadcast Co. v. Maljack Prods., Inc.,* 34 F.Supp.2d 665, 680-81 (N.D.Ill.1998); *Amon,* 1994 WL 532025, at *3. Even if consumers are deceived about the origins of Clickity-Clack Track-a contention which PlayWood supports with inference, rather than direct evidence-the court cannot perceive how these consumers are harmed by such a deception.

Nor does Learning Curve's alleged deception implicate "consumer protection concerns." Although courts have struggled to define the scope of this term, *see Brody v. Finch Univ. of Health Sciences,* 298 Ill.App.3d 146, 159, 698 N.E.2d 257, 269 (2d Dist.1998), it generally involves sharp practices designed to mislead consumers about a competitor company, *see Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 533, 546 N.E.2d 33, 39 (2d Dist.1989) (finding standing for plaintiff whose competitor distributed 15,000 disparaging brochures to consumers), or public health, safety or welfare issues, *see Stickle Enters., Ltd. v. CPC Int'l, Inc.,* No. 96 C 3123, 1997 WL 767301, at *4 (N.D.Ill.Dec. 3, 1997) (allowing plaintiff to challenge competitor's deceptive actions to promote sale of contaminated animal feed). By these standards, Learning Curve's alleged misrepresentation does not implicate consumer protection concerns. Consequently Counterdefendants' motion for summary judgment on Count IV is granted. As the problems identified by the individual Counterdefendants have equal force for Learning Curve L.P., Count IV is dismissed in its entirety.

Count V-Illinois Trade Secrets Act

Counterdefendants submit that PlayWood cannot go forward with this claim because the law requires a showing that the individual defendants personally

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

benefitted or profited from Learning Curve's misappropriation of trade secrets, and PlayWood cannot make this showing. Counterdefendants cite three cases in support of the proposition that proving that "the defendant profited" is an element of a claim under the ITSA: *Syntex Ophthalmics, Inc. v. Novickv,* 745 F.2d 1423 (Fed.Cir.1984), *vacated on other grounds,*470 U.S. 1047 (1985); *Glenayre Electronics, Ltd. v. Sandahl,* 830 F.Supp. 1149 (C.D.Ill.1993); and *Etri, Inc. v. Nippon Miniature Bearing Corp.,* No. 85 C 615, 1989 WL 99575 (N.D.Ill. Aug. 18, 1989). These cases, however, cite the standard for a claim of common law trade secret misappropriation, not a cause of action under the ITSA. *Syntex*(*Syntex* is the seminal case, since *Etri* cites *Syntex* and *Glenayre* cites *Etri* ) outlined the elements of a misappropriation claim at common law, which included a "profit" requirement, based on the decision of *Schulenburg v. Signatrol, Inc.,* 50 Ill.App.2d 402, 200 N.E.2d 615 (4th Dist.1964), *aff'd in part and rev'd in part,*33 Ill.2d 379, 212 N.E.2d 865 (1968), a common law misappropriation case decided more than twenty years before the 1988 effective date of the ITSA. 745 F.2d at 1434. *Etri* also involved a common law claim filed before the ITSA became effective.[FN7]1989 WL 99575, at *6.

> FN7.*Glenayre* did not involve a common law claim, but seems inadvertently to have invoked the old standard. The profit element was not at issue in *Glenayre.*

*6 In short, Counterdefendants' authority is inapposite, since it pertains to a different cause of action than the one PlayWood advances in its ITSA counterclaim. The elements of an ITSA misappropriation claim are simply that the plaintiff had a trade secret, and the defendant misappropriated it for business purposes. *See Composite Marine,* 962 F.2d at 1265-66 (citing 765 ILCS 1065/2(d), *American Antenna Corp. v. Amperex Electronic Corp.,* 190 Ill.App.3d 535, 538, 546 N.E.2d 41, 44 (2d Dist.1989), and *Service Ctrs. of Chicago, Inc. v. Minogue,* 180 Ill.App.3d 447, 453, 535 N.E.2d 1132, 1136 (1st Dist.1989)). PlayWood is not required to show that the individual defendants personally benefitted or profited from Learning Curve's misappropriation of trade secrets.

Counterdefendants also contend that PlayWood cannot make out the elements of an ITSA claim

because PlayWood cannot show the product plans allegedly stolen by Learning Curve satisfy the definition of "trade secret" under the caselaw. Again, Playwood objects that Counterdefendants waited to present this argument in their reply brief. The parties debated this issue also in the first motion for summary judgment, and Judge Grady apparently did not find Learning Curve's position persuasive. *See Learning Curve,* 1998 WL 46894, at *5 (finding "whether PlayWood and Learning Curve had a confidentiality agreement, [and] whether PlayWood otherwise attempted to keep the train track design secret" to be disputed issues of material fact). Therefore, the court will not revisit this argument.

*Counts VI, VII, VIII-Lanham Act Section 43(a), Lanham Act Section 44(b), Uniform Deceptive Trade Practices Act*

PlayWood claims Counterdefendants violated Section 43(a) of the Lanham Act, specifically 15 U.S.C. § 1125(a)(1),[FN8] by falsely designating the origin of Clickity-Clack Track. "[A] plaintiff making a claim of false designation of origin must show that ... [the] mark is entitled to protection as a trademark, and that the false designation of origin creates a likelihood of confusion."*Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1214 (7th Cir.1997) (cite omitted). Counterdefendants dispute whether PlayWood has protectible interests under the Lanham Act, and whether PlayWood can demonstrate likelihood of confusion; PlayWood protests that these arguments were not presented in a timely fashion. These questions arose in the first summary judgment motion, and Judge Grady basically reserved ruling on them. The court now reaches these issues, and will consider each party's arguments from its earlier briefs.

> FN8. This portion of the statute states:
> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

person ...
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

PlayWood's main difficulty is that the interests for which it seeks protection are not protected by the Lanham Act. The Act provides a cause of action for a plaintiff with a "reasonable interest," in the form of some sort of "mark." *Dovenmuehle v. Gilldorn Mtge. Midwest Corp.,* 871 F.2d 697, 700 (7th Cir.1989) (quotes omitted); *see also Advanced Resources Int'l, Inc. v. Tri-Star Petroleum Co.,* 4 F.3d 327, 334 (4th Cir.1993). Typically, a mark is "a brand name, a word, 'a slogan, a combination of words and symbols, an ornamental feature, a distinctive shape, or something else intended to remind the consumer of the brand'-so similar to that of the plaintiff's that the public may be confused as to the source of the good or service. 4 F.3d at 334 (quoting *Blau Plumbing, Inc. v. S.O.S. Fixit, Inc.,* 781 F.2d 604, 609 (7th Cir.1986)). Other courts have taken a broader view of a mark, to encompass "voices, uniforms, likenesses, published words, or names ... used in such a way as to deceive the public into believing that [the plaintiff] endorsed, sponsored, or approved of the defendant's product."*Id.* (collecting cases). Even under the broadest conception of what constitutes a protected interest, however, something about it is at least arguably identifiable as connected to the party alleging false designation of origin.[FN9] PlayWood does not argue that anything about Learning Curve's marketing of Clickity-Clack Track improperly co-opts a mark that customers associate with PlayWood. Absent such circumstances, PlayWood's false designation of origin claim is not sustainable under Section 43(a) of the Lanham Act. *Cf. Blau Plumbing,* 781 F.2d at 609 (remarking on the purpose of Section 43(a)); *McMahon v. City of Chicago,* No. 98 C 8026, 1999 WL 342712, at *3 (N.D.Ill. May 17, 1999) (declining to broaden the scope of Section 43 of the Lanham Act).

FN9. Regarding legislative purpose, the Lanham Act states:
The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial

legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.
15 U.S.C. § 1127.

*7 This point informs the likelihood of confusion inquiry. Counterdefendants note that PlayWood concedes that it has not "identified a single person who has ever been confused about the source or origin of Learning Curve's Clickity-Clack Track."(12N Response ¶ 62.) Counterdefendants further maintain that no confusion is likely to result because PlayWood does not itself manufacture toy wooden trains and track. PlayWood counters that Learning Curve "falsely market[s] the wooden toy track to the public by misrepresenting Learning Curve as its originator" and thereby creates a likelihood of confusion. (PlayWood July 7, 1997 Response, at 8.) As evidence of this false marketing, PlayWood points to language from Learning Curve catalogs and other promotional materials which states that Learning Curve "created" its toy railway system, and calls Clickity-Clack track its "most exciting innovation." (12N Add'l Facts ¶¶ 8, 10.)

"The test for likelihood of confusion is whether the defendant's use of the challenged mark would cause the plaintiff to lose a substantial number of consumers."*Rust Env't,* 131 F.3d at 1216. This inquiry is a function of seven factors, including: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to palm-off his product as that of another."*Id.* (quotes omitted). By PlayWood's own admission there is no evidence to support a finding of actual confusion (sometimes considered one of the most important factors, *see Ziebart Int'l v. After Market Assoc., Inc.,* 802 F.2d 220, 226 (7th Cir.1986)).

Moreover, both the general statement of the test as well as several of the enumerated factors seem

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)                                    Page 7
**(Cite as: Not Reported in F.Supp.2d)**

wholly inapplicable here, as they contemplate one firm's improperly capitalizing on the mark of another. In any event, PlayWood has adduced scant evidence on this issue. Even if Learning Curve's promotional materials are fallacious, and it is reasonable to infer that the public would be misled about the exact origins of the product, this is not the sort of misconception that the Lanham Act prohibits, as the language of the seven-part test indicates. PlayWood makes no claim to have manufactured toys, beyond some prototypes. Therefore, PlayWood cannot demonstrate how the public would be confused as between Learning Curve and PlayWood products, or how Learning Curve's alleged misrepresentations are allowing it to take advantage somehow of PlayWoods' recognizable mark. Without some showing of this sort, there is not sufficient likelihood of confusion to maintain a false designation of origin claim under Section 43(a).*See Libman Co. v. Vining Indus., Inc., 69 F.3d 1360, 1361 (7th Cir.1995).*

PlayWood's attempt to produce authority to the contrary is unavailing. PlayWood cites *Keller Med. Specialties Prods. v. Armstrong Med. Indus., Inc., 842 F.Supp. 1086 (N.D.Ill.1994)* and *Legat Architects, P.C. v. United States Development Corp., 625 F.Supp. 293 (N.D.Ill.1985).* In *Keller,* the defendant stated in its catalog that it was the sole distributor of certain medical products, a claim the plaintiff disputed, and used as a basis to sue under the Lanham Act. The case is factually distinguishable because the parties in the case were business competitors, with one allegedly attempting to gain a competitive advantage over the other by its misrepresentations. Additionally, the court did not reach the likelihood of confusion issue because of inadequate discovery. 842 F.Supp. at 1092-93. *Legat* is distinguishable on its facts as well. There, the defendant corporation commissioned building plans from the plaintiff, an architect. After receiving the plans, an architect on the defendant's staff allegedly signed his name to the plans and submitted them to various government agencies to obtain the necessary permits and approvals. The court held that these actions could create a likelihood of confusion. 625 F.Supp. at 299-300. However, the plaintiff architect in *Legat* had rights under a form agreement to preclude a successor from using the plans prepared by plaintiff. Further, the holding of *Legat* is something of an outlier; the court has found no other case to follow it. Finally, both cases carry less weight than the other authority cited by the court, much of

which is binding. Therefore, the court declines to follow either *Keller* or *Legat.*

**\*8** PlayWood has no mark, and cannot demonstrate a likelihood of confusion. PlayWood cannot proceed against the individual Counterdefendants or Learning Curve L.P.-with its counterclaim for unfair competition in the form of false designation of origin.

The remaining counterclaims-for unfair competition under Section 44(b) of the Lanham Act, and under the Illinois Deceptive Trade Practices Act-also share the requirement that PlayWood prove a likelihood of confusion among consumers. *See McGraw-Edison Co. v. Walt Disney Prods., 787 F.2d 1163, 1167, 1174 (7th Cir.1986); Scotch Whisky Assoc. v. Majestic Distilling Co., Inc., 958 F.2d 594, 597 (4th Cir.1992)* (determining that Section 44(b) of the Lanham Act, read in conjunction with the Paris Union Convention, provides the same protections as Section 43(a)). Therefore, summary judgment is appropriate on these counts as well.

*CONCLUSION*

Summary judgment is granted in favor of all Counterdefendants on Counts II, III, IV, VI, VII and VIII. Although Counterdefendant Learning Curve L.P. was not a party to the instant motion for summary judgment, the court grants summary judgment as to Learning Curve L.P. on Counts II, III, IV, VI, VII and VIII on its own motion. If there are in fact arguments that mandate differentiating between the Counterdefendants' on these counts, PlayWood may make such arguments in a motion for reconsideration.

N.D.Ill.,1999.
Learning Curve Toys, L.P. v. Playwood Toys, Inc.
Not Reported in F.Supp.2d, 1999 WL 529572 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
**(Cite as: Not Reported in F.Supp.)**

**H**qad. inc. v. ALN Associates, Inc.
N.D.Ill.,1990.

United States District Court, N.D. Illinois, Eastern
Division.
qad. INC., et al., Plaintiffs,
v.
ALN ASSOCIATES, INC., et al., Defendants.
**No. 88 C 2246.**

June 20, 1990.

*MEMORANDUM OPINION AND ORDER*

SHADUR, District Judge.
**\*1** ALN Associates, Inc. and its principals Mike and
Sally Allen (collectively "ALN") have moved for the
imposition of attorneys' fees and expenses in
connection with one phase of this litigation-that
relating to the trade-secret claim asserted by plaintiffs
qad.inc. and its principals Karl and Pam Lopker
(collectively "qad") and dismissed by this Court on
ALN's motion May 3, 1990. ALN's current motion is
advanced under the Illinois Trade Secrets Act,
Ill.Rev.Stat. ch. 140, ¶ 355 ("Section 355" [FN1]), and
Fed.R.Civ.P. ("Rule") 11. For the reasons stated in
this memorandum opinion and order, ALN's motion
is granted only in part.

*Background*

After qad filed its initial multi-count Complaint
charging copyright infringement of its computer
software programs as well as the related theft of trade
secrets, the evidence presented by the parties at a
hotly-disputed evidentiary hearing persuaded this
Court to grant preliminary injunctive relief to qad.
More recent developments have suggested that such
interim relief-which conferred a major competitive
advantage on qad-might have been the product of
qad's overselling of its position to this Court in
substantive terms. But whether or not that ultimately
proves to be true in terms of the totality of this case,
it certainly became plain as time went on that qad
should not be permitted to pursue its trade secrets
claim in the form it sought to advance. This Court's
May 3 dismissal of that claim, which has triggered

the current motion, was caused by qad's persistent
and long-protracted failure or refusal (or both) to
identify the specific trade secrets that assertedly
formed the gravamen of its claim in that respect.

Where the subject matter of claimed copyright
infringement or trade secret misappropriation is (as
here) computer software-not only intellectual
property but intangible property as well-each litigant
has a special obligation to the court. Like most
judges, this Court is not conversant with the special
vocabulary and the technical aspects of computers,
and it is therefore all the more important for litigants'
counsel to be entirely forthcoming in their
presentations. Only in that way is the court enabled to
apply conventional legal doctrines (with which it *is*
familiar) to the arcane mysteries of the computer
trade (with which it is *not* familiar). And that
responsibility is further heightened where (as here)
the claim involves defendants' alleged
misappropriation of trade secrets-property that by its
very definition is known only to a few people
(presumably including the litigants, but certainly
excluding this Court).

That makes it all the more troublesome that qad did
not respond to ALN's discovery demands over such
an extended period of time-fully two years-by
identifying its trade secrets that had assertedly been
pirated by ALN. Instead of restating the events that
have been set out accurately by ALN in its original
memorandum in support of its motion to dismiss the
trade secrets count, this opinion simply attaches the
"Factual Background" section of that memorandum
(pages 2-8) and adopts them as its own statement. It
is against that background that the current motion
must be decided.

*Section 355*

**\*2** Section 355 reads:

If (i) a claim of misappropriation is made in bad faith,
(ii) a motion to terminate an injunction is made or
resisted in bad faith, or (iii) willful and malicious
misappropriation exists, the court may award
reasonable attorney's fees to the prevailing party.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
(Cite as: Not Reported in F.Supp.)

Section 355 is part of a statute (the Uniform Trade Secrets Act, the "Act") that took effect in Illinois only a few years ago-on January 1, 1988. Although the Act has (not surprisingly) produced no published Illinois decisions interpreting its provisions, it had previously been adopted in many states: Illinois brought the total to almost exactly half of all the states. That widespread enactment of course expands the researcher's potential a good deal, but even so the Act's attorneys' fees provision appears to have received almost no judicial treatment anywhere.[FN2] Just one reported decision is referred to in the current update of Uniform Laws Annotated cited at n. 2: *Boeing Co. v. Sierracin Corp.,* 108 Wash.2d 38, 738 P.2d 665 (1987).

*Boeing* casts no light whatever on the meaning to be ascribed to the key language here-whether "a claim of misappropriation is made in bad faith"-and particularly as to whether "bad faith" is to be viewed subjectively or objectively. That is so because *Boeing* dealt with an adjudicated true misappropriation of trade secrets (one found by the court there to have been "intentional, willful and malicious"-738 P.2d at 682), not with an ill-founded claim of such misappropriation. Absent then any judicial construction of the portion of Section 355 relevant here, this Court will give the statutory language its normal meaning: "Bad faith" is taken to mean *subjective* bad faith.

### *Rule 11*

By way of contrast, Rule 11 has both a subjective and an objective component. Both its provisions and their application are so well known as to need neither quotation nor citation here. This opinion will simply turn to an examination of qad's conduct as measured against both relevant criteria-the subjective one (applicable under both Section 355 and Rule 11) and the objective one (applicable under Rule 11 only).

### *qad's Conduct-the Subjective Standard*

When qad filed suit, it certainly had a good faith basis for believing that ALN was encroaching on its rights. That was amply demonstrated by the bitterly-disputed *Rashomon*-like differences that were disclosed during the preliminary injunction hearing. And given the interrelationship in the computer software business between copyright protection as invoked by qad and its initial trade secrets claim, such good faith belief can surely be said to have extended to that trade secrets claim as part of the initial Complaint. That then effectively dooms any possible recovery by ALN (1) under Section 355 based on qad's initial allegedly bad-faith assertion of the trade secrets claim or (2) under Rule 11 based on qad's initial allegedly "improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" (the subjective element of Rule 11).

*3 What of the later situation at the time that qad filed its more recent Amended Complaint embodying the same claim? By then qad was in a position to *know* just what qad property ALN had obtained-this Court had compelled ALN to turn over those materials before it would finally require qad to provide the particularized showing that a trade secrets claim calls for (*AMP, Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir.1987)). Nonetheless qad's counsel still reasserted the trade secrets claim at that point, under the obvious (though mistaken) view that qad could simply persist in the blunderbuss statement that "Everything you got from us was a trade secret."

This Court has found that wrong as a matter of law. Indeed, our Court of Appeals had previously made that crystal-clear in *AMP,* 823 F.2d at 1199 (citation and footnote omitted):

AMP has consistently failed throughout this litigation to identify any particularized trade secrets actually at risk. Prior to trial, AMP submitted six single-spaced, typewritten pages listing by general item and category hundreds of pieces of AMP internal information. Other courts have warned plaintiffs of the risks they run by failing to identify specific trade secrets and instead producing long lists of general areas of information which contain unidentified trade secrets. In its principal brief to this Court, AMP has again refused to specify precisely what trade secrets it believes to be at risk by identifying particular documents or other sources of information, relying on its by now familiar refrain that Mr. Fleischhacker has misappropriated "confidential business and technical information."

Accordingly this Court found that qad's whole course of conduct provided strong justification for throwing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
(Cite as: Not Reported in F.Supp.)

the trade secrets claim out of the case. But that has to be perceived as evidencing no worse than the "empty head" part of the "empty head and pure heart" phenomenon found by our Court of Appeals to violate the *objective* branch of Rule 11 (*Tabrizi v. Village of Glen Ellyn,* 883 F.2d 587, 592 (7th Cir.1989)). Nothing before this Court persuasively suggests that qad's or its lawyers' empty head (in the legal sense) was accompanied by the *impure* heart-the catchphrase equivalent of the subjective bad faith standard embodied in Section 355 and prohibited by the alternative subjective branch of Rule 11.

Accordingly no sanctions are called for in subjective bad faith terms. That leaves for consideration the objective test under Rule 11.

### qad's Conduct-the Objective Standard

Before qad originally filed suit, both it and its counsel were obligated by Rule 11 to have conducted a "reasonable inquiry" and to determine that its trade secrets claim was "well grounded in fact." What has been said at the outset of the preceding section of this opinion really negates a violation of that objective provision when this case first began. At that stage of the matter there was no doubt that ALN had been given access to some of qad's computer software materials. Necessarily qad's counsel's (and qad's own) further investigation had to take the form of seeking discovery from ALN-by definition the information was not available from qad alone. Neither qad nor its counsel can be faulted in Rule 11 terms for having brought the Complaint under those circumstances.

**\*4** Our Court of Appeals is part of the "overwhelming weight of authority" (Joseph, *Sanctions: The Federal Law of Litigation Abuse* 94 (1989)) that does not compel a party, under pain of Rule 11 sanctions, to correct a pleading that properly met that Rule's standards when filed but may later have become suspect (see, e.g., *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.,* 809 F.2d 451, 454 (7th Cir.1987)).[FN3] But the corollary of that principle is (*id,* citation omitted):

There is an implicit obligation to update because Rule 11 applies to all papers filed in the litigation. Each filing must reflect the results of reasonable inquiry. Rare is the case that goes from complaint and answer to trial without an intervening filing.

Updating occurs in the course of these filings. A court has ample support for sanctions when new filings do not reflect the full picture.

In this instance qad and its counsel were well aware of what the law of trade secrets required by the time qad filed its Amended Complaint on January 22, 1990 realleging trade secrets misappropriation. Months before that this Court had given qad the substantial benefit of the doubt on its trade secrets claim by this Court's July 7, 1989 oral bench ruling (Tr. 9-11):[FN4]

[THE COURT]: But there is something that I think goes beyond that-and that is, on the trade secret issue, which is the core, I guess, of your dispute, it seems to me that the plaintiffs have the better of the contention here, if only because the discovery process is [not] supposed to be a memory test-that is, plaintiffs are not supposed to remember what it was that was turned over to ALN [ ] and therefore what constitutes trade secrets. And that's why the preferable procedur[e] (although ALN has resisted this) is for ALN to identify to qad in the first instance the things that it has from qad[: [t]he things that Ms. Allen said had been put aside-you know, locked up[-]and that they are not using. And then promptly after that's done qad would then be obligated to identify which aspects of those delivered materials they are characterizing as trade secrets.

MR. RYAN: -Your Honor, may I ask you one question. One problem that pervades the entire discovery issue on the trade secret matters as I was able to glean it this morning-

THE COURT: Yes.

MR. RYAN: -having worked in trade secrets for a while as an intellectual property lawyer, one of [ ] the problem[s] that we really have is that we are continually running into the objection that the only thing you are entitled to is what we gave you, nothing else-no other information about what we gave you are you entitled to, you are not entitled to know whether we disclosed this to others, and under what terms we disclosed it to others.

THE COURT: Well, wait just a minute, though. But you see, the starting point for the designation of the item-don't misunderstand. I am saying that qad is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
(Cite as: Not Reported in F.Supp.)

going to have an obligation to identify for you what it is they are claiming as trade secret[s]. But the precondition to that, given the way this business transaction operated between the parties, is that in the first instance ALN must identify to qad all of the things that are in ALN's possession derived from qad. At that point qad is going to have the burden of saying, "Out of these things, here are the things that we claim are trade secrets." They are going to have to give you chapter and verse on that. Having done that, then that may define the scope of further discovery in terms of, "Well, this is really not a trade secret, because it was disclosed to B, C and D.["]

*5 ALN *did* comply with that requirement of prior disclosure on its part. Accordingly qad was then clearly in a position to do what the law demanded (see the earlier-quoted language from *AMP* ) and what this Court had stated in capsule form during the July 7, 1989 hearing. Yet qad did not do so-instead it simply parroted in the Amended Complaint the same kind of generalized allegations that it had to know were inadequate.

What that means is that the Amended Complaint did fail the objective branch of the Rule 11 requirement. qad could not in good faith (that is, objective good faith) continue to advance the trade secrets claim in the form that it did in that revised pleading. And that means that ALN's legal fees incurred in dispatching that claim from the Amended Complaint are recoverable under Rule 11.

*Conclusion*

ALN's motion is granted only in limited part. Although this may be a forlorn wish in light of the mutual intransigence that has been the hallmark of this litigation, this Court retains the hope that quantifying the sanctions called for by this opinion may be possible without undue expansion of the controversy so as to create a fees-on-fees problem. Counsel for the parties are urged to confer informally to identify the services involved and the claimed hourly rates, thus narrowing if not eliminating entirely any further areas of dispute in quantifying the sanctions. This action is set for a status hearing at 9 a.m. July 9, 1990 to see what remains to be done.[FN5]

FN1. All further references to provisions of

the Illinois Trade Secrets Act will take the form "Section-." That usage comports with the Illinois General Assembly's use of that word and of the symbol "§ " in its enactments, even though the publisher of the Smith-Hurd annotated version has chosen to shift to "¶" instead.

FN2. Not all the states have included the counterpart of Section 355 (Act § 4) in their adoption of the Act. According to 14 *Uniform Laws Annotated,* 1990 supp. pamphlet at 415, both Alaska and Virginia have omitted that section from their enactments.

FN3. It is true that *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1036 (7th Cir.1988) upheld the imposition of sanctions where, at the close of discovery, plaintiff knew that it had no evidence of an antitrust or RICO violation by one defendant but nevertheless failed to dismiss that defendant from the action. But the waters were muddied in *Flip Side*-the district court there had discussed the sanctions issue in terms of *both* Rule 11 and 28 U.S.C. § 1927, and the latter statute of course embraces a lawyer's needless multiplication of proceedings without focusing (as Rule 11 does) only on the situation when a sanctionable *document* is filed (see, e.g., *Walter v. Fiorenzo,* 840 F.2d 427, 435-36 (7th Cir.1988)). When the Court of Appeals in *Flip Side* properly observed that the district court's assessment of fees, because it was imposed only against the plaintiff and not against its lawyer, negated the applicability of 28 U.S.C. § 1927, the Court of Appeals evaluated the matter solely in terms of Rule 11 (843 F.2d at 1035 n. 12). But its discussion did not focus on any particular filed document, as Rule 11 prescribes. There was no discussion of that issue at all in the *Flip Side* opinion. Under those circumstances this Court adheres to *Pantry Queen,* which discussed the issue specifically and applied Rule 11 in accordance with its terms.

FN4. Regrettably the Transcript (Ex. C

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
(Cite as: Not Reported in F.Supp.)

Page 5

attached to the ALN memorandum in support of its motion to dismiss the trade secret claim) is somewhat garbled. Unlike deponents (Rule 30(e)), this Court does not get the opportunity to review and correct obvious errors in transcripts that are delivered to counsel in response to their orders. What follows in the text is a corrected version. But even apart from those corrections, the thrust of the ruling in the respect that is material here was unquestionable.

FN5. Just after the final editing of this opinion had been completed to permit its issuance in final form, this Court received ALN's Reply Memorandum on its previously-filed motion for partial summary judgment:

1. seeking leave to withdraw that motion without prejudice to its possible future renewal; and
2. asking for an award of attorneys' fees for services in connection with the aborted motion.

This Court grants ALN leave to withdraw the previously-filed motion and orders qad to respond to the request for attorneys' fees on or before July 2, 1990. At the July 9 status hearing this Court will review with the parties the need for any further filings on that score.

N.D.Ill.,1990.
qad. inc. v. ALN Associates, Inc.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.                                              Page 1
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**C** Lindora Medical Clinic, Inc. v. Care Charge, Inc.
N.D.Ill.,1993.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
LINDORA MEDICAL CLINIC, INC., Plaintiff,
v.
CARE CHARGE, INC., a Delaware corporation;
Household International, Inc., a Delaware
corporation; Steve Higgins, a/k/a Steve De John;
Kathleen Virlas, a/k/a Kathleen De John, a/k/a
Kathleen Lambrick, a/k/a Anne Lacey; Ray Jennings,
a/k/a Roy De John; and Mary Lou De John, a/k/a
Mary Lou Lawler, Defendants.
**No. 92 C 4148.**

Aug. 26, 1993.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

I. INTRODUCTION

**\*1** Plaintiff, Lindora Medical Clinic ("Lindora"),
brought this diversity suit against Household
International, Inc. ("Household"), Care Charge, Inc.
("Care Charge"), and representatives of Care Charge
individually. Lindora sued Care Charge and its
representatives for fraud and also brought a breach of
contract claim against Care Charge. Lindora sued
Household for breach of contract and unjust
enrichment.

On September 23, 1992, the court dismissed the
claims against Household. In its complaint, Lindora
failed to identify a contract between it and
Household; therefore, the breach of contract count
failed to state a claim. Since the remaining unjust
enrichment count could not stand alone as a cause of
action, the court dismissed that claim as well.

Now, Lindora moves to amend its complaint against
Household by alleging breach of contract on a theory
of apparent agency (Count II) and unjust enrichment
(Count VIII). Lindora also brings claims against
Household for breach of an implied contract (Count

IX) and equitable estoppel (Count X).

Defendant, Household, opposes this proposed
amendment on grounds that it fails to state a claim.
According to Household, the proposed amendment
cannot withstand a motion to dismiss and is therefore
futile. As a result, Household urges the court not to
grant Lindora leave to amend its complaint.

II. BACKGROUND

In order to determine whether Lindora should be
granted leave to file an amended complaint, the court
must determine whether Lindora's proposed amended
complaint can survive a motion to dismiss. A claim
will be dismissed only if plaintiff can prove no set of
facts that would entitle him to relief. *Conley v.
Gibson,* 355 U.S. 41, 45-46 (1957). In ruling on a
motion to dismiss, the court must accept all well pled
facts as true and make all reasonable inferences in a
light most favorable to the plaintiff. *Ellsworth v. City
of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert.
denied,*475 U.S. 1047 (1986). Consequently, the
court accepts all of Lindora's allegations in its
proposed complaint as true. The facts are set forth as
alleged by Lindora.

Defendant, Care Charge, is a corporation that issues
medical care credit cards. These cards allow patients
approved for credit to charge health care costs from
participating health care providers. In October of
1990, Care Charge approached Lindora about
participating in this credit plan. To induce Lindora to
enter into a contract, Care Charge represented that it
was a subsidiary and part of the financial network of
co-defendant Household. On November 23, 1990,
Lindora and Care Charge executed a contract.FN1

Under the contract, Care Charge agreed to purchase
all health care credit contracts at 96 percent of the
contract amount with a 4 percent discount fee. The
agreement further required Care Charge to disburse
these funds to Lindora within seven days of the date
the patients used the service.

After November 23, 1990, Care Charge and
Household approved hundreds of Lindora patients for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

credit. Lindora provided health care services for these patients and called Household to receive approval codes. Household then billed Lindora's patients and the patients directly paid Household for Lindora's medical services.

*2 However, all did not go as planned. Defendants, Care Charge and Household, approved patients for credit but remitted the 96 percent due to Lindora on an average of over 30 days from the date Lindora's patients used the service, instead of the required seven days. Then, by a letter dated September 17, 1991, Household informed Care Charge that its funding would be cut off on December 17, 1991. In spite of this communication, representatives of Care Charge and Household indicated that there were no funding problems between Care Charge and Household. Finally, on October 15, 1991, Care Charge and Household stopped sending payments to Lindora. Lindora subsequently filed the present suit.

### III. ANALYSIS

Although Rule 15 states that leave to amend shall be "freely given," it may be denied where the amendment would be futile. _Foman v. Davis,_ 371 U.S. 178, 182 (1962). An amendment is futile when it fails to state a valid theory of liability or when it cannot withstand a motion to dismiss. _Bower v. Jones,_ 978 F.2d 1004, 1008 (7th Cir.1992).

### A. Implied Contract

Household argues that Lindora has not stated a claim for implied contract in its proposed amended complaint (Count IX). According to Illinois law, an implied contract is created by law as a result of the parties' acts. _Zadrozny v. City Colleges of Chicago,_ 220 Ill.App.3d 290, 295 (1991) ( citing, _Bull v. Mitchell,_ 114 Ill.App.3d 177, 186, 448 N.E.2d 1016 (1983)). Contracts may be implied either in fact or in law. Contracts implied in fact "arise from a promissory expression that is inferred from circumstantial evidence of an intent to be bound." _Zadrozny,_ 220 Ill.App.3d at 295. On the other hand, contracts implied in law are created and governed by principles of equity and "result from a duty imposed by law." _Id._ In this case, Lindora alleges that either a contract implied in law or in fact existed between it and Household. Although Lindora signed an express contract with Care Charge, Lindora seeks to impose

liability on Household for work done under this contract since Household billed and was paid by Lindora's patients.

Household argues that Lindora's proposed amended complaint is legally insufficient since there are no allegations of a promissory expression between Lindora and Household. Household contends that Lindora's proposed amended complaint is insufficient since it does not contain allegations that Household agreed to provide compensation to Lindora. For this proposition, Household cites _Zadrozny,_ 220 Ill.App.3d 290 (1991). The court disagrees. The _Zadrozny_ court clearly held that "[i]n order to recover on an implied contract, the facts and circumstances must show that, at the time the services were rendered, one party expected to receive payment and the other party intended to make payment." _Zadrozny,_ 220 Ill.App.3d at 296. _Zadrozny_ does not stand for the proposition that a complaint on an implied contract must contain allegations that the defendant agreed to make payment. Moreover, in an implied contract, there need not be allegations of an actual promissory expression. Promissory expression may be inferred from circumstantial evidence of an intent to be bound. _Id._ at 295.

*3 Lindora alleges that it expected payment from Household, even though it signed an explicit contract with Care Charge which makes no mention of Household. _See supra_ n. 1. However, Household argues that it cannot be liable under an implied contract for work done under the contract between Care Charge and Lindora. Here, Household has the better of the argument. Under Illinois law, a third party cannot be held liable under an implied contract for the work done under an explicit contract between two different parties merely because the third party benefited from the work. _Decatur Production Credit Ass'n v. Murphy,_ 119 Ill.App.3d 277, 288, 456 N.E.2d 267 (1983). The general rule is that "if you do work pursuant to a contract with X, you don't expect that Y, a nonparty, will pay you if X defaults, merely because Y was benefited by your work." _Midcoast Aviation, Inc. v. GE Credit Corp.,_ 907 F.2d 732, 739 (7th Cir.1990) (quoting _Goldstick v. ICM Realty,_ 788 F.2d 456, 467 (7th Cir.1986)). Therefore, Lindora cannot save its pleading by alleging an expectation of payment from Household. And, "without your expectation of payment, the enrichment of Y can hardly be called unjust." _Id._ Since both contracts

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

implied in fact, and contracts implied in law require that plaintiffs have an expectation of payment, this general rule is fatal to Lindora's implied contract claim.

However, an exception to this rule exists when the nonparty not only benefits from plaintiff's work but entices plaintiff to undertake the work and then refuses to see plaintiff paid. *Midcoast Aviation, Inc., 907 F.2d at 739.* Yet, Lindora neither alleges nor argues that the instant facts come within the purview of this exception. Moreover, none of Lindora's allegations permit an inference that Household enticed Lindora to participate in Care Charge's credit card plan. Consequently, Lindora's claim for implied contract fails to state a valid theory of liability and cannot withstand a motion to dismiss. Therefore, Lindora cannot be granted leave to file this claim.

B. Apparent Agency

Household argues that Lindora has not stated a claim for breach of contract on an apparent agency theory in its proposed amended complaint (Count II). Under Illinois law, apparent authority is "created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Emmenngger Const. Co. v. Frank King, 103 Ill.App.3d 423, 428, 431 N.E.2d 738, 743 (1982), (quoting,* Restatement (Second) of Agency § 27 (1958)). Consequently, when a principal holds an agent out to the public as possessing the power which the agent exercises, the principal may be bound to the extent of the apparent authority which he has conferred upon his agent. *Merchants' Nat'l Bank v. Nichols & Co., 223 Ill. 41, 50 (1906); City of Evanston v. Piotrowicz, 20 Ill.2d 512, 519, 170 N.E.2d 569 (1960).*

*4 In this case, Lindora alleges that Household held out Care Charge as possessing the power to bind Household in contract. Consequently, Lindora alleges that Household is bound by the contract Care Charge and Lindora executed on November 23, 1990. Household urges the court not to allow Lindora to amend its complaint since Lindora's amendment would be futile. According to Household, Lindora's proposed breach of contract-apparent agency and

unjust enrichment claims are virtually identical to the breach of contract and unjust enrichment claims that Lindora raised in its original complaint. Household claims that Lindora has not alleged any new facts in its proposed amended complaint and for this reason has not adequately pled apparent agency.

The court does not find this argument convincing. Lindora asserts new facts in its proposed amended complaint that relate to the role that Household allegedly played in the contract Care Charge signed with Lindora. For example, Lindora alleges that Household provided Lindora with the approval codes for credit services. Lindora also alleges that Household billed its patients and that the patients directly paid Household for Lindora's medical services. By asserting that no new facts were alleged, Household simply does not address the legal import of these allegations. Therefore, this argument fails.

In a footnote, Household makes a passing reference to two arguments made in its prior motion to dismiss Lindora's original complaint. Household argues that Lindora has not stated a claim since plaintiff learned that Care Charge was not Household's agent, thus, any reliance was unreasonable. In support of this proposition, Household cites *Evanston Bank v. Conticommodity Services, Inc., 623 F.Supp. 1014, 1032 (N.D.Ill.1985).* In making this argument, Household points to language in the complaint which states that "[o]nly after an Agreement was signed ... did LINDORA learn that CARE CHARGE was not a subsidiary nor part of HOUSEHOLD." Amended complaint ¶ 9.

The court disagrees. Facially, this language does not compel the court to conclude that Lindora was unreasonably relying on Care Charge's representations. Making all inferences in a light most favorable to Lindora, this does not present adequate grounds for dismissing plaintiff's cause of action. In addition, *Evanston Bank* was not a case concerning the pleading requirements for an apparent agency case; there, motions for summary judgment were before the court. Moreover, according to the court in *Evanston Bank,* it is the duty of the trier of fact to determine whether reliance is unreasonable. *Id.* at 1018 ("Such questions of reasonableness ... in most cases must go to triers of fact"). Consequently, this argument must fail.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Next, Household argues that Lindora does not state a claim since plaintiff did not use reasonable diligence to determine the scope of Care Charge's authority. In support of this argument, Household cites *Malcak v. Westchester Park Dist.*, 754 F.2d 239, 245 (7th Cir.1985). The court disagrees. Again, Household cites inapposite case law. The issue on appeal in *Malcak* was whether the district court erred in denying a defendant's motion for directed verdict. The pleading requirements for an apparent agency case were not at issue. Moreover, questions of reasonableness are properly questions for the trier of fact. *See Evanston Bank*, 623 F.Supp. at 1018.

*5 Household maintains that the court already considered Lindora's apparent agency argument when ruling to dismiss Lindora's original complaint. Household argues that in dismissing Lindora's original complaint in 1992, the court rejected the apparent agency theory that Lindora is advancing now in its proposed amended complaint.

The court disagrees. True, the court previously rejected Lindora's apparent agency argument on the ground that apparent agency must be based upon the words and acts of the principal, not on the words of the agent himself. However, Lindora now alleges conduct on the part of Household in its proposed amended complaint. Obviously, the court did not rule on the legal sufficiency of these new factual allegations in its earlier decision. Again, in this argument, Household simply does not address the facts that Lindora alleges in its proposed amended complaint. Therefore, this argument fails as well.

Nonetheless, Lindora's pleadings are inadequate. Lindora claims that Care Charge was the apparent agent of Household when Care Charge signed the contract of November 23, 1990. Therefore, according to Lindora, Care Charge bound Household to this contract. In order to state a claim under this theory, Lindora must allege that Household's written or spoken words or conduct led Lindora to believe that Household consented to Care Charge's signing the contract on Household's behalf. *See Emmennegger Const. Co., Inc. v. King*, 103 Ill.App.3d 423, 428, 431 N.E.2d 738, 743 (1982). Moreover, to prevail in an apparent agency action, the party dealing with the agent must prove that the facts giving color to the agency were known to him when he dealt with the agent. If he has no knowledge

of such facts, he does not act in reliance upon them and is in no position to claim anything on account of them. *Karetzkis v. Cosmopolitan Nat'l Bank*, 37 Ill.App.2d 484, 489-90 (1962); *Alton Mfg. Co. v. Biblical Institute*, 243 Ill. 298, 311 (1909).

In *Alton*, for example, an individual borrowed money and issued promissory notes on behalf of the Garrett Biblical Institute to the lender. In determining that the borrower was not the apparent agent of the Biblical Institute, the court focused on the acts of the Biblical Institute known to the lender at the time the notes were issued.

Analogously, in this case, Lindora must allege that at the time Care Charge signed the contract, Household held out Care Charge as possessing the power to bind Household in contract. After all, Lindora must have relied upon Household's words or conduct before signing the agreement with Care Charge; otherwise, Lindora is in no position to claim that Care Charge was acting as Household's apparent agent.

However, Lindora does not allege any conduct on the part of Household when Care Charge signed the contract. Lindora alleges that after the contract was already signed, Household approved patients for credit, provided Lindora with approval codes for credit services, and billed patients. This alleged conduct is insufficient to support a claim under apparent agency. Such actions followed the signing of the contract. Consequently, Lindora cannot claim to have acted in reliance upon such conduct in signing the agreement with Care Charge. As a result, Lindora's breach of contract-apparent agency claim has not stated a valid theory of liability and cannot withstand a motion to dismiss. Therefore, Lindora cannot be granted leave to file this breach of contract claim on a theory of apparent agency.

C. Equitable Estoppel

*6 Household argues that Lindora has not stated a claim for equitable estoppel in its proposed amended complaint (Count X). Estoppel to deny the existence of an agency relationship requires allegations that the principal held out another as his agent. The principal's conduct must be such that an ordinarily prudent person would have "considered [the conduct] as consistent only with the fact that the designated party was an agent." *Salisbury v. Chapman Realty,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

124 Ill.App.3d 1057, 1062, 465 N.E.2d 127, 131-32 (1984). Further, the conduct must have been calculated to mislead. Therefore, to state a claim, Lindora must allege facts and conduct which show that Household held out Care Charge as an agent under these conditions. *Id.* However, Lindora has not sufficiently alleged that Household held out Care Charge as its apparent agent. Moreover, Lindora's proposed amended complaint alleges that Household approved patients for credit, provided Lindora with approval codes for credit services, and billed patients. There are no allegations that Household calculated to mislead Lindora by such conduct. As a result, the count suffers the same infirmities as the others and Lindora cannot be granted leave to file this claim.

D. Unjust Enrichment

Finally, in the proposed amended complaint, Lindora seeks relief on a theory of unjust enrichment. A claim for relief based on unjust enrichment cannot stand alone as a cause of action. *Bd. of Trustees v. Liberty Group,* 708 F.Supp. 1504, 1507 (N.D.Ill.1989). Because Lindora has not sufficiently alleged substantive wrongdoing, this claim for relief cannot withstand a motion to dismiss. As a result, Lindora's request for leave to file this claim (Count VIII) is denied as well.

IV. CONCLUSION

The court does not grant Lindora Medical Clinic leave to file its proposed amended complaint.

IT IS SO ORDERED.

> FN1. The court notes that Lindora alleges that it entered into an agreement with both Care Charge and Household on November 23, 1990. However, the contract that Lindora refers to and attaches as an exhibit does not indicate that Household is a party to this agreement. Nor does the contract indicate that Household has any relationship to any of the entities signing the agreement. In fact, the word "Household" does not appear anywhere in the document. In such situations, the terms of the contract must prevail over the allegations in the pleading. *Graue Mill Development v. Colonial Bank & Trust Co.,* 927 F.2d 988, 991 (7th Cir.1991).

N.D.Ill.,1993.
Lindora Medical Clinic, Inc. v. Care Charge, Inc.
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.