# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT W. WELSH, d/b/a BIG TEN DEVELOPMENT, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 08 C 1342 |
| THE BIG TEN CONFERENCE, INC. | ) ) | JURY DEMAND |
| Defendants. | ) ) ) | |

**EXHIBIT 1**

## AMENDED COMPLAINT

Plaintiff Robert W. Welsh (d/b/a Big Ten Development) ("Welsh") for his complaint against The Big Ten Conference, Inc. alleges as follows:

## PRELIMINARY STATEMENT

1.      Scholars of the Big Ten institutions of higher learning undoubtedly embrace Johann Kasper Lavater's *Aphorisms on Man,* particularly no. 449: *"Trust not him with your secrets, who, when left alone in your room, turns over your papers."*

Regrettably, the same is not true of the defendants who – in breach of contract have converted, illegally usurped and exploited the Confidential Business Plan and valuable property rights of Welsh leading to what has become the controversial yet profitable **"BIG TEN NETWORK."** This action seeks relief for, *inter alia,* the defendants' fraudulent registration of trademark rights, theft of trade secrets and breach of contract.

## PARTIES/VENUE

2.      Robert W. Welsh is a businessman who has long supported Big Ten athletics. Welsh is a resident of Lake County.

3.      The Big Ten Conference, Inc. is a Delaware Corporation with its principal place of business in Cook County at 1500 West Higgins Road, Park Ridge, Illinois.

4.      Jurisdiction is founded on 15 U.S.C. 1120 and 28 U.S.C. 1331 as to Count I and 28 U.S. C. 1367 as to Counts II and III.  Venue is proper pursuant to 28 U.S.C. 1391.

**ALLEGATIONS PERTINENT TO ALL COUNTS**
**WELSH SUBMITS AND THE CONFERENCE ACCEPTS**
**THE CONFIDENTIAL WELSH BUSINESS PLAN**

5.      Beginning at least as early as the spring of 1997, Welsh undertook the development of a comprehensive business plan to enhance the profitable promulgation of Big Ten athletics. One component of that plan was the implementation of comprehensive television coverage specifically including coverage of typically non-revenue producing women's and men's athletic events coupled with a variety of so-called "talk show" formats and other features. In his Confidential Business Plan, Welsh identified and specified this programming proposal and the related organizational and functional structure with the trademark **"BIG TEN NETWORK."** Welsh initially contemplated that his business plan would be implemented by a stand-alone entity – Big Ten Development.  The details of the Welsh plan are set forth in a Confidential Business Plan, dated May 1998, attached as **Exhibit A**.

6.      The details of Welsh's Confidential **"BIG TEN NETWORK"** were set forth and presented to the Conference as follows:

**BIG TEN NETWORKS (BTN)**

Goals:

- The goal of the Big Ten Networks, a division of BTD, is to profitably develop a satellite/cable television station, - the subject of which will be in depth coverage of sports and culture of the Big Ten conference.

- Independent regional programming has been minimized by the FOX network purchasing and making generic programming of previously all regional sports stations. The Big Ten Network's goal will be to capture satellite and cable viewership making **BTN** the most popular independent regional sports station in America.

- Because of new technology combining programming with merchandising, **BTN** will generate significant revenue by direct over-the-air marketing of items related to the Big Ten conference and individual member universities.

How It Will Work:

- The Vice President of **BTN** will be an individual with experience in operating a satellite or cable television station. He/she will execute the various programming elements of **BTN** in a professional, first class manner. A fun personality will characterize the "tone" of **BTN**. Some combination of Masterpiece Theater, ESPN, and Wild Chicago will define the station personality.

- **BTN** will contact DirecTV and, for little or no cost, get a satellite "location" channel. Supply of programming stations far exceeds programming available to televise.

- To begin with, this 24 hour satellite station will have a daily 8-hour programming run time, relayed three times per day.

- **BTN** will incorporate some programming elements proven successful on other satellite stations but with all subject matter relating to the Big Ten conference and individual member universities: Programming elements will include, but not be limited to:

  - **A&E:** Biographies of notable, famous, infamous, accomplished people who attended, or were employed by a Big Ten university.

  - **History:** In depth episodes on specific areas of history within the Big Ten conference. How universities were started, when they were started, why they were started, what their missions was and is, - are all examples of the direction this programming element will take.

  - **Food:** Specific alumni, faculty, student food recipes and suggestions accompanied with travelogue and history information of episodes presenter ... Example: Sue

3

Paterno's post-game supper recipes and football tailgating with the Indiana basketball team.

- **Classic Sports:** Time slots daily for replay of highlight films of football and basketball, replay of famous Big Ten football and basketball games, etc.

- **QVC:** Live auction of Big Ten new and used "stuff." Everything from golf bags from Big Ten shops to outdated furniture from the chemistry department at Purdue.

  The QVC concept for this network could also be used by member schools to ask slums to donate items for auction, - proceeds of which would go to the member school.

- Live and delay telecast of Big Ten sports championships (non-football and non-basketball.)  See Appendix B and Big Ten Championships Section.

- Coaches Shows, - football, basketball and possibly other coaches shows replayed at certain times for each university… clear scheduling so alums know when their schools coach's show is on.

- "Let's Talk Sports" show debating sports issues in the Big Ten.  This programming may be for times when viewer interest is highest. (September – November and March.)

- Recruiting Shows, - Experts' regular rundown on which Big Ten football and basketball teams are recruiting which kids, player biographies rundowns and ratings on or around signing days, summarize and rate recruiting classes for each Big Ten team.  Recruiting is growing in popularity.  **BTN** will be "the authority" on all Bit Ten recruiting.

- Weekend news update shows, - giving weeklong updates on all sports in the Big Ten with scores, standings in the conference for each sport, and highlights of sports of highest interest.

- News conferences, - every Tuesday following a football game, Joe Paterno holds a press conference to discuss last weeks' game and the upcoming opponent.  This press conference is now "thrown up" on the satellite for any station to pick up.  **BTN** could carry exclusively.  Other schools must also have press conferences as well.  Air in full or highlights.

4

These programming elements will be tested to find maximum viewership. On air talent will be first class. Partnering with a local production studio, this will occur well in advance of the new station beginning so much programming will be "in the tank" ready to run.

Advertising rates will be analyzed carefully to maximize returns initially, but this will take time. See financial projections.

The expensive items here are producing Big Ten championships. Total renting of all technical equipment for one day of sports events is approximately $50,000/day. Each event will have approximately 3 days of production costs. There are 19 championship events to produce. $50,000x3.19=$2,850,000 per year. Almost $3,000,000 in production cost of equipment only for championship events.

The good news could be subscription rates income for **BTN**. There are 3 million living Big Ten alums world-wide. Of al college athletic conferences, the Big Ten has, arguably, the most loyal alums and fans. The future income and equity of **BTN**, - with new merchandising options, could be very high.

7.      Following a preliminary presentation of his Confidential Business Plan to the Big Ten Conference in early 1998 and the Conference having expressly acknowledged the confidential nature of Welsh's plan (*See* Attached **Ex. B**), Big Ten officials invited Welsh to attend the meeting of all Big Ten officials, including the athletic directors of the Big Ten schools on May 18, 1998. As an inducement for Welsh to make the plan available, albeit under strict terms of confidentiality, Welsh was told of the Big Ten's interest in his plan and that the Big Ten was "prepared to continue to move forward with the development of the relationship" subject to appropriate approvals. (*See* Attached **Ex. C).** As a consequence and based on these promises and inducements, Welsh distributed his business plan on a confidential basis and made a comprehensive and detailed presentation including a specific delineation of the **"BIG TEN NETWORK"** plan as a satellite/cable television medium. Welsh, in confidence, disclosed his plan for the various programming, organizational, financial and operational details of the **"BIG TEN NETWORK"** to assembled Big Ten officials. Welsh's meeting with the Conference

5

Officials on May 18, 1998 lasted over an hour and Welsh amplified various aspects of his confidential plan.

8.      After the lapse of a number of weeks, Welsh was advised that, despite the merits and creativity of the Confidential Business Plan and of the **"BIG TEN NETWORK"** proposal, the Big Ten officials did not wish to "cede control" over such matters to an independent entity. Of course, the Conference did not tell Welsh that the Commission had retained Welsh's confidential materials or that the agreement of confidentiality would soon be breached and that the Big Ten would then usurp and convert Welsh's assets.

9.      Several years after the Big Ten advised Welsh it would not "cede control," word came that the Big Ten Conference would partner with others and would soon introduce the **"BIG TEN NETWORK."** Throughout the various announcements of the **"BIG TEN NETWORK"** – both before and after programming hit the air – the Big Ten issued various promotional pieces that resonate as though lifted from the Confidential Business Plan of Welsh. Indeed, Big Ten Commissioner Delany – who praised the "novel and creative" Confidential Business Plan of Welsh – now touts the **"BIG TEN NETWORK"** as No. 2 on his list of "Innovative Accomplishments."

10.     On information and belief, the Big Ten defendants have converted, usurped and exploited Welsh's assets that were presented to and received by the Big Ten Defendants under terms of an agreement of strict confidentiality.

## THE CONFERENCE MIASPPROPRIATES WELSH'S PROPERTY IN BREACH OF AN EXPRESS AGREEMENT OF CONFIDENTIALITY AND IN VIOLATION OF FEDERAL TRADEMARK LAWS

11.     As part and parcel of the Conference's breach of confidence and theft of Welsh's confidential assets, the Conference undertook to wrongfully translate Welsh's property rights into trademark assets of the Conference.

12.     On information and belief and in order to do so, the conference delegated trademark search activities to a 3rd party entity. It took this action without disclosing to such 3rd party that Welsh's detailed and Confidential Business Plan for the **"BIG TEN NETWORK"** formed the basis for the intended acquisition of rights in and to the mark **"BIG TEN NETWORK"**.

13.     Although the Conference had received the **"BIG TEN NETWORK"** proposal in confidence and knew that Welsh was entitled to pursue the use and ownership of the **"BIG TEN NETWORK"** mark, either identically or in near resemblance and as applied to sports television and related matters as specified above, the Conference undertook to unlawfully pursue trademark rights. To this end, and as hereinafter alleged, the Conference filed a trademark application on September 1, 2006 asserting an "intent to use" the **"BIG TEN NETWORK"** mark that was lifted from the Confidential Welsh Business Plan and further falsely asserting that the Conference owned the right to use the mark, all in violation of Federal Trademark Laws as set out below.

<u>COUNT I</u>

**FALSE AND FRAUDULENT REGISTRATION OF
WELSH'S PROPRIETARY BUSINESS NAME AND PLAN
IN VIOLATION OF 15 U.S.C. 1120**

14.    Welsh realleges and adopts by reference the allegations set forth in the foregoing paragraphs 1-13.

15.    As set forth in the foregoing paragraph 13 and after obtaining Welsh's Confidential Business Plan, the Conference wrongfully pursued the registration of the **"BIG TEN NETWORK"** name and plan developed by Welch in the United States Patent and Trademark Office as exemplified by the following:

    78966000    BIG TEN NETWORK[1]

Other marks included:

    78971639    BIG TEN NETWORK
    78971650    BIG TEN NETWORK
    78971645    BIG TEN NETWORK
    78971648    BIG TEN NETWORK
    78971647    BIG TEN NETWORK
    78971636    BIG TEN NETWORK

16.    In wrongfully pursuing each of the above identified trademark applications the Big Ten Conference falsely and fraudulently asserted:

> The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; he/she believes the applicant to be the owner of the trademark/service mark sought to be registered, or, **if the application is being filed under 15 U.S.C. Section 1051(b),**

---

[1] The identification of the goods and services in this Section 1051(b) application appear to have been virtually copied from Welsh's Confidential Business plan *e.g.* "Entertainment services, namely, production and distribution of television programs, etc. *See* attached **Exhibit D.**

**he/she believes applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce**, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; **and that all statements made of his/her own knowledge are true**; and that all statements made on information and belief are believed to be true. . . *See* (**Exhibit D**) (emphasis added).

17.    Section 1120 of Title 15 of the United States Code provides as follows:

> Any person who shall procure registration in the patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

18.    At the time that the Conference filed and prosecuted the aforementioned registrations before the United States Patent and Trademark office and asserted an "intent to use," the Conference knew that all right, title and interest in and to the **"BIG TEN NETWORK"** name and plan belonged to Welsh and that they gained access to these valuable assets through a confidential relationship.

19.    At the time that the Conference received and gained knowledge of the **"BIG TEN NETWORK"** name and plan of Welsh, these defendants had expressly undertaken and agreed that Welsh's submission and disclosure of the "novel and creative" concepts, plans and programs (including the **"BIG TEN NETWORK"** name and plan) as embodied in the Confidential Business Plan were to be "held in strict confidence and in trust for the sole and exclusive benefit of Robert Welsh."

20.    After falsely asserting to Welsh that the Big Ten Conference had no interest in any aspect of Welsh's Confidential Business Plan and after falsely asserting that all of Welsh's confidential materials had been returned to Welsh, the Big Ten Conference converted the **"BIG TEN NETWORK"** name and plan and then undertook to falsely and fraudulently procure

9

trademark protection in willful violation of §1120 of Title 15. Thus, the Big Ten Conference

knew at the time of its sworn statements that it had agreed to keep confidential Welsh's detailed

proposal for the **"BIG TEN NETWORK."**

21.    The Big Ten Conference's sworn statements to the United States Patent and

Trademark Office were fraudulent because:

a.  The **"BIG TEN NETWORK"** name and plan constituted proprietary trade secrets and confidential information owned by Welch;

b.  Welsh's legal rights in the **"BIG TEN NETWORK"** name and plan were superior to any alleged Conference rights at the time the Big Ten Conference signed the sworn statements;

c.  When it signed the sworn statements, the Big Ten Conference had actual knowledge that the **"BIG TEN NETWORK"** name and plan constituted trade secrets and confidential information owned by Welch, and that Welsh had legal rights in the mark  that were superior to those alleged by the Big Ten Conference;

d.  In intentional contravention of its actual knowledge of the above facts, the Big Ten Conference falsely represented and swore to the Patent Office that it "believe[d itself] to be entitled to use such mark in commerce; [and] to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce . . . and that all statements made of his/her own knowledge are true";

e.  The Big Ten Conference made these false representations with the wrongful intent that the United States Patent and Trademark Office would rely on them and therefore wrongfully grant the Big Ten Conference trademark rights to which the Big Ten Conference is not entitled, such wrongful intent being evidenced, among other things, by (i) the Big Ten Conference's actual knowledge that the **"BIG TEN NETWORK"** name and plan constituted trade secrets and confidential information owned by Welch and that Welsh therefore had legal rights in such name and plan superior to any rights claimed by the Big Ten Conference, and (ii) the fact that the Big Ten Conference expressly and knowingly made its false statements under penalty of perjury;

f.  The United States Patent and Trademark Office reasonably relied on the Big Ten Conference's misrepresentations, such reasonableness being evidenced, among other things, by the fact that the Big Ten Conference made these misrepresentations under penalty of perjury; and

10

    g.   Welch is proximately, directly and grievously damaged by the U.S. Patent and Trademark Office's reasonable reliance on the Big Ten Conference's intentional misrepresentations.

22.     As a direct and proximate result of the intentional tortious conduct of the Big Ten Conference and the wrongful acquisition of false and fraudulent trademark rights by the Big Ten Conference, Welsh has been prevented from using or seeking to register his proprietary name for his confidential business plans, and Welsh has suffered severe economic losses including the loss of the many millions of dollars of revenue that the Big Ten Conference has wrongfully obtained.

**WHEREFORE,** Welsh respectfully requests the following relief:

    A.    That this Court order the defendants to account for all proceeds and profits flowing from the misappropriation, conversion and false and fraudulent registration of Welsh's trademark assets and valuable property rights;

    B.    That this Court impose a constructive trust for Welsh's benefit on all proceeds and profits improperly retained by the defendants and that the Court order all such proceeds and profits be transferred and conveyed to Welsh;

    C.    That this Court order that the defendants assign and transfer to Welsh all right, title and interest in and to any valid property rights which the defendants have acquired as a result of their wrongful and illegal conduct pursuant to 15 U.S.C. 1119; and

    D.    That this Court award Welsh attorneys fees and such other relief as may be appropriate including injunctive relief as may be appropriate.

## COUNT II – VIOLATION OF THE ILLINOIS TRADE SECRETS ACT

23.     Welsh realleges and adopts by reference the allegations set forth in the foregoing paragraphs 1-13.

24.    The Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* prohibits any person from utilizing the trade secrets of another for that person's commercial advantage. That Act defines "trade secrets" to include:

> (d)    information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data or list of actual or potential customers or suppliers that:
>
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
>
> (2)  is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

25.    The Big Ten defendants acknowledged, agreed and understood that the Welsh Business Plan and the novel and creative proposals embodied in that Plan were the confidential property rights and trade secrets of Welsh. Indeed, the information that the Big Ten defendants have exploited for their own use constitutes "trade secrets" under the Act because Welsh's Confidential Business Plan contains programs and methods that were sufficiently secret to derive economic value and were the subject of efforts to maintain the Plan's secrecy. More specifically and as set forth in detail in the foregoing paragraph 6, the Welsh Confidential Business Plan (**Exhibit A)** specified programming, advertising and promotional concepts, business strategies and a financial structure for the "**BIG TEN NETWORK**" along with proposals for affiliation. The Welsh Confidential Business Plan also specified the structure of an internet program to be implemented in conjunction with the "**BIG TEN NETWORK**".

26.    Welsh has never consented nor agreed that the confidential property rights and trade secrets embodied in the Confidential Business Plan and as specified in paragraphs 6 and 25 could be exploited and converted by the Big Ten Defendants. Nonetheless, these defendants

12

have so unlawfully usurped, converted and exploited.  Welsh's Confidential Business Plan and have misappropriated Welsh's confidential property rights and trade secrets.

27.     Such unlawful misappropriation has caused and continues to cause Welsh substantial damages while the Big Ten defendants (and those acting in concert with those defendants) profit to the tune of many millions of dollars.

**WHEREFORE**, Welsh respectfully requests the following relief:

A.     That this Court award Welsh all monetary damages including costs, expenses and attorneys' fees incurred in connection with this action;

B.     That this Court award punitive damages to full extent permitted by law as a result of the defendants' willful and malicious conduct and

C.     That this Court award all other appropriate relief.

## COUNT III – BREACH OF CONTRACT

28.     Welsh realleges and adopts by reference the allegations set forth in the foregoing paragraphs 1-13, 25 and 26.

29.     In 1998, The Big Ten Conference knew that Welsh presented his Confidential Business Plan anticipating the development of, among other programs, the **"BIG TEN NETWORK."**  Indeed, Welsh offered to disclose the Welsh Confidential Business Plan and all its details on the specific condition his Plan would remain confidential.  The Big Ten Conference accepted Welsh's offer and expressly acknowledged the confidential nature of the Welsh Business Plan. (**Exhibit B**).  Thus, there can be no dispute that there was a meeting of the minds regarding the confidentiality of Welsh's work.

13

30.     In acknowledging the confidentiality of the Welsh Confidential Business Plan as well as the "novel and creative" concepts embodied in the Plan, the Conference – with the advice and guidance of counsel – induced Welsh to submit and elaborate the Plan's specific features. Welsh relied on the Big Ten Conference's promise that the Business Plan would remain confidential.

31.     The Big Ten's inducements included The Big Ten Conference's continued interest in exploring the development of the relationship between the Conference and Welsh and the further implementation of the business plan with Welsh.

32.     The Confidential Business Plan included detailed and specific proposals that were specifically acknowledged to be confidential and were to be treated and maintained as Confidential by The Big Ten Conference as well as by the athletic directors of the Big Ten Universities in attendance at the May meeting.

33.     Subsequent to the Welsh submission, and as discovery will reveal and confirm, The Big Ten Conference has undertaken to disclose, use, exploit and profit from the novel and creative proposals presented to these defendants in confidence as herein alleged.  By such disclosure and exploitation of Welsh's Business Plan, the Big Ten Conference breached its contract to maintain the confidentiality of Welsh's detailed work and proposals.

34.     Welsh has never consented to such use, conversion and exploitation of Welsh's "novel and creative" business plans by the Big Ten defendants and/or by those yet unnamed parties acting in concert with the Big Ten defendants.

35.     Welsh has never been compensated for the disclosure, usurpation and conversion of the Confidential Business Plan nor has Welsh received any compensation or remuneration as a

14

result of the promotion and implementation of Welsh's novel and creative plan for the **"BIG TEN NETWORK."**

36.    Such disclosure, usurpation, conversion and exploitation of the Welsh Confidential Business Plan constitute a breach of contract that has caused and continues to cause Welsh substantial damages.

**WHEREFORE**, Welsh respectfully requests the following relief:

A.    That this Court award Welsh all monetary damages including costs, expenses and attorneys' fees incurred in connection with this action; and

B.    That this Court award all other appropriate relief.

PLAINTIFF DEMANDS TRIAL BY JURY.

Dated:  April 14, 2008

**ROBERT W. WELSH,**
**d/b/a BIG TEN DEVELOPMENT**


By:    /s/ Robert P. Cummins
       One of His Attorneys

Robert P. Cummins
Thomas C. Cronin
Cummins & Cronin LLC
77 West Wacker Drive, Suite 4800
Chicago, Illinois  60601
T:  (312)578-0500
F:  (312)578-1234