# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT W. WELSH d/b/a BIG TEN DEVENLOPMENT,<br><br>Plaintiff,<br><br>v.<br><br>BIG TEN CONFERENCE, INC., and BIG TEN NETWORK SERVICES, L.L.C.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)   Case No. 08 C 1342<br>)<br>)   Judge Joan B. Gottschall<br>)   Magistrate Judge Susan E. Cox<br>)<br>)<br>)<br>) |

## DEFENDANT BIG TEN CONFERENCE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS AND REQUEST FOR ATTORNEYS' FEES PURSUANT TO 15 U.S.C. § 1117

Andrew S. Rosenman
Richard M. Assmus
Emily M. Emerson
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
(312) 782-0600 – Phone
(312) 701-7711 – Facsimile

*Attorneys for Defendant Big Ten Conference, Inc.*

5201818

The Big Ten Network is a 24-hour national cable and satellite TV network focusing on sports-related programming of member institutions of The Big Ten Conference, Inc. ("the Conference"). The Big Ten Network began its telecasts in late August, 2007.

Plaintiff Robert Welsh ("Welsh") filed this specious lawsuit against the Conference based on the fiction that a proposed business plan that Welsh submitted to the Conference in early 1998 — which the Conference rejected — gives him eternal federal rights in the "Big Ten Network" name. The absurdity of Welsh's claim is palpable from the fact that he claims ownership rights in a name incorporating "Big Ten," in which the Conference, not Welsh, long has held registered trademarks and has used in commerce for decades in connection with intercollegiate athletics.

In 2006, eight years after rejecting Welsh's proposed plan, the Conference filed intent-to-use applications for the "Big Ten Network" mark at the U.S. Patent & Trademark Office ("PTO"). The PTO examined the application, published the marks for possible opposition, and then, having received no oppositions, granted the Conference Notices of Allowance. Millions of dollars have been spent to develop and promote the Big Ten Network and the Conference has continuously used the trademark in commerce since the network launched in August, 2007.

Now, after sitting idly by since 1998 without doing anything to protect his alleged rights, Welsh filed this lawsuit, claiming that the Conference violated the Lanham Act by fraudulently procuring its trademarks. The Complaint is noteworthy, however, for what it does not allege:

- Welsh does not allege that he ever made any commercial use of "Big Ten Network" or, for that matter, any other components of his proposed business plan, at any time in the past decade.
- Welsh does not allege that he either applied at the PTO to register "Big Ten Network" or any other marks contained in his proposed business plan, or that he received any registered marks.
- Welsh does not allege that he opposed any of the Conference's applications at the PTO.
- Welsh does not allege that, since 1998, he ever has tried to implement his proposed business plan.

As discussed below, Welsh's Complaint contains other glaring factual omissions regarding even the most basic, indisputable background facts set forth in his Complaint.

Welsh's Lanham Act claim is frivolous as a matter of law. Moreover, this is a textbook example of an "exceptional case" under the Lanham Act in which the Court should order Welsh

1

to pay the Conference its attorneys' fees. Welsh's other counts (state law claims for conversion or misappropriation of trademarks, unjust enrichment, misappropriation of trade secrets and breach of implied contract) are equally baseless. Thus, a Rule 12(b)(6) dismissal is warranted.

## SUMMARY OF ALLEGATIONS AND RELATED FACTS

According to the Complaint, Welsh made an initial presentation of his business plan to the Conference "in early 1998." Complaint, ¶7. He alleges that the Conference subsequently acknowledged the confidential nature of his proposed plan and invited Welsh to attend a meeting of Big Ten athletic directors. *Id.* Specifically, Welsh claims that the Conference told him that it was "'prepared to continue to move forward with the development of the relationship' subject to appropriate approvals." *Id.* ¶7. Without saying so, Welsh plucks that quote from an April 23, 1998 letter he received from Jim Delany, Commissioner of the Conference. *See* Exhibit 1.[1]

Welsh avers that as a consequence of the Conference's "promises and inducements," he distributed and made a detailed presentation about his proposed business plan at a meeting with Big Ten representatives and Athletic Directors on May 18, 1998. Complaint, ¶7. The Complaint notes, however, that the Conference rejected Welsh's plan "a number of weeks" later. *Id.* ¶8.

The Complaint is totally silent as to Welsh's actions in the ensuing 10 years. There also is not a single specific allegation in the Complaint that, during that entire decade, the Conference ever disclosed, discussed or did anything with Welsh's business plan. Welsh merely alleges that "several years" after the Conference rejected his plan, the Conference announced (in 2006) that it soon would introduce the Big Ten Network, which Welsh claims — again, without alleging any specific details at all — the Conference "lifted" from his proposed plan. *Id.* ¶9.

The Conference recognizes, of course, that, under Rule 12(b)(6), all well-pleaded factual

---

[1]   Exhibits 1 and 2 should be considered by this Court because the Complaint quotes or cites them implicitly, and "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006) (citation omitted). In *Magellan Int'l Corp. v. Salzgitter Handel GmbH*, 76 F. Supp. 2d 919, 922 (N.D. Ill. 1999), the court considered exhibits to a motion to dismiss because the complaint referred expressly or implicitly to them and the exhibits were central to the plaintiff's claims:

> When parties engage in a chain of correspondence relating to a transaction within a short period of time, and then one party detaches and presents only certain links of the chain in its efforts to state a claim for relief, the party against whom such an incomplete picture is painted is entitled to fill in the skeletal outline thus presented by the complaining party by adding the missing links.

*Id.* at 923. While the court recognized that it had to look at the transaction through a lens most favorable to the plaintiff, it could not do so by examining "only half of that picture in that light." *Id.* Welsh may not cite tidbits of Delany's letters while ignoring portions of the same letters that undermine his claims.

allegations in the Complaint must be accepted as true for purposes of this motion. However, Welsh's incomplete portrait of the most basic underlying facts need not be ignored by this Court.[2] For example, Welsh ignores key portions of the Delany letter from which he quotes. The same letter states: "this is a letter of interest only and is subject to the Conference's satisfaction with the development of the proposed venture, the approvals of the board, various committees and groups of the Conference, and the negotiation and execution of definitive agreements. Consequently, this letter does not constitute a binding obligation for either of us." Exhibit 1 (emphasis added). The Complaint also erroneously alleges (¶22) that the Conference "acknowledged, agreed and understood" that his 1998 proposed plan contained "confidential property rights and trade secrets of Welsh." This allegation implicitly refers to another letter from Delany, which also is dated April 23, 1998. Here too, Welsh's allegations are incomplete and misleading. Delany's second letter acknowledged the confidentiality of Welsh's plan, but stated that "many of the concepts set forth in the Business Plan have been considered from time to time by the Conference and other entities that have contacted the Conference. Accordingly, we cannot agree that such concepts are your proprietary property." Exhibit 2 (emphasis added).

As shown below, even if the Court construes all of the allegations in the Complaint in favor of Welsh, the Complaint still fails to state a claim under Rule 12(b)(6).

## ARGUMENT

When presented with a Rule 12(b)(6) motion, a court need not "strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint." *Coates v. Ill. State Bd. of Ed.*, 559 F.2d 445, 447 (7th Cir. 1977). Nor is the Court required to accept legal conclusions either alleged or inferred from pleaded facts. *Nelson v. Monroe Reg. Med. Ctr.*, 925 F.2d 1555, 1559 (7th Cir. 1991). The complaint must allege facts bearing on all material elements necessary to sustain a recovery under a viable legal theory. *Looper Maint. Serv., Inc. v. City of Indianapolis*, 197 F.3d 908, 911 (7th Cir. 1999).

This case should be dismissed pursuant to Rule 12(b)(6) because Welsh's Lanham Act claim (Count V) is frivolous, and that Count forms the only basis for federal jurisdiction. *See* Complaint, ¶5. Every other Count of Welsh's Complaint also fails to state a viable claim.

---

[2] This Court has stressed that on a Rule 12(b)(6) motion, a court is not "required to ignore facts set forth in a complaint or exhibits that undermine a plaintiff's claim." *Adusumilli v. Discover Fin. Servs., Inc.*, No. 98 C 6129, 1999 WL 286289, at *2 (N.D. Ill. Apr. 19, 1999) (Gottschall, J.). Copies of unpublished cases that are available on Westlaw and cited herein are attached as Exhibit 9.

3

I. **FEDERAL JURISDICTION IS LACKING BECAUSE WELSH FAILS TO STATE A CLAIM UNDER SECTION 38 OF THE LANHAM ACT.**

Count V of Welsh's Complaint purports to state a claim for damages under Section 38 of the Lanham Act, which is codified at 15 U.S.C. § 1120. Section 38 states, in its entirety:

> Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

15 U.S.C. § 1120. Allegations of fraudulent procurement "must be pled with particularity" pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *Publications Int'l, Ltd. v. Leapfrog Enter., Inc.*, No. 01 C 3876, 2002 WL 31426651, at *3 (N.D. Ill. Oct. 29, 2002).

The elements of a Section 38 claim are: (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance. *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 874 (10th Cir. 1995) (citation omitted). "The heightened pleading requirements apply to each element of the fraud claim." *GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234, 243 (S.D.N.Y. 2000) (granting Rule 12(b)(6) dismissal of Section 38 claim). "Fraud must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages [under Section 38]. Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the trademark." *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982) (citations omitted). Courts analyzing Section 38 claims also have stressed that "[t]here is no room for speculation, inference or surmise, and obviously, any doubt must be resolved against the charging party." *Stanfield*, 52 F.3d at 874 (citations omitted). Thus, claims for fraud in the oath usually fail. "Fraud in the oath is a popular but seldom successful claim against the registration of a trademark." *Zip Dee, Inc. v. Dometic Corp.*, 900 F. Supp. 1004, 1015 (N.D. Ill. 1995).

The way in which trademark rights accrue also is critical to the analysis of Welsh's claim.

A. **Trademark rights arise only through actual, commercial use, which Welsh conspicuously has not alleged in his Complaint.**

For at least 90 years, trademark law has been clear that "the right to a particular mark grows out of its use, not its mere adoption." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918). Significantly, the Seventh Circuit has held that a mere proposal to use a

4

mark is irrelevant. "Intent to use a mark, like a naked registration, establishes no rights at all," and "an unregistered *plan* to use a mark creates no rights." *Zazu Designs v. L'Oréal, S.A.*, 979 F.2d 499, 504 (7th Cir. 1992) (italics in original). "Use is neither a glitch in the Lanham Act nor a historical relic. By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly." *Id.* at 503. The requirement of actual, commercial use of a mark is the product of sound policy considerations. Otherwise, "[b]usinesses that knew of an intended use would not be entitled to the mark even if they made the first significant use of it." *Id.* at 504.

This Court often has cited the commercial use requirement. In *DSMR, LLC v. Goldberg*, No. 02 C 5203, 2004 WL 609281 (N.D. Ill. Mar. 25, 2004) (Gottschall, J.), this Court explained that "an entity acquires rights in a trademark only through actual commercial usage." *Id.* at *4. In that case, the plaintiffs were the only company to use the challenged mark in commerce, had used the mark continuously for three years, sold over $500,000 of goods using that mark, and consumers had come to associate the mark with plaintiffs' products. While the defendant claimed that it owned the right to use the mark, this Court stressed that "the flaws in defendant's argument are many, beginning with the fact that 'an intent to use a mark creates no rights a competitor is bound to respect.'" *Id.* at *5 (quoting *Zazu Designs*, 979 F.2d at 504).

In *S Indus., Inc. v. Ecolab Inc.*, No. 96 C 4140, 1999 WL 162785 (Mar. 16, 1999) (Gottschall, J.), this Court noted that a party which has not registered a mark may establish its rights by showing its "use in commerce" of that mark, but "[t]he Lanham Act provides that 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. Commercial utilization must be both bona fide and continuous, not just 'de minimis sales, a few shipments, or pre-marketing tactics that attempt to 'reserve' the mark." *Id.* at *3 (citations omitted). *See also* 15 U.S.C. § 1127 (defining "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark").

Welsh's Complaint is devoid of any allegation that he made any commercial use of the "Big Ten Network" mark at any time, let alone in the entire decade between 1998 and 2008. The absence of any such allegation defeats his assertion of any <u>trademark</u> right.

**B.     <u>An ownership claim based on Section 38 requires actual commercial use.</u>**

Welsh cannot circumvent the Lanham Act's long-settled commercial use requirement by

5

masking his claim under Section 38. Indeed, a similar "end run" was rejected in *Carmichael v. Prime*, No. 02-0379, 2003 WL 1903355 (S.D. Ind. Jan. 6, 2003). There, the plaintiffs had conceived the idea of "Stardust" perfume and entered a contract with defendants in which they agreed to act as the plaintiffs' agents in developing the perfume. Despite making assurances to the plaintiffs that they would register the mark using the plaintiffs' name, the defendants instead applied to the PTO for the "Stardust" mark in the name of their company. Even though the defendants later informed the plaintiffs that they would substitute the plaintiffs' names on the PTO application, they never did so. The parties eventually severed their relationship. Several years later, the defendants: (1) re-applied to the PTO for a trademark (again in the name only of their company), and (2) developed and marketed Stardust perfume. The plaintiffs did neither.

Instead, the plaintiffs filed suit under Section 38, alleging that defendants' applications to the PTO failed to identify the plaintiffs as the true owners of the Stardust mark. The court, however, dismissed that claim pursuant to Rule 12(b)(6). The court initially stressed: "Demonstrating the falsity of Defendants' oath thus depends on the possibility of establishing Plaintiffs' own right to the mark." *Id.* at *3. The plaintiffs raised two arguments to support their claim of ownership: (1) their origination of the idea, and (2) an implied or express contract in which defendants would act as their agents. The court rejected both arguments:

> 'Trademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark.' . . . Therefore, the first of plaintiffs' theories fails. <u>The fact that [plaintiff Shea] hatched the original idea for marketing a perfume under the STARDUST name simply does not give her any rights to the trademark; only by actual usage—which Plaintiffs do not allege—do such rights accrue.</u>

*Id.* at *4 (emphasis added and citation omitted). In rejecting the plaintiffs' second assertion of ownership, the court noted that breach of contract might offer a remedy for the plaintiffs, but "it is a different matter to claim that title to the trademark in fact passed to the Plaintiffs, which can only occur by either use of the mark in commerce or purchase of a pre-existing business which employs that mark." *Id.* The court granted the defendants' Rule 12(b)(6) motion because "there is no possible set of facts that Plaintiff could establish consistent with the allegations that would demonstrate the falsity of [defendants'] oath to the PTO. This inability is fatal to Plaintiffs' claim of fraudulent procurement of a federal trademark." *Id.* at *5.

*Carmichael* provides powerful support for the dismissal of Welsh's Section 38 claim. Welsh claims the Conference lied to the PTO about his so-called "ownership" of the Big Ten

Network name, but fails to allege that he ever used that mark. Indeed, his only "use" was in one proposed business plan way back in 1998. Thus, Welsh cannot state a claim under Section 38.[3]

### C.   A business plan for a television network is not protectable as a "trademark."

A decision from the Fifth Circuit cements the conclusion that no trademark rights arise out of a mere business plan for a television network. *See Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921 (S.D. Tex. 2004), *aff'd*, 2005 WL 627973 (5th Cir. Mar. 17, 2005). The plaintiff in *Keane*, like Welsh, did not allege that he registered or made commercial use of any trademarks, but nonetheless asserted various statutory and common law trademark theories related to his business plan for the "American Idol" television show. However, the district court dismissed the case under Rule 12(b)(6). "This action is derailed by two fundamental, fallacious premises. First, [plaintiff] presupposes that his 'American Idol' concept or idea can be protected by trademark law. However, trademarks are devices intended to identify fully developed products and services, not ideas for products or services." *Id.* at 933. The district court emphasized that "an idea for a television show is neither a product nor a service within the purview of trademark law." *Keane*, 297 F. Supp. 2d at 933 (emphasis added). The court added:

> The second erroneous premise is [plaintiff's] allegation that being the first in time to use the 'American Idol' mark in relation to some kind of commercial activity is sufficient to give him exclusive rights to use the 'American Idol' mark. Mere invention, creation or discussion of a trademark does not create priority rights.

*Id.* at 934 (emphasis added). Later, the court reiterated that "[f]ederal trademark law is not concerned with 'invention or discovery' of ideas, and the [Supreme] Court explicitly cautions against extending trademark law in that manner." 297 F. Supp. 2d at 935 (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003)).

The plaintiff appealed the district court's Rule 12(b)(6) dismissal of his complaint, but the Fifth Circuit affirmed the decision in its entirety.

Because we affirm the district court's dismissal of [plaintiff's] claims on 12(b)(6)

---

[3] Other courts similarly have rejected Section 38 claims where, as here, a party failed in the first instance to establish any protectable trademark rights under the Lanham Act. *See, e.g., Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 985, 990 (8th Cir. 1993) (counter-plaintiff failed to show damages "in consequence of" a fraudulent registration under Section 38 because it "failed to prove a cognizable Lanham Act injury"); *Hampshire Paper Corp. v. Highland Supply Corp.*, No. 02-32, 2002 WL 31114120, at **3-5 (D.N.H. Sept. 23, 2002) (absence of actual trademark infringement meant plaintiff lacked standing to pursue a Section 38 violation); *Jackson v. Lynley Designs, Inc.*, 729 F. Supp. 498, 501 (E.D. La. 1990) (rejecting Section 38 claim where plaintiff, as a threshold matter, had "not established a reasonably protectable interest under the Act").

7

grounds for the reasons stated in the district court's opinion, it is unnecessary for us to engage in a detailed analysis of the various legal issues. Fundamentally, we agree with the district court that [plaintiff's] trademark action is 'derailed by two fundamental, fallacious premises,' *Keane*, 297 F. Supp. 2d at 933: namely, that his rights in an unregistered concept or idea are protectable and that being the first in time to use the phrase 'American Idol' entitles him to trademark protection. <u>Trademarks only protect fully developed products, not ideas for the products. Also, unregistered trademark rights must be appropriated through use, that is, through some commercial activity and [plaintiff] asserted no such commercial activity sufficient to appropriate such rights.</u>

*Keane v. Fox Television Stations*, 129 Fed. Appx. 874, 876, 2005 WL 627973, at *1 (5th Cir. Mar. 17, 2005) (emphasis added).

*Keane* hardly stands alone. There are many cases where courts held that no trademark rights exist in connection with plans for television networks or shows. *See, e.g., Kienzle v. Capital Cities/ABC, Inc.*, 774 F. Supp. 432, 438 (E.D. Mich. 1991) (rejecting trademark claim; plaintiff "<u>has not cited a single case to support his contention that the Lanham Act encompasses a claim that involves only the copying of an idea for a television series</u>") (emphasis added); *Murray v. Nat'l Broadcasting Co., Inc.*, 671 F. Supp. 236, 241 (S.D.N.Y. 1987) (rejecting Lanham Act and common law claims arising out of confidential plan for television sitcom because plaintiff's plan merely combined two ideas which had been circulating in the industry for a number of years), *aff'd*, 844 F.2d 988 (2d Cir. 1988).

These authorities also compel the dismissal of Welsh's Section 38 claim. In addition, as explained in Section D. below, Welsh's entire trademark theory is illogical because he seeks to concoct a "right" from the <u>Conference's</u> long-registered trademarks and decades-long commercial use of the "Big Ten" name in connection with intercollegiate athletics.

### D. <u>The Conference has long-established trademark rights in "Big Ten," and the term "network" is, by itself, not protectable for television network services.</u>

As another federal court has noted, the Conference has been using the "Big Ten" mark since 1917 in connection with intercollegiate athletics and has held federal trademark registrations since 1988. *Big Ten Conference, Inc. v. Big Ten Worldwide Concert & Sport Club at Town Ctr., Ltd.*, No. 96-CV-70617, (E.D. Mich. Oct. 10, 2000) (copy attached as Exhibit 3), slip op. at 6. The Conference has sought and obtained numerous federal trademark registrations for "Big Ten" marks. *Id.* at 5-6. They include "Big Ten", U.S. Reg. No. 1969353, registered on April 23, 1996, for, *inter alia*, "entertainment services, namely sponsoring and coordinating the

8

presentation of athletic events and contests," and "Big Ten Conference" (and design), U.S. Reg. No. 1782645, registered on July 20, 1993, for, *inter alia*, "entertainment services; namely, sponsoring and coordinating the presentation of athletic events and contests, and educational services." *See* Exhibits 4 and 5.[4] These federal registrations remain in full force and effect and are now incontestable under 15 U.S.C. § 1065.

In *Big Ten Conference, Inc.*, *supra*, the court found that "the 'Big Ten' mark is strong" (*see* Exhibit 3, at 16), and noted that the Conference used the mark in many ways, including television programming. "Big Ten promotes the interests of its member schools and their athletic events by overseeing its corporate partner program and its licensing operation, including the televising of Big Ten members' sporting events." *Id.* at 17. The court held that the defendant infringed the Conference's trademark by using "Big Ten" in ticket sales, *id.* at 20, and that the "Big Ten" mark "has developed overwhelmingly secondary meaning and is inherently distinctive. The 'Big Ten' mark enjoys widespread recognition identified with the Big Ten Conference member schools and this recognition is of long duration." *Id.* at 21.

Here, the Conference filed an intent-to-use trademark application on September 1, 2006, for "Big Ten Network" for, *inter alia*, "television transmission services" and "entertainment services, namely, production and distribution of television programs." Exhibit 6.[5] On April 23, 2007, the application was published in the PTO's Official Gazette to allow oppositions to be filed by any party claiming it would be damaged by registration of the mark. Exhibit 7. No such oppositions were filed, and the PTO issued a Notice of Allowance on July 17, 2007. Exhibit 8.

The term "network" is descriptive of the listed services, so the Conference's trademark application disclaimed any exclusive rights in "network" apart from the mark as a whole. Exhibit 6. Indeed, the Lanham Act specifically prohibits the registration of descriptive terms:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of

---

[4] This Court should consider Exhibits 4 through 8 of this motion because trademark filings "are public records subject to judicial notice on a motion to dismiss." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). *See also Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 192 n.4 (8th Cir. 1982) ("this court may take judicial notice of Patent and Trademark documents"). Moreover, the Seventh Circuit allows courts to take judicial notice of matters of public record without converting a motion to dismiss into a summary judgment motion. *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).

[5] This application was one of several the Conference filed in 2006. The Conference also filed other applications for "Big Ten Network" for related goods and services as well as for the logo of the Big Ten Network. The PTO published each application for opposition and later issued multiple Notices of Allowance after none of the Conference's applications was opposed. *See* Exhibit 8.

9

its nature unless it . . . (e) consists of a mark that (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them.

15 U.S.C. § 1052(e)(1). Descriptive terms usually are not protectable because they are a "poor means of distinguishing one source of services from another and because they are often necessary to the description of the goods or services of a similar nature." *Sullivan v. CBS Corp.*, 385 F.3d 772, 776 (7th Cir. 2004) (citation omitted). Thus, "network" is not, by itself, entitled to protection.

Welsh claims trademark rights in Big Ten Network, a name that he never registered or used commercially, and that would plainly infringe upon the Conference's long-established rights to use "Big Ten" in connection with intercollegiate athletics. For all of the reasons above, his trademark claim is totally frivolous. Count V should be dismissed with prejudice.

## II. THIS IS AN "EXCEPTIONAL CASE" UNDER THE LANHAM ACT, SO THE COURT SHOULD AWARD THE CONFERENCE ITS ATTORNEYS' FEES.

Section 35 of the Lanham Act permits courts to award attorneys' fees to prevailing parties in "exceptional cases." 15 U.S.C. § 1117. The Seventh Circuit recently upheld an order granting a prevailing defendant such fees where the plaintiff produced no evidence of actual sales (i.e., no evidence of commercial use) that would support its claim to a trademark right. *Central Mfg., Inc. v. Brett*, 492 F.3d 876, 884 (7th Cir. 2007). Similarly, in *S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001), the court affirmed a Section 35 fee award where the plaintiff filed suit even though it "had no federally protected right to defend." *Id.* at 627. The Seventh Circuit stressed: "This was not a murky case. Based solely on the weakness of [plaintiff's] claims, Judge Lindberg acted well within his discretion in granting attorneys fees." *Id. See also Top Tobacco L.P. v. N. Atlantic Op. Co.*, No. 06 C 950, 2007 WL 1149220, at **1-4 (N.D. Ill. Apr. 17, 2007) (Judge Kennelly awarded fees to prevailing defendant under Section 35 and stressed that "this case could be deemed exceptional based solely on the sheer weakness of [plaintiff's] claims"). This Court likewise has invoked Section 35 to award fees to a prevailing defendant. *S Indus. v. Ecolab, supra*, 1999 WL 162785, at *7 (Gottschall, J.).

The present case is a textbook example of an "exceptional case." Like the plaintiff in *Centra 2000, supra*, Welsh filed this suit with no "federally protected right to defend." He does not allege that he made any commercial use of Big Ten Network at any time in the past decade, or ever, and his claim is based on a plan for a television network using the name "Big Ten," a

famous mark registered and used by the Conference for decades. It is hard to imagine a clearer case in which a defendant should be entitled to its fees under Section 35.

### III.  EACH OF WELSH'S OTHER COUNTS ALSO FAILS TO STATE A CLAIM.

As noted above, a dismissal of Count V extinguishes federal jurisdiction. Nevertheless, the entire Complaint is baseless, so every other Count should be dismissed as well.

#### A.  Count IV should be dismissed with prejudice because no cause of action exists for misappropriation or conversion of trademarks.

Count IV is an invented claim for "misappropriation and conversion of trade and service mark assets." Courts often have granted Rule 12(b)(6) dismissals of claims of misappropriation or conversion of trade and service marks. For example, in *Richmond v. Nat'l Inst. of Certified Estate Planners*, No. 06 C 1032, 2006 WL 2375454 (N.D. Ill. Aug. 15, 2006), Judge Manning dismissed the plaintiff's claim for "conversion" of a trademark under Rule 12(b)(6) because the claim was "just a different and unnecessary restatement of his federal trademark infringement rights." *Id.* at **6-7. Similarly, in *Metro Sanitation, LLC v. C&R Maint., Inc.*, No. 05-70673, 2005 WL 1861931 (E.D. Mich. 2005), the court granted a similar Rule 12(b)(6) motion. "[Plaintiff] has not cited and the Court has not found any cases which extend conversion to trademarks or service marks. In contrast, there are numerous cases which hold that this common law tort does not reach these bounds." *Id.* at *3. *See also Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 981 (S.D. Tex. 1997) ("Texas law does not recognize a claim of conversion of a trademark"); *Liebowitz v. Maxwell*, No. 91 CIV. 4551, 1994 WL 517456, at *2 (S.D.N.Y. 1994) ("Conversion of trademarks has not been recognized in either New York or Maryland").

Courts also repeatedly have rejected claims for "misappropriation" of trademarks. For example, in *Abbott Labs. v. Nutramax Prods., Inc.*, 844 F. Supp. 443 (N.D. Ill. 1994), Judge Norgle granted a Rule 12(c) dismissal of the plaintiff's claim for "unlawful misappropriation of a valuable asset in violation of the common law." Judge Norgle held that the defendant's use of a product configuration which allegedly traded off the goodwill of the plaintiff's use of a similar design "cannot be rectified through a state law claim for misappropriation." *Id.* at 447. *See also Toho Co., Ltd. v. Sears, Roebuck & Co.*, 645 F.2d 788, 794 (9th Cir. 1981) (noting that plaintiff "cites no cases extending the misappropriation theory to trademark infringement" and concluding that "California courts would refuse to make such an extension"); *DeGidio v. West Group Corp.*, 205 F. Supp. 2d 806, 810 (N.D. Ohio 2002) (rejecting claims for common law

11

misappropriation of trademark because plaintiff "has no cognizable state or federal trademark rights"); *Heirs of Estate of Jenkins v. Paramount Pictures Corp.*, 90 F. Supp. 2d 706, 714 n.26 (E.D. Va. 2000) (rejecting "misappropriation" claim because plaintiffs did not establish they had protectable trademark rights), *aff'd*, 7 Fed. Appx. 270 (4th Cir. 2001).

Additional support is found in J. Thomas McCarthy's trademark treatise, which the Seventh Circuit has described as a "leading treatise" on trademark law. *AM Gen'l Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). *See also Abbott Labs*, 844 F. Supp. at 447 (McCarthy is "an esteemed commentator in the field of intellectual property and unfair competition law"). McCarthy flatly rejects the notion that a cause of action exists for either "misappropriation" or "conversion" of trademarks.

> The misappropriation doctrine cannot be used in ordinary trademark infringement cases as a shortcut around the trademark law's standards of protection. That is, one cannot dispense with the carefully constructed requirements for trademark protection by blithely claiming that defendant 'misappropriated' some symbol of plaintiff which may or may not be capable of trademark protection. . . . If there can be such a thing as 'misappropriation' of another's trademark, irrespective of distinctiveness and likelihood of buyer confusion, then a big step has been taken to wipe out the law of trademarks. Thus, it is a misnomer to talk of 'misappropriation' of trademarks or trade symbols of any type. The courts have recognized that if plaintiff has failed under classic trademark law to prove trademark ownership and infringement, then plaintiff cannot claim that defendant has 'misappropriated' the labor expended in creating the 'trademark.'

McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed.), Vol. 2, § 10:72.

> Occasionally, a trademark owner will allege, either with or instead of a traditional infringement claim, that its mark has been 'converted' by defendant. <u>Every court to consider such a claim has rejected it</u>. The author agrees that the tort of 'conversion' should not be stretched and deformed to substitute for the traditional law of trademark infringement. . . . Courts that have been faced with a claim that a trademark has been 'converted' have rejected the concept outright. . . . Were such a claim of 'conversion' viable, it would mean that the tort of conversion could largely displace the IP laws traditionally defining what is an infringement of patents, trademarks and copyrights. . . . Similar to the forbidden misuse of the misappropriation doctrine to assert trademark infringement, the tort of 'conversion' should not be used in ordinary trademark infringement cases as a shortcut around the trademark law's standards of protection.... Trademark law was specifically constructed to balance the private and public interests inherent in commercial symbols: the tort of conversion was not. It is the wrong tool for the job.

*Id.*, Vol. 4, § 25:9.50 (emphasis added). Judges Manning and Norgle each relied on McCarthy's treatise in dismissing claims for "conversion" and "misappropriation" of trade and service marks.

*See Richmond*, 2006 WL 2375454 at **6-7; *Abbott Labs*, 844 F. Supp. at 447.[6]

Because Welsh has not alleged that he used "Big Ten Network" in commerce, he tries to shoehorn a trademark claim through the guise of misappropriation or conversion, which the cases and treatise above unequivocally reject. Thus, Count IV should be dismissed with prejudice.

### B. Count III of the Complaint should be dismissed with prejudice because the Illinois Trade Secrets Act preempts Welsh's unjust enrichment claim.

The Illinois Trade Secrets Act ("ITSA") provides that, except for contractual remedies, the ITSA "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILCS 1065/8(a). The ITSA codified that "Illinois has abolished all common law theories of misuse of such information." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992). Unjust enrichment "is essentially a claim for restitution," so Illinois courts have held that an unjust enrichment claim "is preempted by the [ITSA]" and must be dismissed. *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 619 (Ill. Ct. App. 1998). *See also Learning Curve Toys, L.P. v. Playwood Toys, Inc.*, No. 94 C 6884, 1999 WL 529572, at *3 (N.D. Ill. July 20, 1999) (Pallmeyer, J.) ("plaintiffs who believe their ideas were pilfered may resort only to the ITSA; the alleged theft of ideas cannot support multiple claims under different theories of recovery."); *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664, 683-84 (N.D. Ill. 1997) (Shadur, J.) (ITSA preempts quantum meruit, implied contract and unjust enrichment); *Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316, 321 (N.D. Ill. 1995) (Aspen, J.) ("To the extent that [plaintiff] purports to state a claim for unjust enrichment based on alleged misappropriation of a trade secret, this claim is preempted by section 8 of the [ITSA]."

Welsh's unjust enrichment claim contains no unique allegations. Rather, that count is based on the same set of facts as his ITSA claim. Count III alleges (¶26) that the defendants' "have unjustly retained the benefits flowing from Welsh's confidential information and trade secrets." This claim is preempted by the ITSA and should be dismissed with prejudice.

### C. Count II fails to allege what specific "trade secrets" allegedly were stolen.

Count II purports to allege a claim for misappropriation of trade secrets under the ITSA,

---

[6] Count IV appears to assert a conversion/misappropriation claim under Illinois law rather than the Lanham Act, but that is immaterial. "Under both State and Federal statutes, the principles of trademark law and the tests for infringement are the same as the ones traditionally applied at common law." *Tarin v. Pellonari*, 625 N.E.2d 739, 745-46 (Ill. Ct. App. 1993). *See also Vincent v. City of Chicago*, No. 04 C 7641, 2005 WL 818410, at *3 (N.D. Ill. Apr. 6, 2005) (citing *Tarin*).

13

but does not identify any alleged trade secrets in Welsh's business plan. Even under "notice" pleading standards, the Seventh Circuit has stressed that "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (submission of 43-page document lacked required specificity under ITSA). "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show <u>concrete secrets</u>." *Composite Marine*, 962 F.2d at 1266 (emphasis added). Even before the ITSA was enacted, the Seventh Circuit joined other courts which "have warned plaintiffs of the risks they run by failing to identify specific trade secrets and instead producing long lists of general areas of information which contain unidentified trade secrets." *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987). There is a "particularized showing that a trade secrets claim calls for," and an assertion that everything provided by a plaintiff to a defendant constitutes trade secrets is a "blunderbuss statement." *qad, Inc. v. ALN Assoc., Inc.*, No. 88 C 2246, 1990 WL 93362, at *3 (N.D. Ill. June 20, 1990) (criticizing the bare pleading of "confidential business and technical information").

These cases demonstrate that Count II of the Complaint lacks the required specificity. Welsh pleads only that unidentified "information" (¶22), unnamed "programs and methods" (¶22), and unspecified "confidential property rights" (¶23) constitute the allegedly exploited "trade secrets." Welsh leaves the Court and the Conference guessing as to the <u>specific, concrete secrets</u> he claims the Conference exploited. It therefore is impossible to determine if Welsh can state an actionable claim under the ITSA. After all, a television network hardly is a trade secret.

**D.   Count I fails to state a claim for breach of an implied-in-fact contract.**

An implied-in-fact contract must contain all the elements of an express contract, namely an offer, an acceptance and consideration, but conduct can substitute for the written or oral acceptance. *Barry Mogul & Associates, Inc. v. Terrestris Development Co.*, 643 N.E.2d 245, 251 (Ill. Ct. App. 1994); *Foiles v. North Greene Unit Dist. No. 3*, 633 N.E.2d 24, 27 (Ill. Ct. App. 1994) ("A contract implied in fact must contain all elements of an express contract, and there must be a meeting of the minds."). Here, Welsh has not pled the specific offer, acceptance or consideration, let alone a meeting of the minds on essential contract terms. Delany's April 23, 1998 letter (Exhibit 1) establishes just the opposite. Delany explicitly informed Welsh that "this is a letter of interest only and is subject to the Conference's satisfaction with the development of

14

the proposed venture, the approvals of the board, various committees and groups of the Conference, and the negotiation and execution of definitive agreements. Consequently, this letter does not constitute a binding obligation for either of us." Exhibit 1 (emphasis added). Nor can Welsh establish any "contract" related to his alleged ownership of the business plan. Rather, Delany disclaimed any potential agreement by telling Welsh in April, 1998, that "many of the concepts set forth in the Business Plan have been considered from time to time by the Conference and other entities that have contacted the Conference. Accordingly, we cannot agree that such concepts are your proprietary property." Exhibit 2 (emphasis added). The Complaint does not allege that Welsh responded to either of Delany's letters or voiced any disagreement.

Even if the Court were to ignore Delany's letters, Count I fails to state a claim because there must be an expectation of payment on both sides to establish an implied-in-fact agreement under Illinois law. "In order to recover on an implied contract, the facts and circumstances must show that, at the time services were rendered, one party expected to receive payment and the other party intended to make payment." *Zadrozny v. City Colleges of Chicago*, 581 N.E.2d 44, 48 (Ill. Ct. App. 1991). *See also Lindora Med. Clinic, Inc. v. Care Charge, Inc.*, No. 92 C 4148, 1993 WL 335809, at *3 (N.D. Ill. Aug. 26, 1993) ("both contracts implied in fact, and contracts implied in law require that plaintiffs have an expectation of payment"). Here, Welsh has not alleged that, at the time he presented his plan to the Conference, either: (1) he reasonably expected payment, or (2) the Conference agreed to make any payment (and, if so, what amount, or any basis for determining the amount of any such payment). Thus, Count I fails to state a claim under Rule 12(b)(6) for this independent reason.

## CONCLUSION

For the foregoing reasons, the Conference respectfully requests that the Court dismiss the case under Rule 12(b)(6) and award the Conference its attorneys' fees under 15 U.S.C. § 1117.

THE BIG TEN CONFERENCE, INC.

Dated: April 7, 2008

By: /s/Andrew S. Rosenman
Andrew S. Rosenman
Richard M. Assmus
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606-4637
(312) 782-0600

15

# CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on April 7, 2008, copies of the foregoing Defendant Big Ten Conference, Inc.'s Memorandum of Law in Support of its Rule 12(b)(6) Motion to Dismiss and Request for Attorneys' Fees Pursuant to 15 U.S.C. § 1117, and this Certificate of Service were caused to be delivered to the following:

Robert P. Cummins
Thomas C. Cronin
Cummins & Cronin LLC
77 West Wacker Drive, Suite 4800
Chicago, Illinois 60601

via the Electronic Filing System of the U.S. District Court for the Northern District of Illinois.

MAYER BROWN LLP

By: /s/Andrew S. Rosenman
Andrew S. Rosenman
Richard M. Assmus
Emily M. Emerson
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600