IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT W. WELSH d/b/a BIG TEN DEVELOPMENT, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 C 1342 |
| v. | ) ) | Judge Joan B. Gottschall Magistrate Judge Susan E. Cox |
| THE BIG TEN CONFERENCE, INC., | ) ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND REQUEST FOR ATTORNEYS' FEES PURSUANT TO 15 U.S.C. § 1117**

Andrew S. Rosenman
Richard M. Assmus
Emily M. Emerson
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606-4637
(312) 782-0600 – Phone
(312) 701-7711 – Facsimile

*Attorneys for The Big Ten Conference, Inc.*

5205190

The Big Ten Network is a 24-hour national cable and satellite TV network focusing on sports-related programming of member institutions of The Big Ten Conference, Inc. ("the Conference").  The Big Ten Network began its telecasts in late August, 2007.

Plaintiff Robert Welsh ("Welsh") filed this specious lawsuit against the Conference based on the fiction that a proposed business plan that Welsh submitted to the Conference in early 1998 — which the Conference rejected — gives him eternal federal rights in the "Big Ten Network" name.  The absurdity of Welsh's claim is palpable from the fact that he claims ownership rights in a name incorporating "Big Ten," in which the Conference, not Welsh, long has held registered trademarks and has used in commerce for decades in connection with intercollegiate athletics.

In 2006, eight years after rejecting Welsh's proposed plan, the Conference filed intent-to-use applications for the "Big Ten Network" mark at the U.S. Patent & Trademark Office ("PTO").  The PTO examined the applications, published the marks for possible opposition, and then, having received no oppositions, granted the Conference Notices of Allowance.  Millions of dollars have been spent to develop and promote the Big Ten Network and the Conference has continuously used the trademark in commerce since the network launched in August, 2007.

Now, after sitting idly by since 1998 without doing anything to protect his alleged rights, Welsh filed this lawsuit, claiming that the Conference violated the Lanham Act by fraudulently procuring its trademarks.  The Conference responded to Welsh's initial Complaint by filing a Rule 12(b)(6) motion.  Instead of responding, Welsh quickly filed an Amended Complaint in which he dropped two of his original five claims.  Welsh's Amended Complaint, like his previous Complaint, is most noteworthy for what it does not allege:

- Welsh does not allege that he made any commercial use of "Big Ten Network" or any other components of his proposed business plan at any time in the past 10 years.
- Welsh does not allege that he either applied to register "Big Ten Network" or any other marks contained in his proposed business plan, or that he received any registered marks.
- Welsh does not allege that he opposed any of the Conference's applications at the PTO.
- Welsh does not allege that, since 1998, he ever tried to implement his business plan.

The Amended Complaint lacks any such allegations even though the Conference delineated all of these deficiencies in its Rule 12(b)(6) motion to dismiss Welsh's earlier Complaint.  Welsh's silence on the issue of commercial use is deafening.

As explained below, this case never should have been filed in federal court.  Welsh's

1

Lanham Act claim is frivolous as a matter of law. In fact, this is a textbook example of an "exceptional case" under the Lanham Act in which the Court should order Welsh to pay the Conference its attorneys' fees. Welsh's two other counts in the Amended Complaint (state law claims for misappropriation of trade secrets and breach of implied-in-fact contract) also are baseless. Thus, the Court should dismiss those claims under Rule 12(b)(6) as well.

## SUMMARY OF ALLEGATIONS

According to the Amended Complaint, Welsh made an initial presentation of his business plan to the Conference "in early 1998." Amended Complaint, ¶7. Welsh alleges that the Conference thereafter acknowledged in writing the confidential nature of his proposed plan and invited Welsh to attend a meeting of Big Ten athletic directors. *Id.* and Exhibit B thereto. Welsh further avers that Jim Delany, the Commissioner of the Conference, told him in writing that the Conference was "'prepared to continue to move forward with the development of the relationship' subject to appropriate approvals." *Id.* and Exhibit C thereto.

Welsh avers that as a consequence of the Conference's "promises and inducements," he distributed and made a detailed presentation about his proposed business plan at a meeting with Big Ten representatives and Athletic Directors on May 18, 1998. *Id.* ¶7. Welsh alleges that his presentation took place on a single day and was about one hour in length. *Id.* The Conference rejected Welsh's proposed business plan "a number of weeks" later. *Id.* ¶8.

The Amended Complaint, like Welsh's initial Complaint, is completely silent as to Welsh's actions in the 10 years between May 1998 and his filing of this lawsuit. There also is not a single specific factual allegation that, during that entire decade, the Conference ever disclosed, discussed or did anything with Welsh's business plan. Welsh merely alleges that "[s]everal years" after the Conference rejected his plan, the Conference announced (in 2006) that it soon would introduce the Big Ten Network, which Welsh asserts — again, without alleging a single specific detail — the Conference "lifted" from his proposed plan. *Id.* ¶9.

Welsh's Amended Complaint ignores critical portions of two letters that Delany sent him in April, 1998. For example, Welsh claims that one of Delany's letters acknowledged receipt of the business plan, which he alleges constituted an implied-in-fact contract. Amended Complaint, ¶7 and Exhibit B. But Welsh ignores that Delany also informed him: "this is a letter of interest only and is subject to the Conference's satisfaction with the development of the proposed venture, the approvals of the board, various committees and groups of the Conference, <u>and the</u>

2

negotiation and execution of definitive agreements. Consequently, this letter does not constitute a binding obligation for either of us." Amended Complaint, Exhibit C (emphasis added). Welsh further alleges (¶25) that the Conference "acknowledged, agreed and understood" that his 1998 proposed business plan contained "confidential property rights and trade secrets of Welsh." In fact, Delany wrote that "many of the concepts set forth in the Business Plan have been considered from time to time by the Conference and other entities that have contacted the Conference. Accordingly, we cannot agree that such concepts are your proprietary property." Amended Complaint, Exhibit B (emphasis added). Welsh received both letters from Delany well before making his detailed presentation to the Conference on May 18, 1998. *Id.* ¶7.

## ARGUMENT

While it is true that all well-pleaded factual allegations in a plaintiff's complaint must be accepted as true for purposes of a Rule 12(b)(6) motion, this Court also has stressed that it is not "required to ignore facts set forth in a complaint or exhibits that undermine a plaintiff's claim." *Adusumilli v. Discover Fin. Servs.*, *Inc.*, No. 98 C 6129, 1999 WL 286289, at *2 (N.D. Ill. Apr. 19, 1999) (Gottschall, J.).[1] Moreover, a court need not "strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint." *Coates v. Ill. State Bd. of Ed.*, 559 F.2d 445, 447 (7th Cir. 1977). Nor is the Court required to accept legal conclusions either alleged or inferred from pleaded facts. *Nelson v. Monroe Reg. Med. Ctr.*, 925 F.2d 1555, 1559 (7th Cir. 1991). A complaint must allege facts bearing on all material elements necessary to sustain a recovery under a viable legal theory. *Looper Maint. Serv., Inc. v. City of Indianapolis*, 197 F.3d 908, 911 (7th Cir. 1999).

This case should be dismissed pursuant to Rule 12(b)(6) because Welsh's Lanham Act claim (Count I) is frivolous, and that Count forms the only basis for federal jurisdiction. *See* Amended Complaint, ¶4. Each of Welsh's two state law counts also fails to state a viable claim.

## I.    FEDERAL JURISDICTION IS LACKING BECAUSE WELSH FAILS TO STATE A CLAIM UNDER SECTION 38 OF THE LANHAM ACT.

Count I of Welsh's Complaint purports to state a claim for damages under Section 38 of the Lanham Act, which is codified at 15 U.S.C. § 1120. Section 38 states, in its entirety:

> Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby

---

[1]    Copies of unpublished cases available on Westlaw and cited herein are attached as Exhibit 7.

for any damages sustained in consequence thereof.

15 U.S.C. § 1120.

The elements of a Section 38 claim are:  (1) the false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the intention to induce action or refraining from action in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damages proximately resulting from such reliance. *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 874 (10th Cir. 1995) (citation omitted).  The Seventh Circuit has highlighted the plaintiff's difficult burden of proof:  "Fraud must be shown by clear and convincing evidence in order to provide a basis for either cancellation or damages [under Section 38].  Fraud will be deemed to exist only when there is a <u>deliberate attempt to mislead the Patent Office</u> into registering the trademark."  *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 670 (7th Cir. 1982) (citations omitted and emphasis added).  "There is no room for speculation, inference or surmise, and obviously, any doubt must be resolved against the charging party."  *Stanfield*, 52 F.3d at 874 (citations omitted).  Thus, claims of fraud in the oath usually fail.  "Fraud in the oath is a popular but seldom successful claim against the registration of a trademark."  *Zip Dee, Inc. v. Dometic Corp.*, 900 F. Supp. 1004, 1015 (N.D. Ill. 1995).  This case is no different.  Welsh fails to state a claim under Section 38, particularly when viewed in the light of how trademark rights accrue under the Lanham Act.

A.     <u>Trademark rights arise only through actual commercial use, which Welsh conspicuously has not alleged in his Amended Complaint.</u>

For at least 90 years, trademark law has been clear that "the right to a particular mark grows out of its use, not its mere adoption."  *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918).  Significantly, the Seventh Circuit has held that a mere proposal to use a mark is irrelevant.  "Intent to use a mark, like a naked registration, establishes no rights at all," and "an unregistered *plan* to use a mark creates no rights."  *Zazu Designs v. L'Oréal, S.A.*, 979 F.2d 499, 504 (7th Cir. 1992) (italics in original).  "Use is neither a glitch in the Lanham Act nor a historical relic.  By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly."  *Id.* at 503.  The requirement of actual, commercial use of a mark is the product of sound policy considerations.  Otherwise, "[b]usinesses that knew of an intended use would not be entitled to the mark even if they made the first significant use of it."  *Id.* at 504.

4

This Court often has cited the commercial use requirement. In *DSMR, LLC v. Goldberg*, No. 02 C 5203, 2004 WL 609281 (N.D. Ill. Mar. 25, 2004) (Gottschall, J.), this Court explained that "an entity acquires rights in a trademark only through actual commercial usage." *Id.* at *4. In that case, the plaintiffs were the only company to use the challenged mark in commerce, had used the mark continuously for three years, sold over $500,000 of goods using that mark, and consumers had come to associate the mark with plaintiffs' products. While the defendant claimed that it owned the right to use the mark, this Court stressed that "the flaws in defendant's argument are many, beginning with the fact that 'an intent to use a mark creates no rights a competitor is bound to respect.'" *Id.* at *5 (quoting *Zazu Designs*, 979 F.2d at 504).

In *S Indus., Inc. v. Ecolab Inc.*, No. 96 C 4140, 1999 WL 162785 (Mar. 16, 1999) (Gottschall, J.), this Court noted that a party which has not registered a mark may establish its rights by showing its "use in commerce" of that mark, but "[t]he Lanham Act provides that 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. Commercial utilization must be both bona fide and continuous, not just 'de minimis sales, a few shipments, or pre-marketing tactics that attempt to 'reserve' the mark." *Id.* at *3 (citations omitted). *See also* 15 U.S.C. § 1127 (defining "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark").

Welsh's Amended Complaint is devoid of any allegation that he made any commercial use of the "Big Ten Network" mark at any time, let alone in the entire decade between 1998 and 2008. The absence of any such allegation defeats his assertion of any <u>trademark</u> right.

> **B.**    **<u>A claim based on Section 38 also requires actual commercial use.</u>**

Welsh cannot circumvent the Lanham Act's long-settled commercial use requirement by masking his claim under Section 38. Indeed, the exact same attempted "end run" was rejected by another district judge within the Seventh Circuit. *See Carmichael v. Prime*, No. 02-0379, 2003 WL 1903355 (S.D. Ind. Jan. 6, 2003). In *Carmichael*, the plaintiffs had conceived the idea of "Stardust" perfume and entered into a contract with defendants in which the defendants agreed to act as the plaintiffs' agents in developing the perfume. Despite making assurances to the plaintiffs that they would register the mark using the plaintiffs' name, the defendants instead applied to the PTO for the "Stardust" mark in the name of their company. Even though the defendants later informed the plaintiffs that they would substitute the plaintiffs' names on the

PTO application, they never did so.  The parties eventually severed their relationship.  Several years later, the defendants: (1) re-applied to the PTO for a trademark (again in the name only of their company), and (2) developed and marketed Stardust perfume.  The plaintiffs did neither.

Instead, the plaintiffs filed suit under Section 38, alleging that defendants' applications to the PTO failed to identify the plaintiffs as the true owners of the Stardust mark.  The court, however, dismissed that claim pursuant to Rule 12(b)(6).  The court initially stressed: "Demonstrating the falsity of Defendants' oath thus depends on the possibility of establishing Plaintiffs' own right to the mark."  *Id.* at *3.  The plaintiffs raised two arguments to support their claim of ownership:  (1) their origination of the idea, and (2) an implied or express contract in which defendants would act as their agents.  The court rejected both arguments:

> 'Trademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark.' . . .  Therefore, the first of plaintiffs' theories fails.  <u>The fact that [plaintiff Shea] hatched the original idea for marketing a perfume under the STARDUST name simply does not give her any rights to the trademark; only by actual usage—which Plaintiffs do not allege—do such rights accrue</u>.

*Id.* at *4 (emphasis added and citation omitted).  In rejecting the plaintiffs' second assertion of ownership, the court noted that breach of contract might offer a remedy for the plaintiffs, but "it is a different matter to claim that title to the trademark in fact passed to the Plaintiffs, which can only occur by either use of the mark in commerce or purchase of a pre-existing business which employs that mark."  *Id.*  The court granted the defendants' Rule 12(b)(6) motion because "there is no possible set of facts that Plaintiff could establish consistent with the allegations that would demonstrate the falsity of [defendants'] oath to the PTO.  This inability is fatal to Plaintiffs' claim of fraudulent procurement of a federal trademark."  *Id.* at *5.

*Carmichael* is exactly on point and provides powerful support for the dismissal of Welsh's Section 38 claim.  Welsh claims the Conference defrauded the PTO about his so-called "ownership" of the Big Ten Network name, but fails to allege that he ever used that mark.  Indeed, his only "use" was in one proposed business plan back in 1998.  But Welsh did nothing to establish any <u>trademark</u> rights, so the Conference could not have made a fraudulent oath eight years later regarding its own rights to use the Big Ten Network mark.  That Welsh's claim is not actionable is made more obvious by the fact that even after amending his Complaint, Welsh still has not made a single factual allegation that he used the mark in commerce or even applied for a trademark registration.  Thus, despite being fully aware of the Conference's legal arguments in

support of this motion at the time he sought leave to amend his Complaint, Welsh did not (and cannot) cure this fundamental deficiency in his allegations.

Other courts similarly have rejected Section 38 claims where, as here, a party failed in the first instance to establish any protectable <u>trademark</u> rights under the Lanham Act.  *See, e.g., Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 985, 990 (8th Cir. 1993) (counter-plaintiff failed to show damages "in consequence of" a fraudulent registration under Section 38 because it "failed to prove a cognizable Lanham Act injury"); *Hampshire Paper Corp. v. Highland Supply Corp.*, No. 02-32, 2002 WL 31114120, at **3-5 (D.N.H. Sept. 23, 2002) (absence of actual trademark infringement meant plaintiff lacked standing to pursue a Section 38 violation); *Jackson v. Lynley Designs, Inc.*, 729 F. Supp. 498, 501 (E.D. La. 1990) (rejecting Section 38 claim where plaintiff, as a threshold matter, had "not established a reasonably protectable interest under the Act").  Welsh has failed to state a Section 38 claim.

### C.     <u>A business plan for a television network does not create trademark rights.</u>

A Rule 12(b)(6) decision from the Fifth Circuit cements the conclusion that no trademark rights arise out of a mere business plan for a television network.  *See Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921 (S.D. Tex. 2004), *aff'd*, 2005 WL 627973 (5th Cir. Mar. 17, 2005).  The plaintiff in *Keane*, like Welsh, did not allege that he registered or made commercial use of any trademarks, but nonetheless asserted various statutory and common law trademark theories related to his business plan for the "American Idol" television show.  However, the district court dismissed the case under Rule 12(b)(6).  "This action is derailed by two fundamental, fallacious premises.  First, [plaintiff] presupposes that his 'American Idol' concept or idea can be protected by trademark law.  However, trademarks are devices intended to identify fully developed products and services, not ideas for products or services."  *Id.* at 933.  The court emphasized that "<u>an idea for a television show is neither a product nor a service within the purview of trademark law</u>."  *Keane*, 297 F. Supp. 2d at 933 (emphasis added).  The court added:

> The second erroneous premise is [plaintiff's] allegation that being the first in time to use the 'American Idol' mark in relation to some kind of commercial activity is sufficient to give him exclusive rights to use the 'American Idol' mark.  <u>Mere invention, creation or discussion of a trademark does not create priority rights</u>.

*Id.* at 934 (emphasis added).  Later in its decision, the court reiterated that "[f]ederal trademark law is not concerned with 'invention or discovery' of ideas, and the [Supreme] Court explicitly cautions against extending trademark law in that manner."  297 F. Supp. 2d at 935 (citing *Dastar*

*Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003)).

The plaintiff appealed the district court's Rule 12(b)(6) dismissal of his complaint, but the Fifth Circuit affirmed the dismissal in its entirety.

> Because we affirm the district court's dismissal of [plaintiff's] claims on 12(b)(6) grounds for the reasons stated in the district court's opinion, it is unnecessary for us to engage in a detailed analysis of the various legal issues. Fundamentally, we agree with the district court that [plaintiff's] trademark action is 'derailed by two fundamental, fallacious premises,' *Keane*, 297 F. Supp. 2d at 933: namely, that his rights in an unregistered concept or idea are protectable and that being the first in time to use the phrase 'American Idol' entitles him to trademark protection. <u>Trademarks only protect fully developed products, not ideas for the products. Also, unregistered trademark rights must be appropriated through use, that is, through some commercial activity and [plaintiff] asserted no such commercial activity sufficient to appropriate such rights.</u>

*Keane v. Fox Television Stations*, 129 Fed. Appx. 874, 876, 2005 WL 627973, at *1 (5th Cir. Mar. 17, 2005) (emphasis added).

*Keane* hardly stands alone. There are many cases where courts have held that no trademark rights exist in connection with plans for television networks or shows. *See, e.g., Kienzle v. Capital Cities/ABC, Inc.*, 774 F. Supp. 432, 438 (E.D. Mich. 1991) (rejecting trademark claim; plaintiff "<u>has not cited a single case to support his contention that the Lanham Act encompasses a claim that involves only the copying of an idea for a television series</u>") (emphasis added); *Murray v. Nat'l Broadcasting Co., Inc.*, 671 F. Supp. 236, 241 (S.D.N.Y. 1987) (rejecting Lanham Act and common law claims arising out of confidential plan for television sitcom because plaintiff's plan merely combined two ideas which had been circulating in the industry for a number of years), *aff'd*, 844 F.2d 988 (2d Cir. 1988).

These authorities also compel the dismissal of Welsh's Section 38 claim. In addition, as explained in Section D. below, Welsh's entire trademark theory is illogical because he seeks to concoct an "ownership right" from the <u>Conference's</u> long-registered trademarks and decades-long commercial use of the "Big Ten" name in connection with intercollegiate athletics.

**D.    <u>The Conference has long-established trademark rights in "Big Ten," and the term "network" is, by itself, not protectable for television network services.</u>**

The complete lack of logic in Welsh's claim of fraudulent procurement under Section 38 is readily apparent from a review of the components of the "Big Ten Network" mark.

As another federal court has noted, the Conference has been using the "Big Ten" mark since 1917 in connection with intercollegiate athletics and has held federal trademark

registrations since 1988. *Big Ten Conference, Inc. v. Big Ten Worldwide Concert & Sport Club at Town Ctr., Ltd.*, No. 96-CV-70617, (E.D. Mich. Oct. 10, 2000) (copy attached as Exhibit 1), slip op. at 6. The Conference has sought and obtained numerous federal trademark registrations for "Big Ten" marks. *Id.* at 5-6. Some examples include "Big Ten", U.S. Reg. No. 1969353, registered on April 23, 1996, for, *inter alia*, "entertainment services, namely sponsoring and coordinating the presentation of athletic events and contests," and "Big Ten Conference" (and design), U.S. Reg. No. 1782645, registered on July 20, 1993, for, *inter alia*, "entertainment services; namely, sponsoring and coordinating the presentation of athletic events and contests, and educational services." *See* Exhibits 2 and 3.[2] These federal registrations remain in full force and effect and are now incontestable under 15 U.S.C. § 1065.

In *Big Ten Conference, Inc.*, *supra*, the dispute involved the defendant's attempt to use the "Big Ten" name in its ticket brokering business. The court found that "the 'Big Ten' mark is strong" (*see* Exhibit 1, at 16), and noted that the Conference used the mark in many ways, including television programming. "Big Ten promotes the interests of its member schools and their athletic events by overseeing its corporate partner program and its licensing operation, including the televising of Big Ten members' sporting events." *Id.* at 17. The court held that the defendant infringed the Conference's trademark by using "Big Ten" in ticket sales, *id.* at 20, and that the "Big Ten" mark "has developed overwhelmingly secondary meaning and is inherently distinctive. The 'Big Ten' mark enjoys widespread recognition identified with the Big Ten Conference member schools and this recognition is of long duration." *Id.* at 21.

Here, the Conference filed an intent-to-use trademark application on September 1, 2006, for "Big Ten Network" for, *inter alia*, "television transmission services" and "entertainment services, namely, production and distribution of television programs." Amended Complaint, Exhibit D.[3] On April 23, 2007, the application was published in the PTO's Official Gazette to

---

[2] This Court should consider Exhibits 2 through 6 of this motion because trademark filings "are public records subject to judicial notice on a motion to dismiss." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). *See also Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 192 n.4 (8th Cir. 1982) ("this court may take judicial notice of Patent and Trademark documents"). Moreover, the Seventh Circuit allows courts to take judicial notice of matters of public record without converting a motion to dismiss into a summary judgment motion. *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000).

[3] This application was one of several the Conference filed in 2006. The Conference also filed other applications for "Big Ten Network" for related goods and services as well as for the logo of the Big Ten Network. The PTO published each application for opposition and later issued multiple Notices of Allowance after none of the Conference's applications was opposed. *See* Exhibit 5.

allow oppositions to be filed by any party claiming it would be damaged by registration of the mark. Exhibit 4. No opposition was filed by anyone, and the PTO issued a Notice of Allowance on July 17, 2007. Exhibit 5. On April 15, 2008, after the Conference proved it used "Big Ten Network" in commerce, the PTO issued a Certificate of Registration for that mark. Exhibit 6.

The term "network" is descriptive of the listed services, so the Conference's trademark application (and the resulting registration) disclaimed any exclusive rights in "network" apart from the mark as a whole. *See* Amended Complaint, Exhibit D. *See also* Exhibit 6. Indeed, the Lanham Act specifically prohibits the registration of descriptive terms:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it . . . (e) consists of a mark that (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them.

15 U.S.C. § 1052(e)(1). Descriptive terms usually are not protectable because they are a "poor means of distinguishing one source of services from another and because they are often necessary to the description of the goods or services of a similar nature." *Sullivan v. CBS Corp.*, 385 F.3d 772, 776 (7th Cir. 2004) (citation omitted). Thus, "network" is not, by itself, entitled to protection under the Lanham Act.

Welsh's Section 38 claim is most puzzling. He claims trademark rights in Big Ten Network, a name that he never registered or used commercially, and that would plainly infringe upon the <u>Conference's</u> long-established rights to use "Big Ten" in connection with intercollegiate athletics. Welsh's Section 38 claim is totally frivolous for this reason as well.

### E.    <u>Welsh has not satisfied his pleading requirements under Rule 9(b).</u>

Even if the Court were to conclude that Welsh could overcome each of the arguments set forth in Sections A through D above, Welsh also has failed to satisfy his pleading burdens. Section 38 claims "must be pled with particularity" pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *Publications Int'l, Ltd. v. Leapfrog Enter., Inc.*, No. 01 C 3876, 2002 WL 31426651, at *3 (N.D. Ill. Oct. 29, 2002). "The heightened pleading requirements apply to each element of the fraud claim." *GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234, 243 (S.D.N.Y. 2000) (granting Rule 12(b)(6) dismissal of Section 38 claim).

Welsh has not met his heightened burden with respect to at least two different elements of his claim. First, he has not pled that the Conference made a <u>false</u> representation of <u>material</u>

fact in its September 2006 application to the PTO.  Delany's April 1998 letter informed Welsh that the Conference rejected the notion that Welsh's proposed concepts were his proprietary property.  *See* Amended Complaint, Exhibit B.  The Conference's PTO application in 2006 was consistent with that letter.  Thus, there was no false representation.  Even if the Conference had disclosed to the PTO that Welsh had presented a proposed business plan in 1998, such a fact would have been <u>immaterial</u> to the PTO's determination of trademark rights in September 2006 because, as explained above, trademark rights arise only from commercial use, not from mere ideas or plans.  Welsh has not alleged that he ever made any commercial use of the mark.

Second, Welsh cannot plead *scienter*, i.e., that the Conference knew or believed its statements to the PTO were made with the "deliberate attempt to mislead" the PTO.  *Money Store*, 689 F.2d at 670.  Delany's April 1998 letter rejecting Welsh's claim of proprietary rights, by itself, shows that the Conference long ago believed that Welsh had no rights to the Big Ten Network mark.  *See* Amended Complaint, Exhibit B.  Welsh does not allege that he either disagreed with or refused to proceed after he received Delany's letter.  Rather, one month later, Welsh made a detailed presentation at the Conference's office.  *Id.* ¶7.  More than eight years then passed without any use of the mark by Welsh.  Thus, he has not pled any intent by the Conference to mislead the PTO in September 2006.  Count I should be dismissed with prejudice.

## II.     THIS IS AN "EXCEPTIONAL CASE" UNDER THE LANHAM ACT, SO THE COURT SHOULD AWARD THE CONFERENCE ITS ATTORNEYS' FEES.

Section 35 of the Lanham Act permits courts to award attorneys' fees to prevailing parties in "exceptional cases."  15 U.S.C. § 1117.  The Seventh Circuit has defined "exceptional" to include a lawsuit which is "oppressive," and "a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case…".  *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 126 F.3d 1028, 1032 (7th Cir. 1997).  *See also Bretford Mfg., Inc. v. Smith Sys. Mfg. Co.*, 389 F. Supp. 2d 983, 984 (N.D. Ill. 2005) (awarding fees to prevailing defendant because "a case can be found to be exceptional simply on the basis that it is wholly lacking in merit").

The Seventh Circuit recently upheld an order granting a prevailing defendant fees under Section 35 where the plaintiff produced no evidence of actual sales (i.e., no evidence of commercial use) that would support its claim to a trademark right.  *Central Mfg., Inc. v. Brett*, 492 F.3d 876, 884 (7th Cir. 2007).  Similarly, in *S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d

625, 627 (7th Cir. 2001), the court affirmed a Section 35 fee award where the plaintiff filed suit even though it "had no federally protected right to defend." *Id.* at 627. The Seventh Circuit stressed: "This was not a murky case. Based solely on the weakness of [plaintiff's] claims, Judge Lindberg acted well within his discretion in granting attorneys fees." *Id. See also Top Tobacco L.P. v. N. Atlantic Op. Co.*, No. 06 C 950, 2007 WL 1149220, at **1-4 (N.D. Ill. Apr. 17, 2007) (Judge Kennelly awarded fees to prevailing defendant under Section 35 and stressed that "this case could be deemed exceptional based solely on the sheer weakness of [plaintiff's] claims"). This Court likewise has invoked Section 35 to award fees to a prevailing defendant. *S Indus. v. Ecolab*, *supra*, 1999 WL 162785, at *7 (Gottschall, J.).

The present case is a textbook example of an "exceptional case." Like the plaintiff in *Centra 2000*, *supra*, Welsh filed this suit with no "federally protected right to defend." Indeed, Welsh's initial Complaint did not allege that he made any commercial use of the Big Ten Network mark at any time in the past decade, or ever. In addition, his Lanham Act claim is based on a plan for a television network incorporating the name "Big Ten," a famous mark which has been registered and used by the Conference for decades.

The Conference moved to dismiss Welsh's initial Complaint for all of the reasons set forth in Section I above. Remarkably, despite being forewarned of those arguments, Welsh's newly Amended Complaint again fails to include a single factual allegation of "commercial use" of the Big Ten Network mark by Welsh. This means that the Conference has been forced to incur additional fees and costs in responding to a complaint that — even in its amended form — never should never have been filed in federal court. Under these circumstances, it is ineluctable that the Conference should be awarded its attorneys' fees pursuant to 15 U.S.C. § 1117.

## III.    BOTH OF WELSH'S STATE LAW COUNTS FAIL TO STATE A CLAIM.

As noted above, the dismissal of Count I will extinguish federal jurisdiction. However, Welsh's entire Complaint is baseless, so this Court also should dismiss his state law claims for misappropriation of trade secrets (Count II) and breach of implied-in-fact contract (Count III).

### A.    <u>Count II fails to allege what specific "trade secrets" allegedly were stolen.</u>

Count II purports to allege a claim for misappropriation of trade secrets under the Illinois Trade Secrets Act ("ITSA"), but does not identify any alleged trade secrets in Welsh's business plan. Even under "notice" pleading standards, the Seventh Circuit has stressed that "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the

details in search of items meeting the statutory definition." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (submission of 43-page document lacked required specificity under ITSA). "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show <u>concrete secrets</u>." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) (emphasis added). Even before the ITSA was enacted, the Seventh Circuit joined other courts which "have warned plaintiffs of the risks they run by failing to identify specific trade secrets and instead producing long lists of general areas of information which contain unidentified trade secrets." *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987). There is a "particularized showing that a trade secrets claim calls for," and an assertion that everything provided by a plaintiff to a defendant constitutes trade secrets is a "blunderbuss statement." *qad, Inc. v. ALN Assoc., Inc.*, No. 88 C 2246, 1990 WL 93362, at *3 (N.D. Ill. June 20, 1990) (criticizing the bare pleading of "confidential business and technical information").

These cases demonstrate that Count II of the Amended Complaint lacks the required specificity. Generally, Welsh claims that unidentified "information" (¶25), unnamed "programs and methods" (¶25), and unspecified "confidential property rights" (¶26) constitute the allegedly exploited "trade secrets." These sorts of allegations are plainly insufficient.

Count II also refers back to paragraph 6 of his Amended Complaint, in which he alleges various bullet points, none of which includes any potential "trade secret." For example, the bullet points in paragraph 6 include many unremarkable and/or irrelevant statements and characterizations. Some examples include:

- "The goal of the Big Ten Networks . . . is to profitably develop a satellite/cable television station, the subject of which will be in depth coverage of sports and culture…"
- "Independent regional programming has been minimized by the FOX network purchasing and making generic programming of previously all regional sports stations."
- "The Vice President of BTN will be an individual with experience in operating a satellite or cable television station."

Welsh merely recites a list of information and leaves it to the Court and the Conference to try to separate the wheat from the chaff and guess what <u>specific, concrete secrets</u> he claims the Conference exploited. In the absence of any specificity, it is impossible to determine if Welsh can state an actionable claim under the ITSA. After all, ideas like a television network, a

"coaches' show" and "weekend news update shows" hardly constitute secrets that the ITSA was designed to protect. Amended Complaint, Exhibit A, pp. 19-20.

Finally, Welsh's proposed business plan states: "BTN will incorporate some programming elements proven successful on other satellite stations." *Id.*, p. 19. The plan goes on to identify the elements that would be based off of a number of pre-existing stations, such as A&E, the History Channel, the Food Channel, Classic Sports Television, and QVC, and that coaches' press conferences already were available via satellite. *Id.* pp. 19-21. Thus, Welsh's proposed business plan, which incorporates well-known, existing programming elements, is inconsistent with the notion that it contains any "secrets."[4]

**B.      Count III fails to state a claim for breach of an implied-in-fact contract.**

Under Illinois law, an implied-in-fact contract must contain all the elements of an express contract, namely an offer, an acceptance and consideration, but conduct can substitute for the written or oral acceptance. *Barry Mogul & Associates, Inc. v. Terrestris Development Co.*, 643 N.E.2d 245, 251 (Ill. Ct. App. 1994); *Foiles v. North Greene Unit Dist. No. 3*, 633 N.E.2d 24, 27 (Ill. Ct. App. 1994) ("A contract implied in fact must contain all elements of an express contract, and there must be a meeting of the minds."). Here, Welsh has not pled the specific offer, acceptance or consideration, let alone a meeting of the minds on essential contract terms. Delany's letter to Welsh <u>disproves</u> any possible contract because Delany explicitly informed Welsh that "this is a letter of interest only and is subject to the Conference's satisfaction with the development of the proposed venture, the approvals of the board, various committees and groups of the Conference, <u>and the negotiation and execution of definitive agreements</u>. <u>Consequently, this letter does not constitute a binding obligation for either of us</u>." Amended Complaint, Exhibit C (emphasis added). Nor can Welsh establish any "contract" related to his alleged "property rights" in his proposed business plan. Delany disclaimed any potential agreement by telling Welsh in April, 1998, that "<u>many of the concepts set forth in the Business Plan have been considered from time to time by the Conference and other entities that have contacted the Conference.  Accordingly, we cannot agree that such concepts are your proprietary property</u>." Amended Complaint, Exhibit B (emphasis added). It is noteworthy that the Amended Complaint

---

[4]      It is also quite peculiar that Welsh attached the entire allegedly confidential business plan to a public court filing, despite the fact that the alleged "secrets" related to the Big Ten Network comprised but one portion of his five-part proposed business plan. Welsh's public disclosure of the entire proposed business plan is, of course, plainly inconsistent with his assertion that it is confidential.

does not allege that Welsh responded to either of Delany's letters, let alone voiced any disagreement with any statements therein, at any time in the 10 years since those letters were sent. In short, Welsh cannot possibly establish an implied-in-fact contract here.

Count III also fails to state a claim for an entirely independent reason: there must be an expectation of payment on both sides to establish an implied-in-fact agreement under Illinois law. "In order to recover on an implied contract, the facts and circumstances must show that, at the time services were rendered, one party expected to receive payment and the other party intended to make payment." *Zadrozny v. City Colleges of Chicago*, 581 N.E.2d 44, 48 (Ill. Ct. App. 1991). *See also Lindora Med. Clinic, Inc. v. Care Charge, Inc.*, No. 92 C 4148, 1993 WL 335809, at *3 (N.D. Ill. Aug. 26, 1993) ("both contracts implied in fact, and contracts implied in law require that plaintiffs have an expectation of payment"). Just a few weeks ago, Judge Kocoras reiterated this rule: "In the context of provision of services, an implied contract is formed if the party who provided the services can show that they were performed under circumstances where the recipient would be expected to pay for the services." *Marcatante v. City of Chicago*, No. 06 C 328, 2008 WL 905160, at *5 (N.D. Ill. Mar. 31, 2008).

Here, Welsh has not alleged that, at the time he presented his proposed business plan to the Conference, either: (1) he reasonably expected payment for his services in presenting that plan, or (2) the Conference agreed to make any payment (and, if so, what amount, or any basis for determining the amount of any such payment). In addition, Welsh came to the Conference's offices in May 1998 and met with various individuals, again without requesting any compensation. Count III fails for this reason as well.

## <u>CONCLUSION</u>

For the foregoing reasons, the Conference respectfully requests that the Court dismiss this case under Rule 12(b)(6) and award the Conference its fees under 15 U.S.C. § 1117.

THE BIG TEN CONFERENCE, INC.

Dated: May 7, 2008

By:     /s/Andrew S. Rosenman
Andrew S. Rosenman
Richard M. Assmus
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606-4637
(312) 782-0600

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, an attorney, certifies that on May 7, 2008, copies of the foregoing Defendant's Memorandum of Law in Support of its Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint and Request for Attorneys' Fees Pursuant to 15 U.S.C. § 1117, and this Certificate of Service were caused to be delivered to the following:

Robert P. Cummins
The Cummins Law Firm, P.C.
77 West Wacker Drive, Suite 4800
Chicago, Illinois  60601

and

Thomas C. Cronin
Cronin & Co., Ltd.
77 West Wacker Drive, Suite 4800
Chicago, Illinois  60601

via the Electronic Filing System of the U.S. District Court for the Northern District of Illinois.

MAYER BROWN LLP

By:   /s/Andrew S. Rosenman
Andrew S. Rosenman
Richard M. Assmus
Emily M. Emerson
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600