EXHIBIT 7

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 1999 WL 286289 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**H** Adusumilli v. Discover Financial Services, Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Indira ADUSUMILLI, Plaintiff,
v.
DISCOVER FINANCIAL SERVICES, INC.,
Defendant.
No. 98 C 6129.

April 19, 1999.

MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District J.
*1 Plaintiff, Indira Adusumilli, brings this action
against defendant, Discover Financial Services
("Discover"), alleging sexual harassment, disparate
treatment, and retaliation.[FN1] Discover has moved to
dismiss Adusumilli's First Amended Complaint
("FAC") pursuant to FED. R. CIV. P. 12(b)(6). For
the following reasons, the court grants Discover's
motion and dismisses each of Adusumilli's claims
with prejudice.

> FN1. The court further notes that although
> Adusumilli does not include a breach of
> contract count, it appears from the
> enumerated factual allegations in her
> complaint that she wishes to do so. FAC ¶¶
> 13-15. Adusumilli alleges that her job as
> Senior Secretary was supposed to begin on
> October 13, 1997, but that Discover
> requested that she delay her start date until
> November 2, 1997, which she apparently
> agreed to do. By starting in November rather
> than October, however, Adusumilli alleges
> that she lost a vacation day, a personal day,
> and a family/employee care day. As the
> court dismisses each of her federal causes of
> action, it declines to exercise supplemental
> jurisdiction over this purported state-law
> breach-of-contract claim.

I. BACKGROUND[FN2]

> FN2. The following facts are taken from
> Adusumilli's First Amended Complaint and
> are assumed to be true. See *Frederick v.
> Simmons Airlines, Inc.,* 144 F.3d 500, 502
> (7th Cir.1998).

Adusumilli has been employed by Discover since
August 10, 1997, first as a "temporary employee" in
the Targeted Acquisition department with the title of
Administrative Secretary, then as a regular employee
given the position of Senior Secretary in the
Financial Institution Division, and now as a member
of the Information Technology ("IT") group
following her request for a transfer from the
Financial Institution Division. While working in both
the Administrative and Senior Secretary positions,
Adusumilli alleges that a supervisor, Peter Valle,
"inappropriately ogled" at various parts of her body
on six separate dates. Specifically, Adusumilli alleges
that Valle ogled at her breasts on one occasion, her
legs on three occasions, her groin on one occasion,
and both her breasts and legs on one occasion.

Adusumilli further alleges that she complained at
various times about Valle's behavior. Sometime
between August 14, 1997 and August 20, 1997, she
reported the first three incidents of ogling to her
employment agency.[FN3] After Adusumilli successfully
applied for a regular position as Senior Secretary at
Discover, she made a second complaint, this time to
Discover personnel, about two subsequent incidents
of ogling. Adusumilli maintains that she was told that
no one else had ever complained about Valle but that
she had done "the right thing by reporting incidents
to appropriate people." FAC ¶ 19.

> FN3. At this time, Adusumilli was still a
> temporary employee; Adusumilli does not
> report the outcome of her complaint.

Following her second complaint, Adusumilli alleges
that Valle engaged in four other instances of
inappropriate behavior as well as one final instance
of ogling. Specifically, Adusumilli contends that
Valle: 1) offered to share baby-sitting services [FN4]
with Adusumilli so she and her husband could go to a
dinner dance during a work-related conference both
Adusumilli and Valle were attending in California; 2)

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 286289 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

attempted to sit next to her "all the time" during that conference; 3) invited her to attend an "appreciation lunch for another temporary secretary"; and 4) offered her a stroller for her infant daughter that his son had previously used. FAC ¶¶ 22, 23, 24, 26.

> FN4. Both Valle and Adusumilli have children who apparently attended the conference with them.

Adusumilli's complaint also contains numerous allegations that go either to her disparate treatment or retaliation claims. Specifically, she alleges that: 1) she expressed interest in the position of Federal Relationship Manager but was not promoted to this position even though less-qualified women have been promoted from Senior Secretary to other positions; 2) she was not paid for two days she took off because she and her child were sick; 3) her request for a transfer was granted, but she was transferred to the IT group, where she will not be able to advance given her present degree; 4) she has suffered unfavorable treatment in the IT group, where her computer is below par; 5) she has been told that her transfer date will be used for purposes of calculating her seniority; 6) she has been told she cannot apply for another position until she put in one year at her present position; 7) she has been required to undergo informal counseling regarding her job performance; 8) she was denied a matching grant for the $55 she donated to the Chicago Children's Museum; 9) her work hours at one point changed from 8 or 8:30-5 to 7:30-4; 10) her request for flexible scheduling to enable her to enroll her daughter in swim lessons was denied; 11) her request for a paid day off "to work on election day service" was denied even though the company has a policy of paying employees who engage in such service; 12) her requests for training classes were denied; 13) many suggestions she made for improving the company were not accepted, and she did not receive credit for those that were; 14) she received an unfair performance evaluation.

**\*2** Finally, Adusumilli notes that she filed two charges of discrimination with the EEOC. She filed the first on June 8, 1998, alleging sexual harassment, failure to promote, and improper use of her transfer date as her seniority date, and the second on December 8, 1998, adding a charge of retaliation to her first charge.^FN5

> FN5. The court has obtained information about the first EEOC charge from Adusumilli's original Complaint, as she attached the charge to that complaint but not to her First Amended Complaint. The second EEOC charge is attached to the First Amended Complaint, and it indicates that Adusumilli believes Discover retaliated against her for filing the first EEOC charge. In the second charge, Adusumilli mentions some but not all of the fourteen improper employment actions she lists in her complaint.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

On a Rule 12(b)(6) motion to dismiss, a complaint will be dismissed only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."Ledford v. Sullivan, 105 F.3d 354, 357 (7th Cir.1997). The issue is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence in support of his or her claims. Pickrel v. City of Springfield, 45 F.3d 1115, 1118 (7th Cir.1995). Courts must treat all well-pleaded factual allegations in the complaint as true and must also draw all reasonable inferences from those allegations in the plaintiff's favor. MCM Partners, Inc. v. Andrews-Bartlett & Assoc., 62 F.3d 967, 972 (7th Cir.1995). Courts need not, however, "strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint."Coates v. Illinois State Bd. of Ed., 559 F.2d 445, 447 (7th Cir.1977). Nor are they required to ignore facts set forth in a complaint or exhibits that undermine a plaintiff's claim, Hamilton v. O'Leary, 976 F.2d 341, 343 (7th Cir.1992), much less to accept legal conclusions alleged or inferred from the pleaded facts. Nelson v. Monroe Regional Medical Center, 925 F.2d 1555, 1559 (7th Cir.1991).

### B. Count I: Sexual Harassment

Adusumilli contends that she suffered hostile work environment sexual harassment based on six incidents of "inappropriate ogling" as well as the four additional incidents outlined above. Even taking all of these incidents together, there is no question that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 286289 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Adusumilli's first count fails to make out an actionable claim for sexual harassment.

Adusumilli fails to state a claim for sexual harassment because the alleged conduct was not severe, debilitating, or pervasive enough to create a hostile work environment. "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.' " *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986) (citation omitted). Accordingly, to state a claim, the complained-of conduct must be "hostile or deeply repugnant" rather than merely "unpleasant." *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 431 (7th Cir.1995) (rejecting plaintiff's claim of hostile work environment even though plaintiff alleged that her supervisor called her "pretty girl," made grunting noises when she wore a skirt, suggested she "run around naked," called her his "Anita Hill," and pantomimed masturbation in her presence). Moreover, "isolated and innocuous" incidents will not rise to the level required to establish hostile work environment, whatever the plaintiff's subjective perceptions. *See Doe v. R.R. Donnelly & Sons Co.,* 42 F.3d 439, 444 (7th Cir.1994).

*3 As an initial matter, the court finds that the six instances of "inappropriate ogling" that Adusumilli alleges are not actionable. Numerous courts, including the Seventh Circuit, and two other district courts aside from this one,[FN6] have told Adusumilli that ogling is not actionable. *See Adusumilli v. City of Chicago,* 1997 WL 769457, *9 (N.D.Ill.1997) (granting employer's motion for summary judgment and holding that allegations that co-workers ogled Adusumilli and touched her arm, fingers, and buttocks did not give rise to a Title VII claim), *aff'd Adusumilli v. City of Chicago,* 164 F.3d 353, 361-62 (7th Cir.1998) (affirming summary judgment against Adusumilli on her Title VII claim; *Adusumilli v. Illinois Institute of Technology,* 1998 WL 601822, *4 (granting motion to dismiss Title IX claim of hostile work environment sexual harassment in holding that Adusumilli's allegations that various professors and students ogled her and touched her hand, shoulder, back, leg, and breast failed to state a claim). Indeed, in each of these cases Adusumilli alleged some form of touching in addition to ogling, and still her claims were rejected. In this case, she

does not allege that anyone, much less Valle, touched her on any occasion.

> FN6. The court notes that it advised Adusumilli in open court prior to the filing of her First Amended Complaint that allegations of ogling did not rise to the level of actionable sexual harassment.

Moreover, it is clear that the other instances of conduct Adusumilli alleges in detail in her First Amended Complaint constitute innocuous and isolated incidents that do not rise to the level of creating a hostile work environment. Particularly puzzling are Adusumilli's complaints about what appear, on their face, to be friendly, even generous, gestures on the part of her supervisor, specifically, his offer to share baby-sitting services, his offer to hand down a stroller for her daughter's use, and his invitation to attend a lunch honoring a co-worker. But even assuming Adusumilli perceived these offers as offensive, the court rejects her contention that her subjective perceptions control. The Supreme Court has stated that harassment claims must be evaluated using a 'reasonable person' standard, not simply per the plaintiff's subjective perception. *See Harris v. Fork Lift Systems, Inc.,* 510 U.S. 17, 23 (1993) (holding that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview"); *McKenzie v. Illinois Dept. of Transportation,* 92 F.3d 473, 480 (7th Cir.1996) (citing *Harris* for the proposition that courts are "required to consider the alleged harassment from an objective perspective and ask whether a reasonable person would perceive his or her environment to be hostile or abusive"). Moreover, as *Doe* makes clear, whatever a plaintiff's subjective perceptions, "isolated and innocuous" incidents do not suffice to state a claim for hostile work environment sexual harassment. *Doe,* 42 F.3d at 444. Finally, the court notes that in numerous other cases, including *Baskerville* and Adusumilli's own previous suits, courts have held that conduct much more severe than the conduct Adusumilli currently alleges does not constitute actionable sexual harassment. *See, e.g., McKenzie,* 92 F.3d at 479-80 (holding that three sexually suggestive comments over a three-month period did not create a hostile work environment); *Saxton v. American Telephone & Telegraph Co.,* 10

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.3d 526, 534-35 (7th Cir.1993) (holding that supervisor who inappropriately teased plaintiff, kissed her, touched her leg and upper thigh, and lurched at her did not create hostile work environment).

**\*4** Under these circumstances, it is clear that Adusumilli cannot maintain any claim of sexual harassment. Moreover, given the number of times Adusumilli has been warned about what does and does not rise to the level of an actionable claim for sexual harassment, the court dismisses Count I with prejudice.

*C. Count II: Disparate Treatment*

The basis for Adusumilli's disparate treatment claim in her First Amended Complaint is far from clear, but the court will treat this claim as alleging sex discrimination.[FN7] Because Adusumilli nowhere alleges that she was treated less favorably than similarly situated male employees, the court must also dismiss Count II.

> FN7. The court believes this is the most reasonable assumption concerning the basis for Adusumilli's claim of disparate treatment in light of her initial EEOC charge, in which she alleged sexual harassment and checked the box for "sex discrimination," and her initial complaint in this court, which identified sex discrimination in violation of Title VII as the basis for her claim.

As an initial matter, the court notes that nowhere in either of Adusumilli's EEOC charges does she allege disparate treatment. On the contrary, Adusumilli alleges sexual harassment, failure to promote, improper application of the seniority system, and retaliation, and the allegations she includes in her EEOC charges that *could* be construed as raising a disparate treatment claim [FN8] are expressly cited as examples of retaliation rather than disparate treatment. Moreover, many of the allegations Adusumilli includes in her *complaint* that could be construed as raising a disparate treatment claim [FN9] were not included in either of her EEOC charges. The Seventh Circuit has stated that "allegations not contained in an EEOC charge cannot be contained in the complaint." *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993) (citation

omitted) (holding that plaintiff who included training, discharge, and sexual harassment claims in her EEOC charges was barred from bringing job transfer claim because that claim was not included in either of the charges nor did it reasonably grow out of the claims made in the charges). Even construing Adusumilli's complaint liberally, at least some of her allegations, if not her disparate treatment claim as a whole, would thus appear barred because she did not first raise them in her EEOC charges.

> FN8. Specifically, the negative performance evaluation, inflexible scheduling, denial of credit for Adusumilli's suggestions for company improvement, denial of a matching grant, and denial of requests for training.

> FN9. For instance, her allegedly slower computer and her request for a paid day off "to work on election day service."

The court need not, however, decide this question, because even if it were to construe the allegations in Adusumilli's complaint as properly raising a disparate treatment claim for each identified difference in treatment, the court would still find that Count II fails to state a claim because Adusumilli has failed to allege a prima facie case of disparate treatment on the basis of sex. To state a claim for sex discrimination, Adusumilli must allege the elements of the prima facie case under the *McDonnell-Douglas* framework,[FN10] namely, that she: 1) is a member of the protected class, i.e, a woman; 2) performed her job satisfactorily; 3) suffered an adverse employment action; and 4) was treated less favorably than similarly situated male employees. *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 204 (7th Cir.1996).

> FN10. Adusumilli must proceed under the indirect method of proving discrimination set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973), because she has not alleged any direct evidence of sex discrimination.

Once again, the court notes its skepticism that several of the actions Adusumilli complains of could constitute adverse employment actions, but the court need not decide this issue because it finds that Adusumilli has not alleged the fourth prong of the prima facie case: that Discover treated her less

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 286289 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

favorably than similarly situated males. The complaint is simply devoid of any allegation that similarly situated *male* employees received faster computers, matching grants, better performance reviews, etc. Rather, Adusumilli alleges that "other employees" and "secretaries" received benefits that she was denied. The First Amended Complaint thus not only fails to include allegations from which the court could infer that Adusumilli was denied various benefits because of her status as a woman, but it also actually demonstrates the falsity of such an assertion. According to Adusumilli's own complaint, everyone else-men and women alike-received better treatment than she did.

**\*5** Accordingly, the court dismisses Count II with prejudice.

### D. *Count III: Retaliation*

Adusumilli likewise fails to state a claim for retaliation. According to Adusumilli, the poor performance evaluation she received from Discover, coupled with the company's decision to place her in informal counseling, has "caus[ed] damage to [her] career advancement."FAC ¶ 51. Adusumilli further flatly contends that the evaluation and informal counseling are "a direct result of her complaints" to Discover and to the EEOC. *Id.* ¶ 52.

To state a claim for retaliation, Adusumilli must allege that: 1) she engaged in statutorily protected expression; 2) she suffered an adverse job action; and 3) a causal link exists between the protected expression and the adverse action. *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1457 (7th Cir.1994). Although Adusumilli has alleged that she engaged in statutorily protected activity-at least where her EEOC charge is concerned-the court finds that she has not shown the requisite causal link between the allegedly adverse employment actions she suffered and the complaints she filed with Discover and the EEOC.

As an initial matter, the court doubts that most of the employment actions Adusumilli alleges can be considered "adverse" for purposes of a retaliation claim. Although quantifiability is not necessary to establish that an employment action is adverse, *see Collins v. State of Illinois,* 830 F.2d 692, 703 (7th Cir.1987) (holding that "adverse job action is not

limited solely to loss or reduction of pay or monetary benefits" but, rather, "can encompass other forms of adversity as well," such as transfer to a new department with loss of nonquantifiable benefits such as one's own office, business cards, and listings in professional directories), a "materially adverse change in the terms and conditions of employment" must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."*Crady v. Liberty National Bank and Trust Co. of Indiana,* 993 F.2d 132, 135 (7th Cir.1993). Examples of materially adverse changes include termination of employment; demotion, as evidenced by a decrease in wage or salary; a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; or other indices that might be unique to a particular situation. *See id.*Being denied a matching grant for a contribution Adusumilli made to the Children's Museum, having some but not all of her suggestions for company improvement accepted, or having a slow computer, for instance, clearly do not rise to the level of a "materially adverse change in the terms and conditions of employment."Even some of Adusumilli's more serious allegations-such as the negative performance evaluation and lateral transfer to the IT department-may not rise to the level of an adverse employment action. *See Smart v.. Ball State University,* 89 F.3d 437, 440-41 (7th Cir.1996) (holding that negative evaluations, standing alone, cannot constitute an adverse employment action and citing cases holding that lateral transfers do not rise to the level of an adverse employment action).

**\*6** The court need not, however, decide whether each of the actions to which Adusumilli objects qualifies as an actionable adverse action because it finds that Adusumilli has failed to allege the third prong of the prima facie case: causality. Although Adusumilli alleges in detail what actions she considers adverse, she fails to allege that any of the actors or decision-makers involved in the implementation of those actions knew that she had complained to anyone at Discover or the EEOC either about Valle's alleged sexual harassment, [FN11] the failure to promote, or the seniority system, much less that any of the relevant individuals took action against her *due to* these complaints. Consequently, she has not alleged the third element of the prima facie case of retaliation. *See e.g., McDonnell v. Cisneros,* 84 F.3d 256, 259 (7th Cir.1996) (dismissing retaliation claim where employee alleged no causal connection between retaliatory conduct and protected expression);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 6
Not Reported in F.Supp.2d, 1999 WL 286289 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*Adusumilli v. Illinois Institute of Technology,* 1998 WL 601822, *5 (N.D.Ill.1998) (dismissing Adusumilli's retaliation claim because her "conclusory assertions do not satisfy" the requirement that plaintiff show a causal connection between the allegedly adverse action and the protected activity).

> FN11. Indeed, in her Response, Adusumilli effectively abandons the argument that Discover retaliated against her due to her prior complaints about sexual harassment as she mentions this claim only with respect to her transfer to the IT department. As Adusumilli herself requested this transfer, however, *see* FAC ¶ 29, the court cannot find that the transfer itself occurred in retaliation for Adusumilli's complaints about Valle's conduct.

Accordingly, Count III is also dismissed with prejudice.

## III. *CROSS-REQUESTS FOR SANCTIONS*

Emphasizing that Adusumilli has previously brought-and lost-two nearly identical lawsuits, the main basis for which was her subjective perception that "ogling" was actionable sexual harassment, Discover suggests that this court should sanction Adusumilli to deter her from filing future frivolous complaints. Adusumilli responds that "[e]very single complaint I made is a story of 100% truth. I provided evidence in every case and definitely they are not frivolous.... I have not done any mistakes in my life from the time I was born until today.... I do not need to alter my behavior because I am right."Response at 13, 15. She further requests that Discover be "fined and given additional punishment for their false assumptions and presumptions" in accusing her of filing frivolous complaints. Response at 13.

As Discover points out, three other courts-two district courts in which Adusumilli filed suit and the Seventh Circuit, on appeal of one of these suits-aside from this court have informed Adusumilli that "ogling" does not constitute actionable sexual harassment, despite her subjective perception of such conduct. FED. R. CIV. P. 11 holds even unrepresented parties to a specified standard for filing claims in federal court. Specifically, the rule states that "[b]y

presenting to the court a pleading, ... an unrepresented person is certifying that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances,-*.... (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law" (emphasis added).FED. R. CIV. P. 11(b).

*7 Noting that "[f]rivolous, vexatious, and repeated filings by *pro se* litigants interfere with the orderly administration of justice by diverting scarce judicial resources from cases having merit and filed by litigants willing to follow court orders,"*U.S. ex rel. Verdone v. Circuit Court for Taylor County,* 73 F.3d 669, 671 (7th Cir.1995), the Seventh Circuit has stated that sanctions may be imposed on such a litigant in accordance with a court's "obligation to protect and preserve the sound and orderly administration of justice."*Lysiak v. Comm'r of Internal Revenue,* 816 F.2d 311, 313 (7th Cir.1987).

Such sanctions may entail but are not limited to monetary sanctions. FED R. CIV. P. 11(c)(2). For an example of monetary sanctions, *see Alexander v. U.S.,* 121 F.3d 312, 313, 315 (7th Cir.1997) (fining *pro se* litigant $500 for filing fourth frivolous pleading substantially identical to prior pleadings). Courts may also award attorneys' fees and court costs against *pro se* litigants who file frivolous or vexatious suits. Courts may even restrict a litigant's access to the courts. *Lysiak,* 816 F.2d at 313 (holding that "[a] court faced with a litigant engaged in a pattern of frivolous litigation has the authority to implement a remedy that may include restrictions on that litigant's access to the court" and enjoining *pro se* litigant from filing additional pleadings until previous monetary sanctions were paid); *Verdone,* 73 F.3d at 674 (ordering serial litigant to seek leave to file future pleadings).

Adusumilli's pattern of filing and pressing suits that have no legal basis is both disturbing and unduly costly to defendants and the courts alike. The court takes particular notice of the fact that, after losing two lawsuits in which she alleged similar but more serious conduct, Adusumilli pursued the instant lawsuit, which levels less serious accusations of sexual harassment than the previous suits-and she did so even after being cautioned by this court that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 286289 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

complaints of ogling would not suffice to state a claim for hostile work environment sexual harassment. It thus appears to this court that Adusumilli has not taken prior court rulings and warnings seriously.

As Adusumilli has put this court and yet another defendant to the time and expense of addressing a nearly identical claim that has been repeatedly rejected in her previous suits, the court agrees with Discover that some type of sanction would be appropriate. Because Discover has not, however, requested sanctions in accordance with Rule 11(c)(1)(A),[FN12] the court declines to order them in this case. Nevertheless, the court wishes to make it clear to Adusumilli that she could have been sanctioned for filing this baseless suit-and that she has been so warned. The court will circulate a copy of this opinion to every judge in this district.

> FN12. The court notes that neither Adusumilli nor Discover have moved for sanctions in accordance with subdivision (c)(1)(A), which requires, among other things, that parties moving for sanctions make such requests "separately from other motions or requests" and "describe the specific conduct alleged to violate subdivision (b)."FED. R. CIV. P. 11(c)(1)(A). In this case, both Discover and Adusumilli have included their requests for sanctions in the papers they filed regarding the motion to dismiss rather than moving separately for sanctions as subdivision (c)(1)(A) requires.

To the extent that Discover and Adusumilli merely suggest that this court, on its own initiative, sanction the other party, the court declines to do so given the instant order to dismiss this case with prejudice.

## IV. *CONCLUSION*

For the foregoing reasons, Discover's motion to dismiss is granted as to all three counts of the First Amended Complaint, and this case is dismissed with prejudice.

N.D.Ill.,1999.
Adusumilli v. Discover Financial Services, Inc.
Not Reported in F.Supp.2d, 1999 WL 286289 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609281 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**DSMR, LLC v. Goldberg
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern Division.
DSMR, LLC, et al. Plaintiffs,
v.
Elliott GOLDBERG, Defendant.
**No. 02 C 5203.**

March 25, 2004.

Robert J. Winicki, Winicki Law Firm, P.A., Jacksonville, FL, for Plaintiffs and Counter-Defendants.
William D. Anthony, Jr., Attorney at Law, Chicago, IL, Roger J. Bernstein, New York, NY, Robert N. Harris, Law Office of Robert N. Harris, Miami, FL, for Defendant and Counter-Claimants.

*MEMORANDUM OPINION AND ORDER*

GOTTSCHALL, J.
*1 Plaintiffs DSMR, LLC, and Donovan Industries, Inc., and defendant Elliott Goldberg dispute ownership of the Resist-A-Band trademark, which identifies a type of resistive exercise band commonly used in physical therapy. Both parties claim that they acquired rights to the Resist-A-Band mark from SPRI Medical & Rehab Products Corp. ("SPRI") in separate bankruptcy proceedings. Plaintiffs originally brought this action against defendant in the United States District Court for the Middle District of Florida, seeking declaratory and injunctive relief under the Lanham Act, 15 U.S.C. § 1051, *et seq.,* and the case was later transferred to this court. Both parties have filed cross-motions for summary judgment, asserting exclusive ownership in and rights to the Resist-A-Band trademark. For the reasons that follow, the court finds that plaintiffs DSMR and Donovan Industries possess common law rights arising from their commercial use of the Resist-A-Band trademark and that defendant Goldberg has no rights to the mark. Thus, plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied.

BACKGROUND

The parties in this case have filed cross-motions for summary judgment: plaintiffs DSMR and Donovan Industries seek a declaration that they own the rights to the Resist-A-Band trademark through a series of assignments originating with SPRI and though their use of the mark in commerce; and defendant Goldberg claims that all earlier assignments and purported sales of the trademark are invalid and that he owns the mark through a later purchase agreement with SPRI. The court notes at the outset that substantial relationships exist among the entities involved with this litigation and the Resist-a-Band trademark. Gary Diaz owns both R. Gary Diaz Enterprises, Inc. ("Diaz Enterprises") and Sports Medical Rehab Products, Inc. ("Sports Medical"), John Vuckovich is both the president of Sports Medical and a former officer of SPRI, and Donovan Industries holds an ownership stake in DSMR. Further, the law firm of Foley & Lardner represented both SPRI and Sports Medical in their trademark matters.

*Sale and Assignment of the Resist-A-Band Trademark*

For the purpose of this litigation, SPRI is the original owner and first entity to attempt registration of the Resist-A-Band trademark. In August of 1999 SPRI filed for bankruptcy protection under Chapter 11 in the United States Bankruptcy Court for the Northern District of Illinois. As part of the bankruptcy proceedings, SPRI filed a Schedule of Personal Property which listed patents, copyrights, and other intellectual property, including the "Resist-A-Band Trademark in Process." On September 23, 1999, the bankruptcy court entered an agreed order authorizing the sale of SPRI's assets to Diaz Enterprises, which provided in part:
1) all of the DEBTOR'S assets including but not limited to, accounts receivable inventory, machinery, computer equipment, all causes of action, telephone numbers (to the extent possible), the DEBTOR'S right, title, and interest in any and all of its intellectual property, including but not limited to license trademarks (sic), trade secrets, customer lists, trades names, and associated good will.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609281 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

*2 From plaintiffs' perspective, the agreed order (and subsequently executed bill of sale) sold outright SPRI's rights, title, and interest in the Resist-A-Band trademark to Diaz Enterprises. Defendant Goldberg, however, regards it differently. Goldberg was a party to the agreed order to the extent that he and his companies agreed to release certain claims against SPRI in exchange for money. From his point of view, since Resist-A-Band was only a "trademark in process" when SPRI declared bankruptcy, it did not constitute intellectual property or a trademark as defined in the agreed order and therefore was not sold to Diaz Enterprises.

Notwithstanding Goldberg's denial of the sale of the Resist-A-Band mark from SPRI to Diaz Enterprises, the mark continued to pass by assignment and sale to several entities, each of whom believed that the transaction preceding theirs was legitimate. First, shortly after completing its purchase of SPRI's assets, which it thought to include the Resist-A-Band mark, Diaz Enterprises assigned its rights in the mark to Sports Medical. To reflect this and the earlier assignment of the mark from SPRI to Diaz Enterprises, the parties filed notices of assignment with the United States Patent and Trademark Office ("PTO"). In October of 2000, the PTO issued Notice of Recordation of Assignment Documents reflecting both transactions.[FN1] Then, one year later in October of 2001, Sports Medical and plaintiff DSMR executed an "Asset Purchase and Sale Agreement," in which Sports Medical purported to sell DSMR numerous assets, including inventory, equipment, license agreements and other contracts, accounts receivable, and intellectual property (including trademarks). Finally, in March of 2002, the Resist-A-Band mark was assigned to Donovan Industries from DSMR, and this transfer was reflected in a PTO Notice of Recordation of Assignment Document dated May 14, 2002.

> FN1. The PTO maintains an Assignment Services Division that is separate from Trademark Operation. Recording a document with the Assignment Services Division does not change the ownership status in the Trademark Reporting and Monitoring System ("TRAM"). The Assignment Services Division does not determine the validity of an assignment document or the effect on the ownership of a

mark unless the assignee attempts to take action in connection with an application or registration. See 37 C.F.R. § 3.54; Trademark Manual of Examining Procedure at § 503.01 (3d ed., rev.2003).

SPRI eventually converted its bankruptcy to Chapter 7, and in February of 2000 the bankruptcy court held a hearing to determine whether to authorize the trustee's request to sell SPRI's interest in the Resist-a-Band trademark to Goldberg for $2,500 plus an interest in future royalties. DSMR appeared at this hearing and objected to the proposed sale because it believed that it had acquired the mark through the 1999 bankruptcy proceeding and the subsequent assignments described above. The bankruptcy court declined to determine whether SPRI retained any interest in the Resist-a-Band trademark, and stated "[t]he trustee is only selling what the trustee has, and the trustee is choosing to let somebody else decide whether that has any value. The only thing I'm really worried about is that the buyer is fully aware of the circumstances and, apparently, the buyer is." The court then authorized the trustee to sell the Resist-a-Band mark to Goldberg "subject to all existing liens, claims, and encumbrances...."

*Registration and Use of the Resist-A-Band Trademark*

*3 Separate from the chain of title question are the issues related to the Resist-A-Band mark's use in commerce and its registration. Trademark prosecution for the Resist-A-Band mark began well before SPRI declared bankruptcy or took steps to sell or assign the trademark. On February 10, 1998, SPRI filed an intent to use ("ITU") application with the PTO. The filing of an ITU, which must be based on the applicant's showing of a "bona fide intention" "to use a trademark in commerce," establishes priority of use as of the date of filing, provided the applicant files a statement of use within 6 or up to 24 months. See 15 U.S.C. § 1051(b). At the time SPRI filed its ITU for Resist-A-Band, SPRI had neither sold any products with the mark nor had any concrete plans to develop, market, or sell any such products; and to date, SPRI has never made or sold a Resist-A-Band product.

As early as March 1, 2000, Sports Medical began using the Resist-A-Brand mark in conjunction with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609281 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

its color-coded resistive exercise band products. John Vuckovich, the president of Sports Medical who also remained an officer of SPRI, stated in his deposition that SPRI was aware of Sports Medical's use and that SPRI was letting it happen. At that time, neither SPRI, nor defendant Goldberg, nor any other company had used the Resist-A-Brand mark in commerce. However, prior to Sports Medical's use, in December of 1999, SPRI had asked for an extension of time in which to file a statement of use for the mark, as required by 15 U.S.C. § 1051(c) to complete the registration process. When SPRI eventually filed its statement of use with the PTO in June of 2000, it filed the application under its own name but submitted evidence of Sports Medical's use of the Resist-A-Band trademark to prove that the mark had been used in commerce. None of SPRI's evidentiary submissions to the PTO showed the name SPRI in conjunction with the Resist-A-Brand mark and SPRI never claimed to make or sell such products. Though registration of the mark was delayed for several months due to an administrative filing error (the PTO found the statement of use unacceptable because one of the pages began mid-sentence), on January 29, 2002, the PTO issued Registration No. 2,534,415 for the Resist-a-Band trademark, and the registration showed title to be in SPRI.[FN2]

> FN2. Since the recording of the assignment documents did not update the TRAM, the normal practice of the PTO would be to issue the registration in the name of the original applicant. The PTO will issue a registration in the name of an assignee, if the assignee files a written request that the registration be issued in its name and records the appropriate document in the Assignment Services Division. Here, DSMR and Donovan Industries have never requested that the PTO issue the registration in either name. *See* 37 C.F.R. § 3.85; Trademark Manual of Examining Procedure at § 502.01.

## DISCUSSION

The parties in this case have filed cross-motions for summary judgment. Summary judgment is appropriate when there is no genuine issue of material fact, and the party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). In considering cross-motions for summary judgment, the court must examine all the admissible evidence and "construe all inferences in favor of the party against whom the motion under consideration is made."*Allen v. City of Chicago,* 351 F.3d 306, 311 (7th Cir.2003). Here, although both parties argue that several facts material to the success of the other party's summary judgment motion are "in dispute," the court finds instead that the parties' quarrel stems from their conflicting opinions about trademark law and the legal effect of the documents purporting to buy, sell, assign, and register the Resist-A-Band mark. Thus devoid of any genuine issue of material fact and chiefly concerning a matter of law, this case may properly be decided on summary judgment.

**\*4** Plaintiffs DSMR and Donovan Industries argue that they own the right to use the Resist-a-Band mark because they bought the trademark from Sports Medical, who was the first entity to use the mark in commerce and acquire common law rights in the mark. Though the parties dispute whether the assignment of the Resist-A-Band mark was valid as between SPRI and all later purported buyers of the trademark, the court need not examine each link in the chain of transfer to determine who owns the mark. Nor must the court determine which, if any, of the various PTO filings regarding the Resist-A-Band trademark establish ownership under the Lanham Act. Since an entity acquires rights in a trademark only through actual commercial usage, it is possible that one company could "own" the mark on paper but lose its rights if another company establishes bona fide commercial use of the trademark first. In this case, it is undisputed that Sports Medical was the first to use the Resist-A-Brand mark in commerce and to establish common law rights in the trademark. It is also undisputed that plaintiffs later bought the trademark from Sports Medical and have continued to use of the mark in commerce ever since. From these facts the court can conclude that plaintiffs hold ownership rights in the Resist-A-Band trademark which are enforceable against defendant Goldberg's challenges.

Trademarks are unlike other forms of intellectual property, such as patents, in that an entity only acquires rights in a trademark through the commercial use of the mark. *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.,* 188 F.3d 427, 434 (7th Cir.1999) ("The party who first appropriates the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609281 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

mark through use, and for whom the mark serves as a designation of source, acquires superior rights to it."); *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.,* 80 F.Supp.2d 815, 879 (N.D.Ill.1999) ("A trademark owner must also show that the mark has been in public use."); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 991 F.Supp. 1012, 1018 (N.D.Ill.1998) ("Trademark rights are acquired by adoption and use, not by registration."); *S Indus., Inc. v. Stone Age Equip., Inc.,* 12 F.Supp.2d 796, 805 (N.D.Ill.1998) ("Although registration establishes a rebuttable presumption that the mark was first used on the filing date, ... [s]imply filing an application is not sufficient to create rights in the mark."). Also unlike other forms of intellectual property, a trademark application is always subject to previously established common law trademark rights of another party. *Johnny Blastoff,* 188 F.3d at 435.

Under the common law, ownership is conferred on "the person who employs the 'first actual use of a mark in a genuine commercial transaction." ' *Stone Age Equip.,* 12 F.Supp.2d at 805 (quoting *Allard Enters., Inc. v. Advanced Programming Res., Inc.,* 146 F.3d 350, 358 (6th Cir.1998)). Said another way, "[u]nder the common law, one must win the race to the marketplace to establish exclusive use of the mark." *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992). To establish use, the mark must be attached to the product or service sold to the public, and the use must be continuous and bona fide. *Stone Age Equip.,* 12 F.Supp.2d at 805. The amount of activity sufficient to constitute use is a factual question determined on a case by case basis. *Id.* "The guiding principle is that the activity be 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." ' *Id.* (quoting *Blue Bell, Inc. v. Farah Mfg. Co.,* 508 F.2d 1260, 1266 (5th Cir.1975)).

**\*5** Requiring use before a party acquires trademark rights supports many important public policies. "By insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from reserving brand names in order to make their rivals' marketing more costly." *Zazu Designs,* 979 F.2d at 503. Public sales also provide others with notice that they should not invest resources to "develop a mark similar to one already used in the trade." *Id. See also* William M. Landes and Richard A. Posner, *Trademark Law: An*

*Economic Perspective,* 30 J.L. & Econ. 265, 281-84 (1987). Moreover, the use requirement rewards those who act quickly to bring their goods to the marketplace. *Zazu Designs,* 979 F.2d at 504. Finally and perhaps most importantly, use in commerce allows consumers to associate a mark with the user's goods. *Id.* at 503.

Here, plaintiffs DSMR and Donovan Industries satisfy the requirements for use of the Resist-A-Band trademark under common law. First, it is undisputed that plaintiffs and their immediate predecessor, Sports Medical, are the first and only companies to use the Resist-a-Band mark in commerce. Second, plaintiffs and Sports Medical have used the mark in conjunction with resistive exercise bands continuously for over three years, and since 2001, DSMR and Donovan Industries have sold over $500,000 worth of goods under the Resist-A-Band mark. Third, both SPRI and defendant Goldberg, as well as other competing companies, had contemporaneous notice of plaintiffs' and Sports Medical's commercial use of the trademark both in the resistive band market and through SPRI's registration of the mark with the PTO, which was known by all to be supported by Sports Medical's commercial use. Finally, since no other company (at least as far as the court has been made aware) sells any goods using the Resist-A-Band mark, it seems safe to say that consumers have come to associate the trademark with DSMR's and Donovan Industries' products.

Despite this clear evidence of use by plaintiffs and Sports Medical, Goldberg insists that SPRI retains ownership of the Resist-A-Band trademark because it is the registered owner of the mark. Even assuming that SPRI never executed a valid sale or assignment of the mark to Diaz Enterprises or anyone other than Goldberg, the flaws in defendant's argument are many, beginning with the fact that "an intent to use a mark creates no rights a competitor is bound to respect." *Zazu Designs,* 979 F.2d at 504. This means that despite SPRI's filing of an ITU application in February of 1998, which Goldberg argues gives SPRI priority over subsequent unregistered users, the Resist-A-Band mark remained available for use by another entity until such time SPRI put the mark to use, which it never did. To find otherwise would lead to an absurd situation where, after learning that a competitor intended to adopt a trademark, a company

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 609281 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

could file an ITU application for the competitor's intended mark, wait for the competitor to use the mark in commerce, and then submit photographs of the competitor's use in the marketplace in support of its own registration, thereby gaining priority rights and thwarting the competitor's attempt to establish common law rights in the mark. This is essentially the result defendant favors in this case, but the court finds such an outcome both illogical and contrary to well-established trademark law. Therefore, the court rejects defendant's argument that SPRI's ITU application alone, without commercial use of the mark by SPRI, gave SPRI superior rights to the mark over all future unregistered users.

**\*6** Moreover, while it is undisputed that SPRI was the first to register the mark with the PTO, registration "establishes only a rebuttable presumption of use as of the filing date," *Zazu Designs, 979 F.2d at 504.* Here, there is ample evidence to rebut the presumption that SPRI possessed any rights in the mark after Sports Medical began using it in commerce. First, SPRI never marketed or sold products under the Resist-A-Band trademark and has admitted that it never planned to. Second, SPRI had actual notice that Sports Medical was selling Resist-A-Band goods months before SPRI filed for registration of the mark. And third, when SPRI filed its application for registration, specifically its statement of use, it was supported by Sports Medical's, and not its own, use of the mark. These undisputed facts establish that Sports Medical and, by extension, DSMR and Donovan Industries, won the race to use the mark and that SPRI's registration came too late to confer any rights on SPRI or, by extension, Goldberg.<u>FN3</u>

> FN3. Under the Lanham Act, SPRI could appropriate the benefit of Sports Medical's first use to gain its trademark registration, but only if SPRI controlled the nature and quality of the goods with which the mark was used. 15 U.S.C. § 1055 ("If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be."). Here, however, SPRI had absolutely no control over Sports Medical's or, later, DSMR's and

Donovan Industries', use of the Resist-a-Band mark, and neither SPRI nor Goldberg ever used the mark in commerce. Thus, SPRI and Goldberg cannot invoke § 1055 to claim the benefit of Sports Medical's use and obtain superior rights in the mark.

Having concluded that plaintiffs acquired common law rights to the Resist-A-Band trademark through their exclusive and continuous commercial use and that defendant has no rights in the mark, the court need not decide whether the mark was properly assigned or licensed from SPRI to Diaz Enterprises or from Diaz Enterprises to Sports Medical, and whether it was properly registered with the PTO.

CONCLUSION

Plaintiffs' motion for summary judgment is granted. Plaintiffs are entitled to a declaration that they own the rights to use the Resist-A-Band trademark and that defendant has no rights in the mark. Consequently, defendant's motion for summary judgment on his claims for trademark infringement and false designation of origin, as well as his counter-claims, is denied.

N.D.Ill.,2004.
DSMR, LLC v. Goldberg
Not Reported in F.Supp.2d, 2004 WL 609281 (N.D.Ill.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

▷S Industries, Inc. v. Ecolab Inc.
N.D.Ill.,1999.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
SINDUSTRIES, INC., Plaintiff,
v.
ECOLAB INC., Defendant.
ECOLAB INC., Counter-Plaintiff,
v.
S INDUSTRIES INC., et al., Counter-Defendants.
No. 96 C 4140.

March 16, 1999.

MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District J.
*1 Plaintiff S Industries (SI) is no stranger to the
Northern District of Illinois. It filed at least 33
trademark infringement lawsuits in this Court from
1995 to 1997, all involving the mark STEALTH. In
the past year alone, judges in this district have
granted summary judgment against SI in five
different cases. See S Indus., Inc. v. JL Audio, Inc., 29
F.Supp.2d 878 (N.D.Ill.1998) (Coar, J.); S Indus.,
Inc. v. Stone Age Equip., Inc., 12 F.Supp.2d 796
(N.D.Ill.1998) (Castillo, J.); S Indus., Inc. v. Centra
2000, Inc., 96 C 3524, 1998 WL 157067 (N.D.Ill.
March 31, 1998) (Lindberg, J.); S Indus., Inc. v. GMI
Holdings, Inc., 96 C 2232, 1998 WL 67627 (N.D.Ill.
Jan. 30, 1998) (Kocoras, J.); S Indus., Inc. v.
Diamond Multimedia Sys., Inc., 991 F.Supp. 1012
(N.D.Ill.1998) (Andersen, J.). Now before the court
are cross-motions for summary judgment arising
from SI's allegations that yet one more company's use
of the word STEALTH infringes its trademark. For
the reasons set forth below, the court grants summary
judgment against SI.

I. BACKGROUND

Leo Stoller is the sole shareholder and sole employee
of SI as well as of a number of other entities,
including Stealth Industries, Stealth Brand Products,
and Sentra Sporting Goods. Through these
businesses, Stoller owns or is the assignee or

exclusive licensee of seven federal registrations for
the trademark STEALTH for the following items:
sporting goods; bicycles, motorcycles, and boats;
microwave-absorbing automobile paint; billiard and
darts equipment; metal alloys for use in sporting
goods, auto locks, and window locks; comic books;
and lawn sprinklers. SI also claims to have been
using STEALTH in connection with its sale of pest
elimination devices and services since the mid-1980s.

Ecolab, the defendant in this action, has been using
the mark STEALTH on pest elimination devices and
services since 1993. That year Ecolab filed an
application to register the mark STEALTH FLY
SYSTEMS in connection with its flying insect
electronic/light traps, and later it also filed an
application to register STEALTH in connection with
its pest elimination services. After both of Ecolab's
registration applications were published for third-
party opposition, SI opposed them and filed
applications to register STEALTH for use in
connection with its own pest elimination products
and services. SI also filed this lawsuit, seeking both
injunctive and monetary relief, and the Patent and
Trademark Office suspended the trademark
registration proceedings pending the outcome of this
action.

SI has called to the court's attention the following
evidence that it has used the mark STEALTH in
connection with its provision of pest elimination
products: one invoice dated October 8, 1986, for the
sale of 42 bug zappers-18 are described as
STEALTH bug killers and 24 as STEALTH
SENTRA bug killers-to one retailer; one invoice
dated January 11, 1987, for the sale of two
STEALTH bug zappers to another retailer; three
invoices dated January 10, 1992, for the sale of one
STEALTH 2001 bug killer each to three other
retailers; an undated ledger sheet, handwritten by
Stoller, which he claims is a chart of his total sales of
"STEALTH Bug Killers" from 1991 through 1995;
seventy-eight letters dated October 10, 1992
addressed to "Hardware Dept." or "Buyer,
Hardware" at various stores and corporate offices
"quoting ... Stealth's 1992 line of electronic insect
control products"; three invoices dated February 11,
1994, for the sale of one STEALTH 2001

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

ADVANCED bug killer each to "Buyer, Hardware" at three different locations; sixty-nine letters dated January 20, 1997 addressed to "Buyer, Hardware" or "Coordinator" which claimed to "present ... Stealth's 1997 line of bug killers;" one "advertisement" dated 1995, promoting plaintiff's line of 14 different bug killers, two of which are named STEALTH; and three representative samples of the pest elimination devices imported by SI from Asia. According to Stoller's deposition testimony, SI markets its "bug zappers," which range in price from $9.95 to $99, to three types of customers: "mass merchandisers," individuals, and "people who are in the pest elimination service business." He also stated that he charges $100 to spray "bug-killing juice" in people's homes, although he admitted that he does not have a license to engage in such activity, and he has no record of any customers for his extermination services.

*2 Ecolab claims that its products and services are so different from those offered by SI that its use of the word "Stealth" is not likely to confuse customers and thus is not infringing. In particular, the "Ecolab Stealth Maxima" and "Ecolab Stealth Decora" flying insect traps are intended to provide insect control in areas where traditional "bug zappers" that electrocute insects upon impact are illegal or impractical. According to Ecolab, conventional "bug zappers" tend to disburse dead insect particles into the air, so they cannot be used in areas like restaurant kitchens, and their noisiness and identifiable nature make them undesirable in heavily trafficked areas like hotel lobbies. Ecolab's traps, by contrast, operate by silently emitting a soft ultra-violet light that attracts insects into and captures them in the base of the trap. Designed to be unobtrusive, they are available in many different shapes and colors to blend into the surrounding decor. Ecolab offers its products as part of a comprehensive pest elimination services package.

Ecolab's products are not offered for retail sale and are available only for lease. Typically the company offers lease contracts for at least one year, charging a monthly fee for "on-site" service visits and reassessment of the premises at $25 per trap during the six to eight month fly season. Over ninety percent of the sales of Ecolab's pest elimination division is from these contractual relationships, the average length of which is 7.7 years. Ecolab concentrates solely on the commercial and institutional (as opposed to residential) markets-its typical clients being institutions with large-scale sanitation concerns, such as hospitals and schools, restaurants, hotels, and industrial plants-due to the customized nature of its products and services as well as the long-term costs inherent in its large-scale pest control approach. Ecolab has not offered its products or services to retailers, individuals, or service providers in the pest elimination industry. In fiscal year 1996, the year that this lawsuit was filed, it appears that Ecolab's pest elimination division generated approximately $99.6 million in net sales of STEALTH products and services.

## II. DISCUSSION

### A. Trademark Infringement

SI first alleges that Ecolab's use of STEALTH infringes its registered trademarks. While SI did not register STEALTH in connection with pest elimination products or services of any kind, "[m]odern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be 'closely related' to the senior user's," *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 958 (7th Cir.1992). The Seventh Circuit has defined a "closely related product" as one "which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* (citations omitted); *see also International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1089-1090 (7th Cir.1988) (finding the INTERNATIONAL KENNEL CLUB mark for toy dogs likely to be confused with International Kennel Club of Chicago's use of the mark for sponsoring dog shows); *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 273 (7th Cir.1976) (finding that SIGN OF THE BEEFEATER restaurants are likely to be confused with BEEFEATER mark for gin). By preventing the use of a confusingly similar mark on closely related goods, the law enables a senior user to enter markets in which it does not now trade but into which it might reasonably be expected to expand in the future. *See Sands*, 978 F.2d at 958.

*3 SI has registered STEALTH in connection with

Not Reported in F.Supp.2d                                                                                                                Page 3
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

sporting goods, bicycles, motorcycles, boats, automobile paint, billiard and darts equipment, metal alloys, comic books, and lawn sprinklers-none of which are even slightly related to the pest elimination business. SI claims that its use of STEALTH for its pest control devices and services is protected anyway because they are a part of the same "hardware industry and market" as the products for which he has registered STEALTH, but the court finds this argument unpersuasive. "Hardware" is an extremely broad label, and even though a number of the products for which SI has registered STEALTH might be sold at a hardware store, these products are so different from pest control devices that a consumer could not expect them to come from the same source, just as dishwasher liquid and raw beef are not closely related simply because grocery stores sell both. Ecolab's use of STEALTH does not infringe SI's registered trademarks.

*B. Unfair Competition and False Designation of Origin*

SI also claims that Ecolab's use of STEALTH constitutes false designation of origin and unfair competition in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125. In order to prevail on these claims, SI must prove that: (1) it owns the rights to use STEALTH in connection with pest control devices and services; and (2) Ecolab's use of STEALTH to identify its own products and services creates a likelihood of customer confusion. *See Rust Env't & Infrastructure v. Teunissen,* 131 F.3d 1210, 1214 (7th Cir.1997).

Instead of registering a trademark, a party may establish its rights to a mark by showing its "use in commerce" of the mark. The Lanham Act provides that " 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. Commercial utilization must be both bona fide and continuous, not just "de minimis sales, a few shipments, or pre-marketing tactics that attempt to 'reserve' the mark." *Stone Age Equip.,* 12 F.Supp.2d at 805. While the amount of activity sufficient to constitute "use" can vary, "the guiding principle is that the activity [must] be 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Id.* at 805 (quoting *Blue*

*Bell, Inc. v. Farah Manuf. Co.,* 508 F.2d 1260, 1266 (5th Cir.1975)). This enables consumers "to associate a mark with particular goods and notifies other firms that the mark is so associated," so that others will know "not [to] invest resources to develop a mark similar to one already used in the trade." *Zazu Designs v. L' Oreal,* 979 F.2d 499, 503 (7th Cir.1992) (finding "[a] few bottles sold over the counter in Hinsdale, and a few more mailed to friends in Texas and Florida" insufficient as a matter of law to constitute use because they "neither link the [plaintiff's] mark with [its] product in the minds of customers nor put other producers on notice").

**\*4** SI has the burden of proving that its sales and marketing activity using STEALTH was sufficient to constitute "use" under the Lanham Act, thereby establishing SI's national trademark rights before Ecolab began its use. *See Rust Env't,* 131 F.3d at 1214. For purposes of Ecolab's summary judgment motion, of course, we look at the evidence in the light most favorable to SI and assume that SI made the sales for which it provided admissible proof, although-as we discuss below-the evasive and inconclusive nature of Stoller's deposition testimony gives us great doubt as to the veracity of his documentation.

Stoller's earliest invoice dates back to 1986, reporting the sale of 42 items whose description includes the word STEALTH. Eighteen of the bug killers were priced at $22 each, for a total of $396, and 24 of the bug killers were priced at $15 each, for a total of $360. So SI's total sales in 1986 amounted to $756. Stoller's next invoice is from 1987, recording the shipment of two units at $14 each, for a total of $28. There is no further documentary evidence of pest control device sales until 1992, for which SI has three invoices, each for the sale of one bug killer for $14.95 to three different hardware stores, for a total of $44.85. In sum, SI made 47 documented sales of STEALTH bug zappers prior to 1993 [FN1], for a total of $828.85.[FN2]

> FN1. The court need only consider SI's evidence of its use of STEALTH prior to 1993, when Ecolab began using the mark and filed its application for registration, since SI has no evidence to dispute Ecolab's asserted date of first use. *See Stone Age Equip.,* 12 F.Supp.2d at 811 (finding SI's

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

evidence of use after 1988 irrelevant since the defendant began using STEALTH in 1988).

FN2. Stoller claims that he does not have more documents in his possession accounting for his customers' purchase of bug zappers because he had a dispute with his family that caused him to leave his family's business and he was not given the option of taking his documents with him. *See* 9/24/97 Dep. Tr. of Leo D. Stoller at 153-54. This cannot excuse the lack of documentation. Stoller has the burden of producing evidence in support of his claims. Also, Stoller testified that he broke off from his family's business and started on his own in 1990, yet oddly he has more invoices for his 1980s sales than he does for his 1990s sales.

SI also submitted an undated handwritten chart, which Stoller says he made in 1995, purporting to show SI's total dollar sales of STEALTH bug zappers from 1991 to 1995. The chart does not indicate which models were sold, how many units were sold, to whom they were sold, or at what price. Stoller was unable to explain where he got the figures for each year, what underlying data he relied on, or where that data might be now. His explanation was simply that he "had the total figures" for each year down on separate pieces of paper, and then put those numbers down on the chart when he made it in 1995. *See* Stoller Dep. at 298-307. When asked whether he relied on cash receipts, invoices, checks, or purchase orders to compile those figures, he said, "I don't know if I maintained those ."*Id.* at 302. He said that if he did have any cash receipts, "I probably disposed of them, I guess."*Id.* at 304. Stoller testified that during the years in question he had no "normal business practice" with regard to business records because he was so busy litigating his trademark infringement suits. *Id.*

This chart is not admissible evidence. It is hearsay-an out of court statement offered for its truth-and does not fall within any hearsay exception. The only possibly relevant exception is the one for ordinary business records, *see*F.R.E. 803(6), but Stoller's testimony that he did not keep such records makes the exception inapplicable. And because "the source

of information or the method or circumstances of [its] preparation indicate lack of trustworthiness,"*id.,* the court declines to consider the chart here. *See JL Audio,* 29 F.Supp.2d at 886, n. 9 (finding a remarkably similar "Sales Report" handwritten by Stoller to be inadmissible hearsay).

*5 Even beyond discrediting his own chart, Stoller's deposition testimony is a great obstacle to SI in meeting its burden of proving active and continuous "use" of STEALTH in connection with pest elimination products. When asked "Do you know how many bug zappers you have ever sold?"Stoller's reply was "I don't know." *Id.* at 148. The attorney deposing Stoller continued to ask him questions to "test the bounds" of his memory. She asked whether he had, in his lifetime, sold more than five bug zappers, to which he replied "yes, I can say that." *Id.* When asked whether he had sold more than ten bug zappers, he replied "Yes, I think I've sold more than ten,"*id.,* an incredible answer given that he has invoices for 50 sales and his chart purports to account for more than that. As she raised the number by increments of five-15, 20, 25-Stoller's answers became less confident; his only response to each was "Probably, yes." *Id.* When asked whether he had sold more than 5,000 of them, he said "I don't know if I've sold more. I may have sold more but I'm not sure."*Id.* at 149. Immediately thereafter, in response to the question "Have you sold more than a hundred bug zappers?" he said "Yes." *Id.* Later, when asked how many sales of bug zappers he has made in the 1990s, Stoller replied: "I don't know ... I don't recall the exact amount."*Id.* at 167. He refused to give the attorney an estimate, saying "I can't and I'm not going to speculate."*Id.* When pressed as to whether or not it was more than 50 bug zappers, he said "I believe I've sold more than 50, okay? Right."*Id.*

As a result, Stoller's deposition testimony about SI's sales is "not significantly probative" with respect to SI's prior use, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986), raising at most "some metaphysical doubt as to the material facts."*Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1211-12 (7th Cir.1993) ("[i]t would not be an abuse of discretion if a district court deemed a person to be an unworthy witness because he previously manifested an insufficient recollection of events"). The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

confusing, evasive, and ultimately inconclusive nature of Stoller's deposition testimony suggests that Stoller lacks the knowledge necessary to testify regarding SI's sales of bug zappers. Stoller repeatedly indicated that he had no idea how many bug zapper sales SI had made, and his testimony shows even that he was ignorant of the "hard" evidence he offered-the invoices and the chart. For this reason, no reasonable jury could find Stoller's deposition testimony to make SI's sales any more or less probable than they would be otherwise; it is therefore stricken as irrelevant and thus inadmissible. *See* F.R.E. 401.

The invoices are therefore the only admissible evidence of SI's bug zapper sales under the STEALTH mark. This evidence is insufficient to establish "use in commerce" under the Lanham Act. Even before the Trademark Act was amended in 1988 to require a higher degree of activity to establish and maintain rights in a trademark, the Second Circuit found eighty-nine sales of perfume over a twenty-year period to be "a meager trickle of business," and to constitute only a "token sales program" that was "by its very nature inconsistent with a present plan of commercial exploitation." *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272-73 (2d Cir.1974) (noting courts' "reluctance to consider usage sufficient when it is obviously contrived solely for trademark maintenance purposes"). SI has admissible evidence only of de minimis sales (47 bug zappers for a total of $828.85), 89% of which took place in 1986, ten years before this lawsuit was filed. After the sale of two additional bug zappers in 1987, there is no evidence of any sales activity until five years later, when SI sold only three more. This does not support SI's assertion that it has continuously engaged in *bona fide* use of the STEALTH mark since the mid-1980s in an effort to sell pest elimination devices. Rather, the minimal number and sporadic pattern of SI's sales demonstrate a concerted effort only to establish rights in the STEALTH mark for future licensing opportunities.

**\*6** This conclusion is buttressed by other evidence: one of SI's exhibits in particular-a 1985 internal strategy memoranda written by Stoller and entitled "1985-86 National Brand awareness marketing plan"- suggests that SI was primarily engaged in a trademark maintenance program and that SI's pest control device marketing and sales efforts were intended merely to reserve rights in the mark for later exploitation. The memo states: "It is the company's main marketing plan to build all of it's [sic] trademarks ... as national brands in all categories of merchandise," so that "we will eventually be able to start licensing the companies [sic] trademarks," and continues: "As the company grows, it is our goal to become one of the largest trademark licensing companies in the world."Pl.Ex. C25. In addition, during his deposition Stoller repeatedly referred to his extensive trademark litigation activity as the justification for the minimal and infrequent nature of SI's commercial activity with respect to pest control products. *See, e.g.* Stoller Dep. at 62 ("I just now have been engaged in licensing the intellectual properties, and in a great deal of policing efforts on behalf of my company, and I am in this deposition and I'm in other depositions, and unfortunately because of the policing efforts I have to engage in, and I'm a sole proprietor, doesn't give me the luxury of time to sell as much as I would like"); *id.* at 134 ("I've been engaged in a tremendous amount of litigation and I've not been able to-to exert, have the time or energy to spend on the products or services end of my business"). As the Second Circuit noted, however, such activity does not exempt a producer from having to show use in commerce: "A trademark maintenance program obviously cannot in itself justify a minimal sales effort, or the requirement of good faith commercial use would be read out of trademark law altogether." *La Societe*, 495 F.2d at 1273, n. 10.

With such scant evidence of actual sales, Stoller's seventy-eight promotional letters-dated October 10, 1992, and addressed to "Hardware Dept." or "Buyer, Hardware" at various stores and corporate offices "quoting ... Stealth's 1992 line of electronic insect control products"-do not get SI over the "use in commerce" hurdle. Evidence that Stoller sent letters introducing his STEALTH line of bug zappers to a tiny fraction of the country's countless hardware retailers does not prove that the consuming public came to associate the STEALTH mark with SI's pest elimination goods prior to Ecolab's entry into the market, nor that rival producers of pest control devices were put on notice of SI's use. Also, the letters were written a full six years after the bulk of SI's bug zapper sales, not as part of a continuous stream of promotional activities since the mid-1980s. And SI has no evidence that the letters generated any sales to the retailers contacted, or established any

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

ongoing business relationships with them.

**\*7** As for SI's use of STEALTH in connection with its provision of extermination *services,* Stoller did not submit any documentary evidence to establish the sale of such services, and his testimony confirms that he does not possess any such evidence. *See* Stoller Dep. at 89. Stoller said that he charged $100 an hour for these services, but admitted that he cannot remember where he has offered them, how many customers he has had, how much money he has earned, *see id.* at 85 ("I don't know if I have it written down anywhere offhand right now"), or the size of his current customer base, *see id.* at 88-89. Even in response to questions about the number of customers he has currently, like "Is it less than five?" and "Is it less than three?" he said "I don't know." *Id.* at 89. In reference to the handwritten chart that he submitted listing the dollar amounts of STEALTH "bug zapper" sales he made for each of the years 1991 through 1995, Stoller admitted that the figures do not include proceeds from his extermination business, which "I haven't reduced ... to paper yet."*Id.* at 307. Absent any evidence proving his use of STEALTH in connection with the provision of extermination services, no reasonable jury could find that SI has ownership rights in the mark as applied to those services.[FN3]

> FN3. Furthermore, Stoller testified that he does not have and has never had any sort of exterminator's or pesticide license, *see* Stoller Dep. at 115-16, and that he uses a secret "bug-killing juice" formula that he created himself, *see id.* at 76, though under Illinois law only licensed professionals, using pesticides registered with the Illinois Department of Agriculture, may provide such services. *See* 415 ILCS 60/4, 60/6, 60/10, 60/11. This means that even if Stoller did provide pest elimination services, it was not lawful use and therefore cannot be the basis for enforcing trademark ownership rights. *See Universal Manuf. Co. v. Douglas Press, Inc.,* No. 89 C 3354, 1992 WL 106822, at \*2 (N.D.Ill.1992).

Finding that there is no genuine issue of material fact for a jury to consider regarding SI's prior use of STEALTH in connection with pest elimination products or services, the court grants Ecolab's motion

for summary judgment on SI's Lanham Act claims.

*C. State Law Claims*

Finally, Stoller claims that Ecolab violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, and the Illinois Deceptive Trade Practices Act, 815 ILCS 510/1. Although SI's federal claim is gone and the parties are not diverse, the court retains supplemental jurisdiction over the pendant state law claims since "the correct disposition of the supplemental claim[s] is so clear as a matter of state law that [they] can be determined without a trial and without entanglement in difficult issues of state law."*Khan v. State Oil Co.,* 93 F.3d 1358, 1366 (7th Cir.1996) (citing *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir.1993)). SI's state law claims mirror its federal claims, and the same analysis applies. *See Diamond Multimedia,* 991 F.Supp. at 1022 (citing *Thompson v. Spring-Green Lawn Care Corp.,* 466 N.E.2d 1004, 1010 (Ill.1984)). For the reasons stated above, the court grants summary judgment to Ecolab on SI's state law claims as well.

*D. Attorneys' Fees*

Under the Lanham Act, courts have discretion to award attorneys' fees to prevailing parties "in exceptional cases." 15 U.S.C. § 1117(a). Courts are also authorized to award attorneys' fees to prevailing parties under the Illinois Consumer Fraud and Deceptive Business Practices Act. 815 ILCS 505/10a(c). The standard for determining whether a case is "exceptional" is not whether the suit was filed in bad faith, but whether it "so lacked merit and was so burdensome to defend against that it could fairly be described as oppressive."*Centra 2000,* 1998 WL 395161, at \*1. As the Seventh Circuit has noted, "a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value."*Door Systems, Inc. v. Pro-Line Door Systems, Inc.,* 126 F.3d 1028, 1032 (7th Cir.1997).

**\*8** SI's claim that Ecolab's use of STEALTH infringed its federally registered trademark was one that SI "at the outset of the litigation ... should have known utterly lacked merit."*Centra 2000,* 1998 WL

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

395161, at *2 (finding another of SI's suits to have been needlessly costly and burdensome to the defendants). SI's argument that its pest elimination products are "closely related" to the products for which it has registered STEALTH was fanciful. SI's other claims-federal and state unfair competition-were also frivolous, as they "were not grounded on a plausible theory of ownership, let alone one even remotely supported by the law or the scant evidence presented by S Industries."*Diamond Multimedia,* 17 F.Supp.2d at 777 (finding SI's unfair competition claims oppressive and awarding attorneys' fees to defendant).

Unfortunately, such frivolous arguments are not the end of the similarities between this case and SI's other cases in this district. For example, Judge Lindberg found that SI's conduct-such as its failure to respond to repeated discovery requests, forcing the defendant to file a motion to compel-multiplied the expenses of that case, *Centra 2000, 1998 WL 395161, at *2-3,* and SI did the same thing here. *See* Ecolab's 4/28/97 Motion to Compel; Minute Order of 7/18/97 by Hon. Joan B. Gottschall, granting in part Ecolab's Motion to Dismiss as Sanction for Discovery Abuses. And, as in the case before Judge Castillo, "SI also tried repeatedly to misdirect the court by focusing on federal registrations for goods or marks not at issue in this case, irrelevant PTO proceedings, and license agreements to use STEALTH on goods totally unrelated to the defendants' products. It is as if SI thought that the sheer paper weight of its submissions would magically mutate into probative proof."*Stone Age Equip.,* 12 F.Supp.2d at 819-20.

Stoller presented remarkably little admissible evidence, most of it highly suspect, of SI's sales of STEALTH pest control products since the mid-1980s, and he did not have a shred of admissible evidence to prove SI's provision of pest extermination services under the mark. Furthermore, as observed above, Stoller's deposition testimony demonstrated that he had absolutely no idea how many STEALTH pest control products SI has sold, nor how many extermination customers SI has had, though as the sole proprietor and employee of SI, he would be the only individual qualified to testify as to these matters. The court concludes that requiring Ecolab to spend time and money defending itself against such baseless claims was "oppressive," and therefore

concludes that Ecolab is entitled to recover the reasonable attorneys' fees and costs incurred in its defense. Accordingly, Ecolab may submit a petition for the fees and costs associated with defending itself against this lawsuit.

III. *CONCLUSION*

For the foregoing reasons, Ecolab's motion for summary judgment is granted and SI's cross-motion for summary judgment is denied. Ecolab is to file its bill of fees and costs within 90 days of the entry of this judgment. *See* Local Rule 46(A). It is so ordered.

N.D.Ill.,1999.
S Industries, Inc. v. Ecolab Inc.
Not Reported in F.Supp.2d, 1999 WL 162785 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1903355 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**Carmichael v. Prime
S.D.Ind.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D.
Indiana,Indianapolis Division.
Randy CARMICHAEL and Donna Shea, Plaintiffs,
v.
Cynthia PRIME, Phillip Prime, My Choice, Inc., and
Philippe Llewelyn Fragrances, Ltd., Defendants.
**IP 02-0379-C-T/K.**

Jan. 6, 2003.

Raymond T. Seach, Riley, Bennett & Egloff,
Indianapolis, IN, for Plaintiffs.
John J. Morse, McMains, Foster, Jinks & Morse,
Indianapolis, IN, for Defendants.

**ENTRY ON DEFENDANTS' MOTION TO
DISMISS**[FN1]

> FN1. This Entry is a matter of public record
> and is being made available to the public on
> the court's web site, but it is not intended for
> commercial publication either electronically
> or in paper form. Although the ruling or
> rulings in this Entry will govern the case
> presently before this court, this court does
> not consider the discussion in this Entry to
> be sufficiently novel or instructive to justify
> commercial publication or the subsequent
> citation of it in other proceedings.JOHN
> DANIEL TINDER, District Judge.

*1 This case concerns a dispute surrounding the
registration and use of a trademark. Defendants
Cynthia Prime, Phillip Prime, My Choice, Inc. and
Philippe Llewelyn Fragrances, Ltd., move to dismiss
Plaintiffs Randy Carmichael and Donna Shea's
complaint in its entirety for failure to state a claim
under Federal Rule of Civil Procedure 12(b)(6).

**I. Motion to Dismiss Standard**

A 12(b)(6) motion to dismiss for failure to state a
claim tests the legal sufficiency of a complaint. Autry
v. Northwest Premium Servs., Inc., 144 F.3d 1037,
1039 (7th Cir.1998). Dismissal is appropriate only if

it appears to a certainty that the movant could prove
no set of facts consistent with the allegations which
would entitle him to relief. Conley v. Gibson, 355
U.S. 41, 45-46 (1957); Hishon v. King & Spalding,
467 U.S. 69, 73 (1984); Kennedy v. Nat'l Juvenile
Det. Assoc., 187 F.3d 690, 695 (7th Cir.1999). In its
review of the complaint, the court must treat all well-
pleaded factual allegations as true, and draw all
reasonable inferences in favor of the non-movant.
Szumny v. American Gen. Fin., 246 F.3d 1065, 1067
(7th Cir.2001); Dixon v. Page, 291 F.3d 485, 486
(7th Cir.2002).

**II. The Complaint**

*Though I dream in vain, in my heart it will remain /
My stardust melody, the memory of love's refrain.*So
ends Stardust, the famous song by Indiana composer
and performer Hoagy Carmichael. Its use as the
trademarked name of a perfume sold by the
Defendants is the subject of this lawsuit.

The court begins with a summary of the allegations
contained in the complaint, which must be taken as
true for the purposes of evaluating Defendants'
motion to dismiss. Sometime in 1989, Plaintiff
Donna Shea, working as a publicist for the
Carmichael family-including Randy, Hoagy
Carmichael's son, also a plaintiff in this cause-
conceived the idea of developing and marketing a
fragrance called STARDUST, named after the song
by Hoagy Carmichael. (Compl.¶ 10-11.) She
contacted Cynthia Prime, whose husband Phillip
Prime is an experienced perfumer, with the idea that
the Primes would assist in the creation of the
chemical formula for the fragrance. (Id.¶
12.)Pursuant to these discussions, Ms. Prime drafted
a Memorandum of Understanding, dated May 15,
1990, and attached as Exhibit A to the Complaint,
which sets forth the parties' respective preliminary
undertakings in connection with the STARDUST
project. (id.) The memorandum contains an
acknowledgment that the Primes, along with Donna
Shea and Randy Carmichael, "have agreed together
to participate in development of a fine fragrance to be
marketed under the trademark: STARDUST."It then
briefly describes how each party would contribute to
the product development, specifically attributing the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2003 WL 1903355 (S.D.Ind.)
**(Cite as: Not Reported in F.Supp.2d)**

original suggestion for the fragrance to Ms. Shea. (Compl., Ex. A). On the basis of this and other communications, Plaintiffs allege that they had reached an agreement with the Primes whereby the Primes would act as the agents of Ms. Shea and Mr. Carmichael in developing the formula for the perfume and in securing the necessary financing, in exchange for which they would receive an unspecified percentage of profits from the sale of STARDUST. (Compl.¶ 15.)

**\*2** Ms. Shea offered to have lawyers for her and Mr. Carmichael look into the availability of the STARDUST name as a trademark for perfumes, but Ms. Prime responded that she and her husband were familiar with the registration process and would themselves make an inquiry into whether the STARDUST trademark was free with respect to perfumes, and, if so, reserve it in the name of Ms. Shea and Mr. Carmichael. Plaintiffs consented to this arrangement.(Id.¶ 16.)

In violation of Ms. Prime's assurance, on January 17, 1990, the Primes filed a Statement of Intent to Use the STARDUST trademark with the Patent and Trademark Office ("PTO") in the name of their own company, Defendant My Choice, Inc., rather than in the name of Ms. Shea or Mr. Carmichael. (Id. ¶ 18.)As part of that application, Phillip Prime represented to the PTO that, to the best of his knowledge, no other person or entity has the right to use the trademark STARDUST in commerce. (Id.¶ 19.)

Although Ms. Prime did not immediately inform Ms. Shea of the deviation from her promise to register the trademark in Plaintiffs' names, after repeated inquiries she disclosed that the STARDUST trademark had, in fact, been registered to My Choice, Inc., as she claimed, for the sake of convenience. Ms. Prime assured the Plaintiffs that she would take measures to substitute their names on the application. (Id. ¶ 20.)Nonetheless, the name on the application was neither changed nor were the rights acquired thereunder assigned to Plaintiffs. (Id.¶ 21.)

In the meantime, the Plaintiffs, along with the Primes, entered into discussions with Tiffany & Co. concerning the design of the bottle and the marketing of the STARDUST fragrance. In the spring of 1990, the parties met with representatives of Tiffany, who expressed interest in the project and directed the Plaintiffs and the Primes secure financing, develop the fragrance formula and devise a marketing plan. (Id. ¶¶ 23-24.)Although the Memorandum of Understanding had designated the Primes as the party responsible for these matters, they did not perform in time to meet Tiffany's request, and Tiffany abandoned the project. (Id. ¶ 28.)In light of the Primes failure to perform, as well as their misrepresentations regarding the trademark application, Ms. Shea and Mr. Carmichael decided to sever their relationship with the Defendants. (Id. ¶ 29.)

For a variety of reasons, the Plaintiffs chose to delay further pursuit of the STARDUST perfume concept. (Id. ¶ 30.)The Defendants, however, went forward with the idea. On March 4, 1993, they abandoned their first application to register the STARDUST trademark, and on April 6, 1993, they filed a second Statement of Intent to Use for the same mark in the name of My Choice, Inc. In that statement, Phillip Prime, in his capacity as President of My Choice, Inc., again represented to the PTO that "no other person, firm, corporation or association has the right to use [the STARDUST trademark] in commerce."(Id. ¶ 34.)On March 20, 1996, My Choice, Inc. filed a Statement of Use containing the same oath. On September 3, 1996, the PTO registered that trademark to My, Choice, Inc. (Id. ¶ 40.)The rights in this mark were later assigned to Defendant Philippe Llewelyn Fragrances, Ltd., a company owned and controlled by the Primes. (Id. ¶ 39.)The Defendants continue to market the STARDUST perfume under that name. (Id. ¶ 41.)

**\*3** Based on the foregoing allegations, the Plaintiffs ask for cancellation of the STARDUST trademark under 28 U.S.C. § 1338 and 15 U.S.C. § 1064, and damages pursuant to 15 U.S.C. § 1120. Plaintiffs also assert state law claims for unjust enrichment and criminal conversion.

### III. Discussion

*A. Fraud on the PTO*

15 U.S.C. § 1064 provides, in pertinent part:
A petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows by any person who

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1903355 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d)

believes that he is or will be damaged by the registration of a mark on the principal register established by this chapter[:]
(3) At any time if [the trademark's] registration was obtained fraudulently[.]

In the present case, Plaintiffs claim that Mr. Prime's applications to the PTO on January 6, 1990, April 6, 1993, and March 20, 1996, all contained fraudulent representations in the form of his oath that, to the best of his knowledge, no other person or entity had the right to use the STARDUST trademark in commerce.

A claim of fraud in the procurement of a federal trademark requires the following elements be alleged and proven:
(1) A false representation regarding a material fact; (2) knowledge or belief that the representation is false ("scienter"); (3) an intention to induce the listener to act or refrain from acting in reliance on the misrepresentation; (4) reasonable reliance on the misrepresentation; (5) Damage proximately resulting from such reliance.

2 J. Thomas McCarthy, _McCarthy on Trademarks & Unfair Competition_ § 31:61 (2002) (hereinafter "McCarthy"); _Stanfield v. Osborne Indus., Inc.,_ 52 F.3d 867, 874 (10th Cir.1995) (citing _San Juan Prods., Inc. v. San Juan Pools,_ 849 F.2d 468, 473 (10th Cir.1988))."Fraud will be deemed to exist only when there is a deliberate attempt to mislead the Patent Office into registering the mark."_The Money Store v. Harriscorp Fin., Inc.,_ 689 F.2d 666, 670 (7th Cir.1982). The main issue in those counts asserting fraud on the PTO is whether the Plaintiffs have sufficiently alleged that the Defendants made false representations regarding a material fact.

The Plaintiffs may not rest on the bare allegation that Defendants defrauded the PTO. _See_Fed.R.Civ.P. 9(b) (circumstances constituting fraud must be plead with particularity); 2 Mcarthy § 31:84 (fraud in procurement of trademark registration must be alleged according to requirements of Federal Rule of Civil Procedure 9(b)); _San Juan Prods., Inc.,_ 859 F.3d at 472 (same). The court thus looks to the Plaintiffs' complaint for a more complete description of the fraud. According to the factual averments contained therein, Defendants deceived the PTO by affirming that they were aware of no other party who had exclusive rights to the trademark. This was false

because, as the Primes knew, they, the Plaintiffs, owned exclusive rights to the trademark. Demonstrating the falsity of Defendants' oath thus depends on the possibility of establishing Plaintiffs' own right to the mark. In this regard, the Plaintiffs assert two possible sources of ownership. The first is Ms. Shea's origination of the idea. The second is an implied or express contractual arrangement between the parties whereby the Defendants had agreed to act as agents of the Plaintiffs in procurement of the trademark, or, alternatively, had agreed to assign the future rights to the trademark once those rights had been acquired.

*4 An evaluation of Plaintiffs' theories requires a discussion of federal trademark law under which trademark rights arise. It is well-established that, "[u]nlike patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual usage. Trademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark."2 McCarthy § 16:8. _See also Aveda Corp. v. Evita Marketing, Inc.,_ 706 F.Supp. 1419 (D.Minn.1989) (must use trademark in sale of goods or services to acquire right of ownership of mark); _Victor Tool & Mach. Corp. v. Sun Control Awnings, Inc.,_ (E.D.Mich.1968) (same); _Compton v. Fifth Avenue Assoc.,_ 7 F.Supp.2d 1328 (M.D.Fla.1998) ("Thus, the fact that Compton first conceived of the mark 'Via Colori' is irrelevant to his ownership of the mark.") Therefore, the first of Plaintiffs' theories fails. The fact that Ms. Shea hatched the original idea for marketing a perfume under the STARDUST name simply does not give her any rights to the trademark; only by actual usage-which Plaintiffs do not allege-do such rights accrue.

Plaintiffs' second theory of impeachment fares no better. For the purposes of this motion, the court will assume that the Plaintiffs could prove the existence of some type of contract between themselves and the Defendants. Thus, the court assumes that at the time Defendants registered the mark in their own name, they were acting contrary to an agency agreement under whose terms they were bound to advance the interests of Plaintiffs in procuring the trademark. This agreement may supply the Plaintiffs with a corresponding remedy against Defendants for their faithless conduct. Indeed, that remedy may even take the form of revenues generated by the STARDUST

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1903355 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d)

trademark. *See* Restatement (Second) of Agency § 403 (2002) ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal.") But it is a different matter to claim that title to the trademark in fact passed to the Plaintiffs, which can only occur by either use of the mark in commerce or purchase of a pre-existing business which employs that mark.

This result is the same whether the contract between the parties is considered an agency agreement or an agreement to transfer future rights to the trademark. At best, Plaintiffs could prove, based on the complaint, that Defendants entered into a contract to assign them such trademark rights in the STARDUST name as would arise in the future. Such assignment would also require transfer of all the business assets associated with production of the trademarked product. *See* 15 U.S.C. § 1060 (no assignment of trademarks prior to filing statement of use unless part of the business connected with mark also transferred); 2 McCarthy § 18:2 (prohibition on assignments of trademark in gross, *i.e.,* apart from good will and business with which mark associated). The Defendants' agreement to assign future rights is not *itself* an actual assignment, however, and therefore creates no ownership rights in the trademark (as opposed to a right of recourse against the Defendants on the contract).*See* Li'l Red Barn Inc. v. The Red Barn Sys., 167 U.S.P.Q. 741, 747 (N.D.Ind.), aff'd,174 U.S.P.Q. 193 (7th Cir.1972) ("And the rule is well established that a mere agreement for the future assignment of a trademark is not an assignment of either the mark itself or the good will attached to it.") (citing 87 C.J.S. § 507). Thus, the existence of an implied or express contract, even if true, would not have bestowed upon the Plaintiffs an exclusive right to use the STARDUST trademark.

**\*5** Consequently, there is no possible set of facts that Plaintiff could establish consistent with the allegations that would demonstrate the falsity of Mr. Prime's oath to the PTO. This inability is fatal to Plaintiffs' claim of fraudulent procurement of a federal trademark. With respect to Plaintiffs' prayer for cancellation of the trademark and damages, therefore, Plaintiffs have failed to state a claim upon which relief may be granted.

*B. Unjust Enrichment and Criminal Conversion*

Plaintiffs have raised both unjust enrichment and criminal conversion claims under Indiana law. Indiana Code section 35-43-4-3 defines criminal conversion as follows: "A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor."In other words, the nub of the offense is the exertion of unauthorized control over the property of another. In this case, Plaintiffs claim that Defendants have exerted such control over the STARDUST trademark, of which Plaintiffs are the lawful owners. As discussed above, however, Plaintiffs cannot, consistent with the complaint, show ownership of the mark. The requisite element of control exerted over the property of another is, therefore, lacking. Plaintiffs' criminal conversion count does not survive Defendants' motion to dismiss.

A claim for unjust enrichment will lie where the plaintiff confers a measurable benefit on the defendant at his implied request, the retention of which would be unjust. Bayh v. Sonnenburg, 573 N.E.2d 398, 408 (Ind.1991); Kincaid v. Lazar, 405 N.E.2d 615, 619 (Ind.Ct.App.1980). Plaintiffs here assert that they conferred on Defendants, at their request, the benefits of (1) the STARDUST concept, (2) the tie to the Hoagy Carmichael family, and (3) the right to register the trademark for the Plaintiffs.

Although the parties have supplied no authority construing the concept of a benefit for the purposes of this cause of action-and the court has been unable to locate any-it is unclear whether as a matter of law (1) and (3) qualify as benefits, or if so, whether it would be unjust to retain them. Arguably, the Plaintiffs conferred upon the Defendants something of value in the idea to market a perfume under the STARDUST name. However, they could not convey the right to register that trademark, because they did not own it. To find unjust enrichment where, as here, the originator of a trademark concept communicated that concept to a person who then put it into practice, without sharing the royalties, would have the practical effect of according, under guise of state unjust enrichment law, trademark protection to those who first conceive of a mark. That is contrary to federal trademark law and the common law out of which it arose. "The mere fact that a party conceived

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1903355 (S.D.Ind.)
(Cite as: Not Reported in F.Supp.2d)

the idea of a trademark and discussed it with others does not establish priority as of the date of those events." 2 McCarthy § 16:11. As the Supreme Court said long ago, "[a]t common law the exclusive right to [a trademark] grows out of the use of it, and not its mere adoption.... It requires no fancy or imagination, no genius, no laborious thought. It is simply founded on priority of appropriation." Trade-Mark Cases, 100 U.S. 82 (1879). Of course, Indiana would be free to expand legal protection to the authors of trademarks, see Gardner v. Clark Oil & Refining Corp., 383 F.Supp. 151, 153 (7th Cir.1974) (Lanham Act not preempt state trademark laws), but there is no indication that it has done so. And in light of the long-standing refusal by the common law to grant this type of protection, the court is hesitant to consider the appropriation of someone else's trademark idea an unjust retention of a benefit.

*6 Fortunately, the court need not resolve these matters. For there is a second reason Plaintiffs cannot withstand dismissal of their unjust enrichment claim. It is a general principal of the law of unjust enrichment, followed in Indiana, that a contract bearing on the same subject matter as the claim for restitution bars the availability of that equitable remedy. See Keystone Carbon Co. v. Black, 599 N.E.2d 213, 216 (Ind.Ct.App.1992) ("existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract.") (citing Kincaid, 405 N.E.2d at 615); E. Allan Farnsworth, Contracts (3rd ed.1999) (noting prevalence of rule that express contract precludes recognition of implied-in-law contract governing same subject matter). In the present case, it is not just that Plaintiffs do not deny the existence of an agency contract relating to the proposed trademark; they insist on it. (See Compl. ¶ 15 ("The nature of the parties' arrangement was that the Primes would act as the agents of Shea and Carmichael in developing the chemical formula for the fragrance, and in securing financing for the project.")) 

Plaintiffs protest that they do not allege that a specific contract governed the relations of the parties, apparently intending this as a contrast with "some type" of agency arrangement. The court does not see the distinction. Plaintiffs either assert the existence of a contract-including an agency agreement-or they do

not. And it is clear from the face of the complaint that they assert it. Since that agency contract concerns the same subject matter as their claim for unjust enrichment, namely, the parties respective duties in the procurement of the STARDUST trademark, the Plaintiffs are limited to the relief, if any, afforded them by that agreement. As a result, they have failed to state a claim for unjust enrichment.

### IV. Conclusion

In conclusion, Defendants' motion to dismiss is **GRANTED.** This is the Plaintiffs' first effort, though, to articulate their claims. Perhaps upon consideration of matters addressed in this ruling, the Plaintiffs can allege a claim or claims that would not be subject to the deficiencies noted herein. To that end, the Plaintiffs will be allowed 30 days from this date to file an amended complaint, if they choose to do so. Thus, the granting of this motion to dismiss is without prejudice.[FN2] However, if an adequate amended complaint is not filed within that time frame, an order of dismissal with prejudice will be issued.

> FN2. Counsel should not construe the allowance of repleading as an indication that the court thinks it likely that a viable cause of action can be stated. In fact, a copy of this entry is being sent to the Magistrate Judge to encourage him to schedule a conference within the next 30 days to attempt to resolve that question and the pending sanctions motion as well. The parties should also participate personally in the conference.

The response to the pending sanctions motion will not be scheduled until it is determined whether an amended complaint will be filed.

ALL OF WHICH IS ORDERED this 6th day of January 2003.

S.D.Ind.,2003.
Carmichael v. Prime
Not Reported in F.Supp.2d, 2003 WL 1903355 (S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                             Page 1
Not Reported in F.Supp.2d, 2002 WL 31114120 (D.N.H.), 2002 DNH 171
**(Cite as: Not Reported in F.Supp.2d)**

**H**Hampshire Paper Corp. v. Highland Supply Corp.
D.N.H.,2002.

NOT FOR PUBLICATION

United States District Court, D. New Hampshire.
HAMPSHIRE PAPER CORPORATION
v.
HIGHLAND SUPPLY CORPORATION, et al.
**No. CIV.02-32-JD.**

Sept. 23, 2002.

ORDER

DICLERICO, District J.
**\*1** The plaintiff, Hampshire Paper Corporation,
sought a declaratory judgment, pursuant to 28 U.S.C.
§ 2201, of non-infringement and invalidity of the
defendants' patents and configuration trademarks and
of patent and trademark misuse. Hampshire also
alleged claims of unfair competition in violation of
the Lanham Act and New Hampshire law. The
defendants moved to dismiss Hampshire's claims on a
variety of grounds including an absence of subject
matter jurisdiction with respect to the declaratory
judgment claims. The court granted the motion to
dismiss as to the declaratory judgment claims, Counts
I through IV, and directed Hampshire to file its
response to the motion as to the remaining claims.

Hampshire moved for reconsideration of the part of
the order dismissing its trademark claims, Counts III
and IV. Hampshire has also filed its response to the
defendants' motion to dismiss its unfair competition
claims. Along with its response, Hampshire moves to
filed a second amended complaint.

I. *Motion for Reconsideration*

In support of reconsideration, Hampshire contends
that the court erred in concluding that because the
trademarks at issue in this dispute were registered in
1996, 1998, and 2000, those trademarks were not part
of the parties' dispute in 1987 and 1988. Hampshire
argues that because the defendants have asserted
trademark rights since the beginning of their dispute

it was error to conclude, based on the registration
dates, that Hampshire had not shown facts
sufficiently threatening to support subject matter
jurisdiction. Hampshire now argues that the
defendants' general trademark claims in 1987 could
have included the configuration trademarks at issue
in this case, but still makes no persuasive showing
that it reasonably apprehended suit based on those
trademarks.

In addition, Hampshire misreads the court's order
which is based on alternative grounds:
As explained above, PTII's counsel's letter of October
24, 2001, is not sufficiently adversarial to cause a
reasonable apprehension of suit based on the
trademarks. The parties' original dispute in 1987 and
1988 does not appear to involve the configuration
trademarks at issue here, which were registered in
1996, 1998, and 2000. Although a defendant's
litigiousness on related issues of intellectual property
may be pertinent to deciding whether a reasonable
apprehension of suit exists, Hampshire has not shown
that the circumstances here are sufficiently
threatening to support jurisdiction. *See Arrowhead
Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731,
737 (Fed.Cir.1988). In addition, even if Hampshire
were able to show a justiciable controversy with
respect to the trademarks, the court would exercise its
discretion to decline subject matter jurisdiction as to
the trademark claims to permit the parties to further
develop and clarify their relationship and potential
issues relating to the trademarks. *See EMC Corp.,* 89
F.3d at 815.

Order, July 18, 2002, at 14. Therefore, the court finds
no grounds to reconsider the July 18, 2002, order.

II. *Motion for Leave to Amend*

**\*2** Hampshire filed a motion for leave to file an
amended complaint along with its response to the
defendants' motion to dismiss. "A party may amend
the party's pleading once as a matter of course at any
time before a responsive pleading is served ...
[o]therwise a party may amend the party's pleading
only by leave of court or by written consent of the
adverse party ...."Fed.R.Civ.P. 15(a). For purposes of
Rule 15(a), a motion to dismiss is not a responsive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31114120 (D.N.H.), 2002 DNH 171
**(Cite as: Not Reported in F.Supp.2d)**

pleading. *See Leonard v. Parry*, 219 F.3d 25, 30 (1st Cir.2000). However, because Hampshire previously filed an amended complaint, leave to amend would be required unless the defendants consented to the amendment.

The defendants moved to extend the time to file their reply to Hampshire's objection to the motion to dismiss and their response to Hampshire's motion for leave to file an amended complaint to September 13, 2002. The motion was granted. The defendants then filed their memorandum in reply to Hampshire's objection on September 13, but filed no response to the motion for leave to amend.

Instead, in their reply to the objection, the defendants state: "In an attempt to respond to the arguments set forth in Defendants' motion to dismiss, Hampshire has amended its Complaint for a second time to further identify the conduct which it alleges constitutes unfair competition. Despite this second amendment to its Complaint, Hampshire still has failed to state claims of unfair competition upon which relief can be granted."Reply Mem. at 1-2. Based on that statement, the court will deem the defendants to have consented to the amendment.

The motion for leave to amend is granted. The court will consider the motion to dismiss in the context of the second amended complaint, which supersedes the previous complaint. *See, e.g., Snyder v. Pascack Valley Hosp.*, 2002 WL 1940193, at *4 (3d Cir. Aug. 22, 2002); *Young v. City of Mount Rainier*, 238 F.3d 567, 572 (4th Cir.2001). Although Counts I through IV are re-alleged in the second amended complaint, they remain dismissed for purposes of this case. *See id.*

### III. Motion to Dismiss

Hampshire's remaining claims allege unfair business practices in violation of New Hampshire law and the Lanham Act. The defendants contend that the crux of Hampshire's unfair competition claims is that they obtained their patents and trademarks inequitably or fraudulently, making them invalid. Because the court has ruled that no justiciable controversy exists to support a declaratory judgment action as to the validity of the patents and trademarks, the defendants argue, the court lacks jurisdiction to consider the unfair competition claims. Alternatively, the

defendants contend that even the second amended complaint fails to plead fraud with sufficient particularity, that Hampshire fails to state claims under the Lanham Act and New Hampshire law based on the procurement and enforcement of the patents, and that Hampshire's allegations of false marking do not state a claim of unfair competition.

*3 Hampshire responds to the jurisdictional issue by arguing that subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332 and § 1338(a). As such, Hampshire has not addressed the jurisdictional issue that arises from the court's previous order, which concluded that Hampshire did not present a justiciable controversy to support jurisdiction under the Declaratory Judgment Act. With respect to the unfair competition claims, the jurisdictional issue is the related question of whether Hampshire has standing to assert those claims, which are premised on allegations that the defendants' patents and trademarks are invalid.

"The standing doctrine is grounded in the case-or-controversy requirement of Article III."[FN1] *Donahue v. City of Boston*, 2002 WL 2004680, at *4 (1st Cir. Sept. 5, 2002). Constitutional standing requires a party seeking to invoke the federal court's jurisdiction to show that "he has suffered or is threatened by injury in fact to a cognizable interest," that the injury is "concrete and particularized," and that the injury is "actual or imminent, not conjectural or hypothetical."*Id.* (internal quotations omitted). The standing requirements are assessed in terms of the asserted claims. *Id.*

> FN1. When necessary, Article III standing must be raised and resolved by the court. *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329 (5th Cir.2001) (page references not available).

Hampshire alleges that "defendants have fraudulently procured patents and trademarks and knowingly used them in bad faith against Hampshire Paper and others in the industry for an unfair competitive business advantage. These acts constitute violations of New Hampshire statutory and common law of unfair competition, and for use of the trademarks, also a violation of Lanham Act Section 38 (15 U.S.C. § 1120)." 2d Am. Comp. ¶ 90. Hampshire further alleges violations of Section 43(a) of the Lanham Act

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31114120 (D.N.H.), 2002 DNH 171
(Cite as: Not Reported in F.Supp.2d)

(15 U.S.C. § 1125(a)) and New Hampshire law in that the defendants "used their patents and trademarks against Hampshire for an unfair competitive business advantage knowing full well that the assertion of them was objectively baseless and a sham because defendants knew that Hampshire's pot cover could not possibly infringe due to its prior art Jacobson configuration."*Id.* ¶ 91.

Section 1120 provides a cause of action to any person who is injured due to another's procurement of a registration of a mark by false or fraudulent means. A person so injured is entitled to "damages sustained in consequence thereof." 15 U.S.C. § 1120. For purposes of standing, " 'it is not enough for the plaintiff merely to establish fraud in the registration of the trademark .... [S]he must also show that she sustained some damage in consequence of the fraud; she must indicate an offense to a protected interest ... Without a cognizable injury, plaintiff lacks standing to maintain this action." ' *Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 989 F.2d 985, 991 (8th Cir.1993)* (quoting *Jackson v. Lynley Designs, Inc., 729 F.Supp. 498, 500-01 (E.D.La.1990)); see also Joint Stock Soc'y v. UDV North Am., 53 F.Supp.2d 692, 712 (D.Del.1999).*

**\*4**Section 1125 involves two separate claims. It appears that Hampshire is invoking the false advertising prong, section 1125(a)(1)(B). To satisfy the standing requirement to maintain a false advertising claim, "the plaintiff must allege commercial injury based upon a misrepresentation about a product, and also that the injury was 'competitive,' i.e., harmful to the plaintiff's ability to compete with the defendant."*Barrus v. Sylvania, 55 F.3d 468, 470 (9th Cir.1995); Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 973 (10th Cir.1995).*

New Hampshire's Consumer Protection Statute provides that "[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages and for such equitable relief, including an injunction, as the court deems necessary and proper."N.H.Rev.Stat. Ann. § ("RSA") 358-A:10, I. Under the common law, a plaintiff must allege that "there is a reasonable basis for believing that the representation has caused or is likely to cause a diversion of trade from the [plaintiff] or harm to the [plaintiff's] reputation or good will."*Pacamor*

*Bearings, Inc. v. Minebea Co., Ltd., 918 F.Supp. 491, 501 (D.N.H.1996).*

Therefore, as to all of Hampshire's unfair competition claims, Hampshire must allege its own injury resulting from the defendants' conduct to demonstrate standing. The allegations in the Second Amended Complaint document the defendants' alleged improper conduct in procuring their patents and trademarks but offers very little as to the resulting harm. With respect to its own injury, Hampshire alleges that it "has suffered damage in New Hampshire and elsewhere as a result of defendants' fraudulent procurement of their four configuration trademark registrations because defendants have used them for an unfair competitive business advantage in New Hampshire and elsewhere in the pot cover market. Hampshire has not been able to enter the pot cover market due to defendants' fraudulent procurement of their trademark registrations and their use of such fraudulently procured trademark registrations." 2d Am. Com. ¶ 76. Otherwise, Hampshire simply makes conclusory allegations that the "[d]efendants have done such unlawful acts and damaged Hampshire in the State of New Hampshire and elsewhere." 2d Am. Com. ¶¶ 90, 91.

In addition, as is discussed in the previous order, Hampshire has not manufactured any infringing products. Hampshire alleges that the pot covers it intends to make and sell "do not infringe any plant cover patent owned by defendants. Hampshire Paper's plant covers also do not infringe any configuration trademark registrations owned by defendants." 2d. Am. Com. ¶ 96. Although Hampshire alleges that the defendants recently "threatened" Hampshire with enforcement of their plant cover patents and trademarks, no action has been taken. The court previously concluded that the "threats" alleged by Hampshire did not cause a reasonable apprehension of suit. Order, July 18, 2002, at 12.

**\*5** Because the pot covers it alleges it intends to manufacture do not infringe and because the defendants have not threatened or otherwise inhibited Hampshire's commercial activity as to noninfringing products, Hampshire has not stated an injury cognizable under any of its unfair competition claims. Therefore, Hampshire lacks standing to assert its unfair competition claims, and the court lacks

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31114120 (D.N.H.), 2002 DNH 171
(Cite as: Not Reported in F.Supp.2d)

jurisdiction to consider the claims.

## *Conclusion*

For the foregoing reasons, the plaintiff's motion for leave to amend (document no. 20) is granted. The defendants' motion to dismiss (document no. 7) is granted as to Counts V and VI; Counts I through IV having been previously dismissed.

The Clerk of Court shall docket the second amended complaint, enter judgment in favor of the defendants, and close the case.

SO ORDERED.

D.N.H.,2002.
Hampshire Paper Corp. v. Highland Supply Corp.
Not Reported in F.Supp.2d, 2002 WL 31114120 (D.N.H.), 2002 DNH 171

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

129 Fed.Appx. 874                                                                 Page 1
129 Fed.Appx. 874, 2005 WL 627973 (C.A.5 (Tex.)), 2005 Copr.L.Dec. P 29,063, 75 U.S.P.Q.2d 1061
(Cite as: 129 Fed.Appx. 874)

**H**Keane v. Fox Television Stations, Inc.
C.A.5 (Tex.),2005.
This case was not selected for publication in the Federal Reporter.Please use FIND to look at the applicable circuit court rule before citing this opinion. Fifth Circuit Rule 47.5.4. (FIND CTA5 Rule 47.)

United States Court of Appeals,Fifth Circuit.
Harry T. KEANE, Jr., Plaintiff-Appellant
v.
FOX TELEVISION STATIONS, INC.; Kriv Fox 26 (Houston, TX); Simon Cowell; Simon Fuller, Individually, doing business as 19TV; Fremantlemedia of North America, Inc.; Fremantlemedia, Ltd.; 19TV Ltd.; Nigel Lythgoe, Defendants-Appellees.
**Nos. 04-20340, 04-20437.**

Decided March 17, 2005.

**Background:** Originator of concept for "American Idol" talent show sued television network and production company for trademark infringement and related torts. Defendants moved to dismiss. The United States District Court for the Southern District of Texas, 297 F.Supp.2d 921, granted motion to dismiss, and originator appealed.

**Holdings:** The Court of Appeals held that:
(1) rights in an unregistered concept or idea are not protectable;
(2) being the first in time to use the phrase "American Idol" did not entitle originator to trademark protection;
(3) defendants' misappropriation of trade secret claims were dismissed because originator did not take measures to guard the secrecy of the idea.

Affirmed.

West Headnotes

**[1] Trademarks 382T ⟨key⟩1025**

382T Trademarks
    382TII Marks Protected
        382Tk1022 Subject Matter Underlying

Trademarks
        382Tk1025 k. Particular Goods, Services, or Other Subject Matter. Most Cited Cases
Rights in an unregistered concept or idea are not protectable; trademarks only protect fully developed products, not the ideas for the products.

**[2] Trademarks 382T ⟨key⟩1136(2)**

382T Trademarks
    382TIV Creation and Priority of Rights
        382Tk1132 Use of Mark
            382Tk1136 Nature and Extent of Use
                382Tk1136(2) k. Particular Cases. Most Cited Cases
Being the first in time to use the phrase "American Idol" did not entitle originator to trademark protection, where originator did not have fully developed product, but only ideas for the product, and originator failed to assert any commercial activity sufficient to appropriate unregistered trademark rights through use.

**[3] Copyrights and Intellectual Property 99 ⟨key⟩107**

99 Copyrights and Intellectual Property
    99II Intellectual Property
        99k107 k. Contracts. Most Cited Cases
Television network and production company's acceptance of originator's idea for "American Idol" talent show could not be taken as an implied acceptance of an implied promise to pay, where originator did nothing to indicate that disclosure of his idea was contingent on payment.

**[4] Antitrust and Trade Regulation 29T ⟨key⟩417**

29T Antitrust and Trade Regulation
    29TIV Trade Secrets and Proprietary Information
        29TIV(A) In General
            29Tk417 k. Necessity That Information Be Secret. Most Cited Cases
        (Formerly 382k984 Trade Regulation)

**Antitrust and Trade Regulation 29T ⟨key⟩419**

129 Fed.Appx. 874                                                                    Page 2
129 Fed.Appx. 874, 2005 WL 627973 (C.A.5 (Tex.)), 2005 Copr.L.Dec. P 29,063, 75 U.S.P.Q.2d 1061
**(Cite as: 129 Fed.Appx. 874)**

29T Antitrust and Trade Regulation
 29TIV Trade Secrets and Proprietary Information
  29TIV(A) In General
   29Tk419 k. Vigilance in Protecting Secret; Abandonment or Waiver. Most Cited Cases
  (Formerly 382k984 Trade Regulation)
Idea purveyor, who originated concept for "American Idol" talent show, could not demonstrate that he had a trade secret that was unknown outside of his business or that he took measures to guard the secrecy of the information, and thus, his misappropriation of trade secret claims had to be dismissed, where idea purveyor sent out unsolicited letters, which detailed the specifics of his idea, to several different production companies and advertised his idea on the internet.

**Trademarks 382T ☞1800**

382T Trademarks
 382TXI Trademarks and Trade Names Adjudicated
  382Tk1800 k. Alphabetical Listing. Most Cited Cases
American Idol.

**\*875**Daryl L. Moore, Sharon S. McCally, Storey, Moore & McCally, Houston, TX, for Plaintiff-Appellant.
Robert C. Shaddox, Tom C. Van Arsdel, Winstead, Sechrest & Minick, Houston, TX, Defendants-Appellees.

Appeals from the United States District Court for the Southern District of Texas, 4:03-CV-1642.

Before DAVIS, SMITH, and DeMOSS, Circuit Judges.

PER CURIAM: [FN*]

 FN* Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.
**\*\*1**[1][2] Appellant Keane challenges the district court's Rule 12(b)(6) dismissal of his action alleging defendants' misappropriation of Keane's concept for a television show, which he planned to call "American

Idol."[FN1] We affirm the judgment of the district court essentially for the reasons stated by the district court in its April 13, 2004 Memorandum and Order.

 FN1. According to Keane, he also considered calling his show "Ultimate Starsearch" and "American Superstars". Keane v. Fox Television Stations, Inc., 297 F.Supp.2d 921, 926 (S.D.Tex.2004).

In his complaint, Keane alleged several causes of action, all of which the district court dismissed on 12(b)(6) grounds. On appeal, Keane argues that he stated claims upon which relief can be granted for breach of an implied-in-fact contract, breach of a contract implied in law, quantum meruit, unfair competition (both for \*876 misappropriation of a product and misappropriation of a trade secret), and trademark infringement. As Keane has failed to allege any set of facts to support a claim which would entitle him to relief, the district court did not err in dismissing this claim under rule 12(b)(6). See Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), Leffall v. Dallas Indep. School Dist., 28 F.3d 521, 524 (5th Cir.1994).

Because we affirm the district court's dismissal of Keane's claims on 12(b)(6) grounds for the reasons stated in the district court's opinion, it is unnecessary for us to engage in a detailed analysis of the various legal issues. Fundamentally, we agree with the district court that Keane's trademark action is "derailed by two fundamental, fallacious premises", Keane, 297 F.Supp.2d at 933: namely, that his rights in an unregistered concept or idea are protectable and that being the first in time to use the phrase "American Idol" entitles him to trademark protection. Trademarks only protect fully developed products, not the ideas for the products. Also, unregistered trademark rights must be appropriated through use, that is, through some commercial activity and Keane asserted no such commercial activity sufficient to appropriate such rights.

[3] Beyond his trademark arguments, Keane heavily emphasized his claims for breach of implied-in-fact contract and misappropriation of trade secrets. In Whitfield v. Lear, 751 F.2d 90 (2nd Cir.1984), the Second Circuit asserted that the idea purveyor cannot recover unless he has obtained a promise to pay or the conduct of the offeree reflects an intent to pay for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 Fed.Appx. 874                                                                Page 3
129 Fed.Appx. 874, 2005 WL 627973 (C.A.5 (Tex.)), 2005 Copr.L.Dec. P 29,063, 75 U.S.P.Q.2d 1061
**(Cite as: 129 Fed.Appx. 874)**

the proffered idea. *See also Landsberg v. Scrabble Crossword Game Players, Inc.,* 736 F.2d 485, 489 (9th Cir.1984) (An implied-in-fact contract exists where "the circumstances and conduct manifesting the terms and existence of a contract precede or attend disclosure of the idea".) *See also Kleck v. Bausch & Lomb, Inc.,* 145 F.Supp.2d 819, 825 (W.D.Tx.2000). We agree with the district court's reading of plaintiff's pleadings that he did nothing to indicate that disclosure of his idea was contingent on payment. Consequently, the district court correctly concluded that the defendants' acceptance of plaintiff's idea cannot be taken as an implied acceptance.

**\*\*2**[4] Similarly, we agree with the district court's dismissal of plaintiff's misappropriation of trade secret claims. Because Keane sent out unsolicited letters, which detailed the specifics of his idea, to several different production companies and advertised his idea on the internet, the district court correctly found that he cannot demonstrate that he had a trade secret that was unknown outside of his business or that he took measures to guard the secrecy of the information.

Because we conclude that the district court correctly determined that Keane failed to survive the defendants' 12(b)(6) motion, we need not reach the preemption issue.

We also agree with the district court's thorough consideration of defendants' claim for attorneys' fees and the district court's award of attorneys' fees against the plaintiff and in favor of the defendants. The district court's conclusion that the plaintiff pursued his copyright claim when he knew none existed is supported by the record. The district court's finding of bad faith by plaintiff's attorney also supported imposition of fees under the Lanham Act.

For these reasons we affirm the judgment of the district court.

AFFIRMED.

C.A.5 (Tex.),2005.
Keane v. Fox Television Stations, Inc.
129 Fed.Appx. 874, 2005 WL 627973 (C.A.5 (Tex.)),
2005 Copr.L.Dec. P 29,063, 75 U.S.P.Q.2d 1061

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31426651 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

▷Publications Intern., Ltd. v. Leapfrog Enterprises, Inc.

N.D.Ill.,2002.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.

PUBLICATIONS INTERNATIONAL, LTD., an Illinois corporation, Plaintiff,

v.

LEAPFROG ENTERPRISES, INC., a Delaware corporation, Defendant.

**No. 01 C 3876.**

Oct. 29, 2002.

Corporation that produced, sold, and distributed children's books brought Lanham Act suit against competitor and asserted related state law claims of unfair competition, deceptive trade practices, and false advertising, and seeking injunctive and monetary relief. Alleged infringer moved to dismiss. The District Court, Gettleman, J., held that: (1) corporation failed to state claim against competitor for false procurement of trademark registration; (2) subsequent assignment of trademark registration would not result in liability against competitor for allegedly false procurement of trademark registration; (3) claim under Illinois Consumer Fraud Act did not have heightened pleading requirements; and (4) corporation failed to state common law unfair competition claims.

Motion granted in part and denied in part.

West Headnotes

**[1] Trademarks 382T ☞1382**

382T Trademarks
    382TVII Registration
        382TVII(D) Misuse of Federal Registration
            382Tk1381 False or Fraudulent Registration in General
                382Tk1382 k. In General. Most Cited Cases
    (Formerly 382k264)
Corporation that produced, sold, and distributed children's books failed to state claim against competitor for false procurement of trademark registration, absent allegations that competitor itself made any fraudulent misrepresentations to Patent and Trademark Office (PTO) in connection with maintenance of the registration; alleged fraudulent statements were made five years before competitor existed as an entity. Lanham Trade-Mark Act, § 38, 15 U.S.C.A. § 1120.

**[2] Trademarks 382T ☞1382**

382T Trademarks
    382TVII Registration
        382TVII(D) Misuse of Federal Registration
            382Tk1381 False or Fraudulent Registration in General
                382Tk1382 k. In General. Most Cited Cases
    (Formerly 382k264)
Assignment of trademark registration to competitor of corporation that produced, sold, and distributed children's books would not result in liability against competitor for allegedly false procurement of trademark registration; the "procurement" of a fraudulent registration would trigger damages, not assignment. Lanham Trade-Mark Act, § 38, 15 U.S.C.A. § 1120.

**[3] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
    (Formerly 382k264)
Conduct which confused or created misunderstanding as to source, sponsorship, approval, or certification of goods or which created a likelihood of such confusion or misunderstanding did not constitute "fraud" within meaning of procedural rule requiring heightened pleading for fraud claims, and thus claim under Illinois Consumer Fraud Act, which incorporated Illinois Uniform Deceptive Trade

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31426651 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Practices Act, by corporation which produced, sold, and distributed children's books, did not have heightened pleading requirements, but rather was subject to federal notice pleading. S.H.A. 815 ILCS 505/2; S.H.A. 815 ILCS 510/2; Fed.Rules Civ.Proc.Rules 8(a), 9(b), 28 U.S.C.A.

**[4] Antitrust and Trade Regulation 29T** ☞ 76

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk74 Pleading
                29Tk76 k. Particular Cases. Most Cited Cases
    (Formerly 382k864 Trade Regulation)
Corporation which produced, sold, and distributed children's books failed to state common law unfair competition claims against competitor, absent designation of the states' common laws at issue.

*MEMORANDUM OPINION AND ORDER*

GETTLEMAN, J.
*1 Publications International, Ltd. filed a seven-count amended complaint seeking injunctive and monetary relief against LeapFrog Enterprises, Inc., alleging numerous violations of the Lanham Act, 15 U.S.C. § 1051*et seq.,* as well as state law claims of unfair competition, deceptive trade practices, and false advertising.[FN1] Defendant has filed a motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss three of the seven counts of the amended complaint for failure to state claims. For the reasons stated below, defendant's motion to dismiss is granted in part and denied in part.

> FN1. Defendant has also filed counterclaims for trademark infringement and unfair competition, which are unrelated to the instant motion.

*BACKGROUND*[FN2]

> FN2. In distilling the factual background of the instant dispute, the court is not limited merely to the allegations in the complaint and exhibits attached thereto. Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings

if they are both central to the plaintiff's claim and referenced in the complaint. *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993).

Publications International, Ltd. ("PIL") is an Illinois corporation, with its headquarters and principal place of business located in Lincolnwood, Illinois. PIL produces, distributes and sells children's books throughout the United States on topics ranging from baby's first vocabulary to favorite bible stories. Since 1990, PIL has used a mark consisting of the words "LEAP FROG" in white block letters, beneath which is the depiction of a green frog displayed against a darker green rectangle, along with the "™" symbol. This designation has been used on a number of PIL's book sets, including collections of Christmas stories, Beatrix Potter animal stories, fairy tales, and nature stories, as well as CD-Roms, plush toys, and flashcards. These products have been sold in a variety of retail venues, including Target, Wal-Mart, K-Mart, grocery stores and bookstores.

LeapFrog Enterprises, Inc. ("LeapFrog") is a Delaware corporation, with its headquarters and principal place of business located in Emeryville, California. LeapFrog's predecessor, LeapFrog RBT, LLC ("LeapFrog RBT") was founded in 1995. LeapFrog sells educational toys for infants and toddlers, including interactive children's books.

In 1984, Willowisp Press, Inc. ("Willowisp I") registered a trademark for children's books consisting of the words LEAPFROG SERIES LIMITED VOCABULARY, arranged in a circle with the depiction of a sitting cross-eyed frog, which was assigned U.S. Reg. No. 1,306,993 (the " '993 registration") by the United States Patent and Trademark Office (PTO). Plaintiff alleges that only two titles bearing this logo were ever distributed or offered for sale by Willowisp I or its successors-in-interest, and the entire saleable inventory of these books was disposed of or sold by July 1988.

On July 29, 1988, Willowisp I merged into School Book Fairs, Inc. ("School Book Fairs"), a Florida corporation; however, this merger was not recorded in the PTO. As a result, title to the '993 registration remained in the name of Willowisp I. On August 2, 1988, a new corporation bearing the name Willowisp

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31426651 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

Press, Inc. was incorporated in Florida ("Willowisp II"). According to public records attached to plaintiff's complaint, Willowisp II and Willowisp I had identical addresses, as well as the same board of directors and officers.

In August 1990, Willowisp II filed a combined declaration pursuant to Sections 8 and 15 of the Lanham Act, affirming that the '993 registration had been in continuous use over the preceding five years and was still in use in commerce on children's books, thus preserving the registration of the trademark on the principal register of the PTO. On April 24, 1992, Willowisp II merged into SFB Services, Inc. On July 20, 1994, Willowisp II assigned the '993 registration to School Book Fairs.

**\*2** In 1995, LeapFrog RBT adopted the word LEAPFROG and a designation consisting of a depiction of a green frog on a block as a trademark for a toy phonics bus. In 1997, LeapFrog RBT applied to register this design mark as a trademark for children's educational toys. The registration was blocked, however, by the '993 registration. Plaintiff alleges that after ascertaining that the '993 registration was not being used in commerce in 1997, LeapFrog RBT sought to purchase the mark and related registration to enable the registration of its own design mark. This purchase was allegedly consummated in a quitclaim assignment on July 18, 1996, in which LeapFrog RBT paid School Book Fairs a "nuisance sum" for an assignment in-gross of bare title to the '993 registration. Plaintiff alleges that neither goodwill nor related business assets was conveyed to LeapFrog RBT with the '993 registration. According to the assignment document that School Book Fairs recorded with the PTO, however, goodwill was in fact conveyed along with the trademark .[FN3]

> FN3. The court notes that the notice of assignment submitted to the PTO must be distinguished from the actual deed conveying the trademark to LeapFrog RBT.

On September 23, 1997, LeapFrog RBT assigned its rights in this trademark to defendant, allegedly without goodwill. Defendant subsequently registered several related marks for electronic educational toys, educational software, school bags and children's books. Moreover, defendant also allegedly adopted and used a number of "LEAPFROG" or "LEAP" formative marks, such as LEAPPAD and LEAPFROG LEARNING POND, in conjunction with the registered trademarks. Plaintiff alleges that defendant has undertaken an aggressive advertising campaign involving these marks, which has caused reverse confusion and misled the trade and consumers into believing that PIL's LEAP FROG books and products "emanated from, or were somehow approved or sponsored by defendant."

Accordingly, in its amended complaint, plaintiff seeks injunctive and monetary relief on the basis of the following seven counts: (I) use of false marks which are likely to cause confusion in violation of § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (II) fraudulent maintenance of a federal registration in violation of §§ 14 and 38 of the Lanham Act, 15 U.S.C. §§ 1064(3) and 1120; (III) abandonment of the '993 registration, within the meaning of § 45 of the Lanham Act, 15 U.S.C. § 1127; (IV) false advertising in violation of § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (V) deceptive trade practices in violation of the Illinois Consumer Fraud Deceptive Business Practices Act, 815 ILCS 505/2(8); (VI) false advertising and unfair business practices under §§ 17200 et seq. of the California Business and Professional Code; and (VII) "trade name and trademark infringement and acts of unfair competition in violation of the common law of the states of Illinois, California, and of the other states of the Union."Pursuant to Fed.R.Civ.P. 12(b)(6), defendant has moved to dismiss Counts II, V, and VII for failure to state claims. For the reasons stated below, defendant's motion is granted with respect to Counts II and VII and denied with respect to Count V.

*ANALYSIS*

**\*3** The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to rule on its merits. *See* *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on the motion, the court considers whether relief is possible under any facts that could be established consistent with the allegations. *Bartholet v. Reishauer A.G.,* 953 F.2d 1073, 1078 (7th Cir.1992). To this end, the court accepts the allegations of the complaint as true and views the facts in the light most favorable to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31426651 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

plaintiffs. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1428 (7th Cir.1996). With these standards in mind, the court analyzes Counts II, V, and VII.

*Count II-Fraud in Maintaining a Trademark Registration*

Section 38 of the Lanham Act, 15 U.S.C. § 1120, provides:
Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

Section 14(3), 15 U.S.C. § 1164(3), further provides that, at any time, "any person who believes that he is or will be damaged," may file a petition to cancel a fraudulently registered mark.

At the outset, the court notes that allegations of fraudulent procurement must be pled with particularity, pursuant to Fed.R.Civ.P. 9(b).*Oreck Corp. v. Thomson Consumer Elec., Inc.*, 796 F.Supp. 1152, 1159 (S.D.Ind.1992). Hence, a general allegation of fraud without an accompanying recitation of details is insufficient. *Id.*

[1] In Count II of its amended complaint, plaintiff seeks cancellation of the '993 registration under § 14(3), as well as damages under § 38. Plaintiff alleges that the false Section 8 affidavit filed by Willowisp II constituted fraud, and that defendant "knew or should have known by a cursory examination of the Florida corporate records that the '993 registration was invalid and of no force and effect, and ... knew its title to [the '993 registration] rested on a series of invalid assignments-in-gross in which no goodwill or related assets were conveyed with the trademark ."

In response, defendant asserts three distinct grounds for dismissing plaintiff's claim for damages under § 38. First, defendant maintains that because plaintiff has not alleged that LeapFrog "procured" the '993 registration, or made any false statements to the PTO, LeapFrog cannot be liable in damages to plaintiff under § 38 of the Lanham Act. Defendant also asserts that Count II is barred by the applicable statute of

limitations. Last, defendant contends that plaintiff has not alleged its injury with sufficient particularity, as required under Fed.R.Civ.P. 9(b). Because the court concludes that the first ground for dismissal of Count II is dispositive, the court need not address the potential merits of defendant's other arguments.[FN4]

> FN4. The court notes, however, that statute of limitations is an affirmative defense, which plaintiff is not required to plead around in a complaint. See*Leavell v. Kieffer*, 189 F.3d 492, 494 (7th Cir.1999).

*4 Plaintiff maintains that *Elec. Info. Publ'ns, Inc. v. C-M Periodicals*, 163 U.S.P.Q. 624 (N.D.Ill.1969), undermines defendant's argument that its alleged awareness of Willowisp II's fraudulent misrepresentations does not result in liability under § 38. In *Elec. Info. Publ'ns*, the court imposed § 38 liability on EIP, which had purchased a mark that was obtained through fraudulent representations by another company, Ahrens. In finding liability, the court noted that, at the time of the purchase, EIP knew that Ahrens had not used the mark for several years. *Id.* at 630.Moreover, after the purchase, EIP "represented, and continued to represent, to the Patent Office ... that the two former Ahrens registrations were validly continued," and filed false affidavits with the PTO to maintain its registrations. *Id.* at 631.The court therefore concluded that the federal registrations at issue were "procured and maintained by [EIP's] purposeful misrepresentation of the facts to the Patent Office concerning [EIP's] and [Aherns'] transactions and use, and thus were falsely and fraudulently registered within the meaning of [§ 38]." *Id.* at 632.

Notwithstanding the arguable similarities between *Elec. Info. Publ'ns* and the instant dispute, and putting aside the appropriateness of awarding § 38 liability for misrepresentations made in connection with maintenance, rather than procurement, of a registration, the court concludes that plaintiff has not stated a claim against LeapFrog under § 38. In contrast to *Elec. Info. Publ'ns*, plaintiff in the instant case has not alleged that defendant itself made any fraudulent misrepresentations to the PTO in connection with the maintenance of the registration at issue.

The amended complaint merely states that the '993

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 31426651 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

registration was "fraudulently maintained by the filing of a false Section 8 Declaration ... by a declarant that was not the owner of said registration."This allegation conspicuously fails to identify defendant or its predecessor, LeapFrog RBT, as the party that allegedly made the misstatements. Indeed, plaintiff concedes elsewhere in the complaint that Willowisp II actually filed the allegedly fraudulent affidavits. Moreover, the fraudulent misstatements were submitted to the PTO in 1990, five years before LeapFrog RBT, defendant's predecessor, existed as an entity. Consequently, based on the allegations in the amended complaint, any insinuation that LeapFrog acted in concert with Willowisp II when it filed the allegedly fraudulent affidavits is baseless.

[2] Further, the subsequent assignment of the '993 registration to LeapFrog does not result in § 38 liability against LeapFrog. Plaintiff cites to *Marshak v. Treadwell,* 58 F.Supp.2d 551, 557 (D.N.J.1999), *aff'd* 240 F.3d 184 (3d Cir.2001), for the proposition that the assignee of a trademark stands in the shoes of his assignors and can have no greater trademark rights than they had. In *Marshak,* the district court cancelled the plaintiff's trademark after the jury determined that the plaintiff's assignors had invalidly procured a trademark that they subsequently assigned to the plaintiff. *Id.* at 561.The court notes, however, that the counterclaim at issue in *Marshak* was brought under § 14(3) for cancellation, and did not involve a § 38 claim for damages. Hence, the court in *Marshak* expressed no opinion on the appropriateness of levying damages against an assignee for the alleged fraud of his assignors.

*5 Thus, defendant's alleged knowledge of the misrepresentations at the time it purchased the trademark does not support a claim for § 38 liability. Plaintiff cites to *Merry Hull & Co. v. Hi-Line Co.,* 243 F.Supp. 45 (S.D.N.Y.1965), and *Schwinn Bicycle Co. v. Murray Ohio Mfg. Co.,* 339 F.Supp. 973 (M.D.Tenn.1971), for the proposition that, to state a claim under § 38, plaintiff need only "allege that LeapFrog had knowledge of any false means or fraudulent or false representations made with respect to the registration at issue."Plaintiff's reliance on these cases is misplaced, however, because both *Merry Hull* and *Schwinn* involved allegations that the parties themselves, or their officers, made the misrepresentations in their applications for

registration. *See, e.g., Schwinn,* 339 F.Supp. at 984 ("Before *Schwinn* can incur liability under [§ 38], Murray must present sufficient evidence to support a finding that *Schwinn* procured registration by a declaration or representation that is either incorrect or a willful attempt to mislead the Patent Office."). (Emphasis added.) As the plain text of the statute suggests, it is the "procurement" of the fraudulent registration that triggers damages under § 38.

Accordingly, the court concludes that, to the extent Count II purports to state a claim for damages under § 38 of the Lanham Act, that claim must be dismissed. In so holding, the court notes that plaintiff's claim for cancellation under § 14(3) is not affected by this ruling.

*Count V-Illinois Deceptive Practices Act*

[3] In Count V, plaintiff incorporated the preceding paragraphs of the amended complaint, and asserted that "the aforesaid acts of Defendant, LeapFrog, constitute deceptive trade practices and acts in the conduct of Defendant's business in violation of the Illinois Consumer Fraud Deceptive Practices Act, 815 ILCS 505/2(8)." In its motion to dismiss, defendant maintains that Count V fails to specify which of two Illinois statutes forms the basis of plaintiff's claim, and that the supporting allegations lack sufficient particularity. In response, plaintiff asserts that the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2, has been incorporated into the Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505/2. Plaintiff further asserts that it is "well-settled that the elements of a good § 43(a) Lanham Act claim overlap with the elements of a claim under the Illinois Uniform Deceptive Trade Practices Act, provided that conduct within Illinois is involved."

The Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Consumer Fraud Act") explicitly incorporates § 2 of the Uniform Deceptive Trade Practices Act by prohibiting "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to ... the use or employment of any practice described in § 2 of the 'Uniform Deceptive Trade Practices Act.' ' 815 Ill. Comp. Stat. § 505/2. Section 2 of the Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2, provides that "A person engages in a deceptive

trade practice when ... the person ... (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services ... (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

**\*6** Having established that the Illinois Consumer Fraud Act does in fact incorporate § 2 of the Uniform Deceptive Trade Practices Act, the next issue becomes the degree of specificity with which plaintiff must plead its claim. Defendant contends that plaintiff's claim is subject to the heightened pleading requirements set forth in Fed.R.Civ.P. 9(b), described above. See*Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.,* 940 F.Supp. 176, 180 (N.D.Ill.1996). The plain text of the Illinois Consumer Fraud Act belies defendant's contention, however.

On its face, in both its title and the substantive text of the statute, the Illinois Consumer Fraud Act covers several types of conduct in addition to fraud, including all practices that violate § 2 of the Illinois Deceptive Trade Practices Act. See*Mitsubishi Elec. Corp. v. IMS Technology, Inc.,* 1997 WL 630187, at \*10 (N.D.Ill. Sept.30, 1997); *Hoffman v. Szyszko,* 1995 WL 519815, at \*5 (N.D.Ill. Aug.30, 1995). For example, as noted above, § 2 of the Illinois Deceptive Trade Practices Act provides relief for business activities that create "confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services,"[FN5] as well as "any other conduct which similarly creates a likelihood of confusion or misunderstanding."Such activity, which apparently is relevant to the instant dispute, does not necessarily constitute fraud in a manner that would implicate Fed.R.Civ.P. 9(b).See, e.g., *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.,* 657 F.Supp. 1486, 1494 (N.D.Ill.1987). Therefore, Count V is subject to federal notice pleading, which requires only that the plaintiff "set out in her complaint a short and plain statement of the claim that will provide the defendant with fair notice of the claim."*Scott v. City of Chicago,* 195 F.3d 950, 951 (7th Cir.1999).

> FN5. This language is practically identical to the language in § 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), asserted in Count I of the complaint, which provides relief for misrepresentations that are "likely to cause confusion ... as to the

origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."Defendant has not asserted that plaintiff's Lanham Act claim is subject to the heightened pleading standards outlined in Fed.R.Civ.P. 9(b).

As noted above, in evaluating a motion to dismiss, the court must read the allegations in the complaint in a light most favorable to the plaintiff, and ask whether relief is possible under any facts that could be established consistent with the allegations. Although the court would prefer for plaintiff to specify which subsections were allegedly violated by defendant, plaintiff's failure to do so is not grounds for dismissal under notice pleading. Indeed, the allegations in the complaint are sufficient to put defendant on notice with respect to what claims it must defend against in Count V, notwithstanding plaintiff's typographical errors. Accordingly, the court denies defendant's motion to dismiss Count V.[FN6]

> FN6. In the event that plaintiff does file an amended complaint, the court encourages plaintiff to correct errors related to its citations to the Illinois Consumer Fraud Act and Illinois Uniform Deceptive Trade Practices Act.

*Count VII-Common Law Unfair Competition*

[4] In Count VII, plaintiff alleges "trade name and trademark infringement and acts of unfair competition in violation of the common law of the states of Illinois, California, and of the other states of the Union."In its motion to dismiss, defendant contends that plaintiff's incorporation of 91 paragraphs of the complaint fails to notify LeapFrog which paragraphs allegedly support the claim of unfair competition, and that plaintiff's reliance on the law of every state of the union "fails to provide LeapFrog 'fair notice' of exactly what alleged facts and laws it is supposed to defend against."

**\*7** While the court does not take issue with plaintiff's incorporation of the previous 91 paragraphs of its complaint, the court does conclude that plaintiff must specify which states' common laws are at issue. Indeed, the damages available for an unfair competition claim, as well as the specific elements

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31426651 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

thereof, may vary significantly from state to state. Hence, the court grants defendant's motion to dismiss Count VII without prejudice.

*CONCLUSION*

For the reasons stated herein, defendant's motion to dismiss for failure to state a claim is granted with respect to the damages claim in Count II, granted without prejudice with respect to Count VII, and denied with respect to Count V.

N.D.Ill.,2002.
Publications Intern., Ltd. v. Leapfrog Enterprises, Inc.
Not Reported in F.Supp.2d, 2002 WL 31426651 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                           Page 1
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

**H**Top Tobacco, L.P. v. North Atlantic Operating
Co., Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                         Division.
   TOP TOBACCO, L.P. and Republic Tobacco L.P.,
                         Plaintiffs,
                            v.
     NORTH ATLANTIC OPERATING COMPANY,
    INC. and National Tobacco Company L.P.,
                       Defendants.
                     No. 06 C 950.

                    April 17, 2007.

Antony Joseph McShane, Hillary Altekruse Mann,
Sarah Elizabeth Smith, Neal, Gerber & Eisenberg,
Charles S. Bergen, Lynn Hagman Murray, Lynn
Hagman Murray, Grippo & Elden LLC, William J.
Lenz, Factor & Lake, Ltd., Chicago, IL, for Plaintiffs.
Paul R. Garcia, Daniel Ibsen Morales, Deanna R.
Swits, Jami A. Jarosch, Khara AishaAshanti
Coleman, Lisa M. Holubar, Melody N. Drummond,
Michael P. Bregenzer, Kirkland & Ellis LLP,
Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge.
*1 On January 4, 2007, the Court granted North
Atlantic Operating Company, Inc. and National
Tobacco Company L.P.'s (together, North Atlantic)
motion for summary judgment against Top Tobacco,
L.P. and Republic Tobacco L.P. (together, Top
Tobacco). North Atlantic has moved for an award of
attorneys' fees under the Lanham Act, 15 U.S.C. §
1117(a), which authorizes an award of reasonable
attorneys' fees to the prevailing party in "exceptional
cases." It has also submitted a bill of costs pursuant
to 28 U.S.C. § 1920 and Federal Rule of Civil
Procedure 26(b)(4)(C)(i). Top Tobacco contends that
North Atlantic is not entitled to attorneys' fees and
that its bill of costs should be reduced significantly.
For the following reasons, the Court grants
defendants' motion for attorneys' fees, and grants in
part and denies in part their bill of costs.

### Discussion

#### 1. Attorneys' fees

The facts of this case are fully set forth in the Court's
January 4, 2007 Memorandum Opinion and Order.
*Top Tobacco, L.P. v. North Atlantic Operating Co.,
Inc.,* No. 06 C 950, 2006 WL 118527 (N.D.Ill. Jan. 4,
2007). Top Tobacco and North Atlantic both
manufacture and sell roll-your-own (RYO) cigarette
tobacco and rolling papers. Top Tobacco sells its
products under the TOP brand, and North Atlantic
sells it products under the ZIG-ZAG brand. Top
Tobacco brought five claims based on North
Atlantic's use of "Fresh-Top Canister": a claim under
the Lanham Act for infringement of a registered
trademark (Count 1), a federal dilution claim (Count
2), a Lanham Act unfair competition claim, which
amounts to a claim for infringement of an
unregistered trademark (Count 3), a claim for
violation of the Illinois Consumer Fraud and
Deceptive Trade Practices Act (ICFA) (Count 4), and
a state law unfair competition claim (Count 5). The
Court granted summary judgment in favor of North
Atlantic on all counts.

Under the Lanham Act and ICFA, a court may award
reasonable attorneys' fees to a prevailing party if the
losing party's conduct can be regarded as oppressive.
15 U.S.C. § 1117(a); 815 ILCS 505/10a(c); *Door
Sys., Inc. v. Pro-Line Sys., Inc.,* 126 F.3d 1028, 1029-
30, 1032 (7th Cir.1997) (citations omitted). The
Seventh Circuit has held that a suit is oppressive if "it
lacked merit, had elements of an abuse of process
claim, and plaintiff's conduct unreasonably increased
the cost of defending against the suit."*S Indus., Inc. v.
Centra 2000, Inc.,* 249 F.3d 625, 627 (7th Cir.2001).
A case, however, can be exceptional and fees may be
awarded "simply on the basis that it is wholly lacking
in merit."*Id. at 626* ("[t]his was not a murky case.
Based solely on the weakness of S Industries' claims,
Judge Lindberg acted well within his discretion in
granting attorneys['] fees."); *Bretford Mfg., Inc. v.
Smith Sys. Mfg. Co.,* 389 F.Supp.2d 983, 984
(N.D.Ill.2005).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

North Atlantic argues that this case is exceptional for several reasons. First, it contends that Top Tobacco's claims were extremely weak and that it failed to produce any evidence of a likelihood of confusion. Second, North Atlantic points to Top Tobacco's decision to seek a preliminary injunction and over ten million dollars in damages for the alleged infringement, requiring defendants to defend themselves with "expedited vigor" that resulted in substantial costs. Finally, and most importantly in the Court's view, North Atlantic cites to Top Tobacco's 2002 representations to the United States Patent & Trademark Office (USPTO) when it was attempting to register the TOP mark.

### a. Strength of Top Tobacco's claims

*2 *S Industries* holds that this case may be deemed exceptional "based solely on the weakness of [Top Tobacco's] claims." *S Indus., 249 F.3d at 626.* Top Tobacco's infringement and dilution claims were exceptionally weak. Without rehashing the lengthy analysis in the Court's January 4, 2007 memorandum opinion and order, a simple look at the canisters as they appeared on store shelves shows the virtual impossibility that consumers would be confused by North Atlantic's use of the phrase "Fresh-Top Canister":





Moreover, North Atlantic removed the "Fresh-Top Canister" designation from the front of its product years before Top Tobacco filed this suit. By 2004, a consumer would have had to pick up the ZIG-ZAG product and turn it ninety degrees to the right even to see the words "Fresh-Top Canister." Given these considerations, it is not surprising that Top Tobacco did not come forth with any evidence of actual confusion despite North Atlantic's use of "Fresh-Top Canister" on one of its products for over five years.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
(Cite as: Slip Copy)

Page 3

Top Tobacco argues that, in addition to the canisters, certain North Atlantic price lists identified one of the ZIG-ZAG products as a "Fresh-Top Canister." Top Tobacco's contention that this was likely to confuse wholesale customers regarding the source of ZIG-ZAG MYO tobacco is unavailing. The price list was given only to wholesalers who purchased by the case and, it is fair to infer, took far greater care in purchasing products than ordinary retail consumers. In addition, the price lists all clearly identified the product as ZIG-ZAG. Some of the price lists even had the ZIG-ZAG logo emblazoned on the top of the list. Based on these facts, it is inconceivable that a wholesaler, whose business is purchasing tobacco, would confuse two of the largest players in the MYO market. Moreover, even in the extremely unlikely event that a wholesaler thought he was purchasing a TOP product instead of a ZIG-ZAG product, he would be set straight when a case of ZIG-ZAG canisters that looked nothing like the TOP canisters arrived. Top Tobacco's suggestion that wholesalers may never see the canisters because they are packed in cases, Pl.'s Resp. at 6, is pure conjecture on the present record.

Even more importantly, however, North Atlantic stopped using "Fresh-Top Canister" on its price lists before Top Tobacco filed suit. The injunction sought by Top Tobacco, therefore, plainly did not relate to the price lists. Moreover, as North Atlantic points out, Top Tobacco's damages expert did not even address whether Top Tobacco had suffered injury as a result of the price lists. Rather, he focused entirely on the canisters. In short, the existence of the price lists cannot be used to retroactively buttress the claims that were actually advanced in the litigation. At best, North Atlantic's alleged infringing use of "Fresh-Top Canister" on its price lists was a throw-away issue for Top Tobacco that was just as weak as its claims regarding the canisters.

*3 Top Tobacco now argues for the first time that it has evidence of actual confusion. It has submitted an affidavit from its chairman, Donald Levin, who recounts a conversation he had with a wholesaler at a trade show in Las Vegas in February 2007. According to Levin, the state of Tennessee had issued a document identifying certain tobacco products that could no longer be sold in the state. The list identified several ZIG-ZAG products, including those that used the phrase "Fresh-Top Canister." Levin avers as

follows:
Today, February 22, 2007, at the AWMA "Real Deal" trade show in Las Vegas, Nevada, I was talking with Mr. Charles Enoch, of B & W Wholesale Distributing, Murfreesboro, Tennessee. Mr. Enoch had looked at the de-listing document and asked me, "Are your products being discontinued in Tennessee?" I told him "no," those were not our Top products.

Pl.'s Resp. Ex. K.

The affidavit does not constitute evidence of actual confusion that would bolster the strength of the claims Top Tobacco advanced in this case. First, the conversation occurred a year after Top Tobacco filed suit and after it had lost the case without offering any evidence of confusion. In addition, there are many ways to interpret Enoch's question to Levin. Enoch said nothing about the ZIG-ZIG brand or "Fresh-Top Canister" at all. A perfectly reasonable interpretation is that it simply was a general question about Top Tobacco's products that had nothing to do with ZIG-ZAG. Finally, as discussed above, no matter what Enoch had in mind, the price list issue still was not part of Top Tobacco's claim for injunctive relief or, apparently, its claim for damages. In short, Levin's belated affidavit is not evidence of actual confusion and does not alter the Court's finding regarding the weakness of Top Tobacco's claims.

Top Tobacco also contends that this is not an exceptional case because it had no choice but to file suit to protect its TOP mark. See 2 McCarthy, Trademarks and Unfair Competition § 11:91 (4th ed. 1992) ("The law imposes on trademark owners the duty to be pro-active and to police the relevant market for infringers."). Though true, this does not immunize a trademark owner who filed a baseless suit. Otherwise, every losing Lanham Act plaintiff could claim that his case was not exceptional because he had no choice but to police his mark. Such an interpretation of a trademark owner's duties would read § 1117(a) out of the Act because no case could ever be deemed exceptional.

**b. Arguments before USPTO**

As discussed above, this case could be deemed exceptional based solely on the sheer weakness of Top Tobacco's claims. See S Indus., 249 F.3d at

627. But there is more. As fully discussed in the Court's January 4, 2007 order, the USPTO initially refused to register Top Tobacco's TOP mark. In response, Top Tobacco stated that

[h]ere there are not only 13 Cited Marks which incorporate the term "TOP," but an online search of the Trademark Office's records using the TESS system on May 10, 2002, revealed no less than *2,360* live applications and registrations comprised of "TOP." The overwhelming frequency of applications and registrations comprised of "TOP" in the Trademark Office's records coupled with the longstanding coexistence of the Cited Marks, all in Class 34, demonstrates the Trademark Office's recognition that the scope of protection that should be afforded to these marks is *extremely* narrow. The fact that the Trademark Office has granted coexisting registrations for TOP STONE and TOP VALUE, both for cigars ..., and TOPCO and TOPS, both for book matches ... further bolsters this point.

**4** Def.'s Summ. Judg. Ex. C at 7 (emphasis in original).[FN1] Top Tobacco also told the USPTO that "where the Cited Marks exist in an extremely crowded field, the marks in question should be entitled to a comparably narrow scope of protection."*Id.* at 3. It continued,

> FN1. Class 34, as used in the quoted passage, includes "tobacco, smokers' articles, and matches."

[t]hus, marks like the Cited Marks which incorporate very common terms such as TOP are entitled to only a very narrow scope of protection, and the addition of any matter which could distinguish one mark from another in sight, sound or meaning, or a slight difference in the goods and services with which the respective marks are used should be sufficient to distinguish one mark from the next for the purposes of avoiding consumer confusion.
*Id.* at 3. Top Tobacco further argued that
none of the Cited Marks employ the term 'TOP' in the same or even a similar fashion. They either use 'TOP' as a superlative describing their product as 'the best' or 'above all others' *or to refer to a lid or closure.*Accordingly, these differing commercial impressions *weigh strongly in favor of a finding of no likelihood of confusion....*

*Id.* at 7 (emphasis added).

Top Tobacco's statements to the USPTO to convince it to register the TOP mark quite obviously contradict the positions it took before the Court in this case. Again, these inconsistencies are outlined at length in the Court's January 4, 2007 opinion, so only a few examples will be recited here. First, Top Tobacco told the USPTO that a mark utilizing "top" to refer to a lid or closure would not lead to a likelihood of confusion with its TOP brand tobacco products. North Atlantic's use of the term "Fresh-Top" refers to the lid on the container. Second, Top Tobacco told the USPTO that marks utilizing "top" are entitled to a narrow scope of protection because marks such as TOP STONE and TOP VALUE have coexisted for cigars. In this case, it argued that TOP was entitled to such broad protection that it could not coexist with the phrase "Fresh-Top Canister" affixed in small type to the side of a ZIG ZAG canister. Third, Top Tobacco pointed out to the USPTO that there are many other marks in Class 34 that utilize the word "top." A "humdrum" mark such as "top" cannot achieve fame necessary for dilution protection when so many others use it in a similar field. *See Fruit of the Loom, Inc. v. Girouard,* 994 F.2d 1359, 1363 (9th Cir.1993).

While before the USPTO, Top Tobacco needed other marks using the word "top" to be given a narrow scope of protection so that it could convince the USPTO to register its TOP mark in the already crowded "tobacco, smokers' articles, and matches" classification. So, it argued as such. In this case, it needed to convince the Court of the diametrically opposite view: that its TOP mark enjoyed broad protection against another user of the word "top" in the tobacco market. So, it simply switched positions. This is not cricket. *See Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1427-28 (7th Cir.1993) ("A litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory.") Based on Top Tobacco's statements to the USPTO, it is difficult to reach any conclusion other than it had to know before it filed this case that its claims lacked merit. Its change of positions before this Court needlessly increased the costs of defending this suit.

**5** Top Tobacco argues that the Court has taken its statements before the USPTO out of context. Though the Court need not rehash its opinion granting

Slip Copy                                                                                                              Page 5
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

summary judgment, the Court disagrees. The Court reviewed all of Top Tobacco's statements to the USPTO, not just those portions cited in the summary judgment opinion. Top Tobacco was quite clearly telling the USPTO that marks utilizing "top" in Class 34 were entitled to a narrow scope of protection. It also clearly stated that marks utilizing "top" to "refer to a lid or closure" were unlikely to lead to a likelihood of confusion with other users of "top" in Class 34.

### c. Top Tobacco's litigation positions

The deposition testimony of Top Tobacco's chairman, Donald Levin, further illustrates Top Tobacco's apparent willingness to say whatever it believes suits it at the time and supports a finding that this is an exceptional case within the meaning of § 1117(a). When confronted with the ZIG-ZAG and TOP canisters side-by-side, Top Tobacco's chairman refused to concede the obvious-that they look different. The Court reviewed the testimony on video and could hardly believe that Levin gave the following testimony with a completely straight face:

Q: The appearance with the packaging in Exhibit 1 [TOP canister] and Exhibit 2 [ZIG-ZAG Fresh-Top Canister], do you agree with me that the overall appearance of them is very different?

A: No, as I said, it looks the same. The can looks the same.[FN2]

> FN2. In the quoted excerpt, if one is quite charitable to Levin, one could conclude that at the outset, he might have intended to refer to the bare cans without the labeling. But it soon became apparent that he intended to say that the overall look of the labeling on the cans was the same, a preposterous contention.

...

Q: I'm talking about the way that it looks, the words, the colors, the combination of things. Do you agree with me that Exhibit 1, your can, looks very different from Exhibit 2, our can? If you-yes or no?

...

A: No.

Q: Do you agree with me that the way they look, they're sitting on a counter top or on a shelf, looking at them from the front, they look different?

A: No. They look the same. They're both cans of

tobacco.

...

Q: Okay. Forgive me for pushing you on this, Mr. Levin, because I really want to make sure I understand this. In your judgment as the chairman of the company, looking at Exhibit 2 and looking at Exhibit 1, you think they look similar?

A: I think the cans are identical.

Levin Dep. at 105-07, 110. Levin eventually conceded that ZIG-ZAG is a different word than TOP and that the cans are different colors. He refused, however, to budge from his contention that the cans are "identical." This position is similar to looking at the shelves in a library and maintaining that all the books look identical because they are all books, regardless of their titles, jacket designs, and colors. Simply put, Levin's testimony is absurd; it highlights the weakness of Top Tobacco's claims and-like Top Tobacco's inconsistent positions before the USPTO and the Court-demonstrates that Top Tobacco was not playing straight. Moreover, when witnesses dissemble as Levin did, it needlessly increases the costs of defending a suit, one of the factors the Seventh Circuit said courts may consider when deciding whether a case is exceptional. *See S Indus., 249 F.3d at 627.*

### d. Conclusion

**\*6** These considerations, taken together, establish that this case is exceptional within the meaning of § 1117(a) and that North Atlantic should be awarded reasonable attorneys' fees. The Court cautions North Atlantic that "reasonable" means exactly what it says and requires that its fee petition reflect the exercise of "billing judgment." *See Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In addition, North Atlantic should organize the attorney and paralegal time in its fee petition by activity rather than by date or by attorney.[FN3]*See In re Continental Illinois Securities Litig.,* 572 F.Supp. 931, 934 (N.D.Ill.1983). Finally, to the extent time is claimed for multiple attorneys on the same task, North Atlantic will be expected to justify this in its supporting memorandum. The Court admonishes North Atlantic that it will not sift through an unreasonable request to make it reasonable.

> FN3. In this regard, North Atlantic should include ABA task codes if North Atlantic's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

counsel used them for billing purposes.

In addition, the Court is opting out of the provisions of Local Rule 54.3 to a significant extent, as they are quite cumbersome and, in many cases, lead to undue delay in a court's consideration of a fee request. North Atlantic is to file its fee petition and supporting memorandum by no later than May 7, 2007. On that same date, North Atlantic is to provide to Top Tobacco the materials covered by Local Rule 54.3(d)(1) & (3). Top Tobacco is to file its response to the fee petition by no later than May 29, 2007. If it objects to the amount sought by North Atlantic, it is to produce to North Atlantic on that same date the materials covered by Local Rule 54.3(d)(5). North Atlantic's reply is to be filed by June 8, 2007.

## 2. Bill of costs

Under 28 U.S.C. § 1920, a court may tax "(1) [f]ees of the clerk and marshal; (2)[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3)[f]ees and disbursements for printing and witnesses; (4)[f]ees for exemplification and copies of papers necessarily obtained for use in the case," among other costs. The Court presumes that the prevailing party is entitled to costs, and "the losing party bears the burden of an affirmative showing that the costs taxed are not appropriate."*Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir.2005). North Atlantic has submitted a bill of costs in the amount of $139,541.34, comprised of service fees, court reporting fees, printing and witness fees, copying fees, and fees incurred responding to discovery. Top Tobacco objects to approximately 90% of the costs claimed by North Atlantic.

### a. Service fees

North Atlantic requests $384 for service fees. Top Tobacco raises no objections. The Court therefore taxes these costs to Top Tobacco.

### b. Court reporting fees

### i. Video deposition costs

North Atlantic claims $26,367.46 for court reporting fees related to transcripts for twenty depositions, and

video costs for seventeen of the depositions. The video costs amount to $16,179.13, and the transcript costs amount to $10,188.33. Top Tobacco contends that North Atlantic cannot recover the costs of transcripts and videotapes for the same depositions. Courts may tax the costs of a transcript and a videotape of the same deposition only if both are necessary and reasonable in the context of the particular case. *See Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 448-49 (4th Cir.1999); *Tilton v. Capital Cities/ABC Inc.*, 115 F.3d 1471, 1478 (10th Cir.1997); *Rogers v. City of Chicago*, No. 04 C 5569, 2002 WL 423723, at *3 (N.D.Ill. Mar. 15, 2002).

*7 North Atlantic has not argued that the witnesses it videotaped were outside the Court's subpoena power and therefore potentially unavailable for trial. *See, e.g., Nat'l Diamond Syndicate, Inc. v. Flanders Diamond USA, Inc.*, No. 00 C 6402, 2004 WL 1557765, at *2 (N.D.Ill. Jul.8, 2004). Rather, it cites the benefits of videotape testimony for impeachment at trial and other purposes. Though there is undoubtedly a benefit to having video of a witness's prior testimony (especially a witness like Levin), generally speaking, potential impeachment is not always a proper basis for taxing videotape deposition costs. *See Rockett v. Marten Transp., Ltd.*, No. 99 C 3957, 2002 WL 54545, at *1 (N.D.Ill. Jan.15, 2002) ("If defendants want that impeachment 'edge,' however, they must pay for it themselves."). This Court has rejected requests for costs of transcripts and video recordings for the same deposition for precisely this reason. *See Engate, Inc. v. Esquire Deposition Svcs., LLC*, No. 01 C 6204, 2006 WL 695650, at *2 (N.D.Ill. Mar.13, 2006). This case, however, is different. The videotape of Levin's deposition was not merely useful for impeachment; with the videotape in its arsenal, North Atlantic likely would have eviscerated Levin at trial. Because Levin is Top Tobacco's chairman, it is hard to overestimate the potential impact of the videotape on a jury. The cost of videotaping Levin's deposition, therefore, was reasonable and necessary. With regard to the other seven depositions taken by North Atlantic for which it seeks video costs, North Atlantic has not provided any support for departing from the general rule that a party may not recover both video and transcript costs. The Court therefore taxes Top Tobacco $1,367.63 for video costs related to Levin's deposition.

Nine of the depositions for which North Atlantic

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

seeks video costs were noticed and taken by Top Tobacco. Top Tobacco is the party that decided to video tape these depositions and bore the lion's share of the expense. For these nine depositions, North Atlantic is only seeking the costs incurred to receive a copy of the video tape. Knowing that its opponent possessed video tapes of these depositions, it was reasonable and necessary for North Atlantic to obtain copies. In such a hotly contested case, North Atlantic would have been ill-advised not to do so. The Court taxes Top Tobacco $3,483.50 for video costs related to the nine depositions taken by Top Tobacco.

**ii. Expedited transcripts**

Top Tobacco also contends that North Atlantic cannot recover costs associated with obtaining expedited deposition transcripts. The expedited transcripts cost $4.40 per page instead of the standard $3.30 per page, resulting in an additional cost of $2,187.90. North Atlantic contends that expedited transcripts were necessary because depositions were often scheduled simultaneously or on back-to-back days, due to an expedited discovery schedule, and many Top Tobacco witnesses deferred questions to other witnesses. Therefore, North Atlantic argues, it needed the transcripts to prepare for the immediately upcoming depositions of later witnesses.

**\*8** According to North Atlantic's bill of costs, it took eight depositions of Top Tobacco witnesses and ordered the transcripts at the expedited rate. It took the depositions on the following dates: two on July 12, 2006, and one each on July 13, 2006, July 14, 2006, August 22, 2006, August 30, 2006, September 7, 2006, and September 13, 2006. The July 14, 2006 and September 13, 2006 transcripts did not need to be ordered at an expedited rate because North Atlantic was not deposing any Top Tobacco witnesses shortly after July 14, 2006, and the September 13, 2006 deposition was its last. Those deposition costs will be taxed at the standard rate of $3.30 per page. The remaining depositions were scheduled sufficiently close to the depositions of other Top Tobacco witnesses that it was reasonable and necessary to order expedited transcripts. The Court therefore taxes $9,682.33 to Top Tobacco for deposition transcripts.

**c. Witness costs**

**i. Witness attendance fees and travel costs**

North Atlantic requests $2,024.40 for witness attendance fees and travel costs. Top Tobacco raises no objection. The Court therefore taxes these costs to Top Tobacco.

**ii. Expert discovery costs**

A court may also tax certain expenses incurred responding to expert discovery. Fed.R.Civ.P. 26(b)(4)(C).Rule 26(b)(4) (C) provides that "[u]nless manifest injustice would result ... the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery ...." This allows recovery only for time spent preparing for and attending depositions. See Nilssen v. Osram Sylvania, Inc., No. 01 C 3585, 2007 WL 257711, at \*4 (N.D.Ill. Jan.23, 2007).

North Atlantic requests $43,698 that it spent responding to expert discovery. Top Tobacco objects to the imposition of expert costs because, it contends, North Atlantic did not provide invoices from its experts sufficient to show the time they spent preparing for and attending their depositions, as opposed to other tasks. North Atlantic attaches to its bill of costs invoices for its three expert witnesses. It seeks $17,050 for Walter McCullough, $10,000 for Marian Moore, and $16,648 for Lisa Stamm. McCullough's invoice describes the services he rendered as "reading other expert reports, phone calls with attorneys, reviewing all documents relating to the case, preparing documents for discovery, traveling to Chicago to have my deposition taken, and subsequent examination of document for various issues raised in my deposition."Bill of Costs, Ex. E. He billed thirty-two hours for these services. He did not, however, itemize how much of the thirty-two hours was spent preparing for his deposition. Based on the complexity of the issues and the detailed nature of the consumer survey about which he testified, the Court believes that a ratio of twice the length of the deposition is a reasonable time for preparation. According to Top Tobacco (and undisputed by North Atlantic), McCullough's deposition lasted less than three hours. The Court taxes Top Tobacco with $4,500 in costs for the time McCullough spent preparing for and attending his deposition (McCullough's hourly rate of $500 multiplied by six hours for preparation, plus three

hours for the deposition).

**\*9** Marian Moore's invoice also does not specify precisely how much time she spent preparing for and attending her deposition. Her deposition lasted four hours. The Court taxes Top Tobacco with $6,000 in costs for the time she spent preparing for and attending her deposition (Moore's hourly rate of $500 multiplied by eight hours for preparation, plus four hours for the deposition). Lisa Stamm's invoices are similarly vague. Her deposition lasted six hours. The Court taxes Top Tobacco with $8,910 in costs for the time she spent preparing for and attending her deposition (Stamm's hourly rate of $495 multiplied by twelve hours for preparation, plus six hours for the deposition).

In sum, the Court taxes Top Tobacco $19,410 for costs spent responding to expert discovery.

**c. Copying and exemplification costs**

North Atlantic requests $62,630.72 for photocopying, $706.85 for sequential numbering of documents, and $3,729.91 for obtaining trademark registrations and file histories.

**i. Sequential ("Bates") numbering**

Top Tobacco does not object to the sequential numbering costs, and thus the Court taxes this cost to Top Tobacco.

**ii. Photocopying costs**

A prevailing party may recover photocopying costs for those documents provided to the court or the other parties, but not for those made for its own convenience. See *McIlveen v. Stone Container Corp.,* 910 F.2d 1581, 1584 (7th Cir.1990). Top Tobacco contends that much of North Atlantic's claimed copying costs are not taxable because it produced only 5,000 pages of documents during discovery. Therefore, Top Tobacco argues, there is no way North Atlantic could have incurred $62,630.72 in taxable copying charges. Indeed, North Atlantic seeks to recover for *568,607* black and white copies; this is the equivalent of well over one hundred copies of every piece of paper it produced in discovery. Although the parties' submissions to the Court were

often voluminous, thankfully were not *that* voluminous.

The Court acknowledges, as North Atlantic points out, that a prevailing party is not required to submit a description "so detailed as to make it impossible economically to recover photocopying costs."*Northbrook Excess and Surplus Ins. Co. v. Proctor & Gamble Co.,* 924 F.2d 633, 643 (7th Cir.1991). But it is reasonable to expect a party seeking over $62,000 in photocopying costs to put *some* effort into explaining, at least in general, what was copied. North Atlantic, however, has provided the Court with no justification for its request, other than to say this was a big case. That is insufficient.

For these reasons, the Court will tax photocopying costs for 15,000 pages relating to discovery (one set of discovery documents produced to Top Tobacco, one set for use at depositions, and one set for North Atlantic's attorneys, which the Court finds was reasonable and necessary), and for 3,000 pages of pleadings, motions, and exhibits submitted to the Court and served on Top Tobacco. The latter figure is concededly a rough estimate. Because this case involved trademarks whose color was relevant, the Court will also tax costs related to 500 color copies (as opposed to the almost 4,000 for which North Atlantic seeks reimbursement).

**\*10** In sum, the Court taxes Top Tobacco $2,505 in copying costs (18,000 copies at $0.10 per page, and 500 color copies at $1.41 per page).

**iii. Trademark registrations**

Top Tobacco appears to agree that North Atlantic may recover costs incurred to obtain Top Tobacco's trademark registrations and file histories. It contends, however, that the invoices provided by North Atlantic do not support North Atlantic's claim that it incurred all these costs to obtain registrations and file histories for plaintiffs' trademarks. Rather, some of the invoices appear to relate to other third-party trademarks and certain cancellation and opposition proceedings. In this case, due to Top Tobacco's prior representations to the USPTO, official documents other than plaintiff's trademark registrations were relevant. The Court has reviewed the invoices provided by North Atlantic and concludes that they provide adequate backup for its request. The Court

Slip Copy                                                                    Page 9
Slip Copy, 2007 WL 1149220 (N.D.Ill.)
**(Cite as: Slip Copy)**

taxes Top Tobacco $3,729.91 for trademark registrations and file histories.

### Conclusion

For the reasons stated above, the Court grants defendants' motion for attorneys' fees [docket no. 100] and grants in part and denies in part its bill of costs [docket no. 107]. The Court taxes costs in favor of defendants in the amount of $43,293.62. Defendants are ordered to file their fee petition by May 7, 2007; plaintiffs shall respond by May 29, 2007. Defendants may file a reply by June 8, 2007. The Court will rule by mail.

N.D.Ill.,2007.
Top Tobacco, L.P. v. North Atlantic Operating Co., Inc.
Slip Copy, 2007 WL 1149220 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 1
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
**(Cite as: Not Reported in F.Supp.)**

**H**qad. inc. v. ALN Associates, Inc.
N.D.Ill.,1990.

United States District Court, N.D. Illinois, Eastern
Division.
qad. INC., et al., Plaintiffs,
v.
ALN ASSOCIATES, INC., et al., Defendants.
**No. 88 C 2246.**

June 20, 1990.

*MEMORANDUM OPINION AND ORDER*

SHADUR, District Judge.
**\*1** ALN Associates, Inc. and its principals Mike and
Sally Allen (collectively "ALN") have moved for the
imposition of attorneys' fees and expenses in
connection with one phase of this litigation-that
relating to the trade-secret claim asserted by plaintiffs
qad.inc. and its principals Karl and Pam Lopker
(collectively "qad") and dismissed by this Court on
ALN's motion May 3, 1990. ALN's current motion is
advanced under the Illinois Trade Secrets Act,
Ill.Rev.Stat. ch. 140, ¶ 355 ("Section 355" [FN1]), and
Fed.R.Civ.P. ("Rule") 11. For the reasons stated in
this memorandum opinion and order, ALN's motion
is granted only in part.

*Background*

After qad filed its initial multi-count Complaint
charging copyright infringement of its computer
software programs as well as the related theft of trade
secrets, the evidence presented by the parties at a
hotly-disputed evidentiary hearing persuaded this
Court to grant preliminary injunctive relief to qad.
More recent developments have suggested that such
interim relief-which conferred a major competitive
advantage on qad-might have been the product of
qad's overselling of its position to this Court in
substantive terms. But whether or not that ultimately
proves to be true in terms of the totality of this case,
it certainly became plain as time went on that qad
should not be permitted to pursue its trade secrets
claim in the form it sought to advance. This Court's
May 3 dismissal of that claim, which has triggered

the current motion, was caused by qad's persistent
and long-protracted failure or refusal (or both) to
identify the specific trade secrets that assertedly
formed the gravamen of its claim in that respect.

Where the subject matter of claimed copyright
infringement or trade secret misappropriation is (as
here) computer software-not only intellectual
property but intangible property as well-each litigant
has a special obligation to the court. Like most
judges, this Court is not conversant with the special
vocabulary and the technical aspects of computers,
and it is therefore all the more important for litigants'
counsel to be entirely forthcoming in their
presentations. Only in that way is the court enabled to
apply conventional legal doctrines (with which it *is*
familiar) to the arcane mysteries of the computer
trade (with which it is *not* familiar). And that
responsibility is further heightened where (as here)
the claim involves defendants' alleged
misappropriation of trade secrets-property that by its
very definition is known only to a few people
(presumably including the litigants, but certainly
excluding this Court).

That makes it all the more troublesome that qad did
not respond to ALN's discovery demands over such
an extended period of time-fully two years-by
identifying its trade secrets that had assertedly been
pirated by ALN. Instead of restating the events that
have been set out accurately by ALN in its original
memorandum in support of its motion to dismiss the
trade secrets count, this opinion simply attaches the
"Factual Background" section of that memorandum
(pages 2-8) and adopts them as its own statement. It
is against that background that the current motion
must be decided.

*Section 355*

**\*2** Section 355 reads:

If (i) a claim of misappropriation is made in bad faith,
(ii) a motion to terminate an injunction is made or
resisted in bad faith, or (iii) willful and malicious
misappropriation exists, the court may award
reasonable attorney's fees to the prevailing party.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
**(Cite as: Not Reported in F.Supp.)**

Section 355 is part of a statute (the Uniform Trade Secrets Act, the "Act") that took effect in Illinois only a few years ago-on January 1, 1988. Although the Act has (not surprisingly) produced no published Illinois decisions interpreting its provisions, it had previously been adopted in many states: Illinois brought the total to almost exactly half of all the states. That widespread enactment of course expands the researcher's potential a good deal, but even so the Act's attorneys' fees provision appears to have received almost no judicial treatment anywhere.[FN2] Just one reported decision is referred to in the current update of Uniform Laws Annotated cited at n. 2: *Boeing Co. v. Sierracin Corp.,* 108 Wash.2d 38, 738 P.2d 665 (1987).

*Boeing* casts no light whatever on the meaning to be ascribed to the key language here-whether "a claim of misappropriation is made in bad faith"-and particularly as to whether "bad faith" is to be viewed subjectively or objectively. That is so because *Boeing* dealt with an adjudicated true misappropriation of trade secrets (one found by the court there to have been "intentional, willful and malicious"-738 P.2d at 682), not with an ill-founded claim of such misappropriation. Absent then any judicial construction of the portion of Section 355 relevant here, this Court will give the statutory language its normal meaning: "Bad faith" is taken to mean *subjective* bad faith.

### Rule 11

By way of contrast, Rule 11 has both a subjective and an objective component. Both its provisions and their application are so well known as to need neither quotation nor citation here. This opinion will simply turn to an examination of qad's conduct as measured against both relevant criteria-the subjective one (applicable under both Section 355 and Rule 11) and the objective one (applicable under Rule 11 only).

### qad's Conduct-the Subjective Standard

When qad filed suit, it certainly had a good faith basis for believing that ALN was encroaching on its rights. That was amply demonstrated by the bitterly-disputed *Rashomon*-like differences that were disclosed during the preliminary injunction hearing. And given the interrelationship in the computer

software business between copyright protection as invoked by qad and its initial trade secrets claim, such good faith belief can surely be said to have extended to that trade secrets claim as part of the initial Complaint. That then effectively dooms any possible recovery by ALN (1) under Section 355 based on qad's initial allegedly bad-faith assertion of the trade secrets claim or (2) under Rule 11 based on qad's initial allegedly "improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation" (the subjective element of Rule 11).

**\*3** What of the later situation at the time that qad filed its more recent Amended Complaint embodying the same claim? By then qad was in a position to *know* just what qad property ALN had obtained-this Court had compelled ALN to turn over those materials before it would finally require qad to provide the particularized showing that a trade secrets claim calls for (*AMP, Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir.1987)). Nonetheless qad's counsel still reasserted the trade secrets claim at that point, under the obvious (though mistaken) view that qad could simply persist in the blunderbuss statement that "Everything you got from us was a trade secret."

This Court has found that wrong as a matter of law. Indeed, our Court of Appeals had previously made that crystal-clear in *AMP,* 823 F.2d at 1199 (citation and footnote omitted):

AMP has consistently failed throughout this litigation to identify any particularized trade secrets actually at risk. Prior to trial, AMP submitted six single-spaced, typewritten pages listing by general item and category hundreds of pieces of AMP internal information. Other courts have warned plaintiffs of the risks they run by failing to identify specific trade secrets and instead producing long lists of general areas of information which contain unidentified trade secrets. In its principal brief to this Court, AMP has again refused to specify precisely what trade secrets it believes to be at risk by identifying particular documents or other sources of information, relying on its by now familiar refrain that Mr. Fleischhacker has misappropriated "confidential business and technical information."

Accordingly this Court found that qad's whole course of conduct provided strong justification for throwing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
**(Cite as: Not Reported in F.Supp.)**

the trade secrets claim out of the case. But that has to be perceived as evidencing no worse than the "empty head" part of the "empty head and pure heart" phenomenon found by our Court of Appeals to violate the *objective* branch of Rule 11 (*Tabrizi v. Village of Glen Ellyn,* 883 F.2d 587, 592 (7th Cir.1989)). Nothing before this Court persuasively suggests that qad's or its lawyers' empty head (in the legal sense) was accompanied by the *impure* heart-the catchphrase equivalent of the subjective bad faith standard embodied in Section 355 and prohibited by the alternative subjective branch of Rule 11.

Accordingly no sanctions are called for in subjective bad faith terms. That leaves for consideration the objective test under Rule 11.

*qad's Conduct-the Objective Standard*

Before qad originally filed suit, both it and its counsel were obligated by Rule 11 to have conducted a "reasonable inquiry" and to determine that its trade secrets claim was "well grounded in fact." What has been said at the outset of the preceding section of this opinion really negates a violation of that objective provision when this case first began. At that stage of the matter there was no doubt that ALN had been given access to some of qad's computer software materials. Necessarily qad's counsel's (and qad's own) further investigation had to take the form of seeking discovery from ALN-by definition the information was not available from qad alone. Neither qad nor its counsel can be faulted in Rule 11 terms for having brought the Complaint under those circumstances.

**\*4** Our Court of Appeals is part of the "overwhelming weight of authority" (Joseph, *Sanctions: The Federal Law of Litigation Abuse* 94 (1989)) that does not compel a party, under pain of Rule 11 sanctions, to correct a pleading that properly met that Rule's standards when filed but may later have become suspect (see, e.g., *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.,* 809 F.2d 451, 454 (7th Cir.1987)).[FN3] But the corollary of that principle is (*id,* citation omitted):

There is an implicit obligation to update because Rule 11 applies to all papers filed in the litigation. Each filing must reflect the results of reasonable inquiry. Rare is the case that goes from complaint and answer to trial without an intervening filing.

Updating occurs in the course of these filings. A court has ample support for sanctions when new filings do not reflect the full picture.

In this instance qad and its counsel were well aware of what the law of trade secrets required by the time qad filed its Amended Complaint on January 22, 1990 realleging trade secrets misappropriation. Months before that this Court had given qad the substantial benefit of the doubt on its trade secrets claim by this Court's July 7, 1989 oral bench ruling (Tr. 9-11):[FN4]

[THE COURT]: But there is something that I think goes beyond that-and that is, on the trade secret issue, which is the core, I guess, of your dispute, it seems to me that the plaintiffs have the better of the contention here, if only because the discovery process is [not] supposed to be a memory test-that is, plaintiffs are not supposed to remember what it was that was turned over to ALN [ ] and therefore what constitutes trade secrets. And that's why the preferable procedur[e] (although ALN has resisted this) is for ALN to identify to qad in the first instance the things that it has from qad[: [t]he] things that Ms. Allen said had been put aside-you know, locked up[-]and that they are not using. And then promptly after that's done qad would then be obligated to identify which aspects of those delivered materials they are characterizing as trade secrets.

MR. RYAN: -Your Honor, may I ask you one question. One problem that pervades the entire discovery issue on the trade secret matters as I was able to glean it this morning-

THE COURT: Yes.

MR. RYAN: -having worked in trade secrets for a while as an intellectual property lawyer, one of [ ] the problem[s] that we really have is that we are continually running into the objection that the only thing you are entitled to is what we gave you, nothing else-no other information about what we gave you are you entitled to, you are not entitled to know whether we disclosed this to others, and under what terms we disclosed it to others.

THE COURT: Well, wait just a minute, though. But you see, the starting point for the designation of the item-don't misunderstand. I am saying that qad is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 4
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
(Cite as: Not Reported in F.Supp.)

going to have an obligation to identify for you what it is they are claiming as trade secret[s]. But the precondition to that, given the way this business transaction operated between the parties, is that in the first instance ALN must identify to qad all of the things that are in ALN's possession derived from qad. At that point qad is going to have the burden of saying, "Out of these things, here are the things that we claim are trade secrets." They are going to have to give you chapter and verse on that. Having done that, then that may define the scope of further discovery in terms of, "Well, this is really not a trade secret, because it was disclosed to B, C and D.["]

**\*5** ALN *did* comply with that requirement of prior disclosure on its part. Accordingly qad was then clearly in a position to do what the law demanded (see the earlier-quoted language from *AMP* ) and what this Court had stated in capsule form during the July 7, 1989 hearing. Yet qad did not do so-instead it simply parroted in the Amended Complaint the same kind of generalized allegations that it had to know were inadequate.

What that means is that the Amended Complaint did fail the objective branch of the Rule 11 requirement. qad could not in good faith (that is, objective good faith) continue to advance the trade secrets claim in the form that it did in that revised pleading. And that means that ALN's legal fees incurred in dispatching that claim from the Amended Complaint are recoverable under Rule 11.

### Conclusion

ALN's motion is granted only in limited part. Although this may be a forlorn wish in light of the mutual intransigence that has been the hallmark of this litigation, this Court retains the hope that quantifying the sanctions called for by this opinion may be possible without undue expansion of the controversy so as to create a fees-on-fees problem. Counsel for the parties are urged to confer informally to identify the services involved and the claimed hourly rates, thus narrowing if not eliminating entirely any further areas of dispute in quantifying the sanctions. This action is set for a status hearing at 9 a.m. July 9, 1990 to see what remains to be done.[FN5]

FN1. All further references to provisions of

the Illinois Trade Secrets Act will take the form "Section-." That usage comports with the Illinois General Assembly's use of that word and of the symbol "§ " in its enactments, even though the publisher of the Smith-Hurd annotated version has chosen to shift to "¶" instead.

FN2. Not all the states have included the counterpart of Section 355 (Act § 4) in their adoption of the Act. According to 14 *Uniform Laws Annotated,* 1990 supp. pamphlet at 415, both Alaska and Virginia have omitted that section from their enactments.

FN3. It is true that *Flip Side Productions, Inc. v. Jam Productions, Ltd.,* 843 F.2d 1024, 1036 (7th Cir.1988) upheld the imposition of sanctions where, at the close of discovery, plaintiff knew that it had no evidence of an antitrust or RICO violation by one defendant but nevertheless failed to dismiss that defendant from the action. But the waters were muddied in *Flip Side*-the district court there had discussed the sanctions issue in terms of *both* Rule 11 and 28 U.S.C. § 1927, and the latter statute of course embraces a lawyer's needless multiplication of proceedings without focusing (as Rule 11 does) only on the situation when a sanctionable *document* is filed (see, e.g., *Walter v. Fiorenzo,* 840 F.2d 427, 435-36 (7th Cir.1988)). When the Court of Appeals in *Flip Side* properly observed that the district court's assessment of fees, because it was imposed only against the plaintiff and not against its lawyer, negated the applicability of 28 U.S.C. § 1927, the Court of Appeals evaluated the matter solely in terms of Rule 11 (843 F.2d at 1035 n. 12). But its discussion did not focus on any particular filed document, as Rule 11 prescribes. There was no discussion of that issue at all in the *Flip Side* opinion. Under those circumstances this Court adheres to *Pantry Queen,* which discussed the issue specifically and applied Rule 11 in accordance with its terms.

FN4. Regrettably the Transcript (Ex. C

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122
(Cite as: Not Reported in F.Supp.)

attached to the ALN memorandum in support of its motion to dismiss the trade secret claim) is somewhat garbled. Unlike deponents (Rule 30(e)), this Court does not get the opportunity to review and correct obvious errors in transcripts that are delivered to counsel in response to their orders. What follows in the text is a corrected version. But even apart from those corrections, the thrust of the ruling in the respect that is material here was unquestionable.

FN5. Just after the final editing of this opinion had been completed to permit its issuance in final form, this Court received ALN's Reply Memorandum on its previously-filed motion for partial summary judgment:

1. seeking leave to withdraw that motion without prejudice to its possible future renewal; and

2. asking for an award of attorneys' fees for services in connection with the aborted motion.

This Court grants ALN leave to withdraw the previously-filed motion and orders qad to respond to the request for attorneys' fees on or before July 2, 1990. At the July 9 status hearing this Court will review with the parties the need for any further filings on that score.

N.D.Ill.,1990.

qad. inc. v. ALN Associates, Inc.

Not Reported in F.Supp., 1990 WL 93362 (N.D.Ill.), 18 U.S.P.Q.2d 1122

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**C**Lindora Medical Clinic, Inc. v. Care Charge, Inc.
N.D.Ill.,1993.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
LINDORA MEDICAL CLINIC, INC., Plaintiff,
v.
CARE CHARGE, INC., a Delaware corporation;
Household International, Inc., a Delaware
corporation; Steve Higgins, a/k/a Steve De John;
Kathleen Virlas, a/k/a Kathleen De John, a/k/a
Kathleen Lambrick, a/k/a Anne Lacey; Ray Jennings,
a/k/a Roy De John; and Mary Lou De John, a/k/a
Mary Lou Lawler, Defendants.
**No. 92 C 4148.**

Aug. 26, 1993.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

### I. INTRODUCTION

*1 Plaintiff, Lindora Medical Clinic ("Lindora"),
brought this diversity suit against Household
International, Inc. ("Household"), Care Charge, Inc.
("Care Charge"), and representatives of Care Charge
individually. Lindora sued Care Charge and its
representatives for fraud and also brought a breach of
contract claim against Care Charge. Lindora sued
Household for breach of contract and unjust
enrichment.

On September 23, 1992, the court dismissed the
claims against Household. In its complaint, Lindora
failed to identify a contract between it and
Household; therefore, the breach of contract count
failed to state a claim. Since the remaining unjust
enrichment count could not stand alone as a cause of
action, the court dismissed that claim as well.

Now, Lindora moves to amend its complaint against
Household by alleging breach of contract on a theory
of apparent agency (Count II) and unjust enrichment
(Count VIII). Lindora also brings claims against
Household for breach of an implied contract (Count

IX) and equitable estoppel (Count X).

Defendant, Household, opposes this proposed
amendment on grounds that it fails to state a claim.
According to Household, the proposed amendment
cannot withstand a motion to dismiss and is therefore
futile. As a result, Household urges the court not to
grant Lindora leave to amend its complaint.

### II. BACKGROUND

In order to determine whether Lindora should be
granted leave to file an amended complaint, the court
must determine whether Lindora's proposed amended
complaint can survive a motion to dismiss. A claim
will be dismissed only if plaintiff can prove no set of
facts that would entitle him to relief. _Conley v.
Gibson,_ 355 U.S. 41, 45-46 (1957). In ruling on a
motion to dismiss, the court must accept all well pled
facts as true and make all reasonable inferences in a
light most favorable to the plaintiff. _Ellsworth v. City
of Racine,_ 774 F.2d 182, 184 (7th Cir.1985), _cert.
denied,_ 475 U.S. 1047 (1986). Consequently, the
court accepts all of Lindora's allegations in its
proposed complaint as true. The facts are set forth as
alleged by Lindora.

Defendant, Care Charge, is a corporation that issues
medical care credit cards. These cards allow patients
approved for credit to charge health care costs from
participating health care providers. In October of
1990, Care Charge approached Lindora about
participating in this credit plan. To induce Lindora to
enter into a contract, Care Charge represented that it
was a subsidiary and part of the financial network of
co-defendant Household. On November 23, 1990,
Lindora and Care Charge executed a contract.[FN1]

Under the contract, Care Charge agreed to purchase
all health care credit contracts at 96 percent of the
contract amount with a 4 percent discount fee. The
agreement further required Care Charge to disburse
these funds to Lindora within seven days of the date
the patients used the service.

After November 23, 1990, Care Charge and
Household approved hundreds of Lindora patients for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

credit. Lindora provided health care services for these patients and called Household to receive approval codes. Household then billed Lindora's patients and the patients directly paid Household for Lindora's medical services.

**\*2** However, all did not go as planned. Defendants, Care Charge and Household, approved patients for credit but remitted the 96 percent due to Lindora on an average of over 30 days from the date Lindora's patients used the service, instead of the required seven days. Then, by a letter dated September 17, 1991, Household informed Care Charge that its funding would be cut off on December 17, 1991. In spite of this communication, representatives of Care Charge and Household indicated that there were no funding problems between Care Charge and Household. Finally, on October 15, 1991, Care Charge and Household stopped sending payments to Lindora. Lindora subsequently filed the present suit.

### III. ANALYSIS

Although Rule 15 states that leave to amend shall be "freely given," it may be denied where the amendment would be futile. _Foman v. Davis,_ 371 U.S. 178, 182 (1962). An amendment is futile when it fails to state a valid theory of liability or when it cannot withstand a motion to dismiss. _Bower v. Jones,_ 978 F.2d 1004, 1008 (7th Cir.1992).

#### A. Implied Contract

Household argues that Lindora has not stated a claim for implied contract in its proposed amended complaint (Count IX). According to Illinois law, an implied contract is created by law as a result of the parties' acts. _Zadrozny v. City Colleges of Chicago,_ 220 Ill.App.3d 290, 295 (1991) ( _citing, Bull v. Mitchell,_ 114 Ill.App.3d 177, 186, 448 N.E.2d 1016 (1983)). Contracts may be implied either in fact or in law. Contracts implied in fact "arise from a promissory expression that is inferred from circumstantial evidence of an intent to be bound." _Zadrozny,_ 220 Ill.App.3d at 295. On the other hand, contracts implied in law are created and governed by principles of equity and "result from a duty imposed by law." _Id._ In this case, Lindora alleges that either a contract implied in law or in fact existed between it and Household. Although Lindora signed an express contract with Care Charge, Lindora seeks to impose

liability on Household for work done under this contract since Household billed and was paid by Lindora's patients.

Household argues that Lindora's proposed amended complaint is legally insufficient since there are no allegations of a promissory expression between Lindora and Household. Household contends that Lindora's proposed amended complaint is insufficient since it does not contain allegations that Household agreed to provide compensation to Lindora. For this proposition, Household cites _Zadrozny,_ 220 Ill.App.3d 290 (1991). The court disagrees. The _Zadrozny_ court clearly held that "[i]n order to recover on an implied contract, the facts and circumstances must show that, at the time the services were rendered, one party expected to receive payment and the other party intended to make payment." _Zadrozny,_ 220 Ill.App.3d at 296. _Zadrozny_ does not stand for the proposition that a complaint on an implied contract must contain allegations that the defendant agreed to make payment. Moreover, in an implied contract, there need not be allegations of an actual promissory expression. Promissory expression may be inferred from circumstantial evidence of an intent to be bound. _Id._ at 295.

**\*3** Lindora alleges that it expected payment from Household, even though it signed an explicit contract with Care Charge which makes no mention of Household. _See supra_ n. 1. However, Household argues that it cannot be liable under an implied contract for work done under the contract between Care Charge and Lindora. Here, Household has the better of the argument. Under Illinois law, a third party cannot be held liable under an implied contract for the work done under an explicit contract between two different parties merely because the third party benefited from the work. _Decatur Production Credit Ass'n v. Murphy,_ 119 Ill.App.3d 277, 288, 456 N.E.2d 267 (1983). The general rule is that "if you do work pursuant to a contract with X, you don't expect that Y, a nonparty, will pay you if X defaults, merely because Y was benefited by your work." _Midcoast Aviation, Inc. v. GE Credit Corp.,_ 907 F.2d 732, 739 (7th Cir.1990) (quoting _Goldstick v. ICM Realty,_ 788 F.2d 456, 467 (7th Cir.1986)). Therefore, Lindora cannot save its pleading by alleging an expectation of payment from Household. And, "without your expectation of payment, the enrichment of Y can hardly be called unjust." _Id._ Since both contracts

Not Reported in F.Supp.                                                                        Page 3
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

implied in fact, and contracts implied in law require that plaintiffs have an expectation of payment, this general rule is fatal to Lindora's implied contract claim.

However, an exception to this rule exists when the nonparty not only benefits from plaintiff's work but entices plaintiff to undertake the work and then refuses to see plaintiff paid. *Midcoast Aviation, Inc.,* 907 F.2d at 739. Yet, Lindora neither alleges nor argues that the instant facts come within the purview of this exception. Moreover, none of Lindora's allegations permit an inference that Household enticed Lindora to participate in Care Charge's credit card plan. Consequently, Lindora's claim for implied contract fails to state a valid theory of liability and cannot withstand a motion to dismiss. Therefore, Lindora cannot be granted leave to file this claim.

**B. Apparent Agency**

Household argues that Lindora has not stated a claim for breach of contract on an apparent agency theory in its proposed amended complaint (Count II). Under Illinois law, apparent authority is "created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Emmenegger Const. Co. v. Frank King,* 103 Ill.App.3d 423, 428, 431 N.E.2d 738, 743 (1982), (*quoting,*Restatement (Second) of Agency § 27 (1958)). Consequently, when a principal holds an agent out to the public as possessing the power which the agent exercises, the principal may be bound to the extent of the apparent authority which he has conferred upon his agent. *Merchants' Nat'l Bank v. Nichols & Co.,* 223 Ill. 41, 50 (1906); *City of Evanston v. Piotrowicz,* 20 Ill.2d 512, 519, 170 N.E.2d 569 (1960).

**\*4** In this case, Lindora alleges that Household held out Care Charge as possessing the power to bind Household in contract. Consequently, Lindora alleges that Household is bound by the contract Care Charge and Lindora executed on November 23, 1990. Household urges the court not to allow Lindora to amend its complaint since Lindora's amendment would be futile. According to Household, Lindora's proposed breach of contract-apparent agency and

unjust enrichment claims are virtually identical to the breach of contract and unjust enrichment claims that Lindora raised in its original complaint. Household claims that Lindora has not alleged any new facts in its proposed amended complaint and for this reason has not adequately pled apparent agency.

The court does not find this argument convincing. Lindora asserts new facts in its proposed amended complaint that relate to the role that Household allegedly played in the contract Care Charge signed with Lindora. For example, Lindora alleges that Household provided Lindora with the approval codes for credit services. Lindora also alleges that Household billed its patients and that the patients directly paid Household for Lindora's medical services. By asserting that no new facts were alleged, Household simply does not address the legal import of these allegations. Therefore, this argument fails.

In a footnote, Household makes a passing reference to two arguments made in its prior motion to dismiss Lindora's original complaint. Household argues that Lindora has not stated a claim since plaintiff learned that Care Charge was not Household's agent, thus, any reliance was unreasonable. In support of this proposition, Household cites *Evanston Bank v. Conticommodity Services, Inc.,* 623 F.Supp. 1014, 1032 (N.D.Ill.1985). In making this argument, Household points to language in the complaint which states that "[o]nly after an Agreement was signed ... did LINDORA learn that CARE CHARGE was not a subsidiary nor part of HOUSEHOLD." Amended complaint ¶ 9.

The court disagrees. Facially, this language does not compel the court to conclude that Lindora was unreasonably relying on Care Charge's representations. Making all inferences in a light most favorable to Lindora, this does not present adequate grounds for dismissing plaintiff's cause of action. In addition, *Evanston Bank* was not a case concerning the pleading requirements for an apparent agency case; there, motions for summary judgment were before the court. Moreover, according to the court in *Evanston Bank,* it is the duty of the trier of fact to determine whether reliance is unreasonable. *Id.* at 1018 ("Such questions of reasonableness ... in most cases must go to triers of fact"). Consequently, this argument must fail.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Next, Household argues that Lindora does not state a claim since plaintiff did not use reasonable diligence to determine the scope of Care Charge's authority. In support of this argument, Household cites *Malcak v. Westchester Park Dist.,* 754 F.2d 239, 245 (7th Cir.1985). The court disagrees. Again, Household cites inapposite case law. The issue on appeal in *Malcak* was whether the district court erred in denying a defendant's motion for directed verdict. The pleading requirements for an apparent agency case were not at issue. Moreover, questions of reasonableness are properly questions for the trier of fact. *See Evanston Bank,* 623 F.Supp. at 1018.

**\*5** Household maintains that the court already considered Lindora's apparent agency argument when ruling to dismiss Lindora's original complaint. Household argues that in dismissing Lindora's original complaint in 1992, the court rejected the apparent agency theory that Lindora is advancing now in its proposed amended complaint.

The court disagrees. True, the court previously rejected Lindora's apparent agency argument on the ground that apparent agency must be based upon the words and acts of the principal, not on the words of the agent himself. However, Lindora now alleges conduct on the part of Household in its proposed amended complaint. Obviously, the court did not rule on the legal sufficiency of these new factual allegations in its earlier decision. Again, in this argument, Household simply does not address the facts that Lindora alleges in its proposed amended complaint. Therefore, this argument fails as well.

Nonetheless, Lindora's pleadings are inadequate. Lindora claims that Care Charge was the apparent agent of Household when Care Charge signed the contract of November 23, 1990. Therefore, according to Lindora, Care Charge bound Household to this contract. In order to state a claim under this theory, Lindora must allege that Household's written or spoken words or Household's conduct led Lindora to believe that Household consented to Care Charge's signing the contract on Household's behalf. *See Emmennegger Const. Co., Inc. v. King,* 103 Ill.App.3d 423, 428, 431 N.E.2d 738, 743 (1982). Moreover, to prevail in an apparent agency action, the party dealing with the agent must prove that the facts giving color to the agency were known to him when he dealt with the agent. If he has no knowledge

of such facts, he does not act in reliance upon them and is in no position to claim anything on account of them. *Karetzkis v. Cosmopolitan Nat'l Bank,* 37 Ill.App.2d 484, 489-90 (1962); *Alton Mfg. Co. v. Biblical Institute,* 243 Ill. 298, 311 (1909).

In *Alton,* for example, an individual borrowed money and issued promissory notes on behalf of the Garrett Biblical Institute to the lender. In determining that the borrower was not the apparent agent of the Biblical Institute, the court focused on the acts of the Biblical Institute known to the lender at the time the notes were issued.

Analogously, in this case, Lindora must allege that at the time Care Charge signed the contract, Household held out Care Charge as possessing the power to bind Household in contract. After all, Lindora must have relied upon Household's words or conduct before signing the agreement with Care Charge; otherwise, Lindora is in no position to claim that Care Charge was acting as Household's apparent agent.

However, Lindora does not allege any conduct on the part of Household when Care Charge signed the contract. Lindora alleges that after the contract was already signed, Household approved patients for credit, provided Lindora with approval codes for credit services, and billed patients. This alleged conduct is insufficient to support a claim under apparent agency. Such actions followed the signing of the contract. Consequently, Lindora cannot claim to have acted in reliance upon such conduct in signing the agreement with Care Charge. As a result, Lindora's breach of contract-apparent agency claim has not stated a valid theory of liability and cannot withstand a motion to dismiss. Therefore, Lindora cannot be granted leave to file this breach of contract claim on a theory of apparent agency.

C. Equitable Estoppel

**\*6** Household argues that Lindora has not stated a claim for equitable estoppel in its proposed amended complaint (Count X). Estoppel to deny the existence of an agency relationship requires allegations that the principal held out another as his agent. The principal's conduct must be such that an ordinarily prudent person would have "considered [the conduct] as consistent only with the fact that the designated party was an agent." *Salisbury v. Chapman Realty,*

124 Ill.App.3d 1057, 1062, 465 N.E.2d 127, 131-32 (1984). Further, the conduct must have been calculated to mislead. Therefore, to state a claim, Lindora must allege facts and conduct which show that Household held out Care Charge as an agent under these conditions. *Id.* However, Lindora has not sufficiently alleged that Household held out Care Charge as its apparent agent. Moreover, Lindora's proposed amended complaint alleges that Household approved patients for credit, provided Lindora with approval codes for credit services, and billed patients. There are no allegations that Household calculated to mislead Lindora by such conduct. As a result, the count suffers the same infirmities as the others and Lindora cannot be granted leave to file this claim.

D. Unjust Enrichment

Finally, in the proposed amended complaint, Lindora seeks relief on a theory of unjust enrichment. A claim for relief based on unjust enrichment cannot stand alone as a cause of action. *Bd. of Trustees v. Liberty Group, 708 F.Supp. 1504, 1507 (N.D.Ill.1989).* Because Lindora has not sufficiently alleged substantive wrongdoing, this claim for relief cannot withstand a motion to dismiss. As a result, Lindora's request for leave to file this claim (Count VIII) is denied as well.

IV. CONCLUSION

The court does not grant Lindora Medical Clinic leave to file its proposed amended complaint.

IT IS SO ORDERED.

> FN1. The court notes that Lindora alleges that it entered into an agreement with both Care Charge and Household on November 23, 1990. However, the contract that Lindora refers to and attaches as an exhibit does not indicate that Household is a party to this agreement. Nor does the contract indicate that Household has any relationship to any of the entities signing the agreement. In fact, the word "Household" does not appear anywhere in the document. In such situations, the terms of the contract must prevail over the allegations in the pleading. *Graue Mill Development v. Colonial Bank & Trust Co., 927 F.2d 988, 991 (7th*

Cir.1991).
N.D.Ill.,1993.
Lindora Medical Clinic, Inc. v. Care Charge, Inc.
Not Reported in F.Supp., 1993 WL 335809 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                      Page 1
Slip Copy, 2008 WL 905160 (N.D.Ill.)
**(Cite as: Slip Copy, 2008 WL 905160)**

Marcatante v. City of Chicago
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
John MARCATANTE, John Klaes, Jerry Whitley,
and Thomas Sadowski, on behalf of themselves and
all others similarly situated, Plaintiffs,
v.
CITY OF CHICAGO, Defendant.
**No. 06 C 328.**

March 31, 2008.

<u>Robert R. Cohen</u>, <u>Matthew Douglas Lango</u>, <u>Scott Jay</u>
<u>Frankel</u>, Frankel & Cohen, <u>Thomas Howard</u>
<u>Geoghegan</u>, <u>Carol Tran Nguyen</u>, Despres Schwartz &
Geoghegan, Chicago, IL, for Plaintiffs.
<u>Valerie Depies Harper</u>, <u>Meera Werth</u>, City of
Chicago, Law Department, Chicago, IL, for
Defendant.

### *MEMORANDUM OPINION*

<u>CHARLES P. KOCORAS</u>, District Judge.
**\*1** This matter comes before the court on cross
motions for summary judgment. Plaintiffs John
Marcatante, John Klaes, Jerry Whitley, and Thomas
Sadowski ("Plaintiffs"), move on behalf of
themselves and a previously certified class for
summary judgment of liability against Defendant
City of Chicago ("the City") on the five counts of the
complaint. The City moves for summary judgment in
its favor on all five counts. For the reasons set forth
below, each motion is granted in part and denied in
part.

### BACKGROUND

Plaintiffs are former employees of Defendant City of
Chicago. Marcatante, Klaes, and Whitley each
worked in the Department of Aviation, while
Sadowski was employed by the Department of Fleet
Management. Each was a member of a trade union,
and their terms of employment were set forth in
collective bargaining agreements ("CBAs") between
the City and their respective unions.

The CBAs that were in effect for July 1999-June
2003 expired on June 30, 2003. To bargain for
subsequent CBAs, the unions to which Plaintiffs
belonged joined in a coalition of 35 building trade
unions. However, the City and the coalition were
unable to craft replacement agreements before June
30. Shortly before the expiration date, the attorneys
for the City and for the coalition agreed to extend the
terms of the 1999-2003 agreements through
midnight, July 30. The arrangement was
memorialized in a letter ("the June letter"). It
specified that, after July 30, the agreements would
continue day to day, with no change in their terms,
unless one of the parties terminated in writing. The
June letter further stated that "the City agrees that
wage increases, if any, agreed to by the parties shall
be retroactive to July 1, 2003, unless the parties
mutually agree to another date."

In late 2003 or early 2004, the City offered an early
retirement incentive program ("ERIP") to eligible
employees. Each named Plaintiff took advantage of
this program and retired in February or March 2004.
Meanwhile, the City and the coalition continued their
negotiations. On July 18, 2005, they reached a
tentative agreement. In part, it provided for
retroactive wage increases for work performed
between July 1, 2003, and July 18, 2005, but only for
two identified groups of employees. The first
consisted of employees who were on the City payroll
as of July 18, 2005. The second was comprised of
employees who had been laid off with recall rights.
On October 6, 2005, the City Council ratified the new
CBAs and they took effect.

Because Plaintiffs did not fall within the two groups
identified in the agreement, they did not receive
retroactive wage increases. In January 2006,
Plaintiffs filed a five-count complaint against the
City. Counts I and V claim violations of procedural
due process: Count I is premised on the denial of the
wage increases; Count V, on the City's alleged failure
to provide full information about the ERIP to
prospective participants. Count II is an equal
protection claim. Counts III and IV are state-law
causes of action, for breach of contract and quasi-
contract actions, respectively.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** On December 21, 2007, this court certified a class consisting of all City employees who 1) left their job with the City 2) between June 30, 2003, and July 18, 2005, 3) via the ERIP and 4) belonged to the bargaining units of the unions within the coalition when they left their City job. Each side now moves for summary judgment on all counts of the class complaint.

## LEGAL STANDARD

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed. R. Civ. Proc. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. Buscaglia v. United States, 25 F.3d 530, 534 (7th Cir.1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. Proc. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

When parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other. M. Snower & Co. v. United States, 140 F.2d 367, 369 (7th Cir.1944). Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment.Miller v. LeSea Broadcasting, Inc., 87 F.3d 224, 230 (7th Cir.1996).

With these principles in mind, we turn to the parties' motions.

## DISCUSSION

**A. Procedural Due Process Claims**

Plaintiffs' federal causes of action claim violations of 42 U.S.C. § 1983. Claims under § 1983 are comprised of two parts: 1) a deprivation of a right or interest secured by the Constitution or laws of the United States, 2) by a person or persons acting under color of state law. Reynolds v. Jamison, 488 F.3d 756, 764 (7th Cir.2007). In this case, there is no question that the City and its agents were acting under color of state law. The parties part company on whether Plaintiffs have sufficiently established a deprivation of a protected interest.

The interests asserted in Counts I and V stem from the Fourteenth Amendment, which provides that no state shall "deprive any person of life, liberty, or property, without due process of law."Neither life nor liberty interests are implicated in this case; at issue are solely property interests.

*1. Count I: Denial of Wage Increases*

**\*3** Plaintiffs' contentions for Count I are based on deprivation of three things they argue are protected property. The first is their continued employment with the City with termination only for cause. The second is a contractual right to retroactive wage increases based on the June letter and the City's past practices with respect to retroactive wage increases. The final asserted right is a contractual right to a reasonable wage for the services ERIP participants provided during the approximately seven months that they worked without an explicit agreement in place.

Public employees who have a legitimate claim to continued employment unless certain events occur have a property right in their jobs. Confederation of Police v. City of Chicago, 547 F.2d 375, 376 (7th Cir.1977). According to Plaintiffs, they had a property right to their employment because, while they were still working for the City, they could be discharged only for good cause. Regardless of the correctness of that position, for § 1983 liability to attach, the state actor must be responsible for the deprivation of the right at issue, i.e., the City must be the party who ended the continued employment. In this case, it is undisputed that the ERIP participants left their jobs voluntarily. Plaintiffs' current position

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that they may have acted differently if they had known that the City and the coalition would ultimately bargain for them to be excluded from the groups of employees receiving retroactive wage increases is insufficient to change the fact that it was Plaintiffs who decided to leave their jobs. The City did not force them to do so. Thus, there was no deprivation by the City of Plaintiffs' property right to continued employment.

Plaintiffs' next argument contends that they had a contractual right to retroactive wage increases via the June letter and the City's provision of such increases to employees who took early retirement between 1999 and 2003, the period covered by the previous CBAs. Express contracts with a government entity as well as past practices of a state actor leading to an expectation of consistent future conduct can be sources of constitutionally protected property rights. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (written contract); *Cushing v. City of Chicago,* 3 F.3d 1156, 1160 (7th Cir.1993) (past practices). Moreover, although there can be no property interest in pay increases that depend upon "multiple layers of contingency," *Swartz v. Scruton,* 964 F.2d 607, 610 (7th Cir.1992), or in the timing of particular increases, *Goros v. County of Cook,* 489 F.3d 857, 860 (7th Cir.2007), when pay increases for public employees are promised to occur without conditions precedent that must be satisfied before an entitlement will attach, a constitutionally protectible property interest can arise. *See Rockford v. Principals and Supervisors Ass'n v. Bd. of Educ. of Rockford Sch. Dist. No. 205,* 721 F.Supp. 948, 955 (N.D.Ill.1989); *Begg v. Moffitt,* 555 F.Supp. 1344, 1349 (N.D.Ill.1983).

**\*4** To determine whether the June letter created a contractual right to retroactive wage increases for ERIP participants, we need look no farther than its plain language. The letter unambiguously states that the only wage increases that would be retroactive were those that were "agreed to by the parties." As Plaintiffs point out, the unions to which they had belonged ceased to represent them at the bargaining table when Plaintiffs stopped working for the City. *Allied Chemical and Alkali Workers of America v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 172, 92 S.Ct. 383, 394, 30 L.Ed.2d 341 (1971); *Toth v. USX Corp.,* 693 F.Supp. 693, 700-03 (N.D.Ill.1988). The

only parties to the CBAs were the City and the unions that comprised the coalition, and the only retroactive wage increases agreed to by those parties were for employees who were still working for the City as of July 18, 2005, or who had been laid off with recall rights. Thus, the June letter did not provide a contractual right to Plaintiffs, and the undisputed facts of this case show that the City complied with the obligations contained within the letter by providing the retroactive wage increases to which the City and the coalition agreed: those for employees on the City payroll as of July 18, 2005, and those for employees who had been laid off with recall rights.

The second prong of Plaintiffs' argument with regard to retroactive wage increases asserts that the City had given such increases to retirees in the 1999-2003 CBAs, leading the Plaintiffs to believe that they would be treated in a like manner. Plaintiffs contend that this situation is therefore like that found in *Cushing.* 3 F.3d at 1161. *Cushing* involved review of a motion to dismiss a claim of a Chicago firefighter whose medical bills had been paid by the City for a condition that the City had initially thought to be duty-related. *Id.* at 1158.Eighteen months after the onset of the condition, the City stopped paying the bills without notifying Cushing that they would do so.*Id.* Cushing contended, and the Seventh Circuit agreed, that the City's prior practice of paying the bills could have created a reasonable expectation that it would continue to do so until Cushing's condition resolved. *Id.* at 1161.

We do not agree with Plaintiffs that *Cushing* controls this case, as this dispute arises in a fundamentally different context, namely one in which the contractual relationship under which the past practices occurred was over. When parties negotiate a new contract, they are free to come up with new terms to control their relationship. As a result, Plaintiffs could not reasonably expect that the City's future conduct under a new agreement would be the same as what was required under a terminated agreement. While Plaintiffs may have hoped that the new CBAs would include early retirees as a group receiving retroactive wage increases, an abstract desire or unilateral expectation is insufficient to establish a constitutionally protected property right. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*5** Plaintiffs' final argument for a property right for Count I is founded in the Illinois law of contracts implied in fact. Implied contracts can provide constitutionally protected property rights. *See, e.g., Vail v. Board of Educ. of Paris Union Sch. Dist. No. 95, 706 F.2d 1435, 1438 (7th Cir.1983)*. In the context of provision of services, an implied contract is formed if the party who provided the services can show that they were performed under circumstances where the recipient would be expected to pay for the services.*Ekl v. Knecht, 223 Ill.App.3d 234, 165 Ill.Dec. 760, 585 N.E.2d 156, 161 (Ill.App.Ct.1991)*. The amount due under such a contract is a reasonable price for the services rendered. *Id.* at 162.Here, Plaintiffs provided services to the City during the approximately seven months between the expiration of the previous CBAs and their departure from the City, services that the City would be expected to pay for. The City's acceptance of those services formed an implied contract to pay a reasonable price for Plaintiffs' work. Thus, we agree with Plaintiffs that they had a contractual entitlement to a reasonable rate of pay for the work they performed prior to their retirement that is a constitutionally protected property right.

Plaintiffs end their arguments at this point, but the law is clear that the identification of a constitutionally protected interest is not the end of a procedural due process analysis. "[T]o have and lose an entitlement is not enough to establish a deprivation of property without due process of law; it establishes only that a deprivation of property has taken place."*Ellis v. Sheahan, 412 F.3d 754, 756 (7th Cir.2005)*. To establish a procedural due process claim, a plaintiff must go on to show that the state actor deprived him or her of the protected interest without notice and without giving them the opportunity to contest the deprivation at a meaningful time and in a meaningful way. *Id.*"The amount and timing of the process ... varies with circumstances."*Chicago United Industries, Ltd. v. City of Chicago, 445 F.3d 940, 944 (7th Cir.2006)*.

In cases such as this one, in which a party to a contract seeks only money damages stemming from an alleged failure of a state to keep a contractual promise, a predeprivation hearing is not automatically required. *See, e.g., id.* at 944-45 (7th Cir.2006); *Ellis, 412 F.3d at 758;Mid-American*

*Waste Systems, Inc. v. City of Gary, Ind., 49 F.3d 286, 291 (7th Cir.1995)*. Such procedures are particularly unnecessary where it is difficult to imagine what form a meaningful predeprivation process could have taken. *See Ellis, 412 F.3d at 758.* This is such a case. Moreover, Plaintiffs have also pursued the postdeprivation remedy of a breach of contract claim in Count IV of this suit; they have offered no reason why this remedy does not provide them with all the process that is due in this setting. Accordingly, we conclude that the City is entitled to judgment as a matter of law on the procedural due process claims set out in Count I.

### 2. Count V: Incomplete Disclosure of Information

**\*6** In Count V of the complaint, Plaintiffs contend that the City deprived them of a property right to "important and material information" about the ERIP without due process of law. As stated earlier, the first component of any § 1983 claim is the identification of a constitutionally protected interest or right. *See, e.g., Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994)*. Nowhere do Plaintiffs argue or provide any authority that would support the theory that the information to which they refer could be property in the constitutional sense. Moreover, evidence adduced in this case demonstrates that such information could not even be provided when Plaintiffs contend it was required. At the time that Plaintiffs were making their decision about participation in the ERIP, retroactive pay increases for early retirees were still in the mix of potential outcomes of the CBA negotiations. More than a year passed between Plaintiffs' retirement and the time when the City and the coalition struck the deal that cut Plaintiffs out of the retroactive wage pool. The City was under no constitutional requirement to inform ERIP candidates of the potential fallout from any possible contract that might result from negotiations with the myriad unions representing City employees.

Without a right of constitutional proportion,[FN1] Plaintiffs have no procedural due process claim. The City is entitled to summary judgment on Count V.

> FN1. Plaintiffs make passing reference to their interests in continued employment and to retroactive wage increases via the June letter, but for the reasons set forth above, we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disagree that these assertions can properly underlie a procedural due process claim in this case.

## B. Count II: Equal Protection

With Count II, Plaintiffs again look to the Fourteenth Amendment, which in pertinent part provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."Plaintiffs state that to prevail on this claim, they must show that the City treated them differently from others who were similarly situated with no rational basis for doing so. In support of their argument that they have established these things, they rely exclusively on their interpretation of the June letter as an unequivocal promise that all employees would receive retroactive wage increases. They claim that all City employees were thus similarly situated with respect to the wage increases. On the rationality aspect, they insist that the City's later action with respect to the wage increases was driven not by a rational government interest but by a "desire to exploit the conflict of interest between active and retired employees."Pls.' Mem. of Law in Supp. of Mtn. for Summ. Jgmt., at 10.

As detailed in our discussion of Count I, we do not agree with Plaintiffs' interpretation of the June letter. The letter did not provide a contractual right to Plaintiffs, so they were not similarly situated to employees who received the retroactive increases. Furthermore, the different treatment of Plaintiffs and other employees was based upon the differentiation contained in the new CBAs. Compliance with contractual obligations is a rational basis for a governmental entity to act. Consequently, the City did not deprive Plaintiffs of the equal protection that is required by the Fourteenth Amendment, and it is entitled to summary judgment in its favor on Count II. Plaintiffs' motion on that count is correspondingly denied.

**\*7** In sum, the City is entitled to summary judgment on the § 1983 claims set out in Counts I, II, and V.

Before considering the specifics of Plaintiffs' remaining counts, which assert only state-law claims, we must discuss the issue of jurisdiction. When a district court dispenses of all claims over which it has original jurisdiction, it may decline to continue to exercise jurisdiction over supplemental state-law claims. 28 U.S.C. § 1367(c)(3). Factors that play into the decision to maintain or relinquish jurisdiction include "judicial economy, convenience, fairness, and comity."*Timm v. Mead Corp., 32 F.3d 273, 277 (7th Cir.1994).* The amount and nature of the district court's involvement with the case is also a consideration; if a federal court commits substantial judicial resources or decides an issue dispositive of the state claim in the process of resolving federal claims, retention is appropriate. *Wright v. Associated Ins. Companies Inc., 29 F.3d 1244, 1251 (7th Cir.1994).*

This court has already committed a substantial amount of resources in this case, including deciding a motion to dismiss, resolving discovery disputes, and passing on issues of class certification. Many of the same issues that are presented in the state-law claims have already been considered and addressed for the federal constitutional claims that form part of the Plaintiffs' complaint. To relinquish our supplemental jurisdiction now would cause a substantial duplication of effort by the parties and a state court tribunal if Plaintiffs chose to refile. We therefore conclude that retention of jurisdiction over the state-law claims in this suit is appropriate.

## C. Count III: Breach of Express Contract

Count III is a claim for breach of express contract that is premised upon the June letter. As we explained in the context of the procedural due process claim in Count I, the June letter did not provide Plaintiffs with a clear and unconditional contractual right to retroactive wage increases, and the City complied with the obligations contained within the letter by providing the retroactive wage increases to which the City and the coalition agreed. Thus, the City is not liable for breach of contract and is entitled to summary judgment on Count III.

## D. Count IV: Breach of Implied Contact

Count IV claims a breach of an implied contract [FN2] based on Plaintiffs' provision of services to the City between July 1, 2003, and their retirement in 2004. As discussed above, we agree with Plaintiffs that the circumstances of this case gave rise to an implied contract whereby the City is obligated to pay them a reasonable price for their services during that time.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 6

Slip Copy, 2008 WL 905160 (N.D.Ill.)

**(Cite as: Slip Copy, 2008 WL 905160)**

*See Ekl, 165 Ill.Dec. 760, 585 N.E.2d at 162.*

> FN2. Count IV also refers to quantum
> meruit, but that theory is the measure of the
> appropriate damages for the breach of a
> contract implied in law, not a separate
> ground for recovery. *Hartigan v. E & E
> Hauling, Inc.,* 153 Ill.2d 473, 180 Ill.Dec.
> 271, 607 N.E.2d 165, 177 (Ill.1992).
> Accordingly, we frame our discussion only
> in terms of implied contract.

Plaintiffs have offered up the rate that was paid to
the employees who remained after the new CBAs went
into effect as a reasonable price for the like work that
Plaintiffs performed during late 2003 and early 2004.
The City has not countered with a lesser rate, and the
fact that the City was willing to pay such a rate to
other employees who were providing the same
services would negate any argument that they found
it to be an unreasonable amount. Consequently, for
the work that they performed from July 1, 2003, until
the date of their retirement, the City was obligated to
pay Plaintiffs the same price for their services that
they eventually paid to the employees who continued
to work for the City after July 18, 2003. Because it
did not do so, it breached the terms of the implied
contract. Plaintiffs' motion for summary judgment is
therefore granted as to Count IV. The City's cross
motion on that count is denied.

## CONCLUSION

**\*8** Based on the foregoing analysis, the City's cross
motion [64] for summary judgment is granted with
respect to Counts I, II, III, and V and denied with
respect to Count IV. Plaintiffs' cross motion, Exhibit
1 to Document 73, for summary judgment of liability
is denied with respect to Counts I, II, III, and V and
granted with respect to Count IV.

N.D.Ill.,2008.

Marcatante v. City of Chicago

Slip Copy, 2008 WL 905160 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.