IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT W. WELSH d/b/a BIG TEN DEVENLOPMENT, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 08 C 1342 |
| v. | ) ) | Judge Joan B. Gottschall |
| | ) | Magistrate Judge Susan E. Cox |
| THE BIG TEN CONFERENCE, INC., | ) ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND REQUEST FOR ATTORNEYS' FEES PURSUANT TO 15 U.S.C. § 1117**

Andrew S. Rosenman
Richard M. Assmus
Emily M. Emerson
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
(312) 782-0600 – Phone
(312) 701-7711 – Facsimile

*Attorneys for The Big Ten Conference, Inc.*

5210886.2

The response filed by Plaintiff Robert Welsh ("Welsh") to The Big Ten Conference, Inc.'s ("the Conference") motion to dismiss his Amended Complaint reflects Welsh's fundamental misunderstanding of the Lanham Act, including the standards applicable to claims of fraudulent procurement of a trademark registration. The theory articulated in Welsh's response, *which he does not support with a single citation*, is that he had "trade secret rights" in the "Big Ten Network" name contained in a proposed business plan that he presented to the Conference in early 1998, and because the Conference did not disclose those so-called "rights" to the U.S. Patent and Trademark Office ("PTO") more than eight years later in September 2006, such an omission states a claim for trademark fraud under Section 38 of the Lanham Act.

Welsh pursues this unsupported theory even though: (1) the Big Ten Network mark obviously is not a trade secret; (2) Welsh never used the mark in commerce at any time, including between 1998 and 2006; (3) Welsh neither sought to register the mark himself nor opposed the Conference's trademark applications; and (4) the "rights" claimed by Welsh incorporate "Big Ten," a famous trademark which the Conference has been using in commerce for decades and to which the Conference holds long-established, incontestable and federally-registered trademark rights in connection with intercollegiate athletics.

As explained below, Welsh's response does nothing to save his federal claim from dismissal under Rule 12(b)(6). Welsh's response fails to address cases from the Seventh Circuit, other federal courts and the Trademark Trial and Appeal Board ("TTAB") that flatly reject the very underpinnings of his unsupported legal theory. Welsh even neglects to discuss key, indisputable facts that are set forth in exhibits to his own Amended Complaint that similarly undermine his attempt to establish federal jurisdiction. Welsh's tortured interpretation of the Lanham Act demonstrates that this an "exceptional case" in which the Court should award the Conference its attorneys' fees pursuant to Section 35 of the Lanham Act.

Finally, Welsh cannot avoid dismissal of his state law claims for misappropriation of trade secrets and for breach of contract. The Conference therefore requests that the Court dismiss the entire Amended Complaint, not just the Section 38 claim, pursuant to Rule 12(b)(6).

I.   **WELSH CANNOT STATE A CLAIM FOR FRAUD UNDER SECTION 38 OF THE LANHAM ACT.**

Welsh's response (p. 4) states that he "does not rely on trademark rights" to the Big Ten Network mark. Instead, he claims (p. 3) that his (alleged) trade secret rights form the basis of his

1

claim under Section 38 of the Lanham Act: "Trade secret law – rather than trademark law – is the source of Welsh's rights." Welsh has not supported that theory with a single decision from any appellate court, district court, the TTAB, or even any treatise or other supporting authorities. Welsh's argument runs afoul of Lanham Act precedents in numerous respects.

        **A.**      **<u>Welsh must have trademark rights to state a claim under Section 38.</u>**

As explained in Section I.A. of the Conference's opening brief, trademark rights accrue only through use in commerce, not through adoption of a mark. Welsh's theory therefore is illogical on its face, because he avers that his (alleged) trade secret rights in a proposed business plan, wherein he identified a proposed Big Ten Network, can serve as the foundation for a claim of trademark fraud under the Lanham Act. It is telling that Welsh's response does not cite *any* authorities that hold, or even suggest, that an individual can use *asserted* "trade secret rights" as the foundation for a Section 38 claim. Welsh's failure to cite any citations is not surprising; all of the cases that the Conference has located have rejected the idea that non-trademark rights can be used as the basis of a fraud claim under the Lanham Act.

In *Carmichael v. Prime*, No. 02-0379, 2003 WL 1903355 (S.D. Ind. Jan. 6, 2003), the court dismissed a Section 38 claim pursuant to Rule 12(b)(6). The court explained that the plaintiffs' assertion that the defendants stole their ideas for STARDUST perfume might give rise to certain rights under state law, but those rights could not serve as the foundation for a claim under Section 38 because "it is a different matter to claim that title to the trademark in fact passed to the Plaintiffs, which can only occur by either use of the mark in commerce or purchase of a pre-existing business which employs that mark." *Id.* at *4.

Welsh's response asserts (p. 3) that the present case is the "reverse" of *Carmichael* because Welsh "concededly owned the Confidential Business Plan and the names for the business components of the plan as <u>trade secrets</u>." This assertion goes nowhere in advancing Welsh's theory, both as a matter of law and fact. First, Welsh's statement is nothing more than a legal conclusion about his alleged rights, and legal conclusions are not accepted as true for purposes of a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007) ("on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'") (quoting *Papasan v. Allain*, 478 U.S. 265, 286)). Second, Welsh's assertion is factually incorrect because the Conference made no such "concession." Welsh's response conspicuously fails to discuss, let alone reconcile, the language in Jim

2

Delany's April 23, 1998 letter that expressly *rejected* Welsh's assertion that the concepts in his proposed business plan were his "proprietary property." Amended Complaint, Exhibit B.[1]

Welsh's attempt to rely on *Jackson v. Lynley Designs, Inc.*, 729 F. Supp. 498 (E.D. La. 1990), another case cited in the Conference's opening brief, is equally unpersuasive. The court in *Jackson* noted that Section 38 requires a plaintiff to show "a reasonably protectable interest *under the Act*." *Id.* at 501 (emphasis added). The court stressed: "An essential element of the plaintiff's case with respect to which she has the burden of proof is a cognizable injury *under the Lanham Act*. Without a cognizable injury, plaintiff lacks standing to maintain this action." *Id.* (emphasis added). The plaintiff in *Jackson* failed to show an injury directly resulting from the allegedly fraudulent registration because she was not using her name in commerce at the time of the application. Nor has Welsh, which he readily admits in his response by disclaiming any trademark rights. Furthermore, the court in *Jackson* neither held nor even suggested that a party can state a claim under Section 38 by showing an injury arising under a trade secrets act or any other state law claim. *See also Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 989 F.2d 985 (8th Cir. 1993) (stressing that Section 38 "should not be invoked to block Lanham Act enforcement of Gilbert's marks based upon an ancient nondisclosure to the PTO that has no bearing on whether Gilbert today has a superior right to use the marks in commerce").

In addition to the aforementioned cases, courts have rejected attempts by parties to convert state law theories into Lanham Act claims, including claims under Section 38. In *Country Mut. Ins. Co. v. American Farm Bur. Fed'n*, 876 F.2d 599 (7th Cir. 1989), the Seventh Circuit expressed its view that it is "far from clear" that Section 38 is designed to cover "false statements about ownership of the mark, as opposed to use of the mark in commerce." *Id.* at 601. The court reasoned: "Little, if any, federal interest is at stake. Federal law defines property in trademarks, but who owns the property thus defined is a question of state law – contract or corporate." *Id. See also Truck Components, Inc. v. K-H Corp.*, 776 F. Supp. 405, 411 (N.D. Ill. 1991) (granting Rule 12(b)(6) dismissal of Lanham Act claims and stressing: "This case is essentially a breach of contract case. This Court is unwilling to expand the bounds of the Lanham Act, and thus federal jurisdiction, to every breach of a covenant not to compete.");

---

[1] Under Rule 10(c) of the Federal Rules of Civil Procedure, "[a] copy of a written instrument which is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, the two April 23, 1998 letters from Jim Delany to Welsh that are attached as Exhibits B and C to Welsh's Amended Complaint, as well as the other exhibits thereto, are part of the pleading.

*Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 707 (S.D.N.Y. 1997) (granting Rule 12(b)(6) dismissal and emphasizing: "The Lanham Act should not be used to transform a contractual dispute between parties into a federal cause of action, particularly where a party expresses an opinion about a contractual right.").

Another illustrative case is *Joint Stock Soc'y v. UDV N. Am., Inc.*, 53 F. Supp. 2d 692 (D. Del. 1999), *aff'd*, 266 F.3d 164 (3d Cir. 2001), which involved trademark rights to SMIRNOFF vodka. The plaintiffs sued under Section 38 and several other sections of the Lanham Act even though they had no commercial presence at the time the defendants registered their trademarks with the PTO. The court rejected the plaintiffs' Lanham Act claims because, among other things, the plaintiffs lacked prudential standing generally. "Without a commercial presence, the court cannot conclude that the plaintiffs have asserted a legitimate commercial interest to protect or have suffered a tangible competitive harm within the meaning of the Lanham Act." *Id.* at 708. The court also specifically rejected the plaintiff's fraudulent procurement claim under Section 38. "**[A]lthough Section 38 provides a cause of action to 'any person injured' by a false or fraudulent registration of a trademark, the federal courts have read into this language the same 'reasonable interest' requirement necessary to maintain standing under the other provisions of the Lanham Act**." *Id.* at 712 (emphasis added).[2]

All of these cases are consistent with the principle that a party must have a cognizable *trademark* claim under the Lanham Act in order to pursue relief under Section 38. Otherwise, the mere *assertion* of trade secret rights or some other common law right would create disclosure duties on trademark applicants in any trademark proceeding at the PTO, even though (as here) the applicant's use in commerce of that mark might not even be disputed.

Welsh, by affirmatively stating in his response (p. 4) that he "simply does not rely on trademark rights in BIG TEN NETWORK," concedes that he never used that mark in commerce, particularly during the eight-year period from 1998 to 2006 (and, for that matter, at any time

---

[2] Nothing in *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, No. 03-CV-93, 2007 WL 4292392 (W.D. Ky. Dec. 6, 2007), suggests otherwise. *Maker's Mark* is the only Section 38 case in Welsh's response that was not cited in the Conference's opening brief. Welsh claims that *Maker's Mark* distinguished the *Gilbert/Robinson* line of cases, but he fails to discuss the court's reasoning in *Maker's Mark*. The court explained that, unlike the plaintiffs in *Gilbert/Robinson*, the parties claiming fraud (i.e., the Cuervo entities) were doing business at the time of the allegedly fraudulent registration. *Id.* at *4. Welsh does not allege that he ever made commercial use of the Big Ten Network mark, particularly in the eight years leading up to the Conference's application to the PTO in September 2006. Thus, the present case is much more like *Gilbert/Robinson* and the other cases cited in the text.

4

since 2006). He simply has not alleged, and by his own admission cannot allege, any *trademark* rights in the Big Ten Network. Thus, he cannot, as a matter of law, establish that the Conference fraudulently procured that mark through its September 2006 trademark application to the PTO.

In effect, Welsh seeks to hold the Conference hostage by claiming what amounts to an "eternal right" to the Big Ten Network name, and that the Conference "fraudulently" procured the trademark for that name many years later. Welsh's theory reflects a basic misunderstanding of the Lanham Act. *See Compton v. Fifth Avenue Ass'n*, 7 F. Supp. 2d 1328, 1331 and n.3 (M.D. Fla. 1998) (concluding that "the fact that [plaintiff] first conceived of the mark 'Via Colori' is irrelevant to his ownership of the mark" and underscoring that plaintiff "has evinced a dogged misunderstanding of this fundamental tenet of trademark law").[3]

Finally, Welsh's attempt to shoehorn a Section 38 claim from (alleged) trade secret rights is especially unpersuasive because legal remedies already exist for parties who claim theft of trade secrets. This is precisely what the Illinois Trade Secrets Act ("ITSA") is designed to address, and Welsh has alleged a claim under the ITSA in Count II of his Amended Complaint. Welsh cannot concoct federal jurisdiction under the Lanham Act by relying on the exact same factual allegations that form the basis of his ITSA claim, particularly in the absence of *any* supporting authorities, and in the face of the numerous authorities above that reject his theory.

### B. Welsh had no "clearly established" trademark rights that the Conference was required to disclose to the PTO in September 2006.

Welsh's theory rests on the unsupported assertion that the Conference was obliged to inform the PTO, in September 2006, of Welsh's alleged trade secret rights. Many decisions, however, refute the very underpinnings of that bare assertion. The Seventh Circuit, for example, has rejected the notion that a trademark applicant must search for and disclose to the PTO all

---

[3]   A recent case from the Second Circuit bolsters the conclusion that Welsh has no Lanham Act remedy, even if he had conceived the "Big Ten Network" name. In *American Express Co. v. Goetz*, 515 F.3d 156 (2d Cir. 2008), the plaintiff claimed that he conceived of the "My Life, My Card" slogan that AmEx ultimately used in television advertisements involving Robert DeNiro and Tiger Woods. The plaintiff thought of that slogan and presented it to several credit card companies, including AmEx, with a description of his concept and the slogan. The Second Circuit held that the plaintiff failed to establish any trademark rights because "the only reasonable conclusion that can be drawn is that My Life, My Card was a component of [plaintiff's] business proposal to the credit card companies rather than a mark designating the origin of any goods or services he offered to them." *Id.* at 160. The court cited the long-settled rule that "the right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace." *Id.* at 161 (citations omitted). The plaintiff, however, did not actually use the slogan; his services "were wholly hypothetical when he sent his promotional materials to the credit card companies." *Id.* Thus, the slogan "never came to be associated with [plaintiff] in the public mind." *Id.* at 162.

5

other possible users of a mark before seeking registration of the mark. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670-71 (7th Cir. 1982). Other courts have held that a trademark applicant need only disclose to the PTO other users' conflicting rights which are "clearly established" at the time of the trademark application. *See, e.g., Rosso & Mastracco, Inc. v. Giant Food, Inc.*, 720 F.2d 1263, 1266 (Fed. Cir. 1983). In *Rosso*, the Federal Circuit explained that such conflicting rights "are clearly established, for example, by a court decree, by the terms of a settlement agreement, or by a registration." *Id.* Here, Welsh has not alleged the existence of any court decree, settlement agreement or registration that granted Welsh any trademark rights (or even any other rights).

One instructive analysis of this "clearly established" requirement is *eCash Tech., Inc. v. Guagliardo*, 127 F. Supp. 2d 1069 (C.D. Cal. 2000), *aff'd*, 35 Fed. Appx. 498 (9th Cir. May 13, 2002). In that case, the defendants filed a counterclaim alleging that they registered the internet domain name "ecash.com," and that the plaintiff's subsequent failure to apprise the PTO of that domain registration allowed the plaintiff to fraudulently procure the "eCash" trademark. *See id.* at 1078. The court, however, granted the plaintiff's Rule 12(b)(6) motion to dismiss the counterclaim. Significantly, the court rejected the notion that merely *asserting* common law trademark rights that were not clearly established could support a claim of trademark fraud. "It is not enough that Defendants simply be able to show *some* common law rights to use the mark; they must be able to show that their rights were so 'clearly established' that Plaintiff's failure to disclose Defendants' rights to the PTO would have to constitute fraud." *Id.* (italics in original). The court added that "in what is often considered to be the leading case on the issue, the Seventh Circuit held that a registration applicant has no duty to investigate and report to the PTO all other possible users of the same or a similar mark." *Id.* at 1079 (citing *Money Store*, 689 F.2d at 670). "Only in the rare circumstance that another user of the same mark's rights are 'clearly established' must this use be disclosed." *Id.* at 1079-80 (citing *Rosso & Mastracco*, 720 F.2d at 1266).

The court in *eCash* noted that the only basis on which the defendants claimed rights in the "eCash" mark was their registration of the "ecash.com" domain name. 127 F. Supp. 2d at 1080. However, the court stressed that registration of a domain name alone did not convey trademark rights in the same mark as the domain name, and the defendants had not pled any other clearly established trademark rights that might support a fraudulent procurement claim:

6

> Defendants' allegations do not at present even support the accrual of any trademark rights that conflict with those asserted in Plaintiff's application, let alone 'clearly established' rights that Plaintiff would be required to disclose. Defendants have failed to even plead any other 'use in commerce' of the mark that is sufficient to accrue *any* trademark rights in the 'eCash' mark."

*Id.* (italics in original). The Ninth Circuit affirmed the district court's Rule 12(b)(6) dismissal of the defendants' counterclaim. *eCash Tech., Inc. v. Guagliardo*, 35 Fed. Appx. 498, 2002 WL 987324 (9th Cir. May 13, 2002).

Several TTAB decisions also have stressed that a claim for fraud on the PTO fails unless another user's trademark rights were "clearly established" at the time of the trademark application to the PTO. For example, in *Intellimedia Sports, Inc. v. Intellimedia Corp.*, 43 U.S.P.Q.2d 1203, 1997 WL 398344 (T.T.A.B. May 20, 1997) (a copy of which is attached as Exhibit 1), the petitioner filed a fraud claim, asserting that it had been using the "Intellimedia" mark in commerce and that respondent knew or should have known of that fact when it registered that same mark at the PTO. In response to the claim, the respondent filed a motion to dismiss for failure to state a claim. The TTAB, explicitly applying Rule 12(b)(6), granted the motion. The TTAB rejected the assertion that a party claiming fraud on the PTO can state a claim simply by asserting that its rights are superior to those of the trademark applicant:

> The fact that petitioner 'informed' respondent that petitioner had superior rights in the mark, while perhaps establishing that petitioner believes itself to have such rights, is clearly insufficient, even if proven, to establish that respondent believed that petitioner's rights in the mark were superior to its own and that confusion would be likely to result from respondent's use of its mark. *It is respondent's belief, not petitioner's, that is at issue here*.

*Id.*, 1997 WL 3989344, at *5 (emphasis added).

In *Colt Indus. Operating Corp. v. Olivetti Controllo Numerico S.p.A.*, 221 U.S.P.Q. 76, 1983 TTAB LEXIS 26 (T.T.A.B. Nov. 25, 1983) (a copy of which is attached as Exhibit 2), Olivetti alleged that Colt fraudulently procured the "Horizon" trademark by failing to inform the PTO that Olivetti had previously sent a letter to Colt in which it advised Colt that it was asserting rights to the mark. 1983 TTAB LEXIS 26, at *6. However, the TTAB concluded that an unsubstantiated assertion of prior rights by Olivetti was insufficient to establish a claim that Colt defrauded the PTO. *Id.* at *10-11. "It is our view that [Colt] had no duty to notify the Office of [Olivetti's] bare unsubstantiated allegation and, a fortiori, it cannot be said that [Colt's] failure to notify the Office of the bare unsubstantiated allegation caused [Colt's] oath to become

7

fraudulent." *Id.* at *11. The TTAB also noted that Colt's non-disclosure of Olivetti's claim was consistent with Colt's belief that it had prior rights in the mark. *Id.*

Courts in this District also have emphasized that a trademark applicant is ***not*** required to disclose to the PTO others whom the applicant does not subjectively believe have the legal right to use the mark. *See, e.g.*, *Northwestern Corp. v. Gabriel Mfg. Co.*, No. 95 C 2094, 1996 WL 251433, at *8 (N.D. Ill. May 8, 1996) (granting Rule 12(b)(6) dismissal of claim of fraud on the PTO because an applicant to the PTO "is not required to disclose . . . those it believes do not have the legal right to use the mark"). In the face of all of these authorities, Welsh has pointed this Court to absolutely nothing to support his theory.

These decisions demonstrate that Welsh's self-serving opinion about his (alleged) trade secret rights is immaterial. Instead, Welsh must allege facts that he had "clearly established" rights and that the Conference did not subjectively believe it had superior rights at the time of its September 2006 application to the PTO. This is because the required oath is phrased in terms of a subjective *belief*. *See* McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed.), § 31:76, p. 31-166. But the only facts alleged by Welsh *undermine* any possible claim of fraud. One of Delany's April 23, 1998 letters demonstrates the Conference's subjective belief – going back more than eight years before its trademark application – that its rights to the Big Ten Network were superior. *See* Amended Complaint, Exhibit B. Remarkably, Welsh's response never discusses this letter, let alone attempts to reconcile it with his claim of fraud on the PTO. Welsh has not alleged, and cannot allege, any facts suggesting that the Conference did not reasonably believe in September 2006 that its rights in the "Big Ten Network" were superior to Welsh's (alleged) rights.[4] Welsh's Amended Complaint also does not allege that he ever used the Big Ten Network mark in commerce, let alone at any point between 1998 and 2006. Nor does Welsh allege that he either received any trademark registrations or even applied for the Big Ten Network mark himself. Welsh therefore cannot establish *any* "clearly established" rights that the Conference was obliged to disclose to the PTO in 2006.

   C.     **Welsh has not pled the required elements of fraud under Rule 9(b).**

Even if Welsh could overcome the hurdles discussed in Sections I.A. and B. above, Welsh's fraud claim still must be dismissed because he has not met his heightened pleading

---
[4] Welsh's response asserts (p. 2) in the second bullet point that paragraph 21 of the Amended Complaint alleged that his legal rights were superior to those of the Conference. Again, that pure legal conclusion is not accepted as true for purposes of a motion to dismiss. *Bell*, 127 S. Ct. at 1965.

8

burden as to at least two elements of fraud: materiality and *scienter*.[5]

As to materiality, the name "Big Ten Network" is not a trade secret, and Welsh cites no authorities to suggest otherwise. Thus, even if Welsh could establish some sort of "trade secret right" in the Big Ten Network, his response fails to explain why such a fact would have mattered to the PTO in September 2006. Such (alleged) rights would have had no bearing on the issuance of the "Big Ten Network" trademark registration because trademark rights only accrue through use *in commerce*, which Welsh never alleged, and Welsh now concedes throughout his response that he has no trademark rights.

As to *scienter*, Welsh's response, like his Amended Complaint, offers no factual allegations to suggest that the Conference engaged in a "deliberate attempt to mislead" the PTO. *Money Store*, 689 F.2d at 670. It is apparent from the face of the Amended Complaint that no such allegation possibly could succeed, because Delany rejected Welsh's claim of "ownership" as far back as April 23, 1998. *See* Amended Complaint, Exhibit B. Welsh has not alleged that he ever contested Delany's letter after receiving it. Instead, he alleges that he *proceeded* with a detailed business presentation on May 18, 1998, despite knowing that the Conference already had rejected the notion that the proposed business plan was Welsh's proprietary property. *See* Amended Complaint, ¶ 7. Yet again, Welsh's response does not attempt to reconcile these facts. In short, it is not possible for Welsh to show that the Conference made a deliberate attempt to mislead the PTO eight years after the Conference rejected Welsh's claim of "ownership," particularly where Welsh does not allege that he used the mark in commerce at any time during that eight-year period. For all of the foregoing reasons, any one of which is a sufficient reason for dismissal, Welsh's Section 38 claim is frivolous and should be dismissed with prejudice.

## II. THIS COURT SHOULD AWARD THE CONFERENCE ITS ATTORNEYS' FEES UNDER SECTION 35 OF THE LANHAM ACT.

In response to the Conference's request for attorneys' fees under Section 35 of the Lanham Act, 15 U.S.C. § 1117, Welsh briefly asserts (p. 7) that the Conference's request is mere "gamesmanship" and then engages in personal attacks against defense counsel. Such assertions have nothing to do with the relevant legal standards for an award of fees under Section 35.

---

[5] The heightened pleading standard of Fed. R. Civ. P. 9(b) applies to each element of a Section 38 claim for fraudulent procurement. *See, e.g., Publications Int'l, Ltd. v. Leapfrog Enter., Inc.*, No. 01 C 3876, 2002 WL 31426651, at *3 (N.D. Ill. Oct. 29, 2002); *GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234, 243 (S.D.N.Y. 2000).

As demonstrated above and in the Conference's opening brief, Welsh has not identified any authorities that support his interpretation of the Lanham Act. Rather, the relevant authorities so strongly favor the Conference's position that this is an "exceptional case" in which an award of attorneys' fees to the Conference is warranted. In that regard, Welsh's response brief does not discuss, let alone attempt to distinguish, the cases cited in Section II of the Conference's opening brief. In those cases, courts awarded fees to prevailing defendants under Section 35 because the plaintiffs failed to establish even a colorable claim under the Lanham Act. Here, Welsh also ignores the significant and indisputable fact that, more than a decade ago, Delany unequivocally rejected the notion that the concepts in Welsh's proposed business plan were his proprietary property. *See* Amended Complaint, Exhibit B. Under the circumstances, this Court should award the Conference its attorneys' fees pursuant to Section 35.

### III. THE STATE LAW CLAIMS IN COUNTS II AND III OF WELSH'S AMENDED COMPLAINT ALSO SHOULD BE DISMISSED.

A dismissal of Welsh's Lanham Act claim would be a sufficient basis for the Court to decline supplemental jurisdiction over his two state law claims for misappropriation of trade secrets (Count II) and breach of contract (Count III). Nevertheless, Welsh also has not established that either of those state law claims can survive dismissal under Rule 12(b)(6), so the Court should dismiss the Amended Complaint in its entirety. *See, e.g., Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994) (where pendent claims do not implicate difficult and unsettled state law issues, "it is entirely acceptable under the discretionary principle for a federal court to decide those claims even after dismissing the main claim").

### A. Welsh did not meet his burden of identifying any concrete trade secrets or specifying which of those so-called secrets actually were misappropriated.

Welsh's response to the Conference's argument on his claim for misappropriation of trade secrets under the ITSA leaves the reader guessing on two key points: first, which *specific, concrete secrets* allegedly were contained in his proposed business plan, and, second, which of those so-called secrets the Conference allegedly *misappropriated* from Welsh.

The focus of a trade secrets claim is upon the secrecy of the information sought to be protected; the information must be sufficiently secret to impart economic value to both its owner and its competitors because of its relative secrecy. *George S. May Int'l Co. v. Int'l Profit Assocs.*, 628 N.E.2d 647, 653 (Ill. Ct. App. 1993). Welsh's response directs the Court to paragraph 6 of his Amended Complaint without identifying any *concrete secrets* therein.

10

*Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992). Welsh simply argues in his response (p. 6) that paragraph 6 of the Amended Complaint identified "programs that the new network should develop; methods to employed [sic] to implement those programs; the target customers and audiences to be developed; and the specific projections of the nature and types of revenues and expenses the new network can expect."

These allegations fail, however, to set forth any protectable trade secrets. In *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784 (W.D. Ky. 2001), the plaintiffs created the concept of the "Auto Channel," which would be a cable channel devoted to automobile enthusiasts. The plaintiffs alleged that the defendants misappropriated the plaintiffs' trade secrets by launching Speedvision, a cable channel that shared many attributes with their proposed Auto Channel. The plaintiffs asked the court to grant trade secret protection to several aspects of their business plan: the identification of a target market; their financial models; the business plan itself; the type, arrangement and sources of programming; the 65/35% mix of live and taped programming; the repetition of a structure format; strategies for gradually increasing coverage of live racing events; a "focal point" show; the use of celebrity on-air talent; news coverage of automotive events; coverage of specific automotive-focused events; increased advertising time to local cable operators; home shopping segments; and editorial and promotional relationships with other automotive media and companies. *Id.* at 794. But the court expressed great doubt about whether any of those components individually, or all of them together, could constitute protectable trade secrets.

> The Court will assume, for this analysis, that these concepts derive independent economic value, both individually and as a collection. Independent of any actions by Plaintiffs, however, many of these concepts are clearly readily ascertainable through proper means. Plaintiffs, for example, simply cannot claim that a prospective cable channel about all things automotive having young and middle aged men as a target audience is not readily ascertainable by other means.

*Id.* at 794-95 (citation omitted). The same reasoning applies here. Welsh did not sufficiently plead any trade secrets in his Amended Complaint.[6]

Welsh's response also notes that he attached the entire business plan to the Amended Complaint, thereby making it part of the pleading, and then provides general page references to

---

[6]   *Auto Channel* was decided under the Kentucky Uniform Trade Secrets Act, but that fact does not diminish its persuasive value in any way because Illinois also has adopted the Uniform Trade Secrets Act. *See Flavorchem Corp. v. Mission Flavors & Fragrances, Inc.*, 939 F. Supp. 593, 595 (N.D. Ill. 1996).

11

the Court as allegedly evidencing his trade secrets. But Welsh ignores a Seventh Circuit decision, cited in the Conference's opening brief, that rejected the same conclusory attempt to establish trade secrets. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (submission of 43-page document lacked required specificity under the ITSA).

Welsh also cites two cases parenthetically in his response, but neither case advances his argument. First, Welsh incorrectly relies on *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310 (N.D. Ill. 1990). The subject of the dispute in *ISC* involved detailed computer service manuals and bulletins. While the court noted that the compilations of technical information in computer service manuals and bulletins can, by themselves, constitute trade secrets, the act of compiling information was not the foundation for the court's decision. Instead, the court emphasized that the plaintiff, ISC, had "developed virtually all of the technical information and procedures set forth in its compilations. That information and those procedures, independently, constitute ISC trade secrets." *Id.* at 1322.

The factual allegations in Welsh's Amended Complaint are far different than those raised by the plaintiff in *ISC*. Welsh has not alleged that he developed "virtually all" of the components of the Big Ten Network. To the contrary, Welsh stated in his proposed business plan that he intended to incorporate "programming elements proven successful on other satellite stations." Amended Complaint, Exhibit A, p. 19. Indeed, Welsh merely suggested copying concepts from cable channels like A&E, Classic Sports Network, and the Food Channel. *Id.* But "the mere legwork in acquiring the information cannot be the basis for a [trade secrets] claim. Any other result would mean that a party who learns the basics of an industry from an individual would be precluded from entering the business at all in a competitive relationship." *Southwest Whey, Inc. v. Nutrition 101, Inc.*, 117 F. Supp. 2d 770, 777 (C.D. Ill. 2000) (citation omitted).

> Simply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret. If it did, the first person to use the information, no matter how ordinary or well known, would be able to appropriate it to his own use under the guise of a trade secret. We do not believe such a result was intended under the [ITSA].

*Serv. Ctrs. of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1137 (Ill. Ct. App. 1989).

The other case cited by Welsh, *Nilssen v. Motorola, Inc.*, 963 F. Supp. 664 (N.D. Ill. 1997), also does not advance his argument. In *Nilssen*, the court explained that a plaintiff "must articulate protectable trade secrets *with specificity* or suffer dismissal of his claim." *Id.* at 672

(emphasis added).  The plaintiff in *Nilssen* identified a series of specific, concrete secrets that the defendant allegedly misappropriated.  *Id.* at 672-74.  Here, in contrast, Welsh just makes generalized, conclusory statements and asks the Court to figure out which alleged "secrets" were contained in his proposed business plan.

Even if the Court were inclined to find that Welsh's proposed business plan contains trade secrets, Welsh has failed to allege which so-called secrets the Conference misappropriated.  For example, Welsh has not alleged (and the Big Ten Network does not broadcast) "student food recipes" or many other ideas set forth in his proposed business plan.  Nor has Welsh alleged that the Conference actually used his 1998 financial projections when the Big Ten Network began broadcasting *nine years later* in 2007.  Absent specific allegations about which so-called secrets actually were incorporated into the Big Ten Network, it is impossible to determine whether Welsh could establish the required element of "misappropriation."  Thus, Count II fails to state a claim for this reason as well.

### B.  Welsh has not stated a claim for breach of express contract.

It is clear from Welsh's response that he has changed his theory from breach of implied-in-fact contract in the initial Complaint to breach of an express contract in the Amended Complaint, even though both iterations of the Complaint are based on the exact same factual allegations.[7]

Nevertheless, Welsh's change in theory cannot save his contract claim from dismissal pursuant to Rule 12(b)(6).  For one thing, Welsh does not state whether his alleged contract is oral or written.  Moreover, Welsh's response fails to explain how he can possibly establish an express contract when the Conference, through Jim Delany, sent him a letter on April 23, 1998 that clearly disclaimed any contractual agreement.  Delany stated that "**this is a letter of interest only and is subject to the Conference's satisfaction with the development of the proposed venture, the approvals of the board, various committees and groups of the Conference, and the negotiation and execution of definitive agreements.  Consequently, this letter does not constitute a binding obligation for either of us**."  Amended Complaint, Exhibit C (emphasis

---

[7]  If Welsh believed that he had an actual, express contract with the Conference, it would have been logical to plead such a claim in his initial Complaint.  Welsh did not do so.  Instead, he expressly alleged that he had an implied-in-fact contract.  Other than deleting the phrase "implied-in-fact" and making a few other minor edits in his Amended Complaint, Welsh's allegations in the Amended Complaint are very similar to Welsh's earlier allegations.  Indeed, Welsh does not allege any new facts.

13

added).

Welsh's response makes no attempt to reconcile that letter with his allegation that an express contract existed between the parties. In fact, Welsh does not even *mention* the letter in his response. The Conference explained in its opening brief (p. 14) that Delany's letter expressly disclaiming a contractual agreement refutes any possible assertion of a contract, and cases analyzing Illinois law support that conclusion. *See, e.g., Doe v. First Nat'l Bank of Chicago*, 865 F.2d 864, 873 (7th Cir. 1989) (clear disclaimer of contract demonstrated, as a matter of law, that no contractual rights existed); *Dietz's, Inc. v. City of Chicago*, No. 05 C 684, 2005 WL 2592550, at *3 (N.D. Ill. Oct. 11, 2005) (granting motion to dismiss breach of contract claim because defendant had expressly "disclaimed any purpose to bind the [defendant] to a contract").[8]

Here too, the *Auto Channel* decision is instructive. In that case, the plaintiffs alleged that the defendants made many optimistic statements that a deal would be reached with plaintiffs to develop their Auto Channel, but then breached a contract by launching Speedvision. The plaintiffs alleged that during their negotiations with defendants, the defendants made repeated statements of optimism about developing the channel, and that such representations gave rise to either an express or implied contract. The court rejected that claim: "Optimism alone, however, cannot create binding obligations." *Auto Channel*, 144 F. Supp. 2d at 790.

As explained in the Conference's opening brief (p. 14), Welsh's Amended Complaint suffers from the same infirmities because Welsh did not sufficiently allege the required elements of offer, acceptance and consideration. In his response brief, Welsh quotes (p. 7) language from paragraph 29 of the Amended Complaint in support of his argument that there was a "meeting of the minds." But neither the Amended Complaint nor Welsh's response brief pleads what consideration allegedly was provided by the Conference in conjunction with the alleged express contract. For example, Welsh does not allege that the Conference agreed to keep his proposed business plan confidential *prior* to and as a condition of his disclosure of the plan. Instead, Welsh claims that the Conference acknowledged the confidentiality of his proposed business plan after the Conference already had received it. *See* Amended Complaint, Exhibit B. But "[d]isclosure cannot accompany a condition that is a prerequisite of disclosure." *Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 942 (S.D. Tex. 2004), *aff'd*, 2005 WL 627973

---

[8] Welsh also cannot establish any contract related to his alleged "trade secret rights" because Delany expressly rejected the notion that the proposed business plan was his proprietary property. *See* Amended Complaint, Exhibit B.

14

(5th Cir. Mar. 17, 2005).  Welsh's Amended Complaint is devoid of any specific allegation of consideration, and he therefore has not stated a claim for breach of contract.

## Conclusion

For the foregoing reasons as well as those set forth in the Conference's opening brief, the Conference respectfully requests that the Court dismiss this action with prejudice pursuant to Rule 12(b)(6) and award the Conference its attorneys' fees under 15 U.S.C. § 1117.

THE BIG TEN CONFERENCE, INC.

Dated:  June 4, 2008

By:   /s/Andrew S. Rosenman
Andrew S. Rosenman
Richard M. Assmus
Emily M. Emerson
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL  60606-4637
(312) 782-0600

## **CERTIFICATE OF SERVICE**

  The undersigned, an attorney, certifies that on June 4, 2008, copies of the foregoing Defendant's Reply Memorandum of Law in Support of its Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint and Request for Attorneys' Fees Pursuant to 15 U.S.C. § 1117, and this Certificate of Service were caused to be delivered to the following:

Robert P. Cummins
The Cummins Law Firm, P.C.
77 West Wacker Drive, Suite 4800
Chicago, Illinois  60601

and

Thomas C. Cronin
Cronin & Co., Ltd.
77 West Wacker Drive, Suite 4800
Chicago, Illinois  60601

via the Electronic Filing System of the U.S. District Court for the Northern District of Illinois.

              MAYER BROWN LLP

              By:  /s/Andrew S. Rosenman
              Andrew S. Rosenman
              Richard M. Assmus
              Emily M. Emerson
              71 South Wacker Drive
              Chicago, Illinois  60606
              (312) 782-0600